# EXHIBIT B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, SKYCOIN )
GLOBAL FOUNDATION LIMITED, a )
Singapore Company, and SYMBOLIC )
ANALYTICS INC., a Delaware )
Corporation, )
)
   Plaintiffs, )
)
   v. )
BRADFORD STEPHENS, AARON KUNSTMAN, )
JOEL WAYNE CUTHRIELL, MORGEN PECK, )
CATHERINE BYERLY, ADVANCE MAGAZINE )
PUBLISHERS, INC., d/b/a THE NEW YORKER, )
and UNKNOWN INDIVIDUALS AND )

Case No: 2024L003661

Calendar W

**PLEADINGS INDEX**

| Date | Party | Actions | Document |
|------|-------|---------|----------|
| 04/04/2024 | Plaintiff SMIETANA, BRANDON | Complaint at Law and Exhibits | .pdf 2024L003661 (1).pdf .pdf 2024L003661.pdf |
| 05/30/2024 | Morgen E. Peck, Conde Nast/American Publishers, Catherine Byerly, Aaron Kunstman, Bradford Stephens, Joel Wayne, Ryan Eagle | Summonses issued | Summons - Aaron Kunstman.pdf  Summons - Catherine Byerly.pdf  Summons - The New Yorker Magazin...  Summons - Morgen E. Peck.pdf  Summons - Joel W. Chhriell.pdf  Summons - Bradford Stephens.p...  Summons - Ryan Eagle.pdf |
| 05/30/2024 | Plaintiff | Plaintiffs' Routine Motion To Appoint Special Process Server for Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, American Publishers, Inc., d/b/a Conde Nast and d/b/a | .pdf 2024L003661 (33).pdf |

| BRANDON SMIETANA, Plaintiffs, | ) | Case No: 2024L003661 |
|---|---|---|
| v. | ) | |
| BRADFORD STEPHENS, et al., Defendant. | ) | Calendar W |

| Date | Party | Actions | Document |
|---|---|---|---|
| | | The New Yorker set for **6/11/2024** | |
| 06/06/2024 | Court | Initial Case Management Notice sent for 7/10/2024 | 📄 2024L003661 (31).pdf |
| 06/11/2024 | Court | Order appointing Special Process Server, allowed case set for | 📄 2024L003661 (1).pdf |
| 06/12/2024 | Defendant CUTHRIELL, JOEL WAYNE | Appearance Filed - Fee Paid - Party: Defendant | 📄 2024L003661 (4).pdf |
| 06/18/2024 | Defendant EAGLE, RYAN by Attorney Svoboda, George William | Appearance Filed - Fee Paid - Party: Defendant | 📄 2024L003661 (3).pdf |
| 06/28/2024 | Defendant EAGLE, RYAN | Motion To Dismiss Filed; Notice Of Motion set for 7/10/2024 | 📄 2024L003661 (1).pdf  📄 2024L003661 (35).pdf |
| 07/10/2024 | Court | Eagle's Motion granted in part and denied in part; Complaint Stricken; 14 days to re-plead by 7/24/24; Eagle to answer 14 days by 8/7/24; **Status Hearing** 08/27/2024 at 9:00 AM via zoom | 📄 2024L003661 (16).pdf |
| 07/24/2024 | Plaintiff SMIETANA, BRANDON | Amended Complaint | 📄 2024L003661 (8).pdf |
| 07/26/2024 | Plaintiff SMIETANA, BRANDON | Alias Summons Issued Brandon Stephens (@ Wife's Address) | 📄 2024L003661 (38).pdf |
| 07/29/2024 | Defendant EAGLE, RYAN | Motion to Dismiss filed Notice Of Motion for 8/27/2024 | 📄 2024L003661 (37).pdf |
| 08/20/2024 | Court | Order - Eagle's Motion to dismiss granted in part and enied in part; First Amended complaint stricken; 7 days to | 📄 2024L003661 (2).pdf |

2

BRANDON    SMIETANA,    Plaintiffs,    )    Case No: 2024L003661
v.    )
BRADFORD STEPHENS, et al., Defendant.    )    Calendar W

| Date | Party | Actions | Document |
|------|-------|---------|----------|
| | | replead; Eagle to answer 7 days thereafter; status on 9/17/2024 @ 9 am via Zoom | |
| 08/23/2024 | Defendant AMERICAN PUBLISHERS, INC. d/b/a CONDE NAST and d/b/a THE NEW YORKER MAGAZINE | UNOPPOSED MOTION FOR EXTENSION OF TIME BY DEFENDANT ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE NEW YORKER (INCORRECTLY SUED HEREIN AS AMERICAN PUBLISHERS, INC. d/b/a COND NAST AND d/b/a THE NEW YORKER MAGAZINE, Notice Of Motion | TNY - Extension Motion.pdf<br><br>TNY - Notice of Motion.pdf |
| 08/23/2024 | Defendant AMERICAN PUBLISHERS, INC. d/b/a CONDE NAST and d/b/a THE NEW YORKER MAGAZINE | Appearance of Davis Wright Tremaine, LLP by Harris L. Kay for The New Yorker Magazine | TNY - HLK Apperance.pdf<br><br>TNY - Notice of Filing.pdf |
| 08/23/2024 | Plaintiff SMIETANA, BRANDON | Emergency Motion for Extension of Time to Replead | 2024L003661 (11).pdf<br><br>2024L003661 (14).pdf |
| 08/26/2024 | Court | Emergency motion to replead granted; replead by 9/9/2024; Eagle granted 7 days to answer by 9/16/2024; **Status set for 9/17/2024 to stand** | 2024L003661 (12).pdf |
| 08/29/2024 | Defendant AMERICAN PUBLISHERS, INC. d/b/a CONDE NAST and d/b/a THE NEW YORKER MAGAZINE | UNOPPOSED MOTION FOR EXTENSION OF TIME BY DEFENDANT ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE NEW YORKER; Notice of Motion – for 9/17/2024 | TNY - Notice of Motion.pdf |

BRANDON SMIETANA, Plaintiffs, )    Case No: 2024L003661
v. )
BRADFORD STEPHENS, et al., Defendant. )    Calendar W

| Date | Party | Actions | Document |
|------|-------|---------|----------|
| 09/05/2024 | Defendant AMERICAN PUBLISHERS INC. d/b/a CONDE NAST and d/b/a THE NEW YORKER MAGAZINE | Affidavit Filed Verified Statement of Out-of-State Attorney Pursuant to Supreme Court Rule 707 for Nimra Hameed Azmi; Notice of Filing | Smietana v. Stephens - Affidavit / Smietana v. Stephens - Notice of |
| 09/05/2024 | Defendant AMERICAN PUBLISHERS INC. d/b/a CONDE NAST and d/b/a THE NEW YORKER MAGAZINE | Application Filed Verified Statement of Out-of-State Attorney Pursuant to Supreme Court Rule 707 for Bolger; Notice of Filing | Smietana v. Stephens - Notice of / Smietana v. Stephens - Affidavit |
| 09/09/2024 | Plaintiff SMIETANA, BRANDON | Second Amended Complaint; Notice Of Filing Filed | 2024L003661 (26).pdf |
| 09/11/2024 | Defendant AMERICAN PUBLISHERS, INC. d/b/a CONDE NAST and d/b/a THE NEW YORKER MAGAZINE | UNOPPOSED MOTION FOR EXTENSION OF TIME BY DEFENDANT ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE NEW YORKER; Notice of Motion - For Extension – Updated set for 9/17/2024 | New Yorker - Second Extension M / Smietana v. Stephens - Notice of |
| 09/13/2024 | Plaintiff | Alias Summons Issued Byerly, Catherine J., Kunstman, Aaron, Peck, Morgan, Bradford, Stephens (801 North Brand Blvd) and Alias Summons Issued | Alias Summons - Morgan Peck.pdf / Alias Summons - Aaron M. Kunstman... / Alias Summons - Catherine J. Byerly.pd / Alias Summons - Bradford Stephens.p / Alias Summons - Brandon Stephens / Alias Summons - Brandon Stephens - |
| 09/16/2024 | Plaintiff | Alias Summons Issued for Bradford Stephens (289 Clinton Avenue, Apt 2, Brooklyn NY 11205) | 2024L003661 (8).pdf |

4874-1633-7638v.1 3970178-000015

BRANDON    SMIETANA,    Plaintiffs,    )    Case No: 2024L003661
v.    )
BRADFORD STEPHENS, et al., Defendant.    )    Calendar W

| Date | Party | Actions | Document |
|------|-------|---------|----------|
| 09/17/2024 | Court | Plaintiff's claims against Eagle dismissed; Claims against all other defendants remain pending.<br><br>TNY motion to extend time to answer granted;<br><br>Status on 11/12/2024 at 9:00 am in Room 1912 | .pdf<br>2024-09-17<br>2024-L-003661 Smiet<br><br>.pdf<br>2024-09-17<br>2024-L-003661 Smiet |

4874-1633-7638v.1 3970178-000015

Law Division Motion Section Initial Case Management Dates for CALENDARS (A,B,C,D,E,F,H,R,X,Z) will be heard In Person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 7/10/2024 9:00 AM

FILED
4/4/2024 10:00 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27132074

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED, a Singapore
Company, and SYMBOLIC ANALYTICS INC.,
a Delaware Corporation,

                    Plaintiffs,

    v.                         Case No.

BRADFORD STEPHENS, AARON
KUNSTMAN, RYAN EAGLE, JOEL WAYNE
CUTHRIELL, MORGEN PECK, CATHERINE
BYERLY, AMERICAN PUBLISHERS, INC.
d/b/a CONDÉ NAST and d/b/a THE NEW
YORKER MAGAZINE, and UNKNOWN
INDIVIDUALS AND COMPANIES,

                    Defendants.

## COMPLAINT AT LAW

NOW COME the Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL

FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a

Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, and for their

Complaint against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, RYAN

EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, and

AMERICAN PUBLISHERS, INC. d/b/a CONDÉ NAST and d/b/a THE NEW YORKER

MAGAZINE, and UNKNOWN INDIVIDUAL(S) AND COMPANIES, state as follows:

### PARTIES

1.    SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company (hereafter

"Skycoin") is a consortium of related entities involved in the development of software, hardware,

design, manufacturing, and services operating under the consumer brand name "Skycoin," which

1

FILED DATE: 4/4/2024 10:00 PM    2024L003661

includes Skycoin Global Foundation, Symbolic Analytics Inc., Shellpay China, and other entities that are responsible for regional operations or management of specific assets of Skycoin's global operations.

2.      Skycoin created 100 million Skycoin Tokens during its launch in 2013, which were distributed and traded on various exchanges by 2017.

3.      The peak market capitalization of all existing Skycoin Tokens reached $5 billion USD in January 2018.

4.      Skycoin is a private company organized under the laws of Singapore, its principal place of business located at 2 Venture Drive, #11-31, Vision Exchange, Singapore.

5.      Plaintiff Symbolic Analytics ("SA") is a private company organized under the laws of Delaware, United States.

6.      Plaintiff, BRANDON SMIETANA ("Smietana") is an individual citizen of the United States and is the Chief Software Architect and authorized representative of Skycoin and SA.

7.      Defendant BRADFORD STEPHENS ("Stephens) is an individual citizen of the State of New York, United States.

8.      Defendant RYAN EAGLE ("Eagle") is an individual citizen of the State of Illinois, United States, and the Village of Buffalo Grove.

9.      On information and belief, Defendant JOEL WAYNE CUTHRIELL ("Cuthriell") is an individual citizen of the State of Oklahoma, United States.

10.     Defendant AARON KUNSTMAN ("Kunstman") is an individual citizen of the State of Wisconsin, United States.

FILED DATE: 4/4/2024 10:00 PM   2024L003661

11.     "Sudo" is a network of similarly named Telegram accounts, operated by a minimum of four persons. At least one of these persons is known to be Kunstman. Stephens is widely believed to also be one of the account operators. The other two or more operators are currently unknown.

12.     Defendant CATHERINE BYERLY ("Byerly") is an individual citizen of the State of Florida, United States.

13.     Byerly was employed by a marketing company called 22 Acacia Consulting, located in Chicago, Illinois.

14.     Byerly was hired by Stephens through her employment at 22 Acacia Consulting to perform marketing services for Skycoin.

15.     Defendant MORGEN PECK ("Peck") is a privately paid journalist and individual citizen of the State of New York, United States.

16.     Defendant AMERICAN PUBLISHERS, INC. d/b/a CONDÉ NAST and d/b/a THE NEW YORKER MAGAZINE ("Condé Nast") is a global mass media company in the business of producing world leading print, digital, video, and social media brands organized under the laws of the State of New York.

17.     Condé Nast is the owner, operator, and publisher of The New Yorker Magazine ("The New Yorker"), a prominent American weekly magazine.

18.     On August 28, 2021, Peck authored an article published in The New Yorker titled *Pumpers, Dumpers, and Shills: The Skycoin Saga*.[1]

---

[1] The article can be found at: https://www.newyorker.com/tech/annals-of-technology/pumpers-dumpers-and-shills-the-skycoin-saga

19.     Stephens, recognizing the success of Skycoin, devised a plan and scheme to defraud, extort, and steal money and assets from Skycoin in concert with some or all of the other named party Defendants.

## FACTS COMMON TO ALL COUNTS

20.     On or about January 8, 2018, Plaintiffs entered into discussions with Stephens to develop, launch, and manage a comprehensive marketing and brand awareness program for Skycoin, including but not limited to revamping Skycoin's website, performing search engine optimization ("SEO") services, and generating positive publicity for Skycoin (hereafter referred to as the "Marketing Program").

21.     On or about January 8, 2018, Stephens represented himself to be the owner of Smolder LLC, a marketing startup company, to which the payments would be made for the Marketing Program. Stephens claimed that his business partners were Eagle, Adam Young, and Harrison Gevirtz.

22.     Unbeknownst to Plaintiffs, Stephens and Eagle were prohibited from engaging in activities such as the Marketing Program pursuant to an order from the Federal Trade Commission ("FTC"), dated February 19, 2014 ("the Order"). *See Federal Trade Commission v. CPA Tank, Inc., Vito Glazers, Eagle Web Assets, Inc., and Ryan Eagle,* Case No. 14-cv-1239.

23.     At all times relevant herein, Stephens was aware that pursuant to the Order, he could not accept payments for marketing activities.

24.     Stephens failed to inform Plaintiffs of the existence of the Order and further violated it by offering to provide marketing services to Plaintiffs.

25.     If Plaintiffs had known about the Order and/or if Stephens had not lied about and concealed the Order, Plaintiffs would not have entered into the Marketing Program with Stephens.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

26.     Plaintiffs reached an oral agreement with Stephens to implement the Marketing Program, and as part and parcel of that agreement, paid him $107,948.00 ($66,258.00 in the form of four (4) Bitcoins and $41,690.00 in the form of 1,100 Skycoin Tokens) (the "Initial Payment"). The Initial Payment included an expense budget for an upcoming industry conference in Las Vegas, Nevada. Plaintiffs and Stephens explicitly agreed that as part of their agreement, any expense in excess of $1,000.00 would require prior approval from Skycoin.

27.     In addition to the Initial Payment, Plaintiffs paid Stephens approximately $800,000.00 in Skycoin Tokens for an internet advertising campaign.

28.     Shortly after receiving the Initial Payment, Stephens submitted two additional invoices for certain work allegedly performed by Byerly totaling approximately $14,752.44.

29.     On or about January 12, 2018, Stephens and Byerly notified Plaintiffs of a potential crisis that could critically impact Skycoin's business, marketing, and internet presence. As represented by Stephens and Byerly, an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website. Such content would function to decrease Skycoin's website's ranking precipitously in search engines and irrevocably damage Skycoin's image, reputation, and internet presence.

30.     In order to combat the internet attack by said third party, Stephens represented to Plaintiffs that an additional payment of $38,000.00 would be required.

31.     On or about January 14, 2018, and January 19, 2018, Skycoin paid Stephens the requested $38,000.00.

32.     Stephens's attack on Skycoin's website damaged Skycoin's SEO ranking and significantly reduced internet traffic to Skycoin's website.

FILED DATE: 4/4/2024 10:00 PM  2024L003661

33.     In January of 2018, Skycoin made the following payments to Stephens in connection with the Marketing Program:

   a.  January 11, 2018: 20,000 Skycoin Tokens ($842,400.00) for the Marketing Program budget;

   b.  January 13, 2018: One (1) Bitcoin ($14,314.00) for a conference in Miami, Florida;

   c.  January 16, 2018: 3,899 Skycoin Tokens ($121,337.00) for the Marketing Program budget;

   d.  January 18, 2018: Two (2) Bitcoins ($23,212.00) and 2,625 Skycoin Tokens ($80,929.00) for Marketing Program labor costs; and

   e.  January 19, 2018: Four (4) Bitcoins (56,457.00) and a separate payment of 1.30 Bitcoin for the Marketing Program and to combat the aforementioned attacks on Skycoin's website. These services were never performed.

34.     In late January to early February 2018, Stephens demanded that Skycoin pay him $100,000.00 per month to ward off the supposed third party attacks on Skycoin's website. Stephens later increased his monthly demand to $300,000.00 in order to quell the attacks.

35.     In early February of 2018, Plaintiffs discovered that in actuality, there was no third party attacking Skycoin's website. Rather, the attack was instigated by Stephens as a fraudulent means to extract additional funds from Skycoin. The invoices submitted by Stephens were fabricated.

36.     In early February of 2018, SA received deficient invoices that were highly suggestive of fraud. Upon determining that there may be fraud in Stephens's invoices, Plaintiffs discontinued all additional payments.

**DEFENDANTS' EXTORTION**

37.     Upon Skycoin's refusal to pay Stephens the monthly payments requested in or around February 2018, Stephens met Smietana in Shanghai, China, and in association with Eagle, who was participating via Zoom, threatened to have Skycoin delisted from all exchanges including,

FILED DATE: 4/4/2024 10:00 PM  2024L003661

for example, Bittrex and Binance, unless Smietana agreed to pay them $30,000,000.00 in Bitcoin and $1,000,000.00 in US Dollars.

38.     Defendants' threats included statements that failure to comply would result in Skycoin's destruction and the price of Skycoin being driven to zero.

39.     Stephens demanded that he be made COO of Skycoin and be put in control of the management of the company.

40.     Smietana, in fear of Defendants' threats, capitulated to their demand and initiated the first of three (3) extortion payments on or about February 9, 2018, in the amount of $127,000.00 (the "Extortion Payments").

41.     On or about February 22, 2018, Stephens ended his Marketing Program engagement with Plaintiffs under pressure from Skycoin's advisory board because of the discovery of the fraudulent invoicing and business practices.

42.     Plaintiffs requested a refund of the unspent prepayments made for the Marketing Program, however, Stephens refused to return any of said money.

43.     In and around the time Stephens demanded the Extortion Payments from Smietana, they also attempted to hostilely seize control of Skycoin. Specifically, Stephens threatened to orchestrate the publication of a series of negative and damaging articles through various print and online media sources unless Smietana made Defendant Stephens COO of Skycoin.

44.     In furtherance of this conspiracy and plan to take over Skycoin, Stephens paid journalist Tristian Greene ("Greene") to write and publish the article entitled "Skycoin: Anatomy of a cryptocurrency scam," February 15, 2018 - 10:47 pm UTC under an anonymous name.[2]

---

[2] The article can be found at: https://thenextweb.com/news/anatomy-of-a-cryptocurrency-scam-in-the-wild

FILED DATE: 4/4/2024 10:00 PM    2024L003661

45.     The negative article caused severe damage to the price of Skycoin Tokens and to Skycoin's reputation. Stephens openly admitted that he was responsible for paying Greene to publish the article, but went to Skycoin's investors and claimed that Smietana had ordered him to have a negative article published to intentionally destroy the price of Skycoin Token. Stephens attempted to organize a management and investor revolt, to transfer control of the company to himself, under the pretense that the actions Stephen had himself performed were in fact performed by Smietana

46.     Greene later cited that same article in another negative Skycoin article on "The Next Web," in an article titled "Exclusive: We suspected this shady cryptocurrency project was a scam. Now we're sure of it." Published March 8, 2018, 3:22 am UTC.[3]

47.     A key part of Skycoin's business plan was to be listed on the Bittrex Exchange. The Bittrex Exchange is a world-wide trading platform that facilitates real-time order execution of crypto currencies, such as Skycoin.

48.     Skycoin devoted significant resources to obtain a Bittrex listing, which had been negotiated through a third party.

49.     Knowing that Skycoin was about to obtain a Bittrex listing, on or about February 25, 2018, Stephens threatened Smietana that unless Smietana paid Stephens and Eagle, he would approach Bittrex and purposely interfere with Skycoin's third-party relationships to prevent Skycoin from being listed on Bittrex.

50.     Smietana refused to pay the money demanded by Defendant Stephens, and in turn Stephens did, in fact, provide untrue information to Bittrex and which ultimately led to the spread of false rumors regarding Skycoin and Skycoin ultimately not being listed on the Bittrex Exchange.

---

[3] The article can be found at: https://thenextweb.com/news/exclusive-we-suspected-this-shady-cryptocurrency-project-was-a-scam-now-were-sure-of-it

FILED DATE: 4/4/2024 10:00 PM 2024L003661

51.     Between February 26, 2018, through March 9, 2018, Stephens and Byerly stole access to Skycoin's media accounts, including but not limited to, Skycoin's Shopify store, Twitter account, Linkedin account, Slack channel account, and accounts associate with the operation of Skycoin's website. These media accounts were an integral and necessary component of Skycoin's business.

52.     On or about October 18, 2018, Stephens demanded over $150,000.00 for return of Skycoin's stolen computer-based assets and media accounts.

53.     On or about May 24, 2018, Binace announced that it would list Skycoin on its exchange. Binance holds itself out as the "world's largest crypto exchange" and is a trading platform where customers can buy and sell cryptocurrencies. It is highly desirable for cryptocurrencies to be listed on the Binance exchange.

54.      On or about June 12, 2018, when Smietana refused to succumb to Stephens's extortion demands, Stephens and Eagle conspired with Yan Xiandong, Li Min, Sam Sing Fond and Sun Fei (collectively the "Assailants") in a plot to kidnap Smietana and his girlfriend and steal $30,000,000.00 that Stephens claimed he was due from Skycoin.

55.     In furtherance of the conspiracy, the Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer sustems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

56.     Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin Tokens with a market value of $81,018.98, totaling $220,179.31.

FILED DATE: 4/4/2024 10:00 PM  2024L003661

57.     During the siege and home invasion, the Assailants called Defendant Stephens and complained that they did not find the thousands of Bitcoin promised to them.

## DEFENDANTS' THEFT OF ACCOUNTS

58.     Prior to Stephens's separation from Skycoin, upon notice of his departure, the company made a list of all accounts to which Stephens had authorized access and thereinafter terminated his access to those accounts.

59.     Skycoin staff contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

60.     SA staff and members of Skycoin contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

61.     Stephens acknowledged that there were unspent funds due back to Plaintiffs, however, instead of returning the money due, Defendant Stephens hacked into the various company accounts and began to engage in a series of extortion and fraudulent acts against Skycoin.

62.     Stephens and Byerly changed the passwords to some of the company accounts, locked Skycoin and SA out of them, and then attempted to extort the company for an additional $150,000.00. In addition, Defendants refused to return the unspent money that was prepaid and allocated for marketing services. The amount due back to Skycoin and SA was in excess of $800,000.00.

63.     Plaintiffs incurred considerable expense to regain access to the stolen accounts and to migrate the content to the reacquired accounts. Those accounts included, but were not limited

FILED DATE: 4/4/2024 10:00 PM   2024L003661

to, the Medium Account, Shopify, Twitter, Skycoin Telegram, Skycoin Rewards, Facebook, and Linkedin.

## **DEFENDANTS' UNAUTHORIZED EXPENSES**

64.     Stephens and Byerly engaged in various schemes to defraud Skycoin and attempted to invoice unapproved, non-business related costs including a Las Vegas prostitute orgy, unsubstantiated ATM withdrawals, personal entertainment costs and what is believed to be money for the purchase of drugs. These expenses were neither approved by Skycoin nor related to any legitimate business activities.

65.     For example, Stephens sent invoices to Skycoin totaling $50,000.00 for cash payments for two days in Las Vegas. Despite several requests, Defendants refused to produce ATM receipts for the $50,000.00 expense, could not explain how the cash was used, could not show that the expenses were business related, could not justify the amount spent, and could not produce receipts for any "cash payments."

66.     Stephens and Byerly billed SA for subcontractors without seeking prior authorization from Plaintiffs for such payments.

67.     On information and belief, Stephens and Byerly engaged in a scheme to defraud Plaintiffs by invoicing full time rates for subcontractors employed part time and even invoicing Company for nonexistent persons.

68.     Stephens and Byerly billed for subcontractors work that not only both pre-dated and post-dated the Marketing Program, but which also included full time rates for part-time work and also included invoicing from nonexistent subcontractors.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

69.     Stephens and Byerly billed for invalid date periods, such as submitting invoices for billing periods prior to the Marketing Program and work performed for billing periods after the termination of their relationship with Skycoin.

70.     Stephens and Byerly attempted to bill for costs which had not been submitted to the Company for preapproval and made misrepresentations to Skycoin staff, including Skycoin's Head of Events, who was responsible for event budgets. Stephens made false misrepresentations claiming that these expenses had received approval, and that the Company had been notified of the expenses.

71.     Stephens and Byerly attempted to bill the company for unapproved "events" on non-existent dates. Additionally, there were several other strong indicators that many or all of the claimed expenses were fraudulent or manufactured.

## BINANCE DELISTING

72.     In and around June of 2020, because Smietana refused to capitulate to the extortion demands, Stephens, in conjunction with Kunstman and others, embarked upon a scheme and plan to delist Skycoin from Binance and effectively destroy Skycoin's reputation and depress Skycoin Tokens' market value.

73.     In furtherance of this plan and scheme, Defendant Stephens solicited other individuals to make false complaints against Skycoin in order to have Binance delist Skycoin from the exchange. The false complaints they directed others to make to Binance to achieve the delisting are as follows:

   a.   That Skycoin sells Skycoin Tokens customers outside of the Binance exchange but after receiving the funds, never sends those customers the Skycoin Tokens for which they paid;

   b.   That individuals from Skycoin would privately meet with customers and accept payment for Skycoin Tokens at 15% below market value;

FILED DATE: 4/4/2024 10:00 PM    2024L003661

    c. After customers consummated such side transactions, they would immediately "dump" the Skycoin Tokens on the market;

    d. That Smietana would request that customers privately pay him $1,000,000.00 in Bitcoin or cash for discounted Skycoin Tokens that they could then "dump" on the market immediately and achieve a $150,000.00 profit; and

    e. That Smietana and Skycoin launders money through customers by promising them an immediate 15%-20% profit through the unauthorized purchase of Skycoin Tokens.

74. Upon evidence and belief, Cuthriell and other persons were hired to harass Skycoin and interfere with Skycoin's relationships with exchanges and partners corporations, made public statements in Telegram channels bragging that they had paid journalists to publish articles to slander the company, and even publicly discussed the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance.

75. As part of his plan and scheme to have Skycoin delisted from Binance, Stephens, Kunstman, and Cuthriell also orchestrated having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless allegations.

76. As further evidence of the conspiracy, Cuthriell publicly congratulated all persons involved in the Binance delisting of Skycoin with the exclamation of "Nice work team" and "PARTY TIME."

## COUNT I
### Fraud – Bradford Stephens and Catherine Byerly

77. Plaintiffs repeat and reallege paragraphs 1 through 76 of this Complaint as and for Paragraph 77 of this Count I as if fully set forth herein.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

78.     Stephens approached Plaintiffs representing himself as a legitimate advertising and marketing firm, with Stephens and Eagle Web Assets (EWA) as "business partners" involved in every aspect of the "business".

79.     Plaintiffs would later learn that these persons came from a company "EWA" which had a history of litigation and that these persons were under an FTC Order for fraudulent marketing practices.

80.     Stephens and Byerly represented to Smietana that they would provide advertising and marketing services, including web design, online advertising, conference events, and display advertising.

81.     Stephens represented to Smietana that he would provide advertising, web design, and marketing services for Plaintiffs in return for payment.

82.     In reality, Stephens had no intention of providing any advertising, web design, or marketing of any kind for Plaintiffs.

83.     Stephens and Byerly, in fact, did not provide any advertising or marketing services for Plaintiffs.

84.     Stephens and Byerly never provided any web design services on behalf of Plaintiffs.

85.     In reliance upon the representations of Stephens and Byerly, Plaintiffs paid them approximately $800,000.00 for their services and the costs of advertising and marketing.

86.     When asked, Defendants represented to Plaintiff Smietana that they had no prior lawsuits that had been filed against them.

87.     These representations were knowingly false when made.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

88.     In fact, Stephens' business partners, Harrison Gevirtz and Eagle, had an extensive history of litigation and had been named in multiple lawsuits and were subject to an FTC injunction for fraudulent marketing practices.

89.     Following the payment of the initial $800,000.00, Defendants Stephens and Byerly requested additional money, including an additional $60,000.00.

90.     Stephens and Byerly made these representations to Smietana and other Skycoin staff with the intent to induce payments and defraud Plaintiffs.

91.     These statements made by Stephens and Byerly were false when made.

92.     Defendants created scenarios and orchestrated fraudulent crises, making numerous misrepresentations, solely for the purpose of soliciting more money from Plaintiffs.

93.     Stephens and Byerly made the following misrepresentations and/or omissions upon which Plaintiffs justifiably relied to their detriment:

   a. Lied about, concealed, and denied history of litigation against Defendants' associates, business partners, and former corporations;

   b. Failed to inform Plaintiffs of the FTC Order and government sanctions against their former company, even when explicitly asked about any history of litigation prior to payment and contract negotiations;

   c. Falsely represented that an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website;

   d. Falsely agreed to seek written pre-approval from the Company for incurred expenses;

   e. Falsely represented that they would provide marketing and advertisement services to Plaintiffs;

   f. Falsely representing that they would provide web design services to Plaintiffs; and

   g. Falsely represented the expenses and costs of said marketing and advertising services.

   (*See also* Facts Common to All Counts)

FILED DATE: 4/4/2024 10:00 PM   2024L003661

94.     Plaintiffs relied upon the representations of Defendants Stephens, Gevirtz, and Byerly and paid the requested amounts to Defendants.

95.     As a direct and proximate result of Defendants Stephens, Gevirtz, and Byerly's improper actions, Plaintiffs have sustained substantial economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and damage to their reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and CATHERINE BYERLY, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT II
### Fraud – Bradford Stephens, Aaron Kunstman, and Joel Wayne Cuthriell

96.     Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 96 of this Count II as if fully set forth herein.

97.     On or about January 8, 2018, Plaintiffs entered into an oral agreement with Stephens, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

98.     Following that agreement, Stephens defrauded Plaintiffs by failing to provide the contracted services, creating false "threats," and extorting funds from Plaintiffs through coercion. Once discovered, Plaintiffs attempted to distance themselves from Defendants. However, in retaliation, Stephens, Kunstman, and Cuthriell began making false online profiles and applications

with false information in order to further defraud Plaintiffs out of approximately $2,000,000.00 worth of Skycoin product.

99.     Plaintiffs offered a reward program ("Reward Program") to entice customers to their business.

100.     In order to obtain a reward, each participant is required to submit an application which conformed to S.A.'s terms and conditions. The terms included the following:

   a.  Each customer is only allowed to have one active Skywire Rewards account within a single one month period.

   b.  Each customer is allowed to claim rewards for up to 8 Skywire nodes in a one month period.

   c.  Only one instance of the "Skywire Node" software can be run on a single physical computer.

   d.  Each customer may operate only a single reward program account within a one month period

   e.  Each computer claiming a reward must be a physically separate and independent computer.

   f.  It is a violation of the Rewards Program terms and service, for a user to run more than one Skywire node per physical computer.

101.     Cuthriell and Stephens developed software to run over 300 "nodes" on a single physical computer, to defraud the Reward Program.

102.     Relying on the misrepresentations, SA provided these persons rewards to which they were not entitled, totaling approximately $2-$4 million (the precise amount of which is unknown as they have continued to submit fraudulent applications continuously and under multiple fake aliases). It is a regular method of the conspirators' business to harass SA in this and other ways, and they will not stop without judicial intervention.

17

FILED DATE: 4/4/2024 10:00 PM    2024L003661

103.     Plaintiffs relied upon the information provided in those online applications and profiles.

104.     Had Plaintiffs known that these profiles and applications were being generated and submitted by Stephens, Kunstman, and Cuthriell repeatedly in order to accumulate Skycoin under false pretenses, Plaintiffs would not have made Reward Program payments to Defendants Stephens, Kunstman, and Cuthriell.

105.     Stephens, Kunstman, and Cuthriell made these repeated false representations to Plaintiffs through these applications and profiles even though they knew that they were false and made under false pretenses, with an intent to induce Plaintiffs into providing the $2,000,000.00 in digital payments/digital assets/digital currency.

106.     Stephens, Kunstman, Cuthriell have at all relevant times perpetuated and deliberately concealed this fraud from Plaintiffs.

107.     Stephens, Kunstman, and Cuthriell have engaged in a scheme to defraud Plaintiffs by consistently attempting to conceal this fraud and continue to submit false applications and profiles to Plaintiffs.

108.     Eagle conspired with Stephens and Kunstman to extort Plaintiffs out of money by threats of physical harm through the Assailants who invaded Smietana's home and tortured both him and his pregnant girlfriend for over six hours.

109.     As a direct and proximate result of Stephens, Kunstman, and Cuthriell's improper actions and misrepresentations, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

110.    Plaintiffs relied upon the accuracy and truthfulness of the submitted applications and profiles, and, had Plaintiffs been aware that the representations of Stephens, Kunstman, and Cuthriell were false, Plaintiffs would not have acted as they did.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, and JOEL WAYNE CUTHRIELL, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT III
**Civil Conspiracy – Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, and Unknown Individuals and Companies**

111.    Plaintiffs repeat and reallege Paragraphs 1-76 of this Complaint as and for Paragraph 111 of this Count III as if fully set forth herein.

112.    Defendants agreed and conspired with one another to defraud Plaintiffs, tortiously interfere with their business relationships, commit various acts of wire fraud, computer fraud, manipulate the cryptocurrency market, and convert Plaintiffs' property surreptitiously.

113.    Defendants' acts in furtherance of the conspiracy included, but were not limited to:

    a.    Devising and implementing the Marketing Program to defraud Plaintiffs of money;

    b.    Hacking and linking pornographic blogs and other harmful spam content to Skycoin's website to decrease Skycoin's website's ranking precipitously in search engines and irrevocably destroy Skycoin's image, reputation, and internet presence;

    c.    Threatening Plaintiffs with physical harm to extort them out of money;

FILED DATE: 4/4/2024 10:00 PM    2024L003661

    d.   Invading Smietana's home and torturing Plaintiff Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets;

    e.   Creating and employing a network of journalists to publish fraudulent articles to destroy Skycoin's image and reputation in order to drive down the price of Skycoins; and

        i.   Greene, a journalist and reporter, was employed by Stephens and knowingly published false articles regarding the legitimacy of Skycoin and Skycoin's technology;

           1.   Greene was within Stephens's network and at all times knew Stephens was not the COO of Skycoin, yet published that he was, and continued to publish false information even after Smietana's continuous attempts to correct the false claims.

        ii.   Employing Peck to knowingly write a false and defamatory article published in The New Yorker alleging Skycoin as a fraud and a scam; and

        iii.   Publishing an article in Cointelegraph by Simon Chandler, claiming that Plaintiffs' attackers were "emboldened" to physically harm Smietana due to Skycoin's "shady dealings."

    f.   Hacking Skycoin's Reward Program to defraud Plaintiffs out of millions of dollars.

114.    Defendants worked in concert with one another to accomplish this fraud as evidenced by their various communications and concerted acts against Plaintiffs.

115.    Defendants intended to defraud Plaintiffs out of their money, their product, and to tortiously interfere with their business relationships.

116.    As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully

FILED DATE: 4/4/2024 10:00 PM   2024L003661

pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

**COUNT IV**
**Tortious Interference – Bradford Stephens, Aaron Kunstman, Joel Wayne Cuthriell, Catherine Byerly, Ryan Eagle, and Unknown Individuals and Companies**

117.    Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 117 of this Count IV as if fully set forth herein.

118.    Plaintiffs developed business relationships and contracts with various vendors and customers since its launch in 2013.

119.    Skycoin sells non-fungible electronic products that fluctuate in value based upon the market rates on specific internet exchanges.

120.    For Skycoin to do business, it must participate in these internet exchange markets, such as, but not limited to, Bittrex, Binance, Kraken, Poloniex and Bifinix, in order to sell its goods.

121.    Stephens, Kunstman, Eagle, Cuthriell, Byerly, and UNKNOWN INDIVIDUALS AND COMPANIES, orchestrated various schemes to undermine the reputation of Plaintiffs and cause these internet exchange markets, specifically, Bittrex and Binance, to remove Plaintiffs' products from their exchanges (known as "Delisting").

122.    Defendants were fully aware of Plaintiffs' position within these internet exchange markets.

FILED DATE: 4/4/2024 10:00 PM   2024L003661

123.    Defendants were fully aware that Plaintiffs' Skycoin Token must be sold on these internet exchange markets.

124.    Defendants were fully aware that Plaintiffs had agreements and/or expected agreements with these internet exchange markets.

125.    Defendants, nonetheless, acted in concert to cause these internet exchange markets to remove Plaintiffs' Skycoin Token from those markets by harassing Skycoin and interfering with Skycoin's relationships with exchanges and partners corporations, making public statements bragging that they had paid journalists to publish articles to slander the company, publicly discussing the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance, and orchestrating having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless allegations.

126.    At all relevant times herein, Defendants intended to cause harm to Plaintiffs' reputation and finances in order to interfere with their relationships with these internet exchange markets, along with their customers and vendors.

127.    As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, RYAN EAGLE,

FILED DATE: 4/4/2024 10:00 PM   2024L003661

and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT V
### Unjust Enrichment – Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Catherine Byerly, and Unknown Individuals and Companies

128.    Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 128 of this Count V as if fully set forth herein.

129.    Defendants were provided approximately $860,000.00 in funds to provide marketing, advertising, and web design services to Plaintiffs.

130.    These funds and goods were not earned, and Plaintiffs received no equivalent value for them in return.

131.    It would be unconscionable and against fundamental principles of justice, equity and good conscience for Defendants to retain the benefit from those funds, which were paid by Plaintiffs without receiving any benefit in return.

132.    Defendants also obtained approximately $2,000,000.00 in Skycoin Tokens through false reward applications.

133.    These funds and goods were not earned, were stolen by fraudulent means, and Plaintiffs received no equivalent value for them in return.

134.    It would be unconscionable and against fundamental principles of justice, equity and good conscience for Defendants to be unjustly enriched by retaining the benefit from the stolen funds, without Plaintiffs receiving any benefit in return.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

135.    As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

### COUNT VI
### Defamation – Morgen Peck and Bradford Stephens

136.    Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 136 of this Count VI as if fully set forth herein.

137.    The New Yorker is an American weekly magazine publication owned and published by Defendant Condé Nast.

138.    At all times relevant herein, Peck was an agent of Condé Nast.

139.    At all times relevant herein, Peck was an apparent agent of Condé Nast.

140.    At all times relevant herein, Peck was acting within the course and scope of her authority as an agent of Condé Nast.

141.    At all times relevant herein, Peck was acting within the course and scope of her authority as an apparent agent of Condé Nast.

24

FILED DATE: 4/4/2024 10:00 PM   2024L003661

142.     On Aug 18, 2021 an article submitted by Peck was published in The New Yorker (See Appendix A).

143.     The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

144.     Peck published blatant lies and misrepresentations about Plaintiffs in her article including, but not limited to the following:

   a.   Misrepresenting Smietana's relationship with Stephens and Stephens's involvement with Skycoin and Skycoin's marketing campaign;

   b.   Statements alluding to Smietana and Skycoin as a fraud and a scammer, such as:

      i.   "In a way, it makes you into a fraud";

      ii.   "Is it a scam? I'm 99 percent sure of it"; and

      iii.   Suggesting that Skycoin was part of a "pump and dump" scheme.

   c.   Falsely stating Stephens has recordings of Smietana stating, "We want to feminize the peasant population to make them more docile ... [i]t's so they don't revolt."

      i.   Smietana asked Peck on multiple occasions regarding the existence of the alleged recording to verify the contents of her claims for this statement, however Peck never confirmed that she obtained such a recording, even though it was used as a purported source for factual information in the article.

      ii.   Smietana also denied such statements to Peck multiple times, each time reiterating that they were fabricated and untrue. Peck still published the statements.

25

FILED DATE: 4/4/2024 10:00 PM   2024L003661

    iii.   Peck admitted to Smietana that no one she interviewed would corroborate the quotes given by Stephens. Therefore, Peck knew or should have known the published quotes were false.

    iv.   Peck knew that Stephens and Kunstman were members of the neo-nazi, alt-right internet forum "/pol/" and that similar antisemitic quotes were circulated there.

    v.   As a result of the publication of the article, a Neo Nazi publication cited to the false statement from Peck's article quoting Smietana, and thereby causing damage to Plaintiffs' reputation.

    vi.   As a result of the publication of this statement, Smietana was subjected to numerous death threats, harassment, and various hate crimes.

d.   Stating falsely that Smietana invited Binance executives to a Skycoin party during a 2018 conference in Las Vegas and instructed Stephens to hire prostitues for the executives;

    i.   In fact, it was confirmed there were no Binance executives at the conference and the party was a private party of Stephens, without any affiliations to Skycoin or Plaintiffs. (See Appendix C)

    ii.   Stephens's job was to set up meetings at conferences. He unilaterally held a private party without instruction to do so. Any approval for holding an event was contingent upon finding people from Binance, who were, in fact, not even in attendance at the conference.

FILED DATE: 4/4/2024 10:00 PM   2024L003661

iii. This inaccurate depiction of events was designed to destroy the relationship between Binance and Skycoin and was manufactured solely to do damage to Plaintiffs' reputation and business.

iv. Peck knew or should have known the statements were false, because Smietana sent her the messages from Defendant Stephens for the conference.

v. Peck interviewed Michael Terpin (the event organizer) and Daken Freebourne (Skycoin's head of events), who explicitly told Peck that Stephens was a compulsive liar and that his account was fabricated.

vi. Peck merged stories from three separate conferences into a non-factual and defamatory account, designed to inflict damages to Plaintiffs.

e. Conclusory and unsupported statements by others;

i. Stating that "according to several people" (without any further evidence), that Skycoin privately sold to investors at a discounted rate;

ii. The article continuously includes unsupported statements supposedly from "employees" of Skycoin, however Peck told Smietana in conversations that she did not have documentation to show who these "employees" were, if and when they worked at Skycoin, or any confirmation of their statements.

iii. Peck published statements made by people against whom she knew Plaintiff Smietana had an ongoing lawsuit against and therefore knew or should have known these were unreliable sources.

f. Falsely accusing Smietana of pre-mining "a hundred million coins, which were scheduled for circulation;"

FILED DATE: 4/4/2024 10:00 PM   2024L003661

    i. Peck published this statement with full knowledge that Skycoin does not engage in any mining.

    ii. During fact checking, Peck referenced a website that listed companies with pre-mine scams.[4]

        1. The website listed "SYC Skycoin – premined" under a list titled, "List of scamcoins – do not use"

        2. SYC Skycoin is a completely different company from SKY Skycoin (Plaintiff).

        3. Peck knew that SYC was not Plaintiffs' company and that SYC was not SKY.

        4. Therefore, Peck falsely accused and published in her article that Skycoin engaged in a pre-mining scam.

g. Falsely accusing Smietana of directing Skycoin's marketing unit to purposely spread negative rumors to attract attention by stating "In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention;"

    i. Peck does not provide support to confirm where this chat was from, who the "investors" were, or the full context of the conversations.

    ii. The quote itself is purposely suggestive and alludes that Skycoin publishes negative rumors for promotion but does not clarify who "they" are that "spread negative rumors. "

h. Falsely accusing Smietana of "plotting new distractions;"

---

[4] The website can be found at: https://altcoins.com/scamcoins

i. In support, Peck quoted Smietana, "Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it."

ii. The quote was purposely skewed by Peck and taken out of context to defame Smietana and Skycoin.

iii. The quote is a snippet of a message that clearly signifies a joke, in which the full text reads "The media is retarded. They are still writing articles about the 'insider trading' of cat memes, fake news. Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it. 'Kittycash CEO beheaded by ISIS after SEC investigation.'"

i. Purposely taking direct quotes from chatrooms/messaging conversations and placing them out of context to twist their meaning and damage Plaintiffs;

i. Peck wrote, "A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coordinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved.)"

1. The quote was purposely misconstrued as it had nothing to do with insider trading channels;

29

FILED DATE: 4/4/2024 10:00 PM   2024L003661

   2. It was evident from the chat conversations that any reference to any "secret insider trading" was a joke. (See Appendix I)

   3. Peck knew that the "secret chat rooms" were, in fact, public channels, accessible to all people.

ii. Peck quoted Smietana as stating "If you put in a million dollars now, and we have a run just as large as the last one, you're going to be at fifty million dollars."

   1. This statement was knowing taken out of context, altering its meaning, and presenting Smietana in a false light.

   2. Peck's quote claims that Smietana engaged in price promotion for Skycoin, knowing that Smietana was prohibited from making such statements by company policy and that Smietana could be fired or reprimanded for violation of company policy for making these statements.

   3. Peck knew, or should have known, these out of context statements would expose Plaintiff Smietana to legal liability and damage his reputation and business.

   4. Peck admitted to Smietana that she could find no example of Smietana engaging in price promotion.

iii. Defendant Peck quoted Smietana as stating, "many could be corroborated only by people whom he swore existed but who couldn't talk because they had government security clearance, or were in hiding, or because he didn't know their real names."

FILED DATE: 4/4/2024 10:00 PM    2024L003661

1. Smietana actually said, "all software developers who work in cryptography have government security clearance, because government contractors are the only clients of the industry."

2. Peck distorted, or even manufactured, statements wholesale for the purpose of defaming Plaintiffs.

j. Falsely accusing Smietana of having sole control of the "pre-mined" coins and Skycoin's virtual wallets;

   i. It is public knowledge that Skycoin is an incorporated corporate entity and not under the sole control of one person.

   ii. Peck had posession of Skycoin's incorporation documents and corporate structure, and therefore knew, or should have known, that her statements were false.

k. Accusing Smietana of soliciting advice from an online personality who used a Hitler avatar in his profile;

   i. Peck admitted to Smietana during fact checking that she could not find any evidence substantiating her statement that Smietana solicited and made payments to internet users with a Hitler avatar.

   ii. Peck admitted to Smietana that only Stephens and Kuntsman had made these claims, and that no other persons could corroborate these statements.

   iii. Peck continued to publish the above statement, knowing its defamatory and false nature.

31

l. Alleging that Smietana lied about the extent of his medical injuries sustained from the attack on himself and his girlfriend, even after publishing that Smietana's attackers admitted to detaining and injuring Smietana and his girlfriend;

    i. Smietana provided Peck with copies of court proceedings and medical records, completely contradicting the false statements she published in the article.

m. Alleging that Smietana used the attack on himself and his girlfirend to "use his power to freeze Skycoin transactions," when Smietana clearly stated in an official announcement to the Company that funds were frozen after making sure all Skycoin staff were safe after the attack and extortion demands;

    i. Peck knew that Skycoin's lead developer, Steven Leonard, not Smietana, had initated freezing the stolen funds from the Chinese marketing team and employee accounts after the company detected embezzlement.

    ii. Peck knew that the funds that were frozen were solely company accounts.

n. Peck implied that That Smietana had been employed as a software developer by the notorious Washington DC lobbyist, Jack Amabrov, who had several felony convictions, including a plea bargain for SEC violations; and

    i. Peck was aware that the allegations were false because the company directly informed her that Smietana had briefly spoken to them in 2018, but that no agreement had been reached.

    ii. Peck admitted that the statements were false and apologized to Smietana multiple times for bringing up false claims.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

FILED DATE: 4/4/2024 10:00 PM   2024L003661

      iii.   Peck knew or should have known that claiming Smietana had been employed by Jack Amabrov, would cause severe damage to Plaintiffs' business and reputation.

  o.  Peck implied that one of Skycoin's mathematical algorithms, "Obelisk", did not actually exist and that Plaintiffs committed fraud.

      i.   Peck knew that these statements were false, as she had possession of both the source codes and white paper for the algorithm.

      ii.   Additionally, Skycoin's algorithm papers were published on Skycoin's website and in peer reviewed journal articles. This information was publicly available, and Peck had access to the public links to these algorithms.

      iii.   Peck had this information at the time she claimed these algorithms did not exist.

145.    Defendant Peck published that "Stephens came up with a plan to strip Smietana of power and transfer management of the company to a foundation."

146.    Peck, knowing that Stephens's intentions were to take the Company from Smietana, continued to base her article on information provided mainly by Stephens, completely disregarding his clear bias and motive to disenfranchise Smietana from Skycoin and seize control of the Company.

147.    After publication of the article, a former employee of Stephens and Kunstman contacted Plaintiffs stating that Peck received money to intentionally produce and publish a defamatory article attacking Plaintiffs and would receive bonus payments for destroying Skycoin's relationship with Binance. (See Appendix C)

FILED DATE: 4/4/2024 10:00 PM   2024L003661

148.     The statements made by Peck in the article were purposely false and defamatory in return for financial gain and personal benefit of Peck.

149.     Peck acted within the scope of her agency with principal Condé Nast when she submitted and published the article.

150.     As a direct and proximate result of Peck's libelous publication, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

151.     As a direct and proximate result of the libelous publication in The New Yorker, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendant, MORGEN PECK, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

<u>**COUNT VII**</u>
**Defamation - American Publishers, Inc. d/b/a Condé Nast and d/b/a**
**The New Yorker Magazine**

152.     Plaintiffs repeat and reallege Paragraphs 1 through 76 and Paragraphs 136 through 151 as and for Paragraph 152 of this Count VIII as if fully set forth herein.

153.     Condé Nast is a global mass media company operating various brands, including Defendant The New Yorker.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

154.    The New Yorker is an American weekly magazine publication owned and operated by Defendant Condé Nast.

155.    At all times relevant herein, Peck was an agent of Condé Nast.

156.    At all times relevant herein, Peck was an apparent agent of Condé Nast.

157.    The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

158.    On August 18, 2021, Condé Nast, by and through The New Yorker, published Peck's article which reached millions of readers worldwide.

159.    Approximately one week prior to publication, Anna Boots, Fact Checker for The New Yorker, contacted Smietana regarding the article and stated:

    a.    That Peck's article was the longest fact checking she ever had to do (approximately 3 months);

    b.    That numerous unsubstantiated claims were made in Peck's article;

    c.    That Peck interviewed Michael Terpin regarding the 2018 Las Vegas conference and he informed her that Stephens was an unreliable source and a compulsive liar;

    d.    That the fact checking process was difficult to complete because almost all the information was provided two people, with most claims and statements being unsubstantiated; and

    e.    That her editor at The New Yorker set a "firm publication date regardless of [fact checking] completion."

160.    Condé Nast, by and through The New Yorker, published Peck's article without properly and completely fact checking the defamatory statements made and checking Peck's sources and their credibility.

161.    As a direct and proximate result of the libelous publication in The New Yorker, Plaintiffs suffered economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

162.     As a direct and proximate result of the libelous publication in the New Yorker, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendant, AMERICAN PUBLISHERS, INC., d/b/a CONDÉ NAST and d/b/a THE NEW YORKER MAGAZINE, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT VIII
### Breach of Fiduciary Duty – Bradford Stephens, Aaron Kunstman, Joel Wayne Cuthriell, Catherine Byerly, and Unknown Individuals and Companies

163.     Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 163 of this Count VIII as if fully set forth herein.

164.     At various times, Stephens, Kunstman, Cuthriell, and Byerly were acting as contractors hired by Plaintiffs to perform certain duties for the marketing of Skycoin.

165.     Per that relationship and agreement, Defendants were to adhere to the terms of the agreements and provide the services promised.

166.     Defendants instead engaged in various schemes to defraud Plaintiffs, including promising marketing and promotions materials that were never performed, implementing public schemes to damage Plaintiffs' reputation needing immediate marketing damage control, and providing marketing services below the quality and type of what was agreed upon.

FILED DATE: 4/4/2024 10:00 PM   2024L003661

167.    Defendants did not provide the promised services to Plaintiffs, despite Plaintiffs having paid for those services.

168.    Defendants had a duty to adhere to the terms of the agreements and to provide Plaintiffs with the promised services.

169.    Defendants breached that duty by failing to adhere to the terms of the agreements and failing to provide Plaintiffs with the promised services.

170.    As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## <u>COUNT IX</u>
### Breach of Contract – Bradford Stephens, Aaron Kunstman, and Joel Wayne Guthriell

171.    Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 163 of this Count VIII as if fully set forth herein.

172.    On or about January 8, 2018, Plaintiffs entered into an agreement with Stephens, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

FILED DATE: 4/4/2024 10:00 PM   2024L003661

173. Following that agreement, Stephens failed to provide the contracted services, creating false "threats," and extorting funds from Plaintiffs through coercion.

174. Defendants did not adhere to the terms of the Agreement despite payment.

175. Plaintiffs, at all times relevant herein, fully performed on their obligations under the Agreements with Defendants.

176. Defendants failed to provide any advertising or marketing services to Plaintiffs during the duration of the contract.

177. Defendants breached their obligations under the contract through the following acts or omissions:

    a. failing to provide advertising services;

    b. Failing to provide marketing services;

    c. failing to use the funds provided for the advertising or marketing services;

    d. failing to provide web design services;

    e. failing to use funds to effectuate any web design;

    f. failing to stay within the bounds of the expense budget; and

    g. attempting to extort additional funds outside of the contract terms.

178. As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS

FILED DATE: 4/4/2024 10:00 PM 2024L003661

AARON KUNSTMAN, and JOEL WAYNE CUTHRIELL, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

**COUNT X**
**Violations of 735 ILCS 5/12-7.1 – Bradford Stephens and Aaron Kunstman**

179.    Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 179 of this Count X as if fully set forth herein.

180.    On information and belief, during the years 2019-2021, Stephens and Kunstman, through various internet media and in person, made numerous antisemetic statements and threats of death, kidnapping, and other acts of violence against Smietana.

181.    All of these threats were based on Smietana's religion and Jewish heritage.

182.    Defendants also discussed Company as a "Jew coin", called holders of Skycoin Tokens "Skygoyim",and other similar hate speech, which Smietana perceived as a direct threat due to his being Jewish.

183.    Defendants posted these messages on various social media platforms and also made said threats directly to Plaintiff.

184.    In furtherance of their threats, Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

185.    Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin with a market value of $81,018.98, totalling $220,179.31.

FILED DATE: 4/4/2024 10:00 PM   2024L003661

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and AARON KUNSTMAN, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

Respectfully submitted,

**BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation**

By: /s/James A. Karamanis
One of Plaintiffs' Attorneys

James A. Karamanis
Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

FILED
4/5/2024 1:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27143636

FILED DATE: 4/5/2024 1:57 PM    2024L003661

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED, a Singapore
Company, and SYMBOLIC ANALYTICS INC.,
a Delaware Corporation,

                Plaintiffs,

v.

BRADFORD STEPHENS, AARON
KUNSTMAN, RYAN EAGLE, JOEL WAYNE
CUTHRIELL, MORGEN PECK, CATHERINE
BYERLY, AMERICAN PUBLISHERS, INC.
d/b/a CONDÉ NAST and d/b/a THE NEW
YORKER MAGAZINE, and UNKNOWN
INDIVIDUALS AND COMPANIES,

                Defendants.

Case No.

## AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222(b)

Pursuant to Supreme Court Rule 222(b), counsel for the above-named Plaintiffs certifies that Plaintiff seeks money damages in excess of Fifty Thousand and No/100 ($50,000.00), exclusive of interest and costs.

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

          /s/James A. Karamanis

James A. Karamanis
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, Illinois 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchiagolaw.com

FILED DATE: 4/5/2024 1:57 PM   2024L003661

# APPENDIX A

FILED DATE: 4/5/2024 1:57 PM   2024L003661

ANNALS OF TECHNOLOGY

# PUMPERS, DUMPERS, AND SHILLS: THE SKYCOIN SAGA

*The cryptocurrency promised to change the world and make its users rich in the process. Then it began to fall apart.*

**By Morgen Peck**

August 18, 2021

FILED DATE: 4/5/2024 1:57 PM    2024L003661



Illustration by Nata Metlukh



Save this story

On an April afternoon in 2011, a twenty-seven-year-old tech entrepreneur named Bradford Stephens arrived at a stucco bungalow near the canals of Venice, California. He had recently started a new data-analytics company, and had come to speak with a coder named Brandon Smietana, whom he hoped would get involved. Stephens had already met Smietana online, where he uses the handle Synth, and where he often debated minute points about math and programming. When Stephens and Ryan Rawson, an employee who tagged along, arrived, Smietana invited them into a carpeted den. A computer sat on a table, its casings removed to reveal a tangle of circuits; a sleeping bag lay on a sofa. Smietana was in his early twenties, with dark hair and a youthful face. Rawson told me, "He had the air of this mad scientist couch surfing." Stephens pitched his new company, but got no traction. Smietana had turned his attention to a new technology: cryptocurrency. "The only people who have to work for money are the people who cannot create it or print it out of thin air," he told them.

The first cryptocurrency, Bitcoin—released in 2009 by an anonymous programmer (or a group of them) called Satoshi Nakamoto—was a feat of computational brilliance. A bitcoin is an abstract unit of value that people track and spend with digital wallets. When someone contributes her computer's power to process Bitcoin transactions, the computer also races to solve an equation, a process called "mining." Each solution that meets certain criteria mints new coins. The number created decreases by half every four years or so—an event known as the Halvening—which keeps the supply limited, guarding against inflation. The whole economy is maintained on a blockchain, a shared ledger that keeps a tally of every Bitcoin transaction. As miners add transactions, the Bitcoin software coördinates and finalizes their contributions, making the ledger transparent and unchangeable and the system nearly impossible for governments to shut down.

But the technology has a flaw: as more people use it, transactions become slower and more expensive. The average transaction fee fluctuates wildly; one day last week, it was two dollars and thirty-three cents, making it more expensive than any major credit card for everyday purchases. The pursuit of a better Bitcoin quickly became a full-blown academic field, with its own conferences, university courses, and peer-reviewed journals. But, as Smietana explained over the next few years to anyone who would listen, he had the solution. He was designing a cryptocurrency that could be sent around the world instantaneously, for next to nothing. He called it Skycoin.

He was going to use this currency, he said, to create a decentralized version of the Internet, called Skywire. He planned to build a large mesh network, a system that allows people to use special Internet routers to share bandwidth with their neighbors. With enough members, a network can bypass service providers, making it harder for corporations and governments to surveil Internet use. But it's difficult to

FILED DATE: 4/5/2024 1:57 PM    2024L003661

FILED DATE: 4/5/2024 1:57 PM    2024L003661

retain volunteers. "A community network really needs density before it is useful," Brian Hall, of NYC Mesh, the largest community network in the U.S., wrote in a blog post. "It can be a chicken and egg problem." Smietana's project proposed a different way to attract people: pay them. His customers would share bandwidth using routers called Skyminers, and get paid for their service in Skycoin. He envisioned a new cryptocurrency spent over a community-owned Internet, calling it "the last step to fulfilling Satoshi's mission."

Stephens left his first meeting with Smietana believing that he could be destined for greatness. Skycoin launched publicly two years later, in 2013. The following year, Stephens attended a party at Smietana's new place, an unrenovated warehouse just south of L.A. Someone had painted the walls with images of horned monsters. "It was very Burning Man meets H. P. Lovecraft," Stephens told me. Stephens's friend Baron Chat, a photographer who attended, said, of Smietana, "He seemed to be receiving his signal from a different station than everyone else." According to Stephens, Smietana asked him to join the fledgling project, but he demurred. (Smietana said he doesn't remember seeing Stephens at the party.)

The first cryptocurrency boom arrived in 2017. "Several investors I knew, and a lot of my friends, started pivoting from angel investing to putting money in crypto and seeing insane returns," Stephens told me. Skycoin had a "token sale"—a sort of I.P.O. for cryptocurrencies—and was listed on two small exchanges. By the end of 2017, its price had gone from a little more than a dollar per coin to about fifty dollars per coin. That December, while Stephens was on vacation with his wife in Japan, Smietana messaged him with another chance to get involved. It seemed like an opportunity to work on something revolutionary. But he also thought, Everybody else is getting rich off crypto, so why not me? He said that he later told Smietana, "I'm going to need 50K up front and I gotta hire a team." After a couple days, he checked his Bitcoin wallet and found fifty thousand dollars sitting in it. "I'm, like, 'I guess I'm hired,'" he said. (Smietana denies sending the money, though he had said he would do so in texts, and there's a record of such a transaction on the Bitcoin ledger.) Before leaving Kyoto, he and his wife had visited a shrine to Inari, the Shinto god of rice, where they left offerings and made wishes. His wife wished for the health of her father, who was battling cancer. "I asked for wealth and adventure," Stephens told me. "And I got one of those."

In the past decade, a shift has occurred in the way that cryptocurrencies are distributed. Satoshi put bitcoins into circulation through a reward system: the more computing power you contribute, the more coins you can mint. Some early adopters paid their rent simply through mining. Around 2012, though, people began devising blockchains that could be used for more ambitious applications: supply chains with real-time geolocation, for example, or patient-controlled medical records. Such projects required capital, compelling founders to experiment with less democratic ways to distribute coins. In 2013, J. R. Willett, the founder of Mastercoin, invented the "initial coin offering," or I.C.O., the first token sale: developers partially pre-mined their tokens and then sold them off to raise money. Michael Terpin, who has managed two hundred such token sales, and who handled public relations for Skycoin,

FILED DATE: 4/5/2024 1:57 PM    2024L003661

told me that the scheme empowers entrepreneurs. "Somebody who had an innovative product could sell directly, prior to it being built, to an audience of enthusiasts," he said, without having to "give up a third of the company."

A frenzy followed a few years later. Since 2017, hundreds of projects have announced token sales. One of the most lucrative, EOS, raised about three and a half billion dollars in a yearlong I.C.O. Many projects amassed funds even before their blockchains or applications existed; some prepared assiduously, but others merely threw together a Web site, a list of advisers (sometimes without their knowledge), and some semblance of a technical paper (sometimes plagiarized). "A playbook really emerged for how to set up a legitimate-looking I.C.O.," Matt Chwierut, the head of research at Smith & Crown, a blockchain research firm, told me.

In 2018, I attended the North American Bitcoin Conference, in Miami. On the main stage, representatives from companies with unpronounceable names riled up the crowds. Downstairs, an arcade of booths hawked every kind of blockchain project: smart glasses, cargo robots, refugee-identity documents. At a booth for a group claiming to build a volunteer emergency-services network, I asked why the endeavor required a coin. The attendant told me to come back later when someone more technical would be arriving.

Because bitcoin mining is regulated by algorithms, everyone, in theory, has a fair chance of getting new coins. But, to receive pre-mined coins in a token sale, you often have to buy publicly at the sale price or else negotiate a deal behind the scenes. "A lot of coins were being sold on the side and in secret," Josh, a major cryptocurrency investor—who eventually bought into Skycoin, and requested that I use only his first name, out of concern for his safety regarding another matter—told me. "You'll do special deals with people if they give you three or four or five million dollars up front." This created a sense that making your fortune required being in the right room to get the right tip.

On the second night of the conference, I went to a strip club for an after-party, where flashing your badge got you a crypto-inspired cocktail. (I ordered a Satoshi Sour.) Guests exchanged advice, sure that they were getting the best inside information. But a few hours later a friend whisked me off to a more exclusive party, thrown at a beachside bar by Patrick Byrne, the former C.E.O. of Overstock. (Byrne stepped down in 2019, after it was revealed that he had had an affair with the Russian agent Maria Butina.) The attendees were celebrating the hundred-million-dollar token sale of Byrne's trading platform, TZero, which he said was going to "drag Wall Street behind the barn, kill it with an axe, and re-create it on blockchain." There were giant platters of sushi and oysters; the rapper Flo Rida pulled Byrne up onto the bar for a sing-along. Guests exchanged invites to exclusive chat rooms on Telegram, an app favored by coin enthusiasts. I turned to a man next to me and asked what had brought him to the party. He rubbed his thumb and forefinger together and shouted, "Making money."

FILED DATE: 4/5/2024 1:57 PM    2024L003661

The employment structure at Skycoin was loose, and Stephens joined without a contract. "Here I was, a guy used to wrangling hundred-page venture-capital contracts, and I'm joining a company with no last names and barely any first names," Stephens said. Smietana, who by then was living in Shanghai, had pre-mined a hundred million coins, which were scheduled for circulation. Skyminer routers were just starting to ship, but sales had already outstripped production. Smietana estimated that operators who used Skyminers could make between fifteen thousand and forty-five thousand dollars a month. Most coinholders I spoke to were young men around the world—medical students, craftsmen, 3-D animators—who believed in the project. In chat rooms, Smietana's followers addressed him with reverence. "We all are in honor to speak with synth," a user called Anosis wrote. "It's like having a chance to talk to Satoshi."

Although Stephens studied computer science in college, he admitted that, when he started working with Skycoin, he "hardly knew anything about crypto." He was told to handle marketing, and assembled a team composed mostly of friends and former associates. (Smietana now claims that he contracted a marketing company that Stephens ran, not Stephens himself.) But he soon realized that word about the project was already spreading. Large investors recruited in their own circles, and smaller coinholders hyped Skycoin on social media. At one point, Skycoin advertised a bounty program that promised users coins in exchange for promotional activities, such as writing blog posts and creating YouTube videos. One user-made video, titled "Skycoin - To the Moon," featured footage of a shuttle blasting off next to a chart of Skycoin's market value, interspersed with a closeup of glossy lips and the words "YOU COMIN'?" People who proved their worth on Telegram often got pulled up the ranks. "I started to spend 90 hours a week in the chat room," a user called Sudo, who became one of Skycoin's Telegram channel moderators, and who refused to tell me his name, messaged me. "They seen how active I was and offered me a job."

By early January, 2018, the total estimated value of pre-mined Skycoins had reached almost five billion dollars. Smietana sent representatives to conferences in New York, Lisbon, San Francisco, and Singapore, and arranged a retreat in Mauritius. A former marketing contractor, who requested anonymity out of fear of harassment, recalled that Smietana could spend lavishly on the people who worked with Skycoin, in one case paying for cryotherapy, vitamin injections, thousand-dollar steak dinners, and a twelve-thousand-dollar trip to the Esalen Institute. "Dude was very liberal with his spending and could be very generous," the marketing contractor said. The team posted a video of a yacht party, and thundered around in Ferraris. In New York, Skycoin reps cruised in a helicopter to grab footage of a Skyminer held over Manhattan's skyline.

That month, Stephens flew to Las Vegas to speak on a panel at the CoinAgenda summit. He wasn't up to speed on the technical aspects of Skycoin yet, but he held a Skyminer over his head and said, "You all are the first to see the new Internet!" On the first day of the conference, Smietana sent Stephens a voice memo with an urgent request. He was hoping to get Skycoin listed on Binance, one of the world's

FILED DATE: 4/5/2024 1:57 PM    2024L003661

largest cryptocurrency exchanges, which could help secure its legitimacy. During the I.C.O. boom, it was common for projects to pay a "listing fee" in order to be included on an exchange. (Binance claims that it chooses projects based solely on "strict security, legal, and regulatory compliance standards." In 2018, facing pressure, it announced that it would donate its listing fees to charity.) Smietana said that he had paid Binance executives seven and a half million dollars but that they hadn't followed through. (Binance confirmed that Skycoin paid it a hundred and fifty thousand Skycoins to spend on "promotion," which were worth seven and a half million at the coin's peak.) Smietana told Stephens to entertain the executives, to sweeten the deal. Stephens planned a party in a penthouse suite at the Bellagio. Smietana gave explicit instructions via voice messages: "You have to buy prostitutes for the people at Binance," he said. "Get them, like, three girls each." (Smietana denies any involvement in the party, and claims that his voice messages about it were "either a joke or a deep fake but probably a deep fake.")

That night, Stephens and Baron Chat, who had also started working on Skycoin's marketing, along with Catherine Byerly, another member of the team, sat in the hotel suite, with champagne on ice. Six escorts arrived at nine, and the employees instructed them to make the Binance executives feel like "rock stars." "To them, I was this, like, stereotypical businesswoman in an Ann Taylor dress," Byerly said. "But inside I'm thinking, How did my decisions lead me here?" Chat said, "It felt almost like you were in the process of living out some bizarre reality that sometimes you see in the movies. The weird excess . . . Crazy shit happens when you have a corporate account and a green light." By ten o'clock, the executives hadn't shown up, and Stephens began to worry that he'd lost the deal. He couldn't reach Smietana, so he frantically called the event organizers. They explained that not only had no Binance reps showed up at the conference—they weren't even on the registration list. (A spokesperson at Binance told me that the company neither requested nor knew about the party.) "That's when I started taking anything Brandon said with a grain of salt," Stephens told me. Still, he decided that, "if this is going to be weird, I'm going to make it memorable weird." Some of the escorts took their pay and left; the rest drank champagne and played Cards Against Humanity with the group into the morning.

When Stephens returned from Las Vegas, he set about mapping Skycoin's progress. One of the company's main selling points was Obelisk, an algorithm that allowed it to send coins cheaply and quickly. On Telegram, Smietana insisted that everything that came before was "obsolete and primitive." He boasted that Obelisk was written by Houwu Chen, a developer who had worked on Ethereum, the second-most popular cryptocurrency platform. He posted an academic paper written by Chen on the Skycoin Web site, claiming that it was a Skycoin white paper. But when Stephens reached out to Chen, he got no response. "We kept trying to chase people down to ask details, and it was slowly revealed it just . . . didn't exist," he told me. In a later discussion about technical details, a Skycoin "community manager" told coinholders that "it's too advanced to share" and that the company "can't trust the public with it." When pressed, Smietana wrote, of Chen, "He is a recluse, I doubt anyone can contact him or he would respond." Smietana eventually told me that Chen had taken a payment of a million Skycoins for his work on the white paper and then left the project. (Chen declined to comment,

FILED DATE: 4/5/2024 1:57 PM    2024L003661

saying, "Just don't put my name in the article. That's my statement.") Stephens discovered that Obelisk had never been implemented. (Smietana now acknowledges this, but claims that the project has published some of Obelisk's code and used it in simulations.)

Skycoin's payments were fast, but only because transactions were processed on a single server, rather than on a decentralized network of computers. The server sat in the Shanghai office of Scott Freeman, the C.E.O. of the C2CX cryptocurrency exchange. This also meant that, if Smietana wanted to, he could freeze transactions. "The big thing about a blockchain is it's supposed to be decentralized, and no single entity is supposed to be able to change it," Freeman told me. He added, of Skycoin's setup, "In a way, it makes you into a fraud." (Smietana claims that his power to freeze transactions was designed as a security measure.) Freeman said that he nagged Smietana about implementing Obelisk but that Smietana told him, "People don't really care. It's not worth it. We should spend our resources on other things." (Smietana denies this.)

Skycoin's Web site claimed that multiple payments were scrambled together to provide extra privacy, but this feature was never implemented in the Skycoin wallet. The pre-mined coins sat in virtual wallets under Smietana's sole control. (When pressed, Smietana claimed that he shared control of the coins with a secret group of advisers, but refused to give me their names.) When Stephens asked to see Skycoin's accounting books, Smietana explained that his girlfriend, Sarah, was in charge. Sarah told Stephens that the accounting was a work in progress. (Smietana denies directing Stephens to Sarah, and she denies being in charge of the project's accounting.) Everything seemed haphazard. Stephens was once paid from a bank account in Mauritius registered under a different name; many employees were paid in bitcoin or Skycoin.

In early February, 2018, a month after the CoinAgenda conference, Stephens booked a trip to Shanghai to see Smietana, determined to bring some order to Skycoin. One night, he had dinner with Smietana and members of a Chinese marketing team that Smietana had hired, at a steak house in Xuhui. As the dinner began, Smietana rose from his chair and launched into a rambling diatribe of conspiracy theories. For hours, he catalogued the hidden crimes of a class of global élites who controlled citizens through virtual reality, medical marijuana, and pornography. At some point, Stephens started recording Smietana on his phone. "We want to feminize the peasant population to make them more docile," Smietana says. "It's so they don't revolt."

Stephens told me, "I just became shell-shocked. What the fuck have I gotten myself into?" He had seen Smietana post conspiracy theories on Telegram before, but he figured it was a joke. In the weeks after the dinner, Stephens tried to warn some investors, but felt that they brushed him off: "They would be, like, 'Brandon is just doing his thing, and the value of the coin keeps going up.'"

Shortly after Stephens returned from Shanghai, a reporter named Tristan Greene published a scathing article about Skycoin on the Next Web, a technology-news Web site, condemning the

FILED DATE: 4/5/2024 1:57 PM    2024L003661

company for pre-mining its coins. The Skyminer router was being sold for one bitcoin—worth about ten thousand dollars at the time—but Greene highlighted the fact that it was constructed from components worth about six hundred dollars. Customers got back the ninety-four-hundred-dollar difference, but it came in Skycoin, which still sold only on small exchanges, making it difficult to trade in quantity. (The software for the miners was also incomplete; users connecting to Skywire had no way to pay for the service. Smietana claims that this feature is still under development.) Stephens granted Greene an interview but couldn't persuade him of the project's legitimacy. Greene wrote, "Is it a scam? I'm 99 percent sure of it."

Skycoin went into full damage-control mode. The project had been running a black-ops marketing unit sometimes referred to as Shill Team Six, composed of users plucked from Telegram who specialized in manipulating attention on the Internet. The "shills" occasionally flooded 4chan and Reddit, keeping engagement up with memes and bots. A former member of Skycoin's inner circle, who also requested anonymity, told me that if someone spoke ill of Skycoin the shills could be sent in to "make their life difficult," by digging up embarrassing information. (Smietana denied directing the group, saying it was "completely out of control.") The shills found that even bad publicity could be good for Skycoin. In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention. "Direct promotion does not get to front page and has low click rate," he wrote. "If they create contraversy, then it directs attention and clicks to skycoin." (Smietana claimed that these messages were taken out of context.)

Stephens knew that Smietana pored over texts about crowd psychology and even solicited advice from DJ Hives, an anonymous online personality who at one point used a Hitler avatar, on controlling public opinion. In voice messages, DJ Hives referred to Skycoin customers as "fish," a poker term for easily exploited players, and encouraged Smietana to cultivate an aura of infallibility: "We want to put you on the level of deity as far as the masses are concerned." (When contacted on Telegram, DJ Hives said, "None of this is correct," and declined to comment further.)

The team gamed search algorithms into ignoring Greene's article. "We helped bury that page for a while," Sudo, the anonymous user, who claimed to be part of Shill Team Six, messaged me on Telegram. (Smietana claimed that Skycoin ignored the article.) But word was already spreading. Skeptics showed up in Skycoin's social-media channels to ask questions, and Skycoin moderators started blocking them. "After banning enough losers, everyone left will be winners," Smietana wrote. Skycoin enthusiasts smeared Greene on Telegram, accusing him of writing a paid hit piece. When Greene showed up in the channel to address their concerns, moderators kicked him out. Someone claiming to be a Skycoin investor e-mailed Greene and threatened to "visit" him, his wife, and their son if he didn't stop "messing" with Skycoin, writing, "nothing is really impossible in the world for people like us that grew theire wealth on crypto."

FILED DATE: 4/5/2024 1:57 PM    2024L003661

Stephens contacted Michael Terpin, the adviser, to voice his worries, but, he said, "It turns out Terpin didn't give a shit." (Terpin told me that, by this time, his company was phasing out its involvement with Skycoin. "Brandon's got a flair for the dramatic," he said. "Honestly, that's one reason I found it difficult to keep working with Skycoin.") Stephens came up with a plan to strip Smietana of power and transfer management of the company to a foundation; he still believed that Skycoin could become a reality if reasonable people were in charge. But, by late February, 2018, six weeks after he joined the project, he found that he was locked out of both the Skycoin Telegram and his work e-mail. Members of his team were locked out, too. "The whole thing was so terrible," Chat, from the marketing team, told me. Smietana sent an e-mail to the Next Web denying that Stephens represented Skycoin. "The person you interviewed has nothing to do with Skycoin and is a known scammer," Smietana wrote. "Please update the article." Stephens heard from Smietana again in June, 2018, when Smietana sent him a mysterious Facebook message in which he claimed that he had acted out of concern for Stephens's safety. "I saved your life. You do not even know," Smietana wrote. "I will tell you in a few years."

In July, 2018, a recording leaked of Li Xiaolai, a Chinese billionaire and the founder of a coin that launched with an eighty-two-million-dollar token sale, giving his unfiltered perspective on the industry. "From the start, I knew one thing," he said. "The main power to compete here is the traffic." Successful coins accrue value, in other words, not because of technical sophistication but because they get people's attention. This requires having a founder who can capture the imagination. "All the successful 100X, 1000X projects—you go and look at the founder, they will definitely be a spin doctor," he said. What matters with a coin is that people are talking about it. "The consensus of idiots is still consensus," he said.

To some extent, this is true of most modern currencies: they have no value apart from what we collectively assign them. But the U.S. dollar is supported by government guarantees and controlled through monetary policies. Bitcoin abolished government backing, but its scarcity is regulated through algorithms. (Even so, a tweet or statement from a high-profile coinholder like Elon Musk can raise or crash its price.) Coins that are manually distributed in token sales provide even fewer assurances. It is often impossible to know how many are in circulation. Their value is built on a promise that some feature, often still in development, will make them more useful than other currencies. Until that promise is fulfilled, it is largely a matter of faith. "Money is a social construct," Smietana wrote, on Telegram. "It is based upon CONFIDENCE . . . Confidence is a religion and is built upon perception and not reality."

Founders that control perception control the price of their coin. According to Chwierut, the blockchain researcher, during the I.C.O. bubble, it was not uncommon for founders to spend as much as thirty per cent of their budget on ad campaigns. Some of the effort went to gaming the attention economy, requesting mentions from influencers or using bots to create an illusion of broad support. Traders can even use these metrics to manage their portfolios: IntoTheBlock, a "crypto-intelligence" firm, tracks

FILED DATE: 4/5/2024 1:57 PM    2024L003661

Twitter mentions and Telegram-member counts and sells the information to investors; a data platform called Santiment alerts users when chatter about their coins surges. Recommendation algorithms can encourage the spread of incendiary content, and coins promoted with controversy and falsehood often perform well. Some coin promoters use stunts or scandals to keep users engaged. After closing a fifty-million-dollar token sale, the founder of a cryptocurrency called Savedroid posted a picture of himself at what looked like an airport with a caption reading "Thanks guys! Over and out," which was taken as a confession that he was running off with the funds. A day later, he revealed that he was trolling about escaping with the money, but only after several articles had been written about the scandal. The firm ASKfm hired mountaineers to climb Mt. Everest and film themselves leaving a cryptocurrency wallet on its peak. (The company released a statement saying, "On a market where launching a blockchain endeavor is not really a newsbreak, companies have to stand out.") A sherpa died in the process.

Market manipulation is rampant. In schemes called "pump and dumps," traders meet in exclusive chat rooms where they coördinate to purchase a coin, causing the trading volume to go up and others to take interest. When the price is at its highest, the pump-and-dumpers sell, leaving faithful users holding the bag. In an industry where everyone is a coinholder, there is no one left to pull the alarm. Should investors realize that their coin is a sham, it would be an act of self-sabotage to raise concerns. Better to become evangelists, wooing others in order to boost the price.

U.S. law generally requires projects to register with the S.E.C., forcing them to make financial disclosures that investors could then inspect before buying. Almost none do, giving convoluted rationales that John Reed Stark, the founder of the S.E.C.'s Internet-enforcement office, told me are "poppycock." Not registering can facilitate further rule-breaking, as when, say, influencers promote coins without disclosing their investment, or projects pump coins with fraudulent claims. Stark said, of I.C.O.s, "Every single one I ever saw was unlawful on multiple levels." The S.E.C. began cracking down in 2017, but prosecution often requires "extraordinary resources from an alphabet soup of federal and state law-enforcement agencies," Stark said. As a result, few projects face consequences.

In the spring of 2018, Skycoin climbed into the list of the top hundred coins, and appeared on a Nasdaq Web cast. That May, Binance announced that it would list Skycoin on its trading platform. Around the time of the listing, the price jumped thirty-eight per cent. Then, suddenly, it came crashing down. According to several people involved, Skycoin privately sold to investors at a steep discount—in at least one case, coins worth millions of dollars—inadvertently giving them an incentive to dump it on the market as soon as they could. (Smietana denied being involved in such sales.) Smietana had claimed on Telegram that the investors were restricted from selling. But, as soon as Binance listed Skycoin, the market flooded with sell orders. Freeman, from the C2CX exchange, had been acting as the project's primary "market maker," using a pool of reserves to provide market liquidity and stabilize prices. "I tried to hold at about twenty," he told me. But the sell-off was too much to contain. Coinholders shared their misery on Telegram. "Its been fun guys, i'm gonns hang myself in 2 hours," a user named Willy Jr. wrote.

FILED DATE: 4/5/2024 1:57 PM    2024L003661

"Bought 20K at 20 dollars." A user named Dante wrote, "synth told me this shit would moon," adding, "i took a mortage on my house."

A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coördinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved.) Rumor spread that the S.E.C. would investigate Skycoin as a result, and that Binance was considering delisting it. In the public chat, coinholders prepared for a death spiral. A user called Opaque wrote, "I want to say calm down guys, but its really doesnt look good."

Then, out of nowhere, Smietana announced that he had big news to share once "all the staff are safe." In the coming days, he accused members of the Chinese marketing team of breaking into his house with five gang members, holding him and his girlfriend hostage for six hours, beating him until one of his ribs broke, and stealing a small quantity of cryptocurrency. Members of the Chinese marketing team denied this. In a letter to investors, they claimed that Smietana and his girlfriend had pushed them out, refused to pay them, and frozen their Skycoin wallets, which contained coins that were then worth somewhere between four and nine million dollars. This was the first apparent instance of Smietana's using his power to freeze Skycoin transactions. (Smietana claims that the wallets contained embezzled company funds.) In their letter, the marketing-team members claimed that they had been invited to Smietana's apartment to find a resolution, and a small scuffle broke out in which he got a bruised wrist. Afterward, Smietana's girlfriend filed a police report, and four defendants spent a few months in detention, after admitting to detaining Smietana and his girlfriend in an incident that left them "lightly" injured.

Smietana blitzed Telegram with messages about the alleged "kidnapping." "This is the best thing that has ever happened to Skycoin. Ever...As long as we can keep this drama going, we can get [the trading volume] even higher." He amused himself by plotting new distractions: "Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it." But coinholders seemed not to buy it. When he did a live YouTube interview, shortly after the incident, someone commented, "I dont see one bruise on his face. beaten the shit out of me, what with ? a piece of toast.?" As the sell-off continued, Smietana blamed it on the "kidnappers" for dumping their stolen coins. "They have been surpressing the price the whole time," he wrote.

In November, 2018, Smietana, apparently growing desperate, enlisted John McAfee to promote the coin. McAfee, once famous for the antivirus software that he developed in the eighties, had earned a reputation as a kind of cyber outlaw: he was a "person of interest" in a murder in Belize, in 2012, and subsequently fled the country, later posting images of himself cruising the Caribbean in his yacht, brandishing guns. He was a sought-after crypto promoter. McAfee tweeted a video that seemed to show

FILED DATE: 4/5/2024 1:57 PM 2024L003661

him with the Skycoin logo freshly tattooed on his back and the message, "Why Skycoin? If you have to ask, you've been living in a fucking closet." (Smietana admitted to paying McAfee during this period but insisted that it was a gift to help with "yacht repairs.") Smietana urged people to buy: "If you put in a million dollars now, and we have a run just as large as the last one, you're going to be at fifty million dollars," he said, in a video. Then, in March, 2019, McAfee publicly broke ties with Skycoin. (Smietana told me that McAfee began demanding large fees that he refused to pay.) When asked on Twitter what he would do about the tattoo, McAfee replied, "I'll keep it as a reminder that no matter how old I get, I still get scammed by unscrupulous people with pie in the sky plans. They almost drove me to violence." Stephens, watching from afar, felt that he had been spared the worst. He hadn't behaved perfectly: he had been taken in by Skycoin's promise, but he also promoted a coin that he knew little about. After being cut off, he took Skycoin's social-media accounts hostage, and unsuccessfully demanded a severance payment. In the end, he told me, he sold his holdings for thirty thousand dollars. The internal drama and crashing prices prompted a broader exodus from the project. In 2019, Freeman's exchange announced that it was delisting Skycoin. Michael Terpin's name still appears on the Skycoin Web site, but he told me that he no longer has anything to do with it. Josh, the cryptocurrency investor, lost faith after visiting Smietana in China, last year. "Crypto is a bunch of con artists conning each other," he said. "Obelisk was always a week away, and it still is." He sold his holdings and told me that he lost ninety-nine per cent of his investment.

Investors who sold at the peak would have made large profits, but many average coinholders suffered. (Smietana claimed that he urged restraint: "I told people not to put money into the market that they were not prepared to lose.") Armon Koochek, a recent college graduate in Santa Barbara, California, invested in Skycoin in 2018, lured by the promise of a new Internet and excited by the "memes and content on Reddit and Twitter." He lost some fifteen thousand dollars. He tried to warn others away from the project in the Telegram chat room, and was soon banned. "I hope I saved a lot of investors," he told me. Dael Lithgow, a forty-five-year-old bootmaker in Pietermaritzburg, South Africa, invested most of his savings in Skycoin in 2017, and convinced his mother and girlfriend to invest, as well. Had they sold during the boom, the profits would have been "life-changing," but they held on. "I really believed in what they were trying to do," he told me. Today their coins are nearly worthless.

In the summer of 2019, I met Smietana at a mozzarella bar in Manhattan. He was wearing all black, and his hair was starting to gray. As we sat, he warned me, unprompted, "Honestly, like, ninety-eight per cent of the people are scammers in blockchain." Then, preëmpting my questions, he visited every bit of Skycoin intrigue. The "gang members" who kidnapped him in China had demanded "sixty million dollars." The technology for Skywire, the decentralized Internet service, was already "working" and Obelisk was just "a few months" out. His girlfriend, Sarah, called several times while we were speaking. He showed me frantic messages from her, and said that he was blowing off an important meeting, but he kept talking, telling me about his coin's promise. He seemed to regard me as the next potential pump.

Almost four hours into my lunch, I made an excuse to leave, saying that I needed to walk to my bank. Smietana followed along for almost thirty blocks, ranting about his court case in China. Eventually, I brought him to Times Square, where his girlfriend was waiting. She must have seen something in my eyes, and said, "He's a mad scientist." After New York, they were headed to the Caribbean, where they would see Terpin and check out the crypto scene. They invited me to join. In the months that followed, Skycoin's price dropped below a dollar a coin, but Smietana remained optimistic. He told me, on Telegram, that he had a new hardware lab where he was developing antennae for the Skyminer, and said that Skycoin was moving into the medical industry, agricultural automation, and underground mining.

When I confronted Smietana about Skycoin's history, he began sending me dozens of voice messages a day, spinning elaborate stories that often contradicted one another. Many could be corroborated only by people whom he swore existed but who couldn't talk because they had government security clearance, or were in hiding, or because he didn't know their real names. He attacked those who spoke ill of Skycoin, calling them criminals, junkies, and blackmailers. He claimed at first that he didn't know Stephens ("I contacted advisor board and no one involved in Skycoin has heard of Bradford"), then that he was a "con artist," then that he was a "federal informant/agent" trying to entrap him. At one point, Smietana even suggested that he wasn't the real founder of Skycoin. I began to feel dizzy reporting this story, trying to sort through the layers of deception and to figure out whom I could trust. Everyone seemed to think that they could spin what I wrote to their advantage.

Smietana continues to post in the Telegram chat room, assuring loyal coinholders that the features they've waited years for are almost complete. "In that Telegram group, he is king," the former member of Skycoin's inner circle told me. Former employees remain divided about Smietana's motives. "It's almost as if he viewed Skycoin as a money printer," the former marketing contractor told me. "Everything that happened was a distraction or ruse to keep people in the dark while he kept his shit-coin casino operating." It's impossible to know how much Smietana made on the currency. ("Overall, I would say, I did ok," Smietana wrote to me.) But other founders have pulled "exit scams," dumping all of their coins at the market's height and disappearing entirely, which Smietana never did. One of Skycoin's lead software developers—who was also Smietana's friend from college, and who requested anonymity out of fear of harassment—doesn't think Smietana was in it to get rich: "Being a figurehead in blockchain is like being a cult leader and I think he enjoyed that more than the money." At one point, Smietana sent me a voice message, asking, "Why didn't I just take the seventy million and just, like, run off?"

In the past several years, the S.E.C. has charged multiple I.C.O. operators with offering unregistered securities and committing fraud, and the cases have resulted in settlements that have ordered hundreds of millions of dollars returned to coinholders. Last July, Jack Abramoff, who became famous, in 2006, for his role in a political-lobbying scheme, pleaded guilty to committing securities fraud with a token sale. The project, called AML BitCoin, published a white paper in 2017 that listed Smietana as one of its software developers. (Smietana claims that he was included without his consent.) In October, Spanish

FILED DATE: 4/5/2024 1:57 PM          2024L003661

FILED DATE: 4/5/2024 1:57 PM    2024L003661

authorities arrested McAfee on an extradition request from the U.S., where he faced charges of tax evasion and illegally promoting cryptocurrencies. (In June, he was found dead in his jail cell, in an apparent suicide.) In the past few years, cryptocurrency founders have tweaked their strategies; instead of I.C.O.s, they now hold "initial exchange offerings" and "initial decentralized exchange offerings." Stark, the former S.E.C. official, told me that the new terminology is "designed to create confusion and avoid S.E.C. scrutiny, but all of it is the same." David Silver, a lawyer who represents victims of cryptocurrency fraud, hopes that, as the S.E.C. enforces securities laws, fraud in the market will decrease. "Yesterday's crypto heroes are tomorrow's crypto felons," he said. "The statute of limitations is very long."

This past January, a Telegram channel named after WallStreetBets, the Reddit forum that supercharged GameStop's stock price, targeted Skycoin with a pumping campaign. As the pump spread to other social-media platforms, the price punched up above five dollars per coin. The mood in the chat was ecstatic. "I'm frantically moving funds around to buy more," a user named Krzys P wrote. Smietana wrote, "MOON MOON LAMBO MOON." Stephens is now a software developer at Salesforce, and insists that he is done with cryptocurrency: "My personality is not well suited to fraud, and mafioso, and everything that crypto is." He recently returned with his wife to Japan and sought out a new Shinto shrine where, he said, he wished for good health.

## New Yorker Favorites

- What happens when a bad-tempered, distractible doofus runs an empire?
- Remembering the murder you did not commit.
- The repressive, authoritarian soul of Thomas the Tank Engine.
- The mystery of people who speak dozens of languages.
- Margaret Atwood, the prophet of dystopia.
- The many faces of women who identify as witches.
- Sign up for our daily newsletter to receive the best stories from *The New Yorker*.

*Morgen Peck is a freelance journalist who has covered cryptocurrency since 2012.*

More:   Cryptocurrency      Bitcoin      Entrepreneurs      Fraud      Money      Technology

DAILY

Our flagship newsletter highlights the best of *The New Yorker*, including top stories, fiction, humor, and podcasts.

**E-mail address**

E-mail address

Sign up

By signing up, you agree to our <u>User Agreement</u> and <u>Privacy Policy & Cookie Statement</u>. This site is protected by reCAPTCHA and the Google <u>Privacy Policy</u> and <u>Terms of Service</u> apply.

---

## READ MORE

DAILY COMMENT

### The Obscene Energy Demands of A.I.

How can the world reach net zero if it keeps inventing new ways to consume energy?

**By Elizabeth Kolbert**

ON AND OFF THE MENU

### Why New York Restaurants Are Going Members-Only

Ultra-exclusive places, like Rao's and the Polo Bar, once seemed like rarities in the city's dining scene. Now clubbiness is becoming a norm.

**By Hannah Goldfield**

OUR COLUMNISTS

### A Financial Reckoning for Donald Trump

The former President's inability to secure a $464-million bond in his New York civil fraud case is a reminder of the deep legal and financial peril he's in.

**By John Cassidy**

INFINITE SCROLL

### Trump's Social-Media Potemkin Village

After an I.P.O. last week, Truth Social is confronting the gaping incongruity between its valuation and the paltry reality of its product.

**By Kyle Chayka**

Do Not Sell My Personal Info

FILED DATE: 4/5/2024 1:57 PM   2024L003661

FILED
5/30/2024 8:40 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27913467

FILED DATE: 5/30/2024 8:40 PM   2024L003661

| | | |
|---|---|---|
| 2120 - Served | 2121- Served | 2620 - Sec. of State |
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| Summons - Alias Summons | | (12/01/20) CCG 0001 A |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED and SYMBOLIC
ANALYTICS INC.,

Case No. 2024 L 003661

v.                          Plaintiff,

Aaron Kunstman

1683 Humboldt Ave,
Milwaukee, WI 53202

Address of Defendant(s)

### SUMMONS

Please serve as follows (check one):      Certified Mail      Sheriff Service  Alias  Process Server X̲

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached.
You are summoned and required to file your appearance, in the office of the clerk of this court, within
30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment
by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE
COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed
Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/
appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourtorg**

Page 1 of 3

FILED DATE: 5/30/2024 8:40 PM   2024L003661

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

5/30/2024 8:40 PM IRIS Y. MARTINEZ

Atty. No.: 48525 _____ Witness date _____

Name: _____
Barney & Karamanis, LLP.

Atty. for                                IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____ ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____ ❑ Date of Service: _____

City: Chicago, IL.  60601 _____ (To be inserted by officer on copy left with employer or other person)

Telephone: (312) 553-5300 _____

Primary Email: james@bkchicagolaw.com

FILED DATE: 5/30/2024 8:40 PM  2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

FILED
5/30/2024 8:40 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27913467

FILED DATE: 5/30/2024 8:40 PM   2024L003661

| 2120 - Served | 2121- Served | 2620 - Sec. of State |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |

Summons - Alias Summons                    (12/01/20) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED and SYMBOLIC
ANALYTICS INC.,

Case No. 2024 L 003661

v.                        Plaintiff,

Bradford Stephens

1649 Fairfield Ave Apt 7J,
Chicago, IL 60647

Address of Defendant(s)

### SUMMONS

Please serve as follows (check one):     Certified Mail     Sheriff Service  Alias  Process Server X

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached.
You are summoned and required to file your appearance, in the office of the clerk of this court, within
30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment
by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE
COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed
Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/
appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourtorg**

Page 1 of 3

FILED DATE: 5/30/2024 8:40 PM   2024L003661

**Summons - Alias Summons**             **(12/01/20) CCG 0001 B**

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

5/30/2024 8:40 PM IRIS Y. MARTINEZ

Atty. No.: 48525 _____ Witness date _____

Name: _____ _____
Barney & Karamanis, LLP.

Atty. for                           IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____ ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____ ❑ Date of Service: _____
                                        (To be inserted by officer on copy left with employer or other person)

City: Chicago, IL. 60601 _____

Telephone: (312) 553-5300 _____

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 5/30/2024 8:40 PM   2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
5/30/2024 8:40 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27913467

FILED DATE: 5/30/2024 8:40 PM   2024L003661

| | | |
|---|---|---|
| 2120 - Served | 2121- Served | 2620 - Sec. of State |
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| **Summons - Alias Summons** | | **(12/01/20) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED and SYMBOLIC
ANALYTICS INC.,

Case No. 2024 L 003661

v.                           Plaintiff,

CATHERINE BYERLY

375 S. Lake Howard Drive
Winter Haven, FL  33880

Address of Defendant(s)

### SUMMONS

Please serve as follows (check one):        Certified Mail        Sheriff Service  Alias  Process Server X

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached.
You are summoned and required to file your appearance, in the office of the clerk of this court, within
30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment
by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE
COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed
Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/
appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourtorg**

FILED DATE: 5/30/2024 8:40 PM   2024L003661

**Summons - Alias Summons**            **(12/01/20) CCG 0001 B**

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

5/30/2024 8:40 PM IRIS Y. MARTINEZ

Atty. No.:  48525 _____  Witness date _____

Name: _____  _____
Barney & Karamanis, LLP.

Atty. for                              IRIS Y. MARTINEZ, Clerk of Court

Plaintiff _____  ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____  ❑ Date of Service: _____
                                  (To be inserted by officer on copy left with employer or other person)

City: Chicago, IL.  60601 _____

Telephone: (312) 553-5300 _____

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 2 of 3

FILED DATE: 5/30/2024 8:40 PM   2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

#### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

#### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

#### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

#### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

#### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 5/30/2024 8:40 PM   2024L003661

FILED
5/30/2024 8:40 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27913467

| | | |
|---|---|---|
| **2120 - Served** | **2121- Served** | **2620 - Sec. of State** |
| **2220 - Not Served** | **2221 - Not Served** | **2621 - Alias Sec of State** |
| **2320 - Served By Mail** | **2321 - Served By Mail** | |
| **2420 - Served By Publication** | **2421 - Served By Publication** | |

**Summons - Alias Summons**                              **(12/01/20) CCG 0001 A**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED and SYMBOLIC
ANALYTICS INC.,

Case No. 2024 L 003661

                    v.                    Plaintiff,

Joel Wayne Cuthriell

8922 E. 49th Place
Tulsa, OK 74145

Address of Defendant(s)

### SUMMONS

Please serve as follows (check one):        Certified Mail        Sheriff Service   Alias   Process Server <u>X</u>

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed Appearance form that can be found at <u>http://www.illinoiscourts.gov/Forms/approved/procedures/</u> appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourtorg**

FILED DATE: 5/30/2024 8:40 PM   2024L003661

**Summons - Alias Summons**                                      **(12/01/20) CCG 0001 B**

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

5/30/2024 8:40 PM IRIS Y. MARTINEZ

Atty. No.:   48525 _____   Witness date _____

Name: _____   _____
Barney & Karamanis, LLP.

Atty. for                                                           IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____   ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____   ❑ Date of Service: _____
                                                           (To be inserted by officer on copy left with employer or other person)
City: Chicago, IL.  60601 _____

Telephone: (312) 553-5300 _____

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 5/30/2024 8:40 PM   2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

Case: 1:24-cv-08617 Document #: 1-2 Filed: 09/18/24 Page 77 of 323 PageID #:93
Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED DATE: 5/30/2024 8:40 PM   2024L003661

FILED
5/30/2024 8:40 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27913467

| | | |
|---|---|---|
| 2120 - Served | 2121- Served | 2620 - Sec. of State |
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| Summons - Alias Summons | | (12/01/20) CCG 0001 A |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED and SYMBOLIC ANALYTICS INC.,

Case No. 2024 L 003661

v.                    Plaintiff,

MORGEN E. PECK

76 Canal Street, 3rd Floor
New York, NY 10002

Address of Defendant(s)

### SUMMONS

Please serve as follows (check one):     Certified Mail     Sheriff Service  Alias  Process Server X

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/ appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourtorg**

FILED DATE: 5/30/2024 8:40 PM   2024L003661

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

5/30/2024 8:40 PM IRIS Y. MARTINEZ

Atty. No.: 48525 _____ Witness date _____

Name: _____ _____
Barney & Karamanis, LLP.

Atty. for IRIS Y. MARTINEZ, Clerk of Court

Plaintiff _____ ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____ ❑ Date of Service: _____
(To be inserted by officer on copy left with employer or other person)

City: Chicago, IL. 60601 _____

Telephone: (312) 553-5300 _____

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 5/30/2024 8:40 PM   2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
5/30/2024 8:40 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27913467

FILED DATE: 5/30/2024 8:40 PM   2024L003661

| 2120 - Served | 2121- Served | 2620 - Sec. of State |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| **Summons - Alias Summons** | | **(12/01/20) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED and SYMBOLIC
ANALYTICS INC.,

Case No. 2024 L 003661

v.                            Plaintiff,

Ryan Eagle

363 Wacker Dr Unit 5405,
Chicago, IL 60601

Address of Defendant(s)

### SUMMONS

Please serve as follows (check one):      Certified Mail      Sheriff Service  Alias  Process Server X

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached.
You are summoned and required to file your appearance, in the office of the clerk of this court, within
30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment
by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE
COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed
Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/
appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourtorg**

FILED DATE: 5/30/2024 8:40 PM  2024L003661

**Summons - Alias Summons** (12/01/20) CCG 0001 B

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

5/30/2024 8:40 PM IRIS Y. MARTINEZ

Atty. No.: 48525 _____ Witness date _____

Name: _____
Barney & Karamanis, LLP.
Atty. for                    IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____ ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 ❑ Date of Service: _____
(To be inserted by officer on copy left with employer or other person)

City: Chicago, IL. 60601 _____

Telephone: (312) 553-5300 _____

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 5/30/2024 8:40 PM   2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 5/30/2024 8:40 PM   2024L003661

FILED
5/30/2024 8:40 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27913467

| | | |
|---|---|---|
| **2120 - Served** | **2121- Served** | **2620 - Sec. of State** |
| **2220 - Not Served** | **2221 - Not Served** | **2621 - Alias Sec of State** |
| **2320 - Served By Mail** | **2321 - Served By Mail** | |
| **2420 - Served By Publication** | **2421 - Served By Publication** | |
| **Summons - Alias Summons** | | **(12/01/20) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED and SYMBOLIC
ANALYTICS INC.,

Case No. 2024 L 003661

v.                    Plaintiff,

American Publishers, Inc., d/b/a Conde Naste and
d/b/a The New Yorker Magazine

c/o The Company Corporation, Reg.Agent
251 Little Falls Drive
Wilmington, DE  19808

Address of Defendant(s)

### SUMMONS

Please serve as follows (check one):       Certified Mail        Sheriff Service  Alias  Process Server <u>X</u>

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached.
You are summoned and required to file your appearance, in the office of the clerk of this court, within
30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment
by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE
COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed
Appearance form that can be found at <u>http://www.illinoiscourts.gov/Forms/approved/procedures/</u>
appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourtorg**

Page 1 of 3

FILED DATE: 5/30/2024 8:40 PM   2024L003661

**Summons - Alias Summons**                                              **(12/01/20) CCG 0001 B**

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

5/30/2024 8:40 PM IRIS Y. MARTINEZ

Atty. No.:  48525 _____  Witness date _____

Name: _____
Barney & Karamanis, LLP.

Atty. for                                                                    IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____  ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____  ❑ Date of Service: _____
                                                                     (To be inserted by officer on copy left with employer or other person)

City: Chicago, IL.  60601 _____

Telephone: (312) 553-5300 _____

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 5/30/2024 8:40 PM   2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

#### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

#### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

#### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

#### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

#### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

FILED
5/30/2024 9:00 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27913517

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED and SYMBOLIC ANALYTICS INC. | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 2024 L 003661 |
| | ) |
| BRADFORD STEPHENS, AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, AMERICAN PUBLISHERS, INC., d/b/a CONDE NAST and d/b/a THE NEW YORKER, et al., | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**PLAINTIFFS' ROUTINE MOTION TO APPOINT SPECIAL PROCESS SERVER**

NOW COME the Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION

LIMITED and SYMBOLIC ANALYTICS INC., by and through their attorneys, Barney & Karamanis,

LLP, and respectfully requests that this Court appoint Judicial Attorney Services, as special process

server to serve process on Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, RYAN

EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK,

CATHERINE BYERLY, AMERICAN PUBLISHERS, INC., d/b/a CONDE NAST and

d/b/a THE NEW YORKER.  In support of their motion, Plaintiffs state as follows:

1.     That the Complaint at Law in this matter was filed on April 4, 2024.

2.     Plaintiff filed her Complaint at Law as aforesaid and on May 30, 2024, filed

Summons to be issued to the Defendants.

3.     Plaintiff is unable and/or unwilling to procure service of process through the sheriff's

department due to the unresponsiveness of attempted service upon defendant(s) generally due to

COVID and/or defendants and/or registered agents working remotely.

FILED DATE: 5/30/2024 9:00 PM   2024L003661

4.      A majority of the above-referenced defendants have a history of evading service as this matter was filed in Northern District Federal Court under Case No. 22-cv-00708 and Special Process service is required so that service of Summons and Complaint may be effectuated legally and technically with proper service upon Defendants.

5.      That to date, service has not been procured on Defendants, above-referenced.

6.      That Judicial Attorney Services' employees and/or agents are over the age of 18 and not a party to this action.

7.      That Judicial Attorney Services' license number is 117-001119.

WHEREFORE, the Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED and SYMBOLIC ANALYTICS INC, by and through their attorneys, Barney & Karamanis, LLP, prays that this Honorable Court enter an Order appointing Judicial Attorney Services as special process server, and for such other relief for Plaintiffs as this Honorable Court deems just and fair.

Respectfully submitted,

By: /s/:Michaela Coughlin
        One of Plaintiff's Attorneys

James A. Karamanis (james@bkchicagolaw.com)
Michaela Coughlin (michaela@bkchicagolaw.com)
Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, Illinois 60601
Tel.: 312/553-5300
Attorney No. 48525

Date: 6/6/2024

CIRCUIT COURT OF COOK COUNTY
LAW DIV. RM. 801,  DALEY CENTER.
 CHICAGO IL-60602

SMIETANA BRANDON

 -

KaramanisJames Andreas
james@bkchicagolaw.com

NOTICE OF ZOOM CASE MANAGEMENT
CASE: 2024L003661

BRANDON SMIETANA,SKYCOIN GLOBAL FOUNDATION LIMITED,SYMBOLIC ANALYTICS INC.-vs-BR

This cause is scheduled for initial case management via Zoom
before Judge,  Donnelly, Thomas M  On Wednesday  July  10  2024 at 09:00 AM
         ** DO NOT APPEAR IN PERSON **
To access Zoom by video go to https://zoom.us/join then
enter the access code and password listed below.
ZOOM ACCESS CODE: 921 0771 7798   PASSWORD: 881878

To access Zoom by phone, call 312-626-6799 and then enter
the access code and password listed above.
For questions email: Law.Calwcc@cookcountyil.gov
You cannot access Zoom until your scheduled hearing date.
All attorneys of record and self-represented litigants are
required to appear via Zoom and advise the court as to the status of the case.

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED and SYMBOLIC ANALYTICS INC. | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2024 L 003661 |
| BRADFORD STEPHENS, AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, AMERICAN PUBLISHERS, INC., d/b/a CONDE NAST and d/b/a THE NEW YORKER, et al., | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER APPOINTING SPECIAL PROCESS SERVER

This cause coming on to be heard on Plaintiffs' Routine Motion to Appoint Special Process Server, due notice having been given and the Court being fully advised in the premises,

IT IS HEREBY ORDERED that Judicial Attorney Services, License number is 117-001119, all employees and/or agents being over the age of 18 and not a party to this matter, is hereby appointed as special process server to effect service of process on Defendants. BRADFORD STEPHENS, AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, AMERICAN PUBLISHERS, INC., d/b/a CONDE NAST and d/b/a THE NEW YORKER.

ENTER.

_____
Judge Judge's No.

DATED:

James A. Karamanis, Esq.
Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, Illinois 60601

Judge Thomas More Donnelly

JUN 11 2024

Circuit Court - 1803

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
6/28/2024 3:21 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
28316894

FILED DATE: 6/28/2024 3:21 PM    2024L003661

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY  DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| BRANDON SMIETANA, | ) | |
| SKYCOIN GLOBAL FOUNDATON, | ) | |
| LIMITED., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | LAW DIVISION |
| | ) | CASE NO.: 24-L-003661 |
| Vs. | ) | |
| | ) | |
| BRANDON STEPHENS, RYAN EAGLE, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT, RYAN EAGLE'S COMBINED MOTION TO DISMISS COMPLAINT**

COMES NOW the Defendant, RYAN EAGLE, by and through his undersigned attorney and moves this Court for dismissal of Plaintiff's Complaint against Defendant pursuant to 735 ILCS 5/2-619.1 as a combined motion under sections 735 ILCS 5/2-619 and 735 ILCS 5/2-615 and states as follows:

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs filed this Complaint on April 4, 2024 alleging numerous counts of fraudulent conduct by many Defendants in what is loosely described as a conspiracy to steal money through fraudulent billing and marketing practices targeted against Plaintiffs' cryptocurrency business by Defendants' marketing management practices. Plaintiffs allege the head of the marketing company, Defendant, Bradford Stephens and others employed by and or associated with him engaged in a scheme to defraud Plaintiffs. Plaintiffs allege they hired the marketing company to boost the Plaintiffs' business by marketing and to boost its presence through search engine optimization.

As for Defendant, Ryan Eagle, however, no fraudulent acts whatsoever are alleged against

FILED DATE: 6/28/2024 3:21 PM    2024L003661

him anywhere in the Complaint and therefore the Complaint as a whole fails to state any cause of action against Ryan Eagle. Eagle is named in only 3 counts of the Complaint. They are:

> Count 3: Civil Conspiracy ("to defraud Plaintiffs, tortiously interfere with their business relationships, commit various acts of wire fraud, computer fraud, manipulate the cryptocurrency market, and convert Plaintiffs' property surreptitiously.").

> Count 4: Tortious Interference (the alleged subject of the civil conspiracy).

> Count 5: Unjust Enrichment

Additionally, Plaintiffs actions against Defendant, Eagle are time-barred by the operation of the applicable Statute of Limitations and Plaintiffs lack standing to bring this action under the Business Corporation Act of 1983 (5/1.01 to 5/17.05) for failure to either register to do business in the State of Illinois.

## I.    <u>MEMORANDUM OF LAW</u>

### A. <u>LEGAL STANDARD</u>

A section 2–615(a) motion to dismiss "tests the legal sufficiency of the complaint," *Kean v. Wal–Mart Stores, Inc.*, 235 Ill.2d 351, 361, 336 Ill.Dec. 1, 919 N.E.2d 926, 931–32 (2009). Section 2–615 motions "raise but a single issue: whether, when taken as true, the facts alleged in the complaint set forth a good and sufficient cause of action." *Scott Wetzel Services v. Regard*, 271 Ill.App.3d 478, 480, 208 Ill.Dec. 98, 648 N.E.2d 1020 (1995).

In order to withstand a motion to dismiss based on section 2–615, a complaint must allege facts that set forth the essential elements of the cause of action. *Urbaitis v. Commonwealth Edison*, 143 Ill.2d 458, 475, 159 Ill.Dec. 50, 575 N.E.2d 548 (1991). "[A] court must take as true all well-pled

FILED DATE: 6/28/2024 3:21 PM    2024L003661

allegations of fact contained in the complaint and construe all reasonable inferences therefrom in favor of the plaintiff." *Vernon v. Schuster*, 179 Ill.2d 338, 341, 228 Ill.Dec. 195, 688 N.E.2d 1172 (1997). In ruling on a motion to dismiss, the court will construe pleadings liberally. *Pfendler v. Anshe Emet Day School*, 81 Ill.App.3d 818, 821, 37 Ill.Dec. 1, 401 N.E.2d 1094 (1980). "A plaintiff is not required to prove his case in the pleading stage; rather, **he must merely allege sufficient facts to state all the elements which are necessary to constitute his cause of action**." *Claire Associates v. Pontikes*, 151 Ill.App.3d 116, 123, 104 Ill.Dec. 526, 502 N.E.2d 1186 (1986). [Emphasis added]

"The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proven issues of fact at the outset of litigation." *Dratewska-Zator v. Rutherford*, 2013 IL App (1st) 122699, 996 N.E.2d 1151. A section 2-619 motion to dismiss "admits the legal sufficiency of the complaint, but raises defects, defenses, or other affirmative matters appearing on the face of the complaint or established by external submissions, which defeat the action." *Nourse v. City of Chicago,* 2017 IL App (1st) 160664, 75 N.E.3d 397. "In deciding a section 2-619 motion, a court accepts all well-pleaded facts and their inferences as true and construes all pleadings and supporting documents in favor of the nonmoving party." *In re Estate of Shelton*, 2017 IL 121199, 89 N.E.3d 391. Section 2-619(a)(5) of the Code allows for the involuntary dismissal of an action that "was not commenced within the time limited by law." 735 ILCS 5/2-619(a)(5)

**B. <u>ARGUMENT</u>**

In short summary, Plaintiffs' Complaint entirely fails to make even a single specific factual allegation against Defendant, Ryan Eagle. Plaintiffs instead have only made one conclusory allegation to the effect that Ryan Eagle 'conspired' with Defendant Brandford Stephens and others to commit tortious acts against Plaintiffs. They fail to allege even a single instance of how or in

FILED DATE: 6/28/2024 3:21 PM   2024L003661

what capacity Eagle engaged in such conspiracy as was alleged against Defendant, Stephen. The details of Plaintiffs' allegations and lack thereof as to Defendant, Eagle as set forth below.

**1) <u>CIVIL CONSPIRACY (COUNT 3): [Brought under 735 ILCS 5/2-615]</u>**

Civil conspiracy "requires proof that a defendant 'knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner.' " *McClure v. Owens Corning Fiberglas Corp.,* 188 Ill. 2d 102, 720 N.E.2d 242 (1999), (quoting *Adcock*, 164 Ill.2d at 64). The necessary elements of a civil conspiracy include: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties; and (4) the overt act was done pursuant to and in furtherance of the common scheme. *Canel and Hale, Ltd. v. Tobin*, 304 Ill.App.3d 906, 920 (1999).

Conspiracy is not a separate and distinct tort in Illinois. *Hurst v. Capital Cities Media, Inc.,* 323 Ill.App.3d 812, 822–23 (2001). "To state a cause of action for civil conspiracy, **a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement**, as well as an injury caused by the defendant." [See: *Benton v. Little League Baseball, Inc.*, 181 N.E.3d 902 (Ill. App. Ct. 2020)][Emphasis added] "**Mere knowledge of the fraudulent or illegal actions of another is insufficient**." *Id.* [Emphasis added]

In the instant case, Defendant, Eagle is named in only 3 of the 10 counts and in only 9 of the 185 paragraphs. No allegation, however, extends beyond a possible allegation showing 'knowledge' of a scheme and another is but a mere conclusion. For example, paragraph 37 alleges:

> 37. Upon Skycoin's refusal to pay Stephens the monthly payments requested in or around February 2018, **Stephens met Smietana in Shanghai, China, and in association with Eagle, who was participating via Zoom, threatened to have Skycoin delisted from all exchanges** including, for example, Bittrex and Binance, unless Smietana agreed to pay them $30,000,000.00 in Bitcoin and $1,000,000.00 in US Dollars.

4

FILED DATE: 6/28/2024 3:21 PM    2024L003661

[Complaint, ¶37] [Emphasis added]

> 54. On or about June 12, 2018, when Smietana refused to succumb to Stephens's extortion demands, **Stephens and Eagle conspired with Yan Xiandong, Li Min, Sam Sing Fond and Sun Fei (collectively the "Assailants") in a plot** to kidnap Smietana and his girlfriend and steal $30,000,000.00 that Stephens claimed he was due from Skycoin.

[Complaint, ¶54] [Emphasis added]

Paragraph 37 merely alleges that Defendant, Stephens "threatened to have Skycoin delisted from all exchanges" and only 'incidentally' or 'gratuitously' adds that Defendant, Eagle "was 'participating' via Zoom". The allegation, however, fails to reflect that Eagle said or did anything. It merely, in conclusory language claims he 'was participating'. The threat, however, is clearly alleged to have been made by Defendant, Stephens in this paragraph 37, not by Eagle, who at most was 'listening'. "Mere knowledge of the fraudulent or illegal actions of another is insufficient." *Benton, supra.*

Paragraph 54 on the other hand is likewise insufficient and merely alleges the 'conclusion' that "Stephens and Eagle conspired" with others. It fails, however, to indicate or alleges in any fashion whatsoever what Defendant, Eagle did as on 'overt act' 'in furtherance of the conspiracy'. There can be no conspiracy without such overt act. *Illinois Traffic Court, supra.*

Other references to Defendant, Eagle in the Complaint are no more illuminating as to any act or participation engaged in by Eagle. These appear as follows:

¶21: Defendant, Bradford Stephens claimed Eagle was his business partner.

¶49: Defendant Stephens threatened Plaintiff with harm if he didn't pay Stephens and Eagle.

¶78: Pet Defendant, Stephens, Eagle was his business partner.

¶88: Defendant, Stephens and Eagle were business partners.

5

FILED DATE: 6/28/2024 3:21 PM   2024L003661

¶108:   "Eagle conspired with Stephens and Kunstman to extort Plaintiffs out of money by threats of physical harm through the Assailants who invaded Smietana's home and tortured both him and his pregnant girlfriend for over six hours."

Paragraph 108 again, like paragraph 54 is but a conclusion that Eagle 'conspired' with others. This is clearly insufficient and cites to no 'act performed by Eagle in furtherance of the conspiracy'. Only the conclusion that he 'conspired'. Each of the other references merely allege him to be a business partner of Defendant, Stephens. Nowhere in the Complaint is there any allegation of an overt act committed by Defendant, Eagle.

### 2)   TORTIOUS INTERFERENCE (COUNT 4) and UNJUST ENRICHMENT (COUNT 5): [Brought under 735 ILCS 5/2-615]

At this point, Eagle has no idea what he did to evidence his intent to join or participate in the alleged conspiracy, Count 3, or the substantive counts 4 and 5 for Tortious Interference and Unjust Enrichment, respectively. It is interesting to note further that each of the counts that Eagle is charged in adopt only the prior allegations in paragraphs 1-76 of the Complaint under general facts and no count Eagle is charged in alleges any specific conduct by Eagle.

It is unnecessary to enumerate the elements that must be pled by Plaintiffs to establish the substantive causes of action for 'tortious interference' and 'unjust enrichment' because no allegations are made in any fashion whatsoever. There are no allegations in either count which names Ryan Eagle at all. Instead, the counts are based upon the 'adopted' prior allegations in paragraphs 1-76 of the Complaint. Those allegations, a few of which reference Defendant, Eagle are set forth above. It is abundantly clear from a reading of such allegations that, again, nothing is pled or alleged against Defendant, Eagle by way of a substantive allegation. Nothing showing that he 'did' or 'said' anything at all, let alone anything relevant to the causes of action. The only allegations are that he is the business partner of the primary defendant, Bradford Stephens and that

he 'conspired' with others. Again, other than the mere conclusion of conspiracy, no specific act of the Defendant is alleged or mentioned in any manner whatsoever. These counts must also be dismissed.

### 3. PLAINTIFFS' FAILURE TO REGISTER TO DO BUSINESS PRECLUDES MAINTAING THIS ACTION: [Brough under 735 ILCS 5/2-615]

Plaintiffs are foreign residents to Illinois and are thus required to register to do business in this State and to commence and maintain this litigation against Defendant, Eagle. Plaintiffs have failed to allege such registration or obtaining of the required authorization from the Secretary of State and are this barred from maintaining this action at this time. *Young Am.'s Found. v. Doris A. Pistole Revocable Living Tr.*, 998 N.E.2d 94 (Ill. App. Ct. 2013)

Act 5. Business Corporation Act of 1983 (5/1.01 to 5/17.05) provides in pertinent part, the following:

§ 13.05. Admission of foreign corporation. Except as provided in Article V of the Illinois Insurance Code,1 a foreign corporation organized for profit, before it transacts business in this State, shall procure authority so to do from the Secretary of State.

§ 13.70. Transacting business without authority.

(a) No foreign corporation transacting business in this State without authority to do so is permitted to maintain a civil action in any court of this State, until the corporation obtains that authority. Nor shall a civil action be maintained in any court of this State by any successor or assignee of the corporation on any right, claim or demand arising out of the transaction of business by the corporation in this State, until authority to transact business in this State is obtained by the corporation or by a corporation that has acquired all or substantially all of its

7

assets.

There is no record of the Plaintiffs on the records of the Illinois Secretary of State. Plaintiffs have failed to register to do business in this state and therefore the action must be dismissed for such failure.

### 4. <u>ALL ACTIONS ARE TIME-BARRED</u>: [Brought under 735 ILCS 5/2-619]

As noted above, Plaintiffs have alleged causes of action against Defendant, Eagle for Civil Conspiracy (Count 3), Tortious Interference (Count 4) and Unjust Enrichment (Count 5). The underlying offense of the alleged 'civil conspiracy' against Defendant, Eagle is the alleged fraudulent conduct of Eagle and more specifically, "to defraud Plaintiffs, tortiously interfere with their business relationships, commit various acts of wire fraud, computer fraud, manipulate the cryptocurrency market, and convert Plaintiffs' property surreptitiously." [See Complaint, Count 3, ¶112].

In *Mauvais-Jarvis v. Wong,* 987 N.E.2d 864 (Ill. App. Ct. 2013) the court addressed the applicable statute of limitations ("S/L") issue as it relates to civil conspiracy and ruled that the underlying offense will govern the applicable limitation period. The Court ruled:

> It is well-settled that conspiracy, standing alone, is not a separate and distinct tort in Illinois. … See 15 *C.J.S. Conspiracy* § 26, at 1043 (2013) (Unless a jurisdiction provides an independent statute of limitations for civil conspiracy, "[t]he statute of limitations for a civil-conspiracy claim is determined by the nature of the underlying conduct on which the claim of conspiracy is based. A claim alleging civil conspiracy is thus time-barred if the substantive tort underlying it was time-barred.").

The statute of limitations in a civil conspiracy claim "runs from the commission of the last overt act alleged to have caused damage." *Austin v. House of Vision, Inc*., 101 Ill. App. 2d 251, 255, 243 N.E.2d 297, 299 (1968). A review of the Complaint reveals that the last pled of fraud occurred at the latest, October 18, 2018 (Complaint, ¶52). Notwithstanding that there is no

8

FILED DATE: 6/28/2024 3:21 PM    2024L003661

allegation of Defendant, Eagle as to any the commission of any act or overt act in furtherance of any conspiracy, were this to be the last alleged act, the Complaint is clearly filed more than 5 years from such date.

There is also alleged in paragraph 54 of the Complaint that a kidnap plot occurred on June 12, 2018. Again, not only is Defendant, Eagle not alleged to have participated in this alleged plot, the Complaint is likewise filed beyond the applicable 5 year statute of limitations period. In fact, the only allegation of any act in the Complaint occurring within the 5-year S/L is found in paragraph 72 of the Complaint and regards some plan to 'delist' Plaintiff from certain web based platforms. While this act may be within the S/L, Defendant, Eagle is not alleged to have participated in such act.

Additionally, and more importantly, Count 5, Unjust Enrichment would seem to be a cause of action that is certainly beyond the 5 year S/L in that the action of Unjust Enrichment would necessarily involve the receipt of something of value under circumstances whereby the receiver would expect to pay for such thing of value. "To prevail on a claim for unjust enrichment, a plaintiff must prove that the defendant "retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience." *Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci,* 34 N.E.3d 1023 (Ill. App. Ct. 2015)

The last allegation of anything of value changing hands to the other Defendants, occurred in 2018 and therefore, such cause of action must of necessity have been brought no later than 2023. The complaint was filed on April 4, 2024, and therefore Count 5 must be dismissed as time-barred.

Finally, the blatant pleading deficiencies of the Complaint, in its failure to allege 'any' act that Defendant, Eagle engaged in, prevents the Defendant from properly or adequately responding

9

to the Complaint and prevents him from properly arguing further the definitive violation of any applicable S/L. Defendant simply does not know what he did or said and when he is alleged to have done or said anything that shows his participation in and intent to join the alleged conspiracy.

## II.    <u>CONCLUSION</u>

Plaintiffs have failed to allege sufficient facts, or any facts at all for that matter, to show that Defendant, Ryan Eagle said or did anything at all to evidence his intent to join the conspiracy which Plaintiffs describe in the Complaint. There is in fact, no statement of an overt act or statement of any kind alleged against Defendant, Eagle, save for an allegation that he was present on a Zoom call. This is clearly insufficient to plead a cause of action against Eagle in any of the counts he is included in. Counts 3, 4 and 5 must each be dismissed. Furthermore, Plaintiffs' actions against Defendant, Eagle are time-barred or at least pled in such an egregious and deficient manner so as to prevent Defendant and this Court from properly assessing if the S/L is violated or not. Finally, Plaintiffs' failure to register and obtain authority to engage in and maintain this suit requires dismissal of this action.

Moreover, unless Plaintiffs are prepared to allege that they are in possession of any such acts to allege against Defendant, Eagle in any amended complaint, this dismissal must be with prejudice.

Respectfully submitted,

By: /s/ George W. Svoboda
Attorney for Defendant Ryan Eagle

Atty. No. 65708
George W. Svoboda
The Law Office of George W. Svoboda
P.O. Box 1299
McHenry, IL 60051
(224) 360-0696 – Phone
Email: george@georgesvobodalaw.com

FILED DATE: 6/28/2024 3:21 PM   2024L003661

10

FILED
6/18/2024 12:31 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
28161654

FILED DATE: 6/18/2024 12:31 PM    2024L003661

**Appearance/Jury Demand** _____ **(05/03/21) CCL 0530**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED et al

_____ **Plaintiff**

**v.**

BRADFORD STEPHENS, AARON KUNSTMAN,
RYAN EAGLE, et al

_____ **Defendant**

Case No. ___2024L003661___

Calendar: __W_____

### APPEARANCE/JURY DEMAND

☑ **General Appearance**
  ● 0900 - Appearance - Fee Paid
  ○ 0909 - Appearance- No Fee
  ○ 0904 - Appearance Filed - Fee Waived

☐ **Jury Demand**
  ○ 1900 - Appearance & Jury Demand - Fee Paid
  ○ 1909 - Appearance & Jury Demand - No Fee

The undersigned enters the appearance of:   ○ **Plaintiff**  ● **Defendant**
  ○ **Additional Party**
  ○ **Respondent-in-discovery**

RYAN EAGLE
_____

_____

**Litigant's Name**

**/s/** ___George W. Svoboda___

**Signature**

☑ **INITIAL COUNSEL OF RECORD**     ☐ **PRO SE**
☐ **ADDITIONAL APPEARANCE**         ☐ **SUBSTITUTE APPEARANCE**

**A copy of this appearance shall be given to all parties who have appeared and have not been
found by the Court to be in default.**

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Appearance/Jury Demand** (05/03/21) CCL 0530

FILED DATE: 6/18/2024 12:31 PM   2024L003661

◉ **Atty. No.:** 65708    ○ **Pro Se 99500**

**Name:** George W. Svoboda

**Atty. for (if applicable):**

Defendant, Ryan Eagle

**Address:** P.O. Box 1299

**City:** McHenry

**State:** IL   **Zip:** 60051

**Telephone:** 224-360-0696

**Primary Email:** george@georgesvobodalaw.com

**Pro Se Only:**

☐ **I have read and agree to the terms of the Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:**

_____

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

Page 2 of 2

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED DATE: 6/12/2024 8:58 PM    2024L003661

# APPEARANCE (CIVIL)

## IN THE STATE OF ILLINOIS, CIRCUIT COURT

*This is my official notice that I am participating in this case.*

FILED
6/12/2024 8:58 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
28093851

**COUNTY:** Cook
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Braindon Smietana
*Who started the case.*    *First, Middle, and Last Name, or Business Name*

**DEFENDANTS/RESPONDENTS:** Joel Wayne Cuthriell
*Who the case was filed against.*

*First, Middle, and Last Name, or Business Name*

2024 L 003661
**Case Number**

If you want to request a trial with a judge and a jury (jury trial), you will also need to **fill out and file a separate** *Jury Request* **form**, available at ilcourts.info/appearance. You do not have a right to a jury trial in every case. If you want a trial with a judge only (bench trial), do **not** file the separate *Jury Request* form.

The **deadline** for filing a *Jury Request* is different depending on the type of case and your situation. If you are the plaintiff, usually you must file a *Jury Request* at the same time that you file the case. If you are the defendant, usually you must file a *Jury Request* at the same time as your *Appearance*.

## 1.  NAME & INFORMATION

*If you do not have a lawyer, enter your information below to tell the court how to address you. If you are a lawyer entering an appearance for a client, enter your client's information below.*

**Name:** Joel _____    _____    Cuthriell _____
        *First*                    *Middle*                    *Last Name*

**Pronouns** *(Optional)*:
☐ He/Him    ☐ She/Her    ☐ They/Them    ☐ Other: _____

**Prefix** *(Optional)*:
☑ Mr.    ☐ Ms.    ☐ Mrs.    ☐ Mx.    ☐ Other: _____

## 2.  APPEARANCE

*Check only one box.*

☑ **I do not have a lawyer** and I am entering my own appearance in this case. With this *Appearance* form, I am telling the court that I am participating in this case.

- OR -

☐ **I am a lawyer** entering my appearance for a client in this case:

_____
*Attorney or Firm Name*

*Case Number:* 2024 L 003661

*(sidebar)* FILED DATE: 6/12/2024 8:58 PM  2024L003661

## SIGN

Under Illinois Supreme Court Rule 137, your signature means that you:

1) read the document, 2) believe it is true and correct, and 3) are not filing it to cause delay or for another bad reason.

---

If you are filling out this form online, sign your name by typing it. If you are filling out this form by hand, sign and print your name.

Your Signature /s/ _Joel Cuthriell_____     Print Your Name _Joel Cuthriell_____

Your Address _8922 E 49th Pl Tulsa Oklahoma 74145_____
      *Street, Apt. #*                *City*           *State*    *Zip Code*

Your Phone Number _(405) 582-0062_____     Attorney Number (if any) _____

Your Email (if you have one) _joel@cuthriell.com_____

Be sure to **check your email every day** so you do not miss important information, court dates, or documents from other parties.

## 3. PROOF OF DELIVERY

*Fill out the information below to show how you are sending this document to the other people in the case. If a person in the case has a lawyer, **you must send this document to their lawyer.***

**a. I am sending this document to:**

Name: _48525_____
        *First*            *Middle*           *Last Name*

Address: _180 N Stetson, Suite 3050 Chicago, IL 60601_____
        *Street, Apt. #*            *City*           *State*    *Zip Code*

Email Address: _james@bkchicagolaw.com_____

**By:** ☑ Electronically to the email address in **3a:**
    ☑ By email *(not through an EFSP).*
    ☐ Using an approved electronic filing service provider (EFSP).

☐ I or the person I am sending the document to do not have an email address. I am sending the document by**:**
    ☐ Mail or third-party carrier to the address in **3a,** with postage or delivery charge prepaid.

        Location of mailbox or third-party carrier: _____ _____
                                  *City*             *State*

    ☐ Personal hand delivery at this address:
        *NOTE: You can only deliver to the party, party's family member over 13 at party's residence, party's lawyer, or party's lawyer's office*

        Address _____
                *Street, Apt. #, City, State, and Zip Code*

    ☐ Mail to the address in **3a,** from a prison or jail: _____
                             *Name of Prison or Jail*

**This document will be sent on:** Date: _____ Time: _____
                         *Month, Day, Year*           *Include AM or PM*

*Case Number:* 2024 L 003661

FILED DATE: 6/12/2024 8:58 PM    2024L003661

b. ☑ I am not sending these documents to additional people.

- OR -

☐ I am sending these documents to an additional person not listed in **3a:**

Name: _____
First                    Middle                    Last Name

Address**:** _____
Street, Apt. #              City              State        Zip Code

Email Address: _____

**By:** ☐ Electronically to the email address in **3b:**

☐ By email *(not through an EFSP).*

☐ Using an approved electronic filing service provider (EFSP).

☐ I or the person I am sending the document to do not have an email address. I am sending the document by**:**

☐ Mail or third-party carrier to the address in **3b**, with postage or delivery charge prepaid.

Location of mailbox or third-party carrier: _____ _____
City                    State

☐ Personal hand delivery at this address:
*NOTE: You can only deliver to the party, party's family member over 13 at party's residence, party's lawyer, or party's lawyer's office*

Address _____
Street, Apt. #, City, State, and Zip Code

☐ Mail to the address in **3b,** from a prison or jail: _____
Name of Prison or Jail

**This document will be sent on:** Date: _____  Time: _____
Month, Day, Year                    Include AM or PM

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

☐ I am sending the document to more than 2 people and have completed an *Additional Proof of Delivery* form.

## SIGN

Under [735 ILCS 5/1-109](#), your signature means that you:

1) certify that everything in this document is true and correct, and 2) understand that making a false statement on this form is perjury and has penalties provided by law.

If you are filling out this form online, sign your name by typing it. If you are filling out this form by hand, sign and print your name.

Your Signature /s/ *Joel Cuthriell*              Print Your Name  Joel Cuthriell _____

Your Address  8922 E 49th Pl Tulsa Oklahoma 74145 _____
Street, Apt. #                    City                State    Zip Code

Your Phone Number  (405) 582-0062 ____  Attorney Number (if any) _____

Your Email (if you have one)  joel@cuthriell.com _____

Be sure to **check your email every day** so you do not miss important information, court dates, or documents from other parties.

*Case Number:* 2024 L 003661

FILED DATE: 6/12/2024 8:58 PM   2024L003661



## NEXT STEP FOR PERSON FILLING OUT THIS FORM:

After you fill out your forms, file them with the Circuit Clerk's office in the county where your case is taking place. Then, send your forms to the other people in the case. Find your Circuit Clerk: ilcourts.info/CircuitClerks.



Learn more about each step in the process and how to file in our Instructions: ilcourts.info/appearance-instructions.

## NEXT STEP FOR PERSON RECEIVING THIS DOCUMENT:

For more information about going to court including how to fill out and file forms, call or text **Illinois Court Help** at 833-411-1121 or go to ilcourthelp.gov.

If there are any words or terms that you do not understand, please **visit Illinois Legal Aid Online** at ilao.info/glossary. You may also find more information, resources, and the location of your local legal self-help center at: ilao.info/lshc-directory.

FILED DATE: 6/28/2024 3:21 PM   2024L003661

This form is approved by the Illinois Supreme Court and is accepted in all Illinois Courts. Forms are free at ilcourts.info/forms.

| STATE OF ILLINOIS, CIRCUIT COURT | NOTICE OF COURT DATE FOR MOTION | For Court Use Only |
|---|---|---|
| Cook _____ COUNTY | | FILED<br>6/28/2024 3:21 PM<br>IRIS Y. MARTINEZ<br>CIRCUIT CLERK<br>COOK COUNTY, IL<br>2024L003661<br>Calendar, W<br>28316894 |

| Instructions ▾ | | |
|---|---|---|
| Directly above, enter the name of the county where the case was filed. | | |
| Enter the name of the person who started the lawsuit as Plaintiff/Petitioner. | **BRANDON SMIETANA, Skycoin Global et al**<br>**Plaintiff / Petitioner** *(First, middle, last name)* | |
| Enter the name of the person being sued as Defendant/Respondent. | v. | |
| Enter the Case Number given by the Circuit Clerk. | **BRANDON STEPHENS, RYAN EAGLE, et al**<br>**Defendant / Respondent** *(First, middle, last name)* | 24-L-003661<br><br>**Case Number** |

In **1**, title your *Motion*. Explain in a few words what you are asking the judge to do. This should match the title you wrote in **1** on the *Motion*.

**1. Motion to:**   Motion to Dismiss

In **2**, enter:
-The court date and time of your hearing. Call your Circuit Clerk to get this information. If e-filing in Cook County, you may get the date when you e-file.
-The courtroom and address of the court building.
-The call-in or video information for remote appearances (if applicable).
-The clerk's phone number and website.

All this information is available from the Circuit Clerk. You can find their contact information at: ilcourts.info/CircuitClerks.

**2. Hearing Information**

The hearing for the *Motion* I filed is scheduled:

a. On  07/10/2024 _____   at  9:00 _____   ☑ a.m.  ☐ p.m.   in  Cal W, 1912 _____
    *Date*                   *Time*                                    *Courtroom*

    **In-person at:**

50 W. WASHINGTON ST., Chicago, IL 60602
*Courthouse Address*                        *City*          *State*     *ZIP*

    **OR**

    **Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance.")

By telephone:   312-626-6799
*Call-in number for telephone remote appearance*

By video conference:  https://zoom.us/
*Video conference website*

Zoom ID: 921 0771 7798; Zoom Password: 881878
*Video conference log-in information (meeting ID, password, etc.)*

Call the Circuit Clerk at:  (312) 603-5030 _____   or visit their website at
*Local Circuit Clerk's phone #*

https://www.cookcountyclerkofcourt.org/   to find out more about how to do this.
*Website*

FILED DATE: 6/28/2024 3:21 PM    2024L003661

Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony.

**I certify that everything in the *Notice of Court Date for Motion* is true and correct. I understand that making a false statement on this form is perjury and has penalties provided by law under 735 ILCS 5/1-109.**

If you are completing this form on a computer, sign your name by typing it. If you are completing it by hand, sign and print your name.

| | |
|---|---|
| /s/ George W. Svoboda | P.O. Box 1299 |
| *Your Signature* | *Street Address* |
| George W. Svoboda | McHenry, IL 60051 |
| *Print Your Name* | *City, State, ZIP* |
| george@georgesvobodalaw.com | (224) 360-0696        65708 |
| *Email* | *Telephone*        *Attorney # (if any)* |

Enter your complete address, telephone number, and email address, if you have one.

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

## PROOF OF DELIVERY

In **1a**, enter the name, mailing address, and email address of the party you are sending the document to. If they have a lawyer, you **must** enter the lawyer's information.

1. I am sending the *Notice of Court Date for Motion*

    a. To:

      Name:   James Andreas Karamanis
                *First*          *Middle*         *Last*

      Address:  180 N STETSON, 3050, CHICAGO, IL 60601
                 *Street, Apt #*        *City*    *State*   *ZIP*

      Email address:  james@bkchicagolaw.com

In **1b**, check the box to show how you are sending the document.

**CAUTION:** If you and the person you are sending the document to have an email address, you **must** use one of the first two options. Otherwise, you may use one of the other options.

    b. By:

      ☑ An approved electronic filing service provider (EFSP)

      ☐ Email *(not through an EFSP)*
      *Only use one of the methods below if you do not have an email address, or the person you are sending the document to does not have an email address.*

      ☐ Personal hand delivery to:

        ☐ The party

        ☐ The party's family member who is 13 or older, at the party's residence

        ☐ The party's lawyer

        ☐ The party's lawyer's office

      ☐ Mail or third-party carrier

In **c**, fill in the date and time that you are sending the document.

    c. On: 06/28/2024    at:  3:30    ☐ a.m.  ☑ p.m.
         *Date*            *Time*

In **2**, if you are sending the document to more than 1 party or lawyer, fill in **a**, **b**, and **c**. Otherwise leave **2** blank.

2. I am sending this document:

    a. To:

      Name:
                *First*          *Middle*         *Last*

      Address:
                 *Street, Apt #*        *City*    *State*   *ZIP*

      Email address:

In **2a**, enter the name, mailing address, and email address of the party you are sending the document to. If they have a lawyer, you **must** enter the lawyer's information.

FILED DATE: 6/28/2024 3:21 PM   2024L003661

| | |
|---|---|
| In **2b**, check the box to show how you are sending the document. | |

**CAUTION:** If you and the person you are sending the document to have an email address, you **must** use one of the first two options. Otherwise, you may use one of the other options.

b.  By:

☐ An approved electronic filing service provider (EFSP)

☐ Email *(not through an EFSP)*

*Only use one of the methods below if you do not have an email address, or the person you are sending the document to does not have an email address.*

☐ Personal hand delivery to:

    ☐ The party

    ☐ The party's family member who is 13 or older, at the party's residence

    ☐ The party's lawyer

    ☐ The party's lawyer's office

☐ Mail or third-party carrier

In **c**, fill in the date and time that you are sending the document.

c.  On: _____ at: _____ ☐ a.m. ☐ p.m.
        *Date*

If you are sending your document to more than 2 parties or lawyers, check the box and file the *Additional Proof of Delivery* with this form.

☐ I have completed an *Additional Proof of Delivery* form.

Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony.

**I certify that everything in the *Proof of Delivery* is true and correct. I understand that making a false statement on this form is perjury and has penalties provided by law under 735 ILCS 5/1-109.**

If you are completing this form on a computer, sign your name by typing it. If you are completing it by hand, sign and print your name.

Enter your complete address, telephone number, and email address, if you have one.

/s/ George W. Svoboda
_____
*Your Signature*

George W. Svoboda
_____
*Print Your Name*

(224) 360-0696
_____
*Telephone*

P.O. Box 1299
_____
*Street Address*

McHenry, IL 60051
_____
*City, State, ZIP*

george@georgesvobodalaw.com
_____
*Email*

65708
_____
*Attorney # (if any)*

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, et al.

          Plaintiffs,

v.

BRADFORD STEPHENS, et al.

          Defendants.

Case No. 2024L003661

## ORDER

THIS CAUSE coming to be heard for initial case management and Defendant Ryan Eagle's Motion to Dismiss, due notice having been given and the Court being fully advised in the premises;

IT IS HEREBY ORDERED that:

1. Defendant Eagle's Motion is GRANTED in part and DENIED in part;

2. Plaintiffs' Complaint at Law is STRICKEN;

3. Plaintiffs are granted fourteen (14) days to re-plead, on or before July 24, 2024;

4. Defendant is granted fourteen (14) days to answer or otherwise plead to Plaintiffs' amended pleadings, on or before August 7, 2024; and

5. This matter is continued for status on pleadings and service of remaining Defendants to August 27, 2024, at 9:00 a.m. via Zoom, Meeting ID: 921-0771-7798, password: 881878.

ENTER:

Judge _____  Judge's No. _____

Judge Thomas More Donnelly

DATED: _____

JUL 10 2024

Circuit Court - 1803

James A. Karamanis
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

FILED
7/24/2024 7:59 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
28653777

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED, a Singapore
Company, and SYMBOLIC ANALYTICS INC.,
a Delaware Corporation,

                Plaintiffs,

v.

                Case No. 2024L003661

BRADFORD STEPHENS, AARON
KUNSTMAN, RYAN EAGLE, JOEL WAYNE
CUTHRIELL, MORGEN PECK, CATHERINE
BYERLY, AMERICAN PUBLISHERS, INC.
d/b/a CONDÉ NAST and d/b/a THE NEW
YORKER MAGAZINE, and UNKNOWN
INDIVIDUALS AND COMPANIES,

                Defendants.

## AMENDED COMPLAINT AT LAW

    NOW COME the Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL

FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a

Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, and for their

Amended Complaint against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN,

RYAN EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, and

AMERICAN PUBLISHERS, INC. d/b/a CONDÉ NAST and d/b/a THE NEW YORKER

MAGAZINE, and UNKNOWN INDIVIDUAL(S) AND COMPANIES, state as follows:

## PARTIES

    1.    SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company (hereafter

"Skycoin") is a consortium of related entities involved in the development of software, hardware,

design, manufacturing, and services operating under the consumer brand name "Skycoin," which

1

FILED DATE: 7/24/2024 7:59 PM   2024L003661

includes Skycoin Global Foundation, Symbolic Analytics Inc., Shellpay China, and other entities that are responsible for regional operations or management of specific assets of Skycoin's global operations.

2.     Skycoin created 100 million Skycoin Tokens during its launch in 2013, which were distributed and traded on various exchanges by 2017.

3.     The peak market capitalization of all existing Skycoin Tokens reached $5 billion USD in January 2018.

4.     Skycoin is a private company organized under the laws of Singapore, its principal place of business located at 2 Venture Drive, #11-31, Vision Exchange, Singapore.

5.     Plaintiff Symbolic Analytics ("SA") is a private company organized under the laws of Delaware, United States.

6.     Plaintiff, BRANDON SMIETANA ("Smietana") is an individual citizen of the United States and is the Chief Software Architect and authorized representative of Skycoin and SA.

7.     Defendant BRADFORD STEPHENS ("Stephens) is an individual citizen of the State of New York, United States.

8.     Defendant RYAN EAGLE ("Eagle") is an individual citizen of the State of Illinois, United States, and the Village of Buffalo Grove.

9.     On information and belief, Defendant JOEL WAYNE CUTHRIELL ("Cuthriell") is an individual citizen of the State of Oklahoma, United States.

10.    Defendant AARON KUNSTMAN ("Kunstman") is an individual citizen of the State of Wisconsin, United States.

11.    "Sudo" is a network of similarly named Telegram accounts, operated by a minimum of four persons. At least one of these persons is known to be Kunstman. Stephens is widely believed to also be one of the account operators. The other two or more operators are currently unknown.

12.    Defendant CATHERINE BYERLY ("Byerly") is an individual citizen of the State of Florida, United States.

13.    Byerly was employed by a marketing company called 22 Acacia Consulting, located in Chicago, Illinois.

14.    Byerly was hired by Stephens through her employment at 22 Acacia Consulting to perform marketing services for Skycoin.

15.    Defendant MORGEN PECK ("Peck") is a privately paid journalist and individual citizen of the State of New York, United States.

16.    Defendant AMERICAN PUBLISHERS, INC. d/b/a CONDÉ NAST and d/b/a THE NEW YORKER MAGAZINE ("Condé Nast") is a global mass media company in the business of producing world leading print, digital, video, and social media brands organized under the laws of the State of New York.

17.    Condé Nast is the owner, operator, and publisher of The New Yorker Magazine ("The New Yorker"), a prominent American weekly magazine.

18.    On August 28, 2021, Peck authored an article published in The New Yorker titled *Pumpers, Dumpers, and Shills: The Skycoin Saga* (the "New Yorker Article").[1] A copy of the New Yorker Article is attached hereto as Exhibit A.

---

[1] The article can be found at: https://www.newyorker.com/tech/annals-of-technology/pumpers-dumpers-and-shills-the-skycoin-saga

FILED DATE: 7/24/2024 7:59 PM    2024L003661

19.     Stephens, recognizing the success of Skycoin, devised a plan and scheme to defraud, extort, and steal money and assets from Skycoin in concert with some or all of the other named party Defendants.

## FACTS COMMON TO ALL COUNTS

20.     On or about January 8, 2018, Plaintiffs entered into discussions with Stephens to develop, launch, and manage a comprehensive marketing and brand awareness program for Skycoin, including but not limited to revamping Skycoin's website, performing search engine optimization ("SEO") services, and generating positive publicity for Skycoin (hereafter referred to as the "Marketing Program").

21.     On or about January 8, 2018, Stephens represented himself to be the owner of Smolder LLC, a marketing startup company, to which the payments would be made for the Marketing Program.

22.     Stephens claimed that his business partners were Eagle, Adam Young ("Young"), and Harrison Gevirtz ("Gevirtz") (Stephens, Eagle, Young, and Gevirtz will collectively be referred to hereinafter as the "Smolder Partners").

23.     Stephens represented to Plaintiffs that Eagle, Young, and Gevirtz were the individuals who would be providing the marketing services contemplated by the Marketing Program.

24.     Stephens represented to Plaintiffs that Eagle and Young were the individuals who would receive Plaintiffs' payments and that they were responsible for handling the money.

25.     Stephens represented to Plaintiffs that the Smolder Partners were "inseparable" and that all business activities they conducted were done jointly and that payment for said activities was to be shared or split between them.

4

FILED DATE: 7/24/2024 7:59 PM    2024L003661

26.     Unbeknownst to Plaintiffs, Stephens and Eagle were prohibited from engaging in activities such as the Marketing Program pursuant to an order from the Federal Trade Commission ("FTC"), dated February 19, 2014 ("the Order"). *See Federal Trade Commission v. CPA Tank, Inc., Vito Glazers, Eagle Web Assets, Inc., and Ryan Eagle,* Case No. 14-cv-1239.

27.     At all times relevant herein, Stephens and Eagle were aware that pursuant to the Order, they could not accept payments for marketing activities.

28.     Neither Stephens nor Eagle informed Plaintiffs of the existence of the Order and further violated it by offering to provide marketing services to Plaintiffs.

29.     If Plaintiffs had known about the Order and/or if Stephens and Eagle had not lied about and concealed the Order, Plaintiffs would not have entered into the Marketing Program with Stephens, Eagle, and the Smolder Partners.

30.     Plaintiffs reached an oral agreement with Stephens to implement the Marketing Program, and as part and parcel of that agreement, paid the Smolder Partners $107,948.00 ($66,258.00 in the form of four (4) Bitcoins and $41,690.00 in the form of 1,100 Skycoin Tokens) (the "Initial Payment"). The Initial Payment included an expense budget for an upcoming industry conference in Las Vegas, Nevada. Plaintiffs and Stephens explicitly agreed that as part of their agreement, any expense in excess of $1,000.00 would require prior approval from Skycoin.

31.     In addition to the Initial Payment, Plaintiffs paid the Smolder Partners approximately $800,000.00 in Skycoin Tokens for an internet advertising campaign.

32.     Shortly after receiving the Initial Payment, Stephens submitted two additional invoices for certain work allegedly performed by Byerly totaling approximately $14,752.44.

33.     On or about January 12, 2018, Stephens and Byerly notified Plaintiffs of a potential crisis that could critically impact Skycoin's business, marketing, and internet presence. As

FILED DATE: 7/24/2024 7:59 PM  2024L003661

represented by Stephens and Byerly, an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website. Such content would function to decrease Skycoin's website's ranking precipitously in search engines and irrevocably damage Skycoin's image, reputation, and internet presence.

34.     In order to combat the internet attack by said third party, Stephens represented to Plaintiffs that an additional payment of $38,000.00 would be required.

35.     On or about January 14, 2018, and January 19, 2018, Skycoin paid the Smolder Partners the requested $38,000.00.

36.     The attack on Skycoin's website damaged Skycoin's SEO ranking and significantly reduced internet traffic to Skycoin's website.

37.     In January of 2018, Skycoin made the following payments to the Smolder Partners in connection with the Marketing Program:

    a.  January 11, 2018: 20,000 Skycoin Tokens ($842,400.00) for the Marketing Program budget;

    b.  January 13, 2018: One (1) Bitcoin ($14,314.00) for a conference in Miami, Florida;

    c.  January 16, 2018: 3,899 Skycoin Tokens ($121,337.00) for the Marketing Program budget;

    d.  January 18, 2018: Two (2) Bitcoins ($23,212.00) and 2,625 Skycoin Tokens ($80,929.00) for Marketing Program labor costs; and

    e.  January 19, 2018: Four (4) Bitcoins (56,457.00) and a separate payment of 1.30 Bitcoin for the Marketing Program and to combat the aforementioned attacks on Skycoin's website. These services were never performed.

38.     In late January to early February 2018, Stephens demanded that Skycoin pay the Smolder Partners $100,000.00 per month to ward off the supposed third-party attacks on Skycoin's website. Stephens later increased his monthly demand to $300,000.00 in order to quell the attacks.

FILED DATE: 7/24/2024 7:59 PM    2024L003661

39.     In early February of 2018, Plaintiffs discovered that in actuality, there was no third party attacking Skycoin's website. Rather, the attack was instigated by Stephens, Eagle, and/or the Smolder Partners as a fraudulent means to extract additional funds from Skycoin. The invoices submitted by Stephens were fabricated.

40.     In early February of 2018, SA received deficient invoices that were highly suggestive of fraud. Upon determining that there may be fraud in the Smolder Partners' invoices, Plaintiffs discontinued all additional payments.

## **DEFENDANTS' EXTORTION**

41.     Upon Skycoin's refusal to pay Stephens the monthly payments requested in or around February 2018, Smietana and Stephens met in Shanghai, China, with Eagle joining the meeting via Zoom.

42.     During this meeting, Stephens and Eagle threatened to have Skycoin delisted from all exchanges including, for example, Bittrex and Binance, unless Smietana agreed to pay them $30,000,000.00 in Bitcoin and $1,000,000.00 in US Dollars.

43.     Stephens and Eagle's threats included statements that failure to comply would result in Skycoin's destruction and the price of Skycoin being driven to zero.

44.     Stephens and Eagle also threatened that if Plaintiffs refused to pay, they would block Skycoin from being listed on Bitfinix and would interfere with Plaintiffs' contracts so as to ensure that "no one would work with" Plaintiffs.

45.     Stephens and Eagle attempted to blackmail Plaintiffs into making Stephens the COO of Skycoin and be put in control of the management of the company. Stephens and Eagle also attempted to blackmail Plaintiffs into giving Gevirtz control of all Skycoin's bank accounts.

FILED DATE: 7/24/2024 7:59 PM    2024L003661

46.     Smietana, in fear of Stephens and Eagle's threats, capitulated to their demand and initiated the first of three (3) extortion payments on or about February 9, 2018, in the amount of $127,000.00 (the "Extortion Payments").

47.     On or about February 22, 2018, the Marketing Program engagement between Plaintiffs and the Smolder Partners ended due to pressure from Skycoin's advisory board because of the discovery of the fraudulent invoicing and business practices.

48.     Plaintiffs requested a refund of the unspent prepayments made for the Marketing Program, however, the Smolder Partners refused to return any of said money.

49.     In and around the time Stephens and Eagle demanded the Extortion Payments from Smietana, they also attempted to hostilely seize control of Skycoin. Specifically, Stephens and Eagle threatened to orchestrate the publication of a series of negative and damaging articles through various print and online media sources unless Smietana made Stephens COO of Skycoin.

50.     A Sudo account run by Stephens and/or Kunstman openly admitted their involvement in maintaining the Sudo account and that they were "trying to extort [S]ynth…for $1,000,000.00," through threatening to have published a series of articles and lies about Smietana and Skycoin and that they had a team of twelve (12) individuals who would be splitting the money (See Exhibit B).[2]

51.     In furtherance of this conspiracy and plan to take over Skycoin, Stephens paid journalist Tristian Greene ("Greene") to write and publish the article entitled "Skycoin: Anatomy of a cryptocurrency scam," February 15, 2018 - 10:47 pm UTC under an anonymous name.[3]

52.     The negative article caused severe damage to the price of Skycoin Tokens and to Skycoin's reputation. Stephens openly admitted that he was responsible for paying Greene to

---

[2] "Synth" is Smietana's online persona.
[3] The article can be found at: https://thenextweb.com/news/anatomy-of-a-cryptocurrency-scam-in-the-wild

publish the article, but went to Skycoin's investors and claimed that Smietana had ordered him to have a negative article published to intentionally destroy the price of Skycoin Token.

53.     Stephens attempted to organize a management and investor revolt, to transfer control of the company to himself, under the pretense that the unlawful actions Stephen had himself performed were in fact performed by Smietana.

54.     Greene later cited that same article in another negative Skycoin article on "The Next Web," in an article titled "Exclusive: We suspected this shady cryptocurrency project was a scam. Now we're sure of it." Published March 8, 2018, 3:22 am UTC.[4]

55.     A key part of Skycoin's business plan was to be listed on the Bittrex Exchange. The Bittrex Exchange is a world-wide trading platform that facilitates real-time order execution of crypto currencies, such as Skycoin.

56.     Skycoin devoted significant resources to obtain a Bittrex listing, which had been negotiated through a third party.

57.     Knowing that Skycoin was about to obtain a Bittrex listing, on or about February 25, 2018, Stephens and Eagle threatened Smietana that unless Smietana paid them, they would approach Bittrex and purposely interfere with Skycoin's third-party relationships to prevent Skycoin from being listed on Bittrex.

58.     Smietana refused to pay the money demanded by Stephens and Eagle, and in turn they did, in fact, provide untrue information to Bittrex and which ultimately led to the spread of false rumors regarding Skycoin and Skycoin ultimately not being listed on the Bittrex Exchange.

59.     Between February 26, 2018, through March 9, 2018, Stephens and Byerly stole access to Skycoin's media accounts, including but not limited to, Skycoin's Shopify store, Twitter

---

[4] The article can be found at: https://thenextweb.com/news/exclusive-we-suspected-this-shady-cryptocurrency-project-was-a-scam-now-were-sure-of-it

FILED DATE: 7/24/2024 7:59 PM     2024L003661

FILED DATE: 7/24/2024 7:59 PM 2024L003661

account, Linkedin account, Slack channel account, and accounts associate with the operation of Skycoin's website. These media accounts were an integral and necessary component of Skycoin's business.

60.     On or about October 18, 2018, Stephens demanded over $150,000.00 for return of Skycoin's stolen computer-based assets and media accounts.

61.     On or about May 24, 2018, Binace announced that it would list Skycoin on its exchange. Binance holds itself out as the "world's largest crypto exchange" and is a trading platform where customers can buy and sell cryptocurrencies. It is highly desirable for cryptocurrencies to be listed on the Binance exchange.

62.     After Smietana refused to pay the Extortion Payments demanded by Stephens and Eagle, both defendants conspired with Yan Xiandong, Li Min, Sam Sing Fond and Sun Fei (collectively the "Assailants") in a plot to kidnap Smietana and his girlfriend and steal $30,000,000.00 that Stephens and Eagle claimed they were due from Skycoin.

63.     In furtherance of the conspiracy to kidnap Smietana and his girlfriend and steal money from them with Stephens and Eagle, the Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

64.     Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin Tokens with a market value of $81,018.98, totaling $220,179.31.

65.     During the siege and home invasion, the Assailants called Stephens and complained that they did not find the thousands of Bitcoin promised to them.

FILED DATE: 7/24/2024 7:59 PM 2024L003661

## DEFENDANTS' THEFT OF ACCOUNTS

66.     Prior to the conclusion of Stephens' work with Skycoin, upon notice of his separation, the company made a list of all accounts to which Stephens had authorized access and thereinafter terminated his access to those accounts.

67.     Skycoin staff contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

68.     SA staff and members of Skycoin contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

69.     Stephens acknowledged that there were unspent funds due back to Plaintiffs, however, instead of returning the money due, Stephens hacked into the various company accounts and began to engage in a series of extortion and fraudulent acts against Skycoin.

70.     Stephens and Byerly changed the passwords to some of the company accounts, locked Skycoin and SA out of them, and then attempted to extort the company for an additional $150,000.00.

71.     Stephens and Byerly also refused to return the unspent money that was prepaid and allocated for marketing services. The amount due back to Skycoin and SA was in excess of $800,000.00.

72.     Plaintiffs incurred considerable expense to regain access to the stolen accounts and to migrate the content to the reacquired accounts. Those accounts included, but were not limited to, the Medium Account, Shopify, Twitter, Skycoin Telegram, Skycoin Rewards, Facebook, and Linkedin.

FILED DATE: 7/24/2024 7:59 PM    2024L003661

## DEFENDANTS' UNAUTHORIZED EXPENSES

73.    Stephens and Byerly engaged in various schemes to defraud Skycoin and attempted to invoice unapproved, non-business related costs including a Las Vegas prostitute orgy, unsubstantiated ATM withdrawals, personal entertainment costs, and what is believed to be money for the purchase of drugs. These expenses were neither approved by Skycoin nor related to any legitimate business activities.

74.    For example, Stephens sent invoices to Skycoin totaling $50,000.00 for cash payments for two days in Las Vegas. Despite several requests, Defendants refused to produce ATM receipts for the $50,000.00 expense, could not explain how the cash was used, could not show that the expenses were business related, could not justify the amount spent, and could not produce receipts for any "cash payments."

75.    Stephens and Byerly billed SA for subcontractors without seeking prior authorization from Plaintiffs for such payments.

76.    Stephens and Byerly engaged in a scheme to defraud Plaintiffs by invoicing full time rates for subcontractors employed part time and even invoicing Company for nonexistent persons.

77.    Stephens and Byerly billed for subcontractors work that not only both pre-dated and post-dated the Marketing Program, but which also included full time rates for part-time work and also included invoicing from nonexistent subcontractors.

78.    Stephens and Byerly billed for invalid date periods, such as submitting invoices for billing periods prior to the Marketing Program and work performed for billing periods after the termination of their relationship with Skycoin.

79.     Stephens and Byerly attempted to bill for costs which had not been submitted to the Company for preapproval and made misrepresentations to Skycoin staff, including Skycoin's Head of Events, who was responsible for event budgets. Stephens made false misrepresentations claiming that these expenses had received approval, and that the Company had been notified of the expenses.

80.     Stephens and Byerly attempted to bill the company for unapproved "events" on non-existent dates. Additionally, there were several other strong indicators that many or all of the claimed expenses were fraudulent or manufactured.

### BINANCE DELISTING

81.     In and around June of 2020, because Smietana refused to capitulate to the extortion demands, Stephens, in conjunction with Eagle, Kunstman and others, embarked upon a scheme and plan to delist Skycoin from Binance and effectively destroy Skycoin's reputation and depress Skycoin Tokens' market value.

82.     In furtherance of this plan and scheme, Stephens solicited other individuals to make false complaints against Skycoin in order to have Binance delist Skycoin from the exchange. The false complaints they directed others to make to Binance to achieve the delisting are as follows:

  a.  That Skycoin sells Skycoin Tokens customers outside of the Binance exchange but after receiving the funds, never sends those customers the Skycoin Tokens for which they paid;

  b.  That individuals from Skycoin would privately meet with customers and accept payment for Skycoin Tokens at 15% below market value;

  c.  After customers consummated such side transactions, they would immediately "dump" the Skycoin Tokens on the market;

  d.  That Smietana would request that customers privately pay him $1,000,000.00 in Bitcoin or cash for discounted Skycoin Tokens that they could then "dump" on the market immediately and achieve a $150,000.00 profit; and

FILED DATE: 7/24/2024 7:59 PM    2024L003661

FILED DATE: 7/24/2024 7:59 PM    2024L003661

    e.    That Smietana and Skycoin launders money through customers by promising them an immediate 15%-20% profit through the unauthorized purchase of Skycoin Tokens.

83.    Upon information and belief, Cuthriell and other persons were hired to harass Skycoin and interfere with Skycoin's relationships with exchanges and partners corporations, made public statements in Telegram channels bragging that they had paid journalists to publish articles to slander the company, and even publicly discussed the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance.

84.    As part of their plan and scheme to have Skycoin delisted from Binance, Stephens, Kunstman, and Cuthriell also orchestrated having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless complaints.

85.    As further evidence of the conspiracy, Cuthriell publicly congratulated all persons involved in the Binance delisting of Skycoin with the exclamation of "Nice work team" and "PARTY TIME."

## COUNT I
## FRAUD – BRADFORD STEPHENS AND CATHERINE BYERLY

86.    Plaintiffs repeat and reallege paragraphs 1 through 85 of this Amended Complaint as and for Paragraph 86 of this Count I as if fully set forth herein.

87.    Stephens approached Plaintiffs representing himself as a legitimate advertising and marketing firm, with Stephens and Eagle Web Assets (EWA) as "business partners" involved in every aspect of the "business."

88.    EWA is and/or was a business owned and/or operated by Eagle, Gevirtz, and Young.

89.    Plaintiffs would later learn that EWA and Eagle, Gevirtz, and Young had a history of litigation and that these persons were under an FTC Order for fraudulent marketing practices.

FILED DATE: 7/24/2024 7:59 PM    2024L003661

90.     Stephens and Byerly represented to Smietana that they would provide advertising and marketing services, including web design, online advertising, conference events, and display advertising.

91.     Stephens represented to Smietana that he would provide advertising, web design, and marketing services for Plaintiffs in return for payment.

92.     In reality, Stephens had no intention of providing any advertising, web design, or marketing of any kind for Plaintiffs.

93.     Stephens and Byerly, in fact, did not provide any advertising or marketing services for Plaintiffs.

94.     Stephens and Byerly never provided any web design services on behalf of Plaintiffs.

95.     In reliance upon the representations of Stephens and Byerly, Plaintiffs paid them approximately $800,000.00 for their services and the costs of advertising and marketing.

96.     When asked, Stephens and Byerly represented to Smietana that they had no prior lawsuits that had been filed against them.

97.     These representations were knowingly false when made.

98.     In fact, Stephens' business partners, Eagle and Gevirtz, had an extensive history of litigation and had been named in multiple lawsuits and were subject to an FTC injunction for fraudulent marketing practices.

99.     Following the payment of the initial $800,000.00, Defendants Stephens and Byerly requested additional money, including an additional $60,000.00.

100.    Stephens and Byerly made these representations to Smietana and other Skycoin staff with the intent to induce payments and defraud Plaintiffs.

101.    These statements made by Stephens and Byerly were false when made.

15

FILED DATE: 7/24/2024 7:59 PM 2024L003661

102.     Stephens and Byerly created scenarios and orchestrated fraudulent crises, making numerous misrepresentations, solely for the purpose of soliciting more money from Plaintiffs.

103.     Stephens and Byerly made the following misrepresentations and/or omissions upon which Plaintiffs justifiably relied to their detriment:

a.  Lied about, concealed, and denied history of litigation against Defendants' associates, business partners, and former corporations;

b.  Failed to inform Plaintiffs of the FTC Order and government sanctions against their former company, even when explicitly asked about any history of litigation prior to payment and contract negotiations;

c.  Falsely represented that an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website;

d.  Falsely agreed to seek written pre-approval from the Company for incurred expenses;

e.  Falsely represented that they would provide marketing and advertisement services to Plaintiffs;

f.  Falsely represented that they would provide web design services to Plaintiffs; and

g.  Falsely represented the expenses and costs of said marketing and advertising services.

(*See also* Facts Common to All Counts)

104.     Plaintiffs relied upon the representations of Stephens and Byerly and paid them the requested amounts.

105.     As a direct and proximate result of Stephens and and Byerly's improper actions, Plaintiffs have sustained substantial economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and damage to their reputation.

WHEREFORE,  Plaintiffs,  BRANDON  SMIETANA,  SKYCOIN  GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully

16

FILED DATE: 7/24/2024 7:59 PM   2024L003661

pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and CATHERINE BYERLY, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

**<u>COUNT II</u>**
**FRAUD – BRADFORD STEPHENS, AARON KUNSTMAN,**
**AND JOEL WAYNE CUTHRIELL**

106. Plaintiffs repeat and reallege Paragraphs 1 through 85 of this Amended Complaint as and for Paragraph 106 of this Count II as if fully set forth herein.

107. On or about January 8, 2018, Plaintiffs entered into an oral agreement with Stephens, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

108. Following that agreement, Stephens defrauded Plaintiffs by failing to provide the contracted services, creating false "threats," and extorting funds from Plaintiffs through coercion. Once discovered, Plaintiffs attempted to distance themselves from Defendants. However, in retaliation, Stephens, Kunstman, and Cuthriell began making false online profiles and applications with false information in order to further defraud Plaintiffs out of approximately $2,000,000.00 worth of Skycoin product.

109. Plaintiffs offered a reward program ("Reward Program") to entice customers to their business.

110. In order to obtain a reward under the Reward Program, each participant was required to submit an application which conformed to S.A.'s terms and conditions. The terms included the following:

    a. Each customer is only allowed to have one active Skywire Rewards account within a single one month period;

17

FILED DATE: 7/24/2024 7:59 PM 2024L003661

b.    Each customer is allowed to claim rewards for up to 8 Skywire nodes in a one month period;

c.    Only one instance of the "Skywire Node" software can be run on a single physical computer;

d.    Each customer may operate only a single reward program account within a one month period;

e.    Each computer claiming a reward must be a physically separate and independent computer; and

f.    It is a violation of the Rewards Program terms and service for a user to run more than one Skywire node per physical computer.

111.    Cuthriell and Stephens developed software to run over 300 "nodes" on a single physical computer in order to defraud the Reward Program.

112.    Relying on the misrepresentations by Stephens, Kunstman, and Cuthriell, SA provided these persons rewards to which they were not entitled, totaling approximately $2-$4 million (the precise amount of which is unknown as they have continued to submit fraudulent applications continuously and under multiple fake aliases).

113.    Plaintiffs relied upon the information provided in those online applications and profiles.

114.    Had Plaintiffs known that these profiles and applications were being generated and submitted by Stephens, Kunstman, and Cuthriell repeatedly in order to accumulate Skycoin under false pretenses, Plaintiffs would not have made Reward Program payments to Stephens, Kunstman, and Cuthriell.

115.    Stephens, Kunstman, and Cuthriell made these repeated false representations to Plaintiffs through these applications and profiles even though they knew that they were false and

made under false pretenses, with an intent to induce Plaintiffs into providing the $2-$4 million in digital payments/digital assets/digital currency.

116.    Stephens, Kunstman, Cuthriell have at all relevant times perpetuated and deliberately concealed this fraud from Plaintiffs.

117.    Stephens, Kunstman, and Cuthriell have engaged in a scheme to defraud Plaintiffs by consistently attempting to conceal this fraud and continue to submit false applications and profiles to Plaintiffs.

118.    Plaintiffs relied upon the accuracy and truthfulness of the submitted applications and profiles, and, had Plaintiffs been aware that the representations of Stephens, Kunstman, and Cuthriell were false, Plaintiffs would not have acted as they did.

119.    As a direct and proximate result of Stephens, Kunstman, and Cuthriell's improper actions and misrepresentations, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, and JOEL WAYNE CUTHRIELL, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT III
### CIVIL CONSPIRACY – BRADFORD STEPHENS AND RYAN EAGLE

120.    Plaintiffs repeat and reallege Paragraphs 1 through 85 of this Amended Complaint as and for Paragraph 120 of this Count III as if fully set forth herein.

19

FILED DATE: 7/24/2024 7:59 PM    2024L003661

121. Stephens and Eagle agreed and conspired with one another to defraud Plaintiffs, tortiously interfere with their business relationships, commit various acts of wire fraud, computer fraud, manipulate the cryptocurrency market, and convert Plaintiffs' property surreptitiously.

122. Stephens and Eagle knowingly and voluntarily entered into an agreement and participated in a scheme to defraud Plaintiffs of money.

123. Stephens and Eagle, as business partners in Smolder, had an agreement to provide "marketing services" to Plaintiffs as part of the Marketing Program.

124. Stephens and Eagle initiated a cyber-attack on Skycoin's website, linking pornographic blogs and other harmful spam content to the website in order to decrease Skycoin's website's ranking precipitously in search engines and destroy Skycoin's image, reputation, and internet presence.

125. Stephens and Eagle represented to Plaintiffs that the cyber-attack was being carried out by unknown third parties, despite their knowledge that they had initiated the cyber-attack themselves.

126. Stephens and Eagle demanded an additional $38,000.00 from Plaintiffs in order to fight off the supposed third-party attacks, which Plaintiffs paid.

127. Stephens and Eagle's cyber-attack damaged Skycoin's SEO ranking and significantly reduced internet traffic to Skycoin's website.

128. Stephens and Eagle conspired to extort Plaintiffs out of money through threats of ruining Skycoin's reputation, having Skycoin delisted from cryptocurrency exchanges, destroying the company, and of physical harm through the Assailants who invaded Smietana's home and tortured both him and his pregnant girlfriend, .

FILED DATE: 7/24/2024 7:59 PM    2024L003661

129.    Stephens and Eagle's acts in furtherance of the conspiracy included, but were not limited, to the following:

    a.  Devising and implementing the Marketing Program to defraud Plaintiffs of money;

    b.  Submitting falsified and fraudulent invoices to Plaintiffs;

    c.  Hacking and linking pornographic blogs and other harmful spam content to Skycoin's website to decrease Skycoin's website's ranking precipitously in search engines and irrevocably destroy Skycoin's image, reputation, and internet presence;

    d.  Threatening Plaintiffs with having Skycoin delisted from cryptocurrency exchanges to extort them out of money;

    e.  Threatening to and ultimately providing false information about Skycoin to Bittrex in order to prevent Skycoin from being listed on Bittrex to extort Plaintiffs out of money;

    f.  Attempting to blackmail Plaintiffs into making Stephens COO of Skycoin;

    g.  Attempting to hostilely seize control of Skycoin through orchestrating the publication of a series of negative and damaging articles through various print and online media sources unless Smietana made Stephens COO of Skycoin;

    h.  Attempting to blackmail Plaintiffs into making Gevirtz in charge of all of Skycoin's bank accounts;

    i.  Lying about Eagle's history of litigation and the FTC injunction against Eagle for fraudulent marketing practices;

    j.  Refusing to return unspent money that was prepaid and allocated for the Marketing Program;

    k.  Threatening Plaintiffs with physical harm to extort them out of money;

    l.  Refusing to refund Plaintiffs for unspent pre-payments made for the Marketing Program;

    m.  Directing the Assailants to invade Smietana's home and torturing Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets; and

FILED DATE: 7/24/2024 7:59 PM    2024L003661

n. Publishing material stolen during the home invasion to Telegram as blackmail in order to extort Plaintiffs out of money.

(*See also* Facts Common to All Counts)

130. Stephens and Eagle worked in concert with one another to accomplish this fraud as evidenced by their various communications and concerted acts against Plaintiffs.

131. Stephens and Eagle intended to defraud Plaintiffs out of their money, their product, and to tortiously interfere with their business relationships.

132. As a direct and proximate result of Stephens and Eagle's aforesaid unlawful acts, Plaintiffs were damaged, forced to pay Stephens and Eagle large sums of money, subjected to a home invasion, kidnapping and torture, had great sums of money stolen by the Assailants, and Skycoin was ultimately not listed on the Bittrex Exchange and was delisted from Binance, resulting in loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and RYAN EAGLE, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

**COUNT IV**
**CIVIL CONSPIRACY – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS AND COMPANIES**

FILED DATE: 7/24/2024 7:59 PM    2024L003661

133.    Plaintiffs repeat and reallege Paragraphs 1 through 85 of this Amended Complaint as and for Paragraph 133 of this Count IV as if fully set forth herein

134.    Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies conspired to destroy Skycoin's reputation and Plaintiffs' business by publishing false and inflammatory news articles and to extort Plaintiffs of money through making monetary demands in exchange for the articles not being published.

135.    Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies' acts in furtherance of the conspiracy included, but were not limited to:

    a.   Creating and employing a network of journalists to publish fraudulent articles to destroy Skycoin's image and reputation in order to drive down the price of Skycoins; and

        i.   Greene, a journalist and reporter, was employed by Stephens and knowingly published false articles regarding the legitimacy of Skycoin and Skycoin's technology;

            1.   Greene was within Stephens's network and at all times knew Stephens was not the COO of Skycoin, yet published that he was, and continued to publish false information even after Smietana's continuous attempts to correct the false claims.

    b.   Employing Peck to knowingly write the false and defamatory New Yorker Article alleging that Skycoin a fraud and a scam;

    c.   Publishing an article in Cointelegraph by Simon Chandler, claiming that Plaintiffs' attackers were "emboldened" to physically harm Smietana due to Skycoin's "shady dealings;"

    d.   Soliciting individuals to make false complaints against Skycoin in order to have Skycoin delisted from the Binance Exchange;

    e.   Stealing access to Skycoin's media accounts and demanding over $150,000.00 for return of the accounts;

    f.   Refusing to return unspent money that was prepaid and allocated for marketing services;

FILED DATE: 7/24/2024 7:59 PM          2024L003661

g.  Invoicing unapproved and non-business related costs and personal entertainment costs;

h.  Invoicing Skycoin and/or SA for $50,000.00 in cash payments and refusing to provide an explanation or receipts for how the cash was used;

i.  Invoicing Skycoin and/or SA for subcontractors without prior authorization;

j.  Invoicing Skycoin and/or SA full time rates for part-time subcontractors;

k.  Invoicing Skycoin and/or SA for payment to non-existent persons;

l.  Invoicing Skycoin and/or SA for marketing services performed both before and after the company's relationship with Defendants;

m.  Made false representations to Skycoin staff that costs had been approved by Skycoin when they knew said costs had not been approved;

n.  Invoicing Skycoin and/or SA for unapproved "events" on non-existent dates; and

o.  Creating false online profiles and Rewards Program applications with false information in order to defraud Skycoin of $2-$4 million.

(*See also* Facts Common to All Counts)

136.    Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies worked in concert with one another to accomplish this fraud as evidenced by their various communications and concerted acts against Plaintiffs.

137.    Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies intended to defraud Plaintiffs out of their money, their product, and to tortiously interfere with their business relationships.

138.    As a direct and proximate result of Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies improper actions, Plaintiffs were damaged and defamed, forced to pay large sums of money, were defrauded of $2-$4 million, and Skycoin was ultimately not listed on the Bittrex Exchange and was delisted from Binance, resulting in loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

24

FILED DATE: 7/24/2024 7:59 PM    2024L003661

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

### COUNT V
### TORTIOUS INTERFERENCE – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, RYAN EAGLE, AND UNKNOWN INDIVIDUALS AND COMPANIES

139.    Plaintiffs repeat and reallege Paragraphs 1 through 85 of this Amended Complaint as and for Paragraph 139 of this Count V as if fully set forth herein.

140.    Plaintiffs developed business relationships and contracts with various vendors and customers since Skycoin's launch in 2013.

141.    Skycoin sells non-fungible electronic products that fluctuate in value based upon the market rates on specific internet exchanges.

142.    For Skycoin to do business, it must participate in these internet exchange markets, such as, but not limited to, Bittrex, Binance, Kraken, Poloniex and Bifinix, in order to sell its goods.

143.    Stephens, Kunstman, Eagle, Cuthriell, Byerly, and Unknown Individuals and Companies orchestrated various schemes to undermine the reputation of Plaintiffs and cause these internet exchange markets, specifically, Bittrex and Binance, to remove Plaintiffs' products from their exchanges.

25

FILED DATE: 7/24/2024 7:59 PM    2024L003661

144.     Stephens, Kunstman, Eagle, Cuthriell, Byerly, and Unknown Individuals and Companies were fully aware of Plaintiffs' position within these internet exchange markets.

145.     Stephens, Kunstman, Eagle, Cuthriell, Byerly, and Unknown Individuals and Companies were fully aware that Plaintiffs' Skycoin Token must be sold on these internet exchange markets.

146.     Stephens, Kunstman, Eagle, Cuthriell, Byerly, and Unknown Individuals and Companies were fully aware that Plaintiffs had agreements and/or expected agreements with these internet exchange markets.

147.     Stephens, Kunstman, Eagle, Cuthriell, Byerly, and Unknown Individuals and Companies nonetheless acted in concert to cause these internet exchange markets to remove Plaintiffs' Skycoin Token from those markets by committing the following acts:

   a.  Stephens and Eagle hacked and linked pornographic blogs and other harmful spam content to Skycoin's website to decrease Skycoin's website's ranking precipitously in search engines and irrevocably destroy Skycoin's image, reputation, and internet presence;

   b.  Stephens, Kunstman, Cuthriell, and Byerly created and employed a network of journalists to publish fraudulent articles to destroy Skycoin's image and reputation in order to drive down the price of Skycoins;

      i.  Greene, a journalist and reporter, was employed by Stephens and knowingly published false articles regarding the legitimacy of Skycoin and Skycoin's technology;

      ii. Greene was within Stephens's network and at all times knew Stephens was not the COO of Skycoin, yet published that he was, and continued to publish false information even after Smietana's continuous attempts to correct the false claims;

   c.  Stephens, Kunstman, Cuthriell, and Byerly employed Peck to knowingly write a false and defamatory article published in The New Yorker alleging Skycoin as a fraud and a scam;

FILED DATE: 7/24/2024 7:59 PM    2024L003661

d. Stephens solicited an article to be published in Cointelegraph by Simon Chandler, claiming that Plaintiffs' attackers were "emboldened" to physically harm Smietana due to Skycoin's "shady dealings;"

e. Stephens, Kunstman, Eagle, Cuthriell, Byerly, and Unknown Individuals and Companies made public statements bragging that they had paid journalists to publish articles to slander the company;

f. Stephens, Kunstman, Eagle, Cuthriell, Byerly, and Unknown Individuals and Companies publicly discussed the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance; and

g. Stephens, Kunstman, Eagle, Cuthriell, Byerly, and Unknown Individuals and Companies orchestrated having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless allegations.

(*See also* Facts Common to All Counts)

148.    At all relevant times herein, Stephens, Kunstman, Eagle, Cuthriell, Byerly, and Unknown Individuals and Companies intended to cause harm to Plaintiffs' reputation and finances in order to interfere with their relationships with these internet exchange markets, along with their customers and vendors.

149.    As a direct and proximate result of Stephens, Kunstman, Eagle, Cuthriell, Byerly, and Unknown Individuals and Companies' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, RYAN EAGLE, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess

FILED DATE: 7/24/2024 7:59 PM    2024L003661

of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

<u>**COUNT VI**</u>
**UNJUST ENRICHMENT – BRADFORD STEPHENS, AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS AND COMPANIES**

150.    Plaintiffs repeat and reallege Paragraphs 1 through 85 of this Amended Complaint as and for Paragraph 150 of this Count VI as if fully set forth herein.

151.    Defendants were provided approximately $860,000.00 in funds to provide marketing, advertising, and web design services to Plaintiffs.

152.    Specifically, Plaintiffs made the following payments to Stephens, Kunstman, Eagle, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners:

   a.  $107,948.00 ($66,258.00 in the form of four (4) Bitcoins and $41,690.00 in the form of 1,100 Skycoin Tokens) in an initial payment for the Marketing Program paid to Smolder Partners;

   b.  $800,000.00 in Skycoin Tokens paid to Stephens for an internet advertising campaign;

   c.  $14,752.44 paid to Stephens and Byerly as a result of a fraudulent invoice;

   d.  $38,000.00 to Stephens and Eagle in order to quell the cyber attacks initiated by Stephens and Eagle;

   e.  20,000 Skycoin Tokens ($842,400.00) to Smolder Partners for the Marketing Program budget;

   f.  One (1) Bitcoin ($14,314.00) to Smolder Partners for a conference in Miami, Florida;

   g.  3,899 Skycoin Tokens ($121,337.00) to Smolder Partners for the Marketing Program budget;

   h.  Two (2) Bitcoins ($23,212.00) and 2,625 Skycoin Tokens ($80,929.00) to Smolder Partners for Marketing Program labor costs;

FILED DATE: 7/24/2024 7:59 PM    2024L003661

    i.    Four (4) Bitcoins (56,457.00) and a separate payment of 1.30 Bitcoin to Stephens and Eagle for the Marketing Program and to combat the aforementioned attacks on Skycoin's website; and

    j.    $127,000.00 as part of the Extortion Payments to Stephens and Eagle.

    (*See also* Facts Common to All Counts)

153.    In addition to the payments made by Plaintiffs, the Assailants, in connection with their conspiracy with Stephens and Eagle, stole 18.88 Bitcoin ($139,160.33) and 6,466 Skycoin ($81,018.98), totaling $220,179.31 from Plaintiffs.

154.    Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies also obtained approximately $2-$4 million in Skycoin Tokens through false reward applications.

155.    Stephens, Kunstman, Eagle, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners invoiced and charged Plaintiffs for work that was never completed.

156.    These funds and goods were not earned, were stolen by fraudulent means, and Plaintiffs received no equivalent value for them in return.

157.    It would be unconscionable and against fundamental principles of justice, equity and good conscience for Stephens, Kunstman, Eagle, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners to retain the benefit from those funds, which were paid by Plaintiffs without receiving any benefit in return.

158.    As a direct and proximate result of Stephens, Kunstman, Eagle, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

FILED DATE: 7/24/2024 7:59 PM    2024L003661

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT VII
### DEFAMATION – MORGEN PECK AND BRADFORD STEPHENS

159.    Plaintiffs repeat and reallege Paragraphs 1 through 85 of this Amended Complaint as and for Paragraph 159 of this Count VII as if fully set forth herein.

160.    The New Yorker is an American weekly magazine publication owned and published by Defendant Condé Nast.

161.    At all times relevant herein, Peck was an actual agent of Condé Nast.

162.    At all times relevant herein, Peck was an apparent agent of Condé Nast.

163.    At all times relevant herein, Peck was acting within the course and scope of her authority as an agent of Condé Nast.

164.    At all times relevant herein, Peck was acting within the course and scope of her authority as an apparent agent of Condé Nast.

165.    On Aug 18, 2021, the New Yorker Article authored by Peck was published in the New Yorker (see Ex. A).

166.    The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

FILED DATE: 7/24/2024 7:59 PM    2024L003661

167.    Peck published blatant lies and misrepresentations about Plaintiffs in her New Yorker article including, but not limited to the following:

a.  Misrepresenting Smietana's relationship with Stephens and Stephens's involvement with Skycoin and Skycoin's marketing campaign;

b.  Statements alluding to Smietana and Skycoin as a fraud and a scammer, such as:

  i.  "In a way, it makes you into a fraud;"

  ii.  "Is it a scam? I'm 99 percent sure of it"; and

  iii.  Suggesting that Skycoin was part of a "pump and dump" scheme.

c.  Falsely stating that Stephens has recordings of Smietana stating, "We want to feminize the peasant population to make them more docile ... [i]t's so they don't revolt;"

  i.  Smietana asked Peck on multiple occasions about the existence of the alleged recording to verify the contents of her claims for this statement, however Peck never confirmed that she obtained such a recording, even though it was used as a purported source for factual information in the article.

  ii.  Smietana denied such statements to Peck multiple times, each time reiterating that they were fabricated and untrue. Peck still published the statements.

  iii.  Peck admitted to Smietana that no one she interviewed would corroborate the quotes given by Stephens. Therefore, Peck knew or should have known the published quotes were false.

  iv.  Peck knew that Stephens and Kunstman were members of the Neo Nazi alt-right internet forum "/pol/" and that similar antisemitic quotes were circulated there.

  v.  As a result of the publication of the article, a Neo Nazi publication cited to the false statement from Peck's article quoting Smietana, and thereby causing damage to Plaintiffs' reputation.

  vi.  As a result of the publication of this statement, Smietana was subjected to numerous death threats, harassment, and various hate crimes.

FILED DATE: 7/24/2024 7:59 PM    2024L003661

d. Falsely stating that Smietana invited Binance executives to a Skycoin party during a 2018 conference in Las Vegas and instructed Stephens to hire prostitutes for the executives;

    i. In fact, it was confirmed there were no Binance executives at the conference and the party was a private party of Stephens, without any affiliation to Skycoin or Plaintiffs.

    ii. Stephens's job was to set up meetings at conferences. He unilaterally held a private party without instruction to do so. Any approval for holding an event was contingent upon finding people from Binance, who were, in fact, not in attendance at the conference.

    iii. This inaccurate depiction of events was designed to destroy the relationship between Binance and Skycoin and was manufactured solely to do damage to Plaintiffs' reputation and business.

    iv. Peck knew or should have known the statements were false because Smietana sent her the messages from Stephens relating to the conference.

    v. Peck interviewed Michael Terpin (the event organizer) and Daken Freebourne (Skycoin's head of events), who explicitly told Peck that Stephens was a compulsive liar and that his account was fabricated.

    vi. Peck merged stories from three separate conferences into a non-factual and defamatory account, designed to inflict damages to Plaintiffs.

e. Publishing conclusory and unsupported statements by others;

    i. Stating that "according to several people" (without any evidence or support), that Skycoin privately sold to investors at a discounted rate;

    ii. Publishing numerous unsupported statements supposedly from "employees" of Skycoin, however, Peck told Smietana that she did not have documentation to show who these "employees" were, if and when they worked at Skycoin, or any confirmation of their statements; and

    iii. Publishing statements made by people against whom she knew Smietana had an ongoing lawsuit against and therefore knew or should have known these were unreliable sources.

f. Falsely accusing Smietana of pre-mining "a hundred million coins, which were scheduled for circulation;"

    i. Peck published this statement with full knowledge that Skycoin does not engage in any mining.

FILED DATE: 7/24/2024 7:59 PM    2024L003661

ii. During fact checking, Peck referenced a website that listed companies with pre-mine scams.[5]

1. The website listed "SYC Skycoin – premined" under a list titled, "List of scamcoins – do not use."

2. SYC Skycoin is a completely different company from SKY Skycoin (Plaintiff).

3. Peck knew that SYC was not Plaintiffs' company and that SYC was not SKY.

4. Peck falsely accused and published in her article that Skycoin engaged in a pre-mining scam.

g. Falsely accusing Smietana of directing Skycoin's marketing unit to purposely spread negative rumors to attract attention by stating "In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention;"

i. Peck does not provide support to confirm where this chat was from, who the "investors" were, or the full context of the conversations.

ii. The quote itself is purposely suggestive and alludes that Skycoin publishes negative rumors for promotion but does not clarify who "they" are that "spread negative rumors."

h. Falsely accusing Smietana of "plotting new distractions;"

i. In support of this claim, Peck quoted Smietana, "Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it."

ii. Smietana was improperly quoted and Smietana's words were purposely skewed by Peck and taken out of context to defame Smietana and Skycoin.

iii. The quote is a snippet of a message that clearly signifies a joke, in which the full text reads "The media is retarded. They are still writing articles about the 'insider trading' of cat memes, fake news. Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it. 'Kittycash CEO beheaded by ISIS after SEC investigation.'"

---

[5] The website can be found at: https://altcoins.com/scamcoins

33

FILED DATE: 7/24/2024 7:59 PM    2024L003661

i. Purposely taking direct quotes from chatrooms/messaging conversations and placing them out of context to twist their meaning and damage Plaintiffs;

    i. Peck wrote, "A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coordinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved)."

        1. The quote was purposely misconstrued as it had nothing to do with insider trading channels.

        2. It was evident from the chat conversations that any reference to any "secret insider trading" was a joke.

        3. Peck knew that the "secret chat rooms" were, in fact, public channels, accessible to all people.

    ii. Peck quoted Smietana as stating "If you put in a million dollars now, and we have a run just as large as the last one, you're going to be at fifty million dollars;"

        1. This statement was knowingly taken out of context, altering its meaning, and presented Smietana in a false light.

        2. Peck's quote claims that Smietana engaged in price promotion for Skycoin, knowing that Smietana was prohibited from making such statements by company policy and that Smietana could be fired or reprimanded for violation of company policy for making these statements.

        3. Peck knew or should have known that these out of context statements would expose Plaintiff Smietana to legal liability and damage his reputation and business.

        4. Peck admitted to Smietana that she could find no example of Smietana engaging in price promotion.

    iii. Peck quoted Smietana as stating, "many could be corroborated only by people whom he swore existed but who couldn't talk because they had government security clearance, or were in hiding, or because he didn't know their real names;"

34

FILED DATE: 7/24/2024 7:59 PM    2024L003661

1. Smietana's actual quote was, "all software developers who work in cryptography have government security clearance, because government contractors are the only clients of the industry."

2. Peck distorted and/or manufactured, statements wholesale for the purpose of defaming Plaintiffs.

j. Falsely accusing Smietana of having sole control of the "pre-mined" coins and Skycoin's virtual wallets;

   i. It is public knowledge that Skycoin is an incorporated corporate entity and not under the sole control of one person.

   ii. Peck had possession of Skycoin's incorporation documents and corporate structure, and therefore knew or should have known that her statements were false.

k. Accusing Smietana of soliciting advice from an online personality who used a Hitler avatar in his profile;

   i. Peck admitted to Smietana during fact checking that she could not find any evidence substantiating her statement that Smietana solicited and made payments to internet users with a Hitler avatar.

   ii. Peck admitted to Smietana that only Stephens and Kuntsman had made these claims, and that no other persons could corroborate these statements.

   iii. Peck continued to publish the above statement, knowing its defamatory and false nature.

l. Alleging that Smietana lied about the extent of his medical injuries sustained from the attack on himself and his girlfriend, even after publishing that Smietana's attackers admitted to detaining and injuring Smietana and his girlfriend;

   i. Smietana provided Peck with copies of court proceedings and medical records, clear evidence that the claims she published in the article were false.

m. Alleging that Smietana used the attack on himself and his girlfriend to "use his power to freeze Skycoin transactions," when Smietana clearly stated in an official announcement to the Company that funds were frozen after making sure all Skycoin staff were safe after the attack and extortion demands;

   i. Peck knew that Skycoin's lead developer, Steven Leonard, not Smietana, had initiated freezing the stolen funds from the Chinese marketing team and employee accounts after the company detected embezzlement.

35

FILED DATE: 7/24/2024 7:59 PM    2024L003661

    ii.   Peck knew that the funds that were frozen were solely company accounts.

n.   Peck implied that that Smietana had been employed as a software developer by the notorious Washington DC lobbyist, Jack Amabrov, who had several felony convictions, including a plea bargain for SEC violations; and

    i.   Peck was aware that the allegations were false because the company directly informed her that Smietana had briefly spoken to them in 2018, but that no agreement had been reached.

    ii.   Peck admitted that the statements were false and apologized to Smietana multiple times for bringing up false claims.

    iii.   Peck knew or should have known that claiming Smietana had been employed by Jack Amabrov would cause severe damage to Plaintiffs' business and reputation.

o.   Peck implied that one of Skycoin's mathematical algorithms, "Obelisk", did not actually exist and that Plaintiffs committed fraud.

    i.   Peck knew that these statements were false, as she had possession of both the source codes and white paper for the algorithm.

    ii.   Additionally, Skycoin's algorithm papers were published on Skycoin's website and in peer reviewed journal articles. This information was publicly available, and Peck had access to the public links to these algorithms.

    iii.   Peck had this information at the time she claimed these algorithms did not exist.

168.    Peck wrote that "Stephens came up with a plan to strip Smietana of power and transfer management of the company to a foundation."

169.    Peck, knowing that Stephens' intentions were to take Skycoin from Smietana, continued to base her article on information provided mainly by Stephens, completely disregarding his clear bias and motive to disenfranchise Smietana from Skycoin and seize control of Skycoin.

170.    After the New Yorker Article was published, a former employee of Stephens and Kunstman contacted Plaintiffs stating that Peck received money to intentionally produce and

36

FILED DATE: 7/24/2024 7:59 PM   2024L003661

publish a defamatory article attacking Plaintiffs and would receive bonus payments for destroying Skycoin's relationship with Binance.

171.    The statements made by Peck in the New Yorker Article were purposely false and defamatory in return for financial gain and personal benefit of Peck.

172.    Peck acted within the scope of her agency with principal Condé Nast when she submitted and published the New Yorker Article.

173.    As a direct and proximate result of Peck's libelous publication, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

174.    As a direct and proximate result of Peck's libelous publication, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendant, MORGEN PECK, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## <u>COUNT VIII</u>
## DEFAMATION - AMERICAN PUBLISHERS, INC. d/b/a CONDÉ NAST AND d/b/a THE NEW YORKER MAGAZINE

175.    Plaintiffs repeat and reallege Paragraphs 1 through 85 and Paragraphs 160 through 174, inclusive of subparts, of this Amended Complaint as and for Paragraph 175 of this Count VIII as if fully set forth herein.

FILED DATE: 7/24/2024 7:59 PM   2024L003661

176.     Condé Nast is a global mass media company operating various brands, including Defendant The New Yorker.

177.     The New Yorker is an American weekly magazine publication owned and operated by Defendant Condé Nast.

178.     At all times relevant herein, Peck was an actual agent of Condé Nast.

179.     At all times relevant herein, Peck was an apparent agent of Condé Nast.

180.     The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

181.     On August 18, 2021, Condé Nast, by and through The New Yorker, published the New Yorker Article authored by Peck which reached millions of readers worldwide.

182.     Approximately one week prior to publication, Anna Boots, Fact Checker for The New Yorker, contacted Smietana regarding the article and stated:

     a.  That Peck's article was the longest fact checking she ever had to do (approximately 3 months);

     b.  That numerous unsubstantiated claims were made in Peck's article;

     c.  That Peck interviewed Michael Terpin regarding the 2018 Las Vegas conference and he informed her that Stephens was an unreliable source and a compulsive liar;

     d.  That the fact checking process was difficult to complete because almost all the information was provided two people, with most claims and statements being unsubstantiated; and

     e.  That her editor at The New Yorker set a "firm publication date regardless of [fact checking] completion."

183.     Condé Nast, by and through The New Yorker, published Peck's article without properly and completely fact checking the defamatory statements made and checking Peck's sources and their credibility.

38

FILED DATE: 7/24/2024 7:59 PM    2024L003661

184.    As a direct and proximate result of the libelous publication in The New Yorker, Plaintiffs suffered economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

185.    As a direct and proximate result of the libelous publication in the New Yorker, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendant, AMERICAN PUBLISHERS, INC., d/b/a CONDÉ NAST and d/b/a THE NEW YORKER MAGAZINE, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

### COUNT IX
### BREACH OF FIDUCIARY DUTY – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS AND COMPANIES

186.    Plaintiffs repeat and reallege Paragraphs 1 through 85 of this Amended Complaint as and for Paragraph 186 of this Count IX as if fully set forth herein.

187.    At various times, Stephens, Kunstman, Cuthriell, and Byerly were acting as contractors hired by Plaintiffs to perform certain duties for the marketing of Skycoin.

188.    Per that relationship and agreement, Stephens, Kunstman, Cuthriell, and Byerly were to adhere to the terms of the agreement and provide the services promised.

189.    Stephens, Kunstman, Cuthriell, and Byerly instead engaged in various schemes to defraud Plaintiffs, including promising marketing and promotions materials that were never

FILED DATE: 7/24/2024 7:59 PM    2024L003661

performed, implementing public schemes to damage Plaintiffs' reputation needing immediate marketing damage control, and providing marketing services below the quality and type of what was agreed upon.

190.    Stephens, Kunstman, Cuthriell, and Byerly did not provide the promised services to Plaintiffs, despite Plaintiffs having paid for those services.

191.    Stephens, Kunstman, Cuthriell, and Byerly had a duty to adhere to the terms of the agreements and to provide Plaintiffs with the promised services.

192.    Stephens, Kunstman, Cuthriell, and Byerly breached that duty by failing to adhere to the terms of the agreements and failing to provide Plaintiffs with the promised services.

193.    As a direct and proximate result of Stephens, Kunstman, Cuthriell, and Byerly's improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT X
### BREACH OF CONTRACT – BRADFORD STEPHENS, AARON KUNSTMAN, AND JOEL WAYNE CUTHRIELL

FILED DATE: 7/24/2024 7:59 PM    2024L003661

194.     Plaintiffs repeat and reallege Paragraphs 1 through 85 of this Amended Complaint as and for Paragraph 194 of this Count X as if fully set forth herein.

195.     On or about January 8, 2018, Plaintiffs entered into an agreement with Stephens, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

196.     Following that agreement, Stephens failed to provide the contracted services, creating false "threats," and extorting funds from Plaintiffs through coercion.

197.     Stephens, Kunstman, and Cuthriell did not adhere to the terms of the Agreement despite payment.

198.     Plaintiffs, at all times relevant herein, fully performed on their obligations under the their agreement with Stephens, Kunstman, and Cuthriell.

199.     Stephens, Kunstman, and Cuthriell failed to provide any advertising or marketing services to Plaintiffs during the duration of the contract.

200.     Stephens, Kunstman, and Cuthriell breached their obligations under the contract through the following acts or omissions:

   a.   Failing to provide advertising services;

   b.   Failing to provide marketing services;

   c.   Failing to use the funds provided for the advertising or marketing services;

   d.   Failing to provide web design services;

   e.   Failing to use funds to effectuate any web design;

   f.   Failing to stay within the bounds of the expense budget; and

   g.   Attempting to extort additional funds outside of the contract terms.

41

FILED DATE: 7/24/2024 7:59 PM    2024L003661

201.    As a direct and proximate result of Stephens, Kunstman, and Cuthriell's improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, and JOEL WAYNE CUTHRIELL, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT XI
### VIOLATIONS OF 735 ILCS 5/12-7.1 – BRADFORD STEPHENS AND AARON KUNSTMAN

202.    Plaintiffs repeat and reallege Paragraphs 1 through 85 of this Amended Complaint as and for Paragraph 202 of this Count XI as if fully set forth herein.

203.    Upon information and belief, during the years 2019-2021, Stephens and Kunstman, through various internet media and in person, made numerous anti-Semitic statements and threats of death, kidnapping, and other acts of violence against Smietana.

204.    All of these threats were based on Smietana's religion and Jewish heritage.

205.    Stephens and Kunstman also discussed Skycoin as a "Jew coin", called holders of Skycoin Tokens "Skygoyim," and other similar hate speech, which Smietana perceived as a direct threat due to his being Jewish (See Exhibit C).

206.    Stephens and Kunstman posted these messages on various social media platforms and also made said threats directly to Plaintiff.

FILED DATE: 7/24/2024 7:59 PM    2024L003661

207.    In furtherance of their threats, the Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

208.    Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin with a market value of $81,018.98, totaling $220,179.31.

209.    As a direct and proximate result of Stephens and Kunstman's aforesaid unlawful acts, Plaintiffs were damaged, subjected to religion and heritage-based violence, online harassment, a home invasion, kidnapping and torture, and had great sums of money stolen by the Assailants.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and AARON KUNSTMAN, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

Respectfully submitted,

**BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation**

By: /s/James A. Karamanis
One of Plaintiffs' Attorneys

43

FILED DATE: 7/24/2024 7:59 PM   2024L003661

James A. Karamanis
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

FILED DATE: 7/24/2024 7:59 PM    2024L003661

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS INC., a Delaware Corporation, | |
| Plaintiffs, | |
| v. | Case No. 2024L003661 |
| BRADFORD STEPHENS, AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, AMERICAN PUBLISHERS, INC. d/b/a CONDÉ NAST and d/b/a THE NEW YORKER MAGAZINE, and UNKNOWN INDIVIDUALS AND COMPANIES, | |
| Defendants. | |

### AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222(b)

Pursuant to Supreme Court Rule 222(b), counsel for the above-named Plaintiffs certifies that Plaintiffs seek money damages in excess of Fifty Thousand and No/100 ($50,000.00), exclusive of interest and costs.

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

/s/James A. Karamanis

James A. Karamanis
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

45

FILED DATE: 7/24/2024 7:59 PM   2024L003661

# EXHIBIT A

FILED DATE: 7/24/2024 7:59 PM    2024L003661

ANNALS OF TECHNOLOGY

# PUMPERS, DUMPERS, AND SHILLS: THE *SKYCOIN* SAGA

*The cryptocurrency promised to change the world and make its users rich in the process. Then it began to fall apart.*

**By Morgen Peck**

August 18, 2021

FILED DATE: 7/24/2024 7:59 PM    2024L003661



Illustration by Nata Metlukh


Save this story

FILED DATE: 7/24/2024 7:59 PM    2024L003661

On an April afternoon in 2011, a twenty-seven-year-old tech entrepreneur named Bradford Stephens arrived at a stucco bungalow near the canals of Venice, California. He had recently started a new data-analytics company, and had come to speak with a coder named Brandon Smietana, whom he hoped would get involved. Stephens had already met Smietana online, where he uses the handle Synth, and where he often debated minute points about math and programming. When Stephens and Ryan Rawson, an employee who tagged along, arrived, Smietana invited them into a carpeted den. A computer sat on a table, its casings removed to reveal a tangle of circuits; a sleeping bag lay on a sofa. Smietana was in his early twenties, with dark hair and a youthful face. Rawson told me, "He had the air of this mad scientist couch surfing." Stephens pitched his new company, but got no traction. Smietana had turned his attention to a new technology: cryptocurrency. "The only people who have to work for money are the people who cannot create it or print it out of thin air," he told them.

The first cryptocurrency, Bitcoin—released in 2009 by an anonymous programmer (or a group of them) called Satoshi Nakamoto—was a feat of computational brilliance. A bitcoin is an abstract unit of value that people track and spend with digital wallets. When someone contributes her computer's power to process Bitcoin transactions, the computer also races to solve an equation, a process called "mining." Each solution that meets certain criteria mints new coins. The number created decreases by half every four years or so—an event known as the Halvening—which keeps the supply limited, guarding against inflation. The whole economy is maintained on a blockchain, a shared ledger that keeps a tally of every Bitcoin transaction. As miners add transactions, the Bitcoin software coördinates and finalizes their contributions, making the ledger transparent and unchangeable and the system nearly impossible for governments to shut down.

But the technology has a flaw: as more people use it, transactions become slower and more expensive. The average transaction fee fluctuates wildly; one day last week, it was two dollars and thirty-three cents, making it more expensive than any major credit card for everyday purchases. The pursuit of a better Bitcoin quickly became a full-blown academic field, with its own conferences, university courses, and peer-reviewed journals. But, as Smietana explained over the next few years to anyone who would listen, he had the solution. He was designing a cryptocurrency that could be sent around the world instantaneously, for next to nothing. He called it Skycoin.

He was going to use this currency, he said, to create a decentralized version of the Internet, called Skywire. He planned to build a large mesh network, a system that allows people to use special Internet routers to share bandwidth with their neighbors. With enough members, a network can bypass service providers, making it harder for corporations and governments to surveil Internet use. But it's difficult to

FILED DATE: 7/24/2024 7:59 PM    2024L003661

retain volunteers. "A community network really needs density before it is useful," Brian Hall, of NYC Mesh, the largest community network in the U.S., wrote in a blog post. "It can be a chicken and egg problem." Smietana's project proposed a different way to attract people: pay them. His customers would share bandwidth using routers called Skyminers, and get paid for their service in Skycoin. He envisioned a new cryptocurrency spent over a community-owned Internet, calling it "the last step to fulfilling Satoshi's mission."

Stephens left his first meeting with Smietana believing that he could be destined for greatness. Skycoin launched publicly two years later, in 2013. The following year, Stephens attended a party at Smietana's new place, an unrenovated warehouse just south of L.A. Someone had painted the walls with images of horned monsters. "It was very Burning Man meets H. P. Lovecraft," Stephens told me. Stephens's friend Baron Chat, a photographer who attended, said, of Smietana, "He seemed to be receiving his signal from a different station than everyone else." According to Stephens, Smietana asked him to join the fledgling project, but he demurred. (Smietana said he doesn't remember seeing Stephens at the party.)

The first cryptocurrency boom arrived in 2017. "Several investors I knew, and a lot of my friends, started pivoting from angel investing to putting money in crypto and seeing insane returns," Stephens told me. Skycoin had a "token sale"—a sort of I.P.O. for cryptocurrencies—and was listed on two small exchanges. By the end of 2017, its price had gone from a little more than a dollar per coin to about fifty dollars per coin. That December, while Stephens was on vacation with his wife in Japan, Smietana messaged him with another chance to get involved. It seemed like an opportunity to work on something revolutionary. But he also thought, Everybody else is getting rich off crypto, so why not me? He said that he later told Smietana, "I'm going to need 50K up front and I gotta hire a team." After a couple days, he checked his Bitcoin wallet and found fifty thousand dollars sitting in it. "I'm, like, 'I guess I'm hired,' " he said. (Smietana denies sending the money, though he had said he would do so in texts, and there's a record of such a transaction on the Bitcoin ledger.) Before leaving Kyoto, he and his wife had visited a shrine to Inari, the Shinto god of rice, where they left offerings and made wishes. His wife wished for the health of her father, who was battling cancer. "I asked for wealth and adventure," Stephens told me. "And I got one of those."

In the past decade, a shift has occurred in the way that cryptocurrencies are distributed. Satoshi put bitcoins into circulation through a reward system: the more computing power you contribute, the more coins you can mint. Some early adopters paid their rent simply through mining. Around 2012, though, people began devising blockchains that could be used for more ambitious applications: supply chains with real-time geolocation, for example, or patient-controlled medical records. Such projects required capital, compelling founders to experiment with less democratic ways to distribute coins. In 2013, J. R. Willett, the founder of Mastercoin, invented the "initial coin offering," or I.C.O., the first token sale: developers partially pre-mined their tokens and then sold them off to raise money. Michael Terpin, who has managed two hundred such token sales, and who handled public relations for Skycoin,

told me that the scheme empowers entrepreneurs. "Somebody who had an innovative product could sell directly, prior to it being built, to an audience of enthusiasts," he said, without having to "give up a third of the company."

A frenzy followed a few years later. Since 2017, hundreds of projects have announced token sales. One of the most lucrative, EOS, raised about three and a half billion dollars in a yearlong I.C.O. Many projects amassed funds even before their blockchains or applications existed; some prepared assiduously, but others merely threw together a Web site, a list of advisers (sometimes without their knowledge), and some semblance of a technical paper (sometimes plagiarized). "A playbook really emerged for how to set up a legitimate-looking I.C.O.," Matt Chwierut, the head of research at Smith & Crown, a blockchain research firm, told me.

In 2018, I attended the North American Bitcoin Conference, in Miami. On the main stage, representatives from companies with unpronounceable names riled up the crowds. Downstairs, an arcade of booths hawked every kind of blockchain project: smart glasses, cargo robots, refugee-identity documents. At a booth for a group claiming to build a volunteer emergency-services network, I asked why the endeavor required a coin. The attendant told me to come back later when someone more technical would be arriving.

Because bitcoin mining is regulated by algorithms, everyone, in theory, has a fair chance of getting new coins. But, to receive pre-mined coins in a token sale, you often have to buy publicly at the sale price or else negotiate a deal behind the scenes. "A lot of coins were being sold on the side and in secret," Josh, a major cryptocurrency investor—who eventually bought into Skycoin, and requested that I use only his first name, out of concern for his safety regarding another matter—told me. "You'll do special deals with people if they give you three or four or five million dollars up front." This created a sense that making your fortune required being in the right room to get the right tip.

On the second night of the conference, I went to a strip club for an after-party, where flashing your badge got you a crypto-inspired cocktail. (I ordered a Satoshi Sour.) Guests exchanged advice, sure that they were getting the best inside information. But a few hours later a friend whisked me off to a more exclusive party, thrown at a beachside bar by Patrick Byrne, the former C.E.O. of Overstock. (Byrne stepped down in 2019, after it was revealed that he had had an affair with the Russian agent Maria Butina.) The attendees were celebrating the hundred-million-dollar token sale of Byrne's trading platform, TZero, which he said was going to "drag Wall Street behind the barn, kill it with an axe, and re-create it on blockchain." There were giant platters of sushi and oysters; the rapper Flo Rida pulled Byrne up onto the bar for a sing-along. Guests exchanged invites to exclusive chat rooms on Telegram, an app favored by coin enthusiasts. I turned to a man next to me and asked what had brought him to the party. He rubbed his thumb and forefinger together and shouted, "Making money."

FILED DATE: 7/24/2024 7:59 PM    2024L003661

FILED DATE: 7/24/2024 7:59 PM          2024L003661

The employment structure at Skycoin was loose, and Stephens joined without a contract. "Here I was, a guy used to wrangling hundred-page venture-capital contracts, and I'm joining a company with no last names and barely any first names," Stephens said. Smietana, who by then was living in Shanghai, had pre-mined a hundred million coins, which were scheduled for circulation. Skyminer routers were just starting to ship, but sales had already outstripped production. Smietana estimated that operators who used Skyminers could make between fifteen thousand and forty-five thousand dollars a month. Most coinholders I spoke to were young men around the world—medical students, craftsmen, 3-D animators—who believed in the project. In chat rooms, Smietana's followers addressed him with reverence. "We all are in honor to speak with synth," a user called Anosis wrote. "It's like having a chance to talk to Satoshi."

Although Stephens studied computer science in college, he admitted that, when he started working with Skycoin, he "hardly knew anything about crypto." He was told to handle marketing, and assembled a team composed mostly of friends and former associates. (Smietana now claims that he contracted a marketing company that Stephens ran, not Stephens himself.) But he soon realized that word about the project was already spreading. Large investors recruited in their own circles, and smaller coinholders hyped Skycoin on social media. At one point, Skycoin advertised a bounty program that promised users coins in exchange for promotional activities, such as writing blog posts and creating YouTube videos. One user-made video, titled "Skycoin - To the Moon," featured footage of a shuttle blasting off next to a chart of Skycoin's market value, interspersed with a closeup of glossy lips and the words "YOU COMIN'?" People who proved their worth on Telegram often got pulled up the ranks. "I started to spend 90 hours a week in the chat room," a user called Sudo, who became one of Skycoin's Telegram channel moderators, and who refused to tell me his name, messaged me. "They seen how active I was and offered me a job."

By early January, 2018, the total estimated value of pre-mined Skycoins had reached almost five billion dollars. Smietana sent representatives to conferences in New York, Lisbon, San Francisco, and Singapore, and arranged a retreat in Mauritius. A former marketing contractor, who requested anonymity out of fear of harassment, recalled that Smietana could spend lavishly on the people who worked with Skycoin, in one case paying for cryotherapy, vitamin injections, thousand-dollar steak dinners, and a twelve-thousand-dollar trip to the Esalen Institute. "Dude was very liberal with his spending and could be very generous," the marketing contractor said. The team posted a video of a yacht party, and thundered around in Ferraris. In New York, Skycoin reps cruised in a helicopter to grab footage of a Skyminer held over Manhattan's skyline.

That month, Stephens flew to Las Vegas to speak on a panel at the CoinAgenda summit. He wasn't up to speed on the technical aspects of Skycoin yet, but he held a Skyminer over his head and said, "You all are the first to see the new Internet!" On the first day of the conference, Smietana sent Stephens a voice memo with an urgent request. He was hoping to get Skycoin listed on Binance, one of the world's

FILED DATE: 7/24/2024 7:59 PM 2024L003661

largest cryptocurrency exchanges, which could help secure its legitimacy. During the I.C.O. boom, it was common for projects to pay a "listing fee" in order to be included on an exchange. (Binance claims that it chooses projects based solely on "strict security, legal, and regulatory compliance standards." In 2018, facing pressure, it announced that it would donate its listing fees to charity.) Smietana said that he had paid Binance executives seven and a half million dollars but that they hadn't followed through. (Binance confirmed that Skycoin paid it a hundred and fifty thousand Skycoins to spend on "promotion," which were worth seven and a half million at the coin's peak.) Smietana told Stephens to entertain the executives, to sweeten the deal. Stephens planned a party in a penthouse suite at the Bellagio. Smietana gave explicit instructions via voice messages: "You have to buy prostitutes for the people at Binance," he said. "Get them, like, three girls each." (Smietana denies any involvement in the party, and claims that his voice messages about it were "either a joke or a deep fake but probably a deep fake.")

That night, Stephens and Baron Chat, who had also started working on Skycoin's marketing, along with Catherine Byerly, another member of the team, sat in the hotel suite, with champagne on ice. Six escorts arrived at nine, and the employees instructed them to make the Binance executives feel like "rock stars." "To them, I was this, like, stereotypical businesswoman in an Ann Taylor dress," Byerly said. "But inside I'm thinking, How did my decisions lead me here?" Chat said, "It felt almost like you were in the process of living out some bizarre reality that sometimes you see in the movies. The weird excess . . . Crazy shit happens when you have a corporate account and a green light." By ten o'clock, the executives hadn't shown up, and Stephens began to worry that he'd lost the deal. He couldn't reach Smietana, so he frantically called the event organizers. They explained that not only had no Binance reps showed up at the conference—they weren't even on the registration list. (A spokesperson at Binance told me that the company neither requested nor knew about the party.) "That's when I started taking anything Brandon said with a grain of salt," Stephens told me. Still, he decided that, "if this is going to be weird, I'm going to make it memorable weird." Some of the escorts took their pay and left; the rest drank champagne and played Cards Against Humanity with the group into the morning.

When Stephens returned from Las Vegas, he set about mapping Skycoin's progress. One of the company's main selling points was Obelisk, an algorithm that allowed it to send coins cheaply and quickly. On Telegram, Smietana insisted that everything that came before was "obsolete and primitive." He boasted that Obelisk was written by Houwu Chen, a developer who had worked on Ethereum, the second-most popular cryptocurrency platform. He posted an academic paper written by Chen on the Skycoin Web site, claiming that it was a Skycoin white paper. But when Stephens reached out to Chen, he got no response. "We kept trying to chase people down to ask details, and it was slowly revealed it just . . . didn't exist," he told me. In a later discussion about technical details, a Skycoin "community manager" told coinholders that "it's too advanced to share" and that the company "can't trust the public with it." When pressed, Smietana wrote, of Chen, "He is a recluse, I doubt anyone can contact him or he would respond." Smietana eventually told me that Chen had taken a payment of a million Skycoins for his work on the white paper and then left the project. (Chen declined to comment,

FILED DATE: 7/24/2024 7:59 PM    2024L003661

saying, "Just don't put my name in the article. That's my statement.") Stephens discovered that Obelisk had never been implemented. (Smietana now acknowledges this, but claims that the project has published some of Obelisk's code and used it in simulations.)

Skycoin's payments were fast, but only because transactions were processed on a single server, rather than on a decentralized network of computers. The server sat in the Shanghai office of Scott Freeman, the C.E.O. of the C2CX cryptocurrency exchange. This also meant that, if Smietana wanted to, he could freeze transactions. "The big thing about a blockchain is it's supposed to be decentralized, and no single entity is supposed to be able to change it," Freeman told me. He added, of Skycoin's setup, "In a way, it makes you into a fraud." (Smietana claims that his power to freeze transactions was designed as a security measure.) Freeman said that he nagged Smietana about implementing Obelisk but that Smietana told him, "People don't really care. It's not worth it. We should spend our resources on other things." (Smietana denies this.)

Skycoin's Web site claimed that multiple payments were scrambled together to provide extra privacy, but this feature was never implemented in the Skycoin wallet. The pre-mined coins sat in virtual wallets under Smietana's sole control. (When pressed, Smietana claimed that he shared control of the coins with a secret group of advisers, but refused to give me their names.) When Stephens asked to see Skycoin's accounting books, Smietana explained that his girlfriend, Sarah, was in charge. Sarah told Stephens that the accounting was a work in progress. (Smietana denies directing Stephens to Sarah, and she denies being in charge of the project's accounting.) Everything seemed haphazard. Stephens was once paid from a bank account in Mauritius registered under a different name; many employees were paid in bitcoin or Skycoin.

In early February, 2018, a month after the CoinAgenda conference, Stephens booked a trip to Shanghai to see Smietana, determined to bring some order to Skycoin. One night, he had dinner with Smietana and members of a Chinese marketing team that Smietana had hired, at a steak house in Xuhui. As the dinner began, Smietana rose from his chair and launched into a rambling diatribe of conspiracy theories. For hours, he catalogued the hidden crimes of a class of global élites who controlled citizens through virtual reality, medical marijuana, and pornography. At some point, Stephens started recording Smietana on his phone. "We want to feminize the peasant population to make them more docile," Smietana says. "It's so they don't revolt."

Stephens told me, "I just became shell-shocked. What the fuck have I gotten myself into?" He had seen Smietana post conspiracy theories on Telegram before, but he figured it was a joke. In the weeks after the dinner, Stephens tried to warn some investors, but felt that they brushed him off: "They would be, like, 'Brandon is just doing his thing, and the value of the coin keeps going up.' "

Shortly after Stephens returned from Shanghai, a reporter named Tristan Greene published a scathing article about Skycoin on the Next Web, a technology-news Web site, condemning the

FILED DATE: 7/24/2024 7:59 PM    2024L003661

company for pre-mining its coins. The Skyminer router was being sold for one bitcoin—worth about ten thousand dollars at the time—but Greene highlighted the fact that it was constructed from components worth about six hundred dollars. Customers got back the ninety-four-hundred-dollar difference, but it came in Skycoin, which still sold only on small exchanges, making it difficult to trade in quantity. (The software for the miners was also incomplete; users connecting to Skywire had no way to pay for the service. Smietana claims that this feature is still under development.) Stephens granted Greene an interview but couldn't persuade him of the project's legitimacy. Greene wrote, "Is it a scam? I'm 99 percent sure of it."

Skycoin went into full damage-control mode. The project had been running a black-ops marketing unit sometimes referred to as Shill Team Six, composed of users plucked from Telegram who specialized in manipulating attention on the Internet. The "shills" occasionally flooded 4chan and Reddit, keeping engagement up with memes and bots. A former member of Skycoin's inner circle, who also requested anonymity, told me that if someone spoke ill of Skycoin the shills could be sent in to "make their life difficult," by digging up embarrassing information. (Smietana denied directing the group, saying it was "completely out of control.") The shills found that even bad publicity could be good for Skycoin. In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention. "Direct promotion does not get to front page and has low click rate," he wrote. "If they create contraversy, then it directs attention and clicks to skycoin." (Smietana claimed that these messages were taken out of context.)

Stephens knew that Smietana pored over texts about crowd psychology and even solicited advice from DJ Hives, an anonymous online personality who at one point used a Hitler avatar, on controlling public opinion. In voice messages, DJ Hives referred to Skycoin customers as "fish," a poker term for easily exploited players, and encouraged Smietana to cultivate an aura of infallibility: "We want to put you on the level of deity as far as the masses are concerned." (When contacted on Telegram, DJ Hives said, "None of this is correct," and declined to comment further.)

The team gamed search algorithms into ignoring Greene's article. "We helped bury that page for a while," Sudo, the anonymous user, who claimed to be part of Shill Team Six, messaged me on Telegram. (Smietana claimed that Skycoin ignored the article.) But word was already spreading. Skeptics showed up in Skycoin's social-media channels to ask questions, and Skycoin moderators started blocking them. "After banning enough losers, everyone left will be winners," Smietana wrote. Skycoin enthusiasts smeared Greene on Telegram, accusing him of writing a paid hit piece. When Greene showed up in the channel to address their concerns, moderators kicked him out. Someone claiming to be a Skycoin investor e-mailed Greene and threatened to "visit" him, his wife, and their son if he didn't stop "messing" with Skycoin, writing, "nothing is really impossible in the world for people like us that grew theire wealth on crypto."

FILED DATE: 7/24/2024 7:59 PM    2024L003661

Stephens contacted Michael Terpin, the adviser, to voice his worries, but, he said, "It turns out Terpin didn't give a shit." (Terpin told me that, by this time, his company was phasing out its involvement with Skycoin. "Brandon's got a flair for the dramatic," he said. "Honestly, that's one reason I found it difficult to keep working with Skycoin.") Stephens came up with a plan to strip Smietana of power and transfer management of the company to a foundation; he still believed that Skycoin could become a reality if reasonable people were in charge. But, by late February, 2018, six weeks after he joined the project, he found that he was locked out of both the Skycoin Telegram and his work e-mail. Members of his team were locked out, too. "The whole thing was so terrible," Chat, from the marketing team, told me. Smietana sent an e-mail to the Next Web denying that Stephens represented Skycoin. "The person you interviewed has nothing to do with Skycoin and is a known scammer," Smietana wrote. "Please update the article." Stephens heard from Smietana again in June, 2018, when Smietana sent him a mysterious Facebook message in which he claimed that he had acted out of concern for Stephens's safety. "I saved your life. You do not even know," Smietana wrote. "I will tell you in a few years."

In July, 2018, a recording leaked of Li Xiaolai, a Chinese billionaire and the founder of a coin that launched with an eighty-two-million-dollar token sale, giving his unfiltered perspective on the industry. "From the start, I knew one thing," he said. "The main power to compete here is the traffic." Successful coins accrue value, in other words, not because of technical sophistication but because they get people's attention. This requires having a founder who can capture the imagination. "All the successful 100X, 1000X projects—you go and look at the founder, they will definitely be a spin doctor," he said. What matters with a coin is that people are talking about it. "The consensus of idiots is still consensus," he said.

To some extent, this is true of most modern currencies: they have no value apart from what we collectively assign them. But the U.S. dollar is supported by government guarantees and controlled through monetary policies. Bitcoin abolished government backing, but its scarcity is regulated through algorithms. (Even so, a tweet or statement from a high-profile coinholder like Elon Musk can raise or crash its price.) Coins that are manually distributed in token sales provide even fewer assurances. It is often impossible to know how many are in circulation. Their value is built on a promise that some feature, often still in development, will make them more useful than other currencies. Until that promise is fulfilled, it is largely a matter of faith. "Money is a social construct," Smietana wrote, on Telegram. "It is based upon CONFIDENCE . . . Confidence is a religion and is built upon perception and not reality."

Founders that control perception control the price of their coin. According to Chwierut, the blockchain researcher, during the I.C.O. bubble, it was not uncommon for founders to spend as much as thirty per cent of their budget on ad campaigns. Some of the effort went to gaming the attention economy, requesting mentions from influencers or using bots to create an illusion of broad support. Traders can even use these metrics to manage their portfolios: IntoTheBlock, a "crypto-intelligence" firm, tracks

FILED DATE: 7/24/2024 7:59 PM                2024L003661

Twitter mentions and Telegram-member counts and sells the information to investors; a data platform called Santiment alerts users when chatter about their coins surges. Recommendation algorithms can encourage the spread of incendiary content, and coins promoted with controversy and falsehood often perform well. Some coin promoters use stunts or scandals to keep users engaged. After closing a fifty-million-dollar token sale, the founder of a cryptocurrency called Savedroid posted a picture of himself at what looked like an airport with a caption reading "Thanks guys! Over and out," which was taken as a confession that he was running off with the funds. A day later, he revealed that he was trolling about escaping with the money, but only after several articles had been written about the scandal. The firm ASKfm hired mountaineers to climb Mt. Everest and film themselves leaving a cryptocurrency wallet on its peak. (The company released a statement saying, "On a market where launching a blockchain endeavor is not really a newsbreak, companies have to stand out.") A sherpa died in the process.

Market manipulation is rampant. In schemes called "pump and dumps," traders meet in exclusive chat rooms where they coördinate to purchase a coin, causing the trading volume to go up and others to take interest. When the price is at its highest, the pump-and-dumpers sell, leaving faithful users holding the bag. In an industry where everyone is a coinholder, there is no one left to pull the alarm. Should investors realize that their coin is a sham, it would be an act of self-sabotage to raise concerns. Better to become evangelists, wooing others in order to boost the price.

U.S. law generally requires projects to register with the S.E.C., forcing them to make financial disclosures that investors could then inspect before buying. Almost none do, giving convoluted rationales that John Reed Stark, the founder of the S.E.C.'s Internet-enforcement office, told me are "poppycock." Not registering can facilitate further rule-breaking, as when, say, influencers promote coins without disclosing their investment, or projects pump coins with fraudulent claims. Stark said, of I.C.O.s, "Every single one I ever saw was unlawful on multiple levels." The S.E.C. began cracking down in 2017, but prosecution often requires "extraordinary resources from an alphabet soup of federal and state law-enforcement agencies," Stark said. As a result, few projects face consequences.

In the spring of 2018, Skycoin climbed into the list of the top hundred coins, and appeared on a Nasdaq Web cast. That May, Binance announced that it would list Skycoin on its trading platform. Around the time of the listing, the price jumped thirty-eight per cent. Then, suddenly, it came crashing down. According to several people involved, Skycoin privately sold to investors at a steep discount—in at least one case, coins worth millions of dollars—inadvertently giving them an incentive to dump it on the market as soon as they could. (Smietana denied being involved in such sales.) Smietana had claimed on Telegram that the investors were restricted from selling. But, as soon as Binance listed Skycoin, the market flooded with sell orders. Freeman, from the C2CX exchange, had been acting as the project's primary "market maker," using a pool of reserves to provide market liquidity and stabilize prices. "I tried to hold at about twenty," he told me. But the sell-off was too much to contain. Coinholders shared their misery on Telegram. "Its been fun guys, i'm gonns hang myself in 2 hours," a user named Willy Jr. wrote.

"Bought 20K at 20 dollars." A user named Dante wrote, "synth told me this shit would moon," adding, "i took a mortage on my house."

A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coördinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved.) Rumor spread that the S.E.C. would investigate Skycoin as a result, and that Binance was considering delisting it. In the public chat, coinholders prepared for a death spiral. A user called Opaque wrote, "I want to say calm down guys, but its really doesnt look good."

Then, out of nowhere, Smietana announced that he had big news to share once "all the staff are safe." In the coming days, he accused members of the Chinese marketing team of breaking into his house with five gang members, holding him and his girlfriend hostage for six hours, beating him until one of his ribs broke, and stealing a small quantity of cryptocurrency. Members of the Chinese marketing team denied this. In a letter to investors, they claimed that Smietana and his girlfriend had pushed them out, refused to pay them, and frozen their Skycoin wallets, which contained coins that were then worth somewhere between four and nine million dollars. This was the first apparent instance of Smietana's using his power to freeze Skycoin transactions. (Smietana claims that the wallets contained embezzled company funds.) In their letter, the marketing-team members claimed that they had been invited to Smietana's apartment to find a resolution, and a small scuffle broke out in which he got a bruised wrist. Afterward, Smietana's girlfriend filed a police report, and four defendants spent a few months in detention, after admitting to detaining Smietana and his girlfriend in an incident that left them "lightly" injured.

Smietana blitzed Telegram with messages about the alleged "kidnapping." "This is the best thing that has ever happened to Skycoin. Ever…As long as we can keep this drama going, we can get [the trading volume] even higher." He amused himself by plotting new distractions: "Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it." But coinholders seemed not to buy it. When he did a live YouTube interview, shortly after the incident, someone commented, "I dont see one bruise on his face. beaten the shit out of me, what with ? a piece of toast.?" As the sell-off continued, Smietana blamed it on the "kidnappers" for dumping their stolen coins. "They have been surpressing the price the whole time," he wrote.

In November, 2018, Smietana, apparently growing desperate, enlisted John McAfee to promote the coin. McAfee, once famous for the antivirus software that he developed in the eighties, had earned a reputation as a kind of cyber outlaw: he was a "person of interest" in a murder in Belize, in 2012, and subsequently fled the country, later posting images of himself cruising the Caribbean in his yacht, brandishing guns. He was a sought-after crypto promoter. McAfee tweeted a video that seemed to show

FILED DATE: 7/24/2024 7:59 PM    2024L003661

him with the Skycoin logo freshly tattooed on his back and the message, "Why Skycoin? If you have to ask, you've been living in a fucking closet." (Smietana admitted to paying McAfee during this period but insisted that it was a gift to help with "yacht repairs.") Smietana urged people to buy: "If you put in a million dollars now, and we have a run as large as the last one, you're going to be at fifty million dollars," he said, in a video. Then, in March, 2019, McAfee publicly broke ties with Skycoin. (Smietana told me that McAfee began demanding large fees that he refused to pay.) When asked on Twitter what he would do about the tattoo, McAfee replied, "I'll keep it as a reminder that no matter how old I get, I still get scammed by unscrupulous people with pie in the sky plans. They almost drove me to violence." Stephens, watching from afar, felt that he had been spared the worst. He hadn't behaved perfectly: he had been taken in by Skycoin's promise, but he also promoted a coin that he knew little about. After being cut off, he took Skycoin's social-media accounts hostage, and unsuccessfully demanded a severance payment. In the end, he told me, he sold his holdings for thirty thousand dollars. The internal drama and crashing prices prompted a broader exodus from the project. In 2019, Freeman's exchange announced that it was delisting Skycoin. Michael Terpin's name still appears on the Skycoin Web site, but he told me that he no longer has anything to do with it. Josh, the cryptocurrency investor, lost faith after visiting Smietana in China, last year. "Crypto is a bunch of con artists conning each other," he said. "Obelisk was always a week away, and it still is." He sold his holdings and told me that he lost ninety-nine per cent of his investment.

Investors who sold at the peak would have made large profits, but many average coinholders suffered. (Smietana claimed that he urged restraint: "I told people not to put money into the market that they were not prepared to lose.") Armon Koochek, a recent college graduate in Santa Barbara, California, invested in Skycoin in 2018, lured by the promise of a new Internet and excited by the "memes and content on Reddit and Twitter." He lost some fifteen thousand dollars. He tried to warn others away from the project in the Telegram chat room, and was soon banned. "I hope I saved a lot of investors," he told me. Dael Lithgow, a forty-five-year-old bootmaker in Pietermaritzburg, South Africa, invested most of his savings in Skycoin in 2017, and convinced his mother and girlfriend to invest, as well. Had they sold during the boom, the profits would have been "life-changing," but they held on. "I really believed in what they were trying to do," he told me. Today their coins are nearly worthless.

In the summer of 2019, I met Smietana at a mozzarella bar in Manhattan. He was wearing all black, and his hair was starting to gray. As we sat, he warned me, unprompted, "Honestly, like, ninety-eight per cent of the people are scammers in blockchain." Then, preëmpting my questions, he visited every bit of Skycoin intrigue. The "gang members" who kidnapped him in China had demanded "sixty million dollars." The technology for Skywire, the decentralized Internet service, was already "working" and Obelisk was just "a few months" out. His girlfriend, Sarah, called several times while we were speaking. He showed me frantic messages from her, and said that he was blowing off an important meeting, but he kept talking, telling me about his coin's promise. He seemed to regard me as the next potential pump.

FILED DATE: 7/24/2024 7:59 PM 2024L003661

Almost four hours into my lunch, I made an excuse to leave, saying that I needed to walk to my bank. Smietana followed along for almost thirty blocks, ranting about his court case in China. Eventually, I brought him to Times Square, where his girlfriend was waiting. She must have seen something in my eyes, and said, "He's a mad scientist." After New York, they were headed to the Caribbean, where they would see Terpin and check out the crypto scene. They invited me to join. In the months that followed, Skycoin's price dropped below a dollar a coin, but Smietana remained optimistic. He told me, on Telegram, that he had a new hardware lab where he was developing antennae for the Skyminer, and said that Skycoin was moving into the medical industry, agricultural automation, and underground mining.

When I confronted Smietana about Skycoin's history, he began sending me dozens of voice messages a day, spinning elaborate stories that often contradicted one another. Many could be corroborated only by people whom he swore existed but who couldn't talk because they had government security clearance, or were in hiding, or because he didn't know their real names. He attacked those who spoke ill of Skycoin, calling them criminals, junkies, and blackmailers. He claimed at first that he didn't know Stephens ("I contacted advisor board and no one involved in Skycoin has heard of Bradford"), then that he was a "con artist," then that he was a "federal informant/agent" trying to entrap him. At one point, Smietana even suggested that he wasn't the real founder of Skycoin. I began to feel dizzy reporting this story, trying to sort through the layers of deception and to figure out whom I could trust. Everyone seemed to think that they could spin what I wrote to their advantage.

Smietana continues to post in the Telegram chat room, assuring loyal coinholders that the features they've waited years for are almost complete. "In that Telegram group, he is king," the former member of Skycoin's inner circle told me. Former employees remain divided about Smietana's motives. "It's almost as if he viewed Skycoin as a money printer," the former marketing contractor told me. "Everything that happened was a distraction or ruse to keep people in the dark while he kept his shit-coin casino operating." It's impossible to know how much Smietana made on the currency. ("Overall, I would say, I did ok," Smietana wrote to me.) But other founders have pulled "exit scams," dumping all of their coins at the market's height and disappearing entirely, which Smietana never did. One of Skycoin's lead software developers—who was also Smietana's friend from college, and who requested anonymity out of fear of harassment—doesn't think Smietana was in it to get rich: "Being a figurehead in blockchain is like being a cult leader and I think he enjoyed that more than the money." At one point, Smietana sent me a voice message, asking, "Why didn't I just take the seventy million and just, like, run off?"

In the past several years, the S.E.C. has charged multiple I.C.O. operators with offering unregistered securities and committing fraud, and the cases have resulted in settlements that have ordered hundreds of millions of dollars returned to coinholders. Last July, Jack Abramoff, who became famous, in 2006, for his role in a political-lobbying scheme, pleaded guilty to committing securities fraud with a token sale. The project, called AML BitCoin, published a white paper in 2017 that listed Smietana as one of its software developers. (Smietana claims that he was included without his consent.) In October, Spanish

FILED DATE: 7/24/2024 7:59 PM    2024L003661

authorities arrested McAfee on an extradition request from the U.S., where he faced charges of tax evasion and illegally promoting cryptocurrencies. (In June, he was found dead in his jail cell, in an apparent suicide.) In the past few years, cryptocurrency founders have tweaked their strategies; instead of I.C.O.s, they now hold "initial exchange offerings" and "initial decentralized exchange offerings." Stark, the former S.E.C. official, told me that the new terminology is "designed to create confusion and avoid S.E.C. scrutiny, but all of it is the same." David Silver, a lawyer who represents victims of cryptocurrency fraud, hopes that, as the S.E.C. enforces securities laws, fraud in the market will decrease. "Yesterday's crypto heroes are tomorrow's crypto felons," he said. "The statute of limitations is very long."

This past January, a Telegram channel named after WallStreetBets, the Reddit forum that supercharged GameStop's stock price, targeted Skycoin with a pumping campaign. As the pump spread to other social-media platforms, the price punched up above five dollars per coin. The mood in the chat was ecstatic. "I'm frantically moving funds around to buy more," a user named Krzys P wrote. Smietana wrote, "MOON MOON LAMBO MOON." Stephens is now a software developer at Salesforce, and insists that he is done with cryptocurrency: "My personality is not well suited to fraud, and mafioso, and everything that crypto is." He recently returned with his wife to Japan and sought out a new Shinto shrine where, he said, he wished for good health.

## New Yorker Favorites

- What happens when a bad-tempered, distractible doofus runs an empire?
- Remembering the murder you did not commit.
- The repressive, authoritarian soul of Thomas the Tank Engine.
- The mystery of people who speak dozens of languages.
- Margaret Atwood, the prophet of dystopia.
- The many faces of women who identify as witches.
- Sign up for our daily newsletter to receive the best stories from *The New Yorker*.

*Morgen Peck is a freelance journalist who has covered cryptocurrency since 2012.*

More:   Cryptocurrency     Bitcoin     Entrepreneurs     Fraud     Money     Technology

DAILY

Our flagship newsletter highlights the best of *The New Yorker*, including top stories, fiction, humor, and podcasts.

**E-mail address**

E-mail address

Sign up

By signing up, you agree to our <u>User Agreement</u> and <u>Privacy Policy & Cookie Statement</u>. This site is protected by reCAPTCHA and the Google <u>Privacy Policy</u> and <u>Terms of Service</u> apply.

---

READ MORE

DAILY COMMENT

## The Obscene Energy Demands of A.I.

How can the world reach net zero if it keeps inventing new ways to consume energy?

**By Elizabeth Kolbert**

ON AND OFF THE MENU

## Why New York Restaurants Are Going Members-Only

Ultra-exclusive places, like Rao's and the Polo Bar, once seemed like rarities in the city's dining scene. Now clubbiness is becoming a norm.

**By Hannah Goldfield**

OUR COLUMNISTS

## A Financial Reckoning for Donald Trump

The former President's inability to secure a $464-million bond in his New York civil fraud case is a reminder of the deep legal and financial peril he's in.

**By John Cassidy**

INFINITE SCROLL

## Trump's Social-Media Potemkin Village

After an I.P.O. last week, Truth Social is confronting the gaping incongruity between its valuation and the paltry reality of its product.

**By Kyle Chayka**

FILED DATE: 7/24/2024 7:59 PM    2024L003661

FILED DATE: 7/24/2024 7:59 PM   2024L003661

# EXHIBIT B

FILED DATE: 7/24/2024 7:59 PM    2024L003661



FILED DATE: 7/24/2024 7:59 PM    2024L003661



FILED DATE: 7/24/2024 7:59 PM   2024L003661

# EXHIBIT C

FILED DATE: 7/24/2024 7:59 PM    2024L003661



**Paul Brainy** @Paul__Brainy · Oct 13

**Sudo** 🔒 @Sudo_TCPdump · 3 godz.
W odpowiedzi do @Sudo_TCPdump
There will be articles coming out that will be forever engraved into googles search that I plan to release, those will be my main focus. Every time you search skygoyim you'll be conflicted between truths (from my articles) and lies the same bullshit Skycoin regurgitates yearly.

◯ 1          ⇄          ♡ 2          ⤜

**Sudo** 🔒 @Sudo_TCPdump · 3 godz.
The average skygoyim holder (that still remains) is just entirely too stupid to even try to persuade they are so lost into the Scientology cult Brandon Smietana

◯ 3      ⇄      ♡      ✉

**Garrett Grubbs** @GarrettJGrubbs · Oct 13
Sadly he doesnt understands that we understand that Synth is an ass just like @realDonaldTrump but we only care about the technology and the vision so as long as they get it done, we don't cares.

◯ 2      ⇄      ♡ 1      ✉

4

FILED DATE: 7/24/2024 7:59 PM    2024L003661

**Anonymous** Thu May 30 16:02:31 2019 No.13913634
Quoted by: >>13914238

>>OP

synth is an ashkenazi jew and unironically drinks the blood of newborns

**Anonymous** Fri Feb 15 09:43:09 2019 No.12759311
Quoted by: >>12759390

>>12759145

Brandon is a literal Israeli Jew.

**Anonymous** Tue Oct 1 15:40:04 2019 No.15777897

>>OP

Synth is a homosexual Mossad agent

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
7/26/2024 11:32 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
28679181

| | | |
|---|---|---|
| 2120 - Served | 2121- Served | 2620 - Sec. of State |
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |

Summons - Alias Summons                                      (12/01/20) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

BRANDON SMIETANA/SKYCOIN,

_____

                                   Plaintiff(s)

V.

BRANDON STEPHENS

_____

                                   Defendant(s)

**1011 Wolcott Ave., 1S, Chicago, IL. 60622**

_____

                    Address of Defendant(s)

Case No.  2024 L 003661

Please serve as follows (check one):      Certified Mail      Sheriff Service  Alias  Process Server X̲

### ALIAS SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/ appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourtorg**

**Summons - Alias Summons**            **(12/01/20) CCG 0001 B**

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

Atty. No.: __48525_____ Witness date _____

                                               7/26/2024 11:32 AM IRIS Y. MARTINEZ

Name: Barney & Karamanis, LLP. _____ _____

Atty. for                                  IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____ ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____ ❑ Date of Service: _____

City: Chicago, IL. 60601 _____    (To be inserted by officer on copy left with employer or other person)

Telephone: (312) 553-5300 _____

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 7/26/2024 11:32 AM 2024L003661

FILED DATE: 7/26/2024 11:32 AM   2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
7/29/2024 2:39 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
28708464

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA,                    )
SKYCOIN GLOBAL FOUNDATON,            )
LIMITED., et al.                     )
                                     )
        Plaintiffs,                  )        LAW DIVISION
                                     )        CASE NO.: 24-L-003661
Vs.                                  )
                                     )
BRANDON STEPHENS, RYAN EAGLE,        )
et al.,                              )
                                     )
        Defendants.                  )
_____)

## DEFENDANT, RYAN EAGLE'S COMBINED MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW the Defendant, RYAN EAGLE, by and through his undersigned attorney and moves this Court for dismissal of Plaintiff's First Amended Complaint against Defendant pursuant to 735 ILCS 5/2-619.1 as a combined motion under sections 735 ILCS 5/2-619 and 735 ILCS 5/2-615 and states as follows:

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs filed this Complaint on April 4, 2024, alleging numerous counts of fraudulent conduct by many Defendants in what is loosely described as a conspiracy to steal money through fraudulent billing and marketing practices targeted against Plaintiffs' cryptocurrency business by Defendants' marketing management practices. Plaintiffs allege the head of the marketing company, Defendant, Bradford Stephens and others employed by and or associated with him, allegedly including, Defendant, Ryan Eagle, engaged in a scheme to defraud Plaintiffs in various ways. Plaintiffs allege they hired the marketing company to boost the Plaintiffs' business by marketing and to boost its presence through search engine optimization.

FILED DATE: 7/29/2024 2:39 PM    2024L003661

After Plaintiffs filed their Complaint, Defendant, Eagle, filed his Combined Motion to Dismiss alleging multiple deficiencies, including failure to state a cause of action under either of the three (3) counts Eagle was named in and that the actions were time-barred. The chief argument being that the Plaintiffs failed to allege any specific act or conduct on the part of Eagle and instead relied upon general conclusions and classic hearsay as allegations, none of which was sufficient to support the pleading and all of which lacked any firsthand specificity as detailed below.

Following the Court's granting of Eagle's Motion to Dismiss, Plaintiffs, filed their instant First Amended Complaint ("FAC"). The FAC, trying desperately to tie Defendant, Eagle to the alleged conspiracy, clearly added the name of Defendant, Ryan Eagle to several additional allegations. However, the FAC still suffers from the same deficiencies and blatantly and completely fail to allege any 'facts' to support their conclusory allegations. Adding more conclusion and more hearsay not only fail to cure the earlier deficiencies of the initial Complaint but show more clearly that Plaintiffs can allege no specific conduct on the part of Eagle to support the same causes of action as set forth in the earlier Complaint.

Similar to the initial Complaint, the FAC again fails to allege any fraudulent acts, acts in furtherance of any alleged conspiracy whatsoever against Eagle and therefore the FAC as a whole fails once again to state any cause of action against Ryan Eagle. Eagle is named in only the same 3 counts of the FAC as in the initial Complaint. They are:

<u>Count 3</u>: Civil Conspiracy ("to defraud Plaintiffs, tortiously interfere with their business relationships, commit various acts of wire fraud, computer fraud, manipulate the cryptocurrency market, and convert Plaintiffs' property surreptitiously.").

FILED DATE: 7/29/2024 2:39 PM    2024L003661

<u>Count 4</u>: Tortious Interference (the alleged subject of the civil conspiracy).

<u>Count 5</u>: Unjust Enrichment

Additionally, Plaintiffs actions against Defendant, Eagle are time-barred by the operation of the applicable Statute of Limitations and Plaintiffs lack standing to bring this action under the Business Corporation Act of 1983 (5/1.01 to 5/17.05) for failure to register to do business in the State of Illinois.

## I.     <u>MEMORANDUM OF LAW</u>

### A. <u>LEGAL STANDARD</u>

A section 2–615(a) motion to dismiss "tests the legal sufficiency of the complaint," *Kean v. Wal–Mart Stores, Inc.*, 235 Ill.2d 351, 361, 336 Ill.Dec. 1, 919 N.E.2d 926, 931–32 (2009). Section 2–615 motions "raise but a single issue: whether, when taken as true, the facts alleged in the complaint set forth a good and sufficient cause of action." *Scott Wetzel Services v. Regard*, 271 Ill.App.3d 478, 480, 208 Ill.Dec. 98, 648 N.E.2d 1020 (1995).

In order to withstand a motion to dismiss based on section 2–615, a complaint must allege facts that set forth the essential elements of the cause of action. *Urbaitis v. Commonwealth Edison,* 143 Ill.2d 458, 475, 159 Ill.Dec. 50, 575 N.E.2d 548 (1991). "[A] court must take as true all well-pled allegations of fact contained in the complaint and construe all reasonable inferences therefrom in favor of the plaintiff." *Vernon v. Schuster*, 179 Ill.2d 338, 341, 228 Ill.Dec. 195, 688 N.E.2d 1172 (1997). In ruling on a motion to dismiss, the court will construe pleadings liberally. *Pfendler v. Anshe Emet Day School*, 81 Ill.App.3d 818, 821, 37 Ill.Dec. 1, 401 N.E.2d 1094 (1980). "A plaintiff is not required to prove his case in the pleading stage; rather, **he must merely allege sufficient facts to state all the elements which are necessary to constitute his cause of action**."

FILED DATE: 7/29/2024 2:39 PM          2024L003661

*Claire Associates v. Pontikes*, 151 Ill.App.3d 116, 123, 104 Ill.Dec. 526, 502 N.E.2d 1186 (1986). [Emphasis added]

"The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proven issues of fact at the outset of litigation." *Dratewska-Zator v. Rutherford*, 2013 IL App (1st) 122699, 996 N.E.2d 1151. A section 2-619 motion to dismiss "admits the legal sufficiency of the complaint, but raises defects, defenses, or other affirmative matters appearing on the face of the complaint or established by external submissions, which defeat the action." *Nourse v. City of Chicago,* 2017 IL App (1st) 160664, 75 N.E.3d 397. "In deciding a section 2-619 motion, a court accepts all well-pleaded facts and their inferences as true and construes all pleadings and supporting documents in favor of the nonmoving party." *In re Estate of Shelton*, 2017 IL 121199, 89 N.E.3d 391. Section 2-619(a)(5) of the Code allows for the involuntary dismissal of an action that "was not commenced within the time limited by law." 735 ILCS 5/2-619(a)(5)

## B. <u>ARGUMENT</u>

Plaintiffs' FAC again, entirely fails to make even a single specific factual allegation against Defendant, Ryan Eagle. Plaintiffs instead have only made one conclusory allegation to the effect that Ryan Eagle 'conspired' with Defendant Brandford Stephens and others to commit tortious acts against Plaintiffs. They fail to allege even a single instance of how or in what capacity or means Eagle engaged in such conspiracy as was alleged against Defendant, Stephen. The details of Plaintiffs' allegations and lack thereof as to Defendant, Eagle as set forth below.

### 1) <u>CIVIL CONSPIRACY (COUNT 3): [Brought under 735 ILCS 5/2-615]</u>

Civil conspiracy "requires proof that a defendant 'knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner.' " *McClure v. Owens Corning Fiberglas Corp.,* 188 Ill. 2d 102, 720 N.E.2d 242 (1999), (quoting *Adcock*, 164

FILED DATE: 7/29/2024 2:39 PM    2024L003661

Ill.2d at 64). The necessary elements of a civil conspiracy include: (1**) an agreement** between two or more persons; (2) **to participate in an unlawful act**, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties; and (4) **the overt act was done pursuant to and in furtherance of the common scheme**. *Canel and Hale, Ltd. v. Tobin*, 304 Ill.App.3d 906, 920 (1999). [Emphasis added]

Conspiracy is not a separate and distinct tort in Illinois. *Hurst v. Capital Cities Media, Inc.,* 323 Ill.App.3d 812, 822–23 (2001). "To state a cause of action for civil conspiracy, **a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement**, as well as an injury caused by the defendant." [See: *Benton v. Little League Baseball, Inc*., 181 N.E.3d 902 (Ill. App. Ct. 2020)][Emphasis added] "**Mere knowledge of the fraudulent or illegal actions of another is insufficient**." *Id.* [Emphasis added] "It is the act performed in pursuit of the agreement that may create liability." *Weber v. Cueto*, 253 Ill.App.3d 509, 518 (1993). **"There is no cause of action unless an overt, tortious, or unlawful act is done that, in absence of the conspiracy, would give rise to a claim for relief."** *Illinois Traffic Court Driver Improvement Educational Foundation v. Peoria Journal Star, Inc.,* 144 Ill.App.3d 555, 562 (1986). [Emphasis added]

"However, **these allegations do not include any facts to support an agreement. Merely alleging that a party knows that the acts of another are illegal is not enough** to show a conspiracy (McClure, 188 Ill.2d at 134, 241 Ill.Dec. 787, 720 N.E.2d at 258), and merely characterizing "a combination of acts as a conspiracy is insufficient to withstand a motion to dismiss" (Buckner, 182 Ill.2d at 23, 230 Ill.Dec. 596, 694 N.E.2d at 571)." See. *Reuter v. MasterCard Intern., Inc*., 921 N.E.2d 1205 (Ill. App. Ct. 2010).

5

FILED DATE: 7/29/2024 2:39 PM    2024L003661

In the instant case, Defendant, Eagle is named in only 3 of the 11 counts. No allegation, however, extends beyond a possible allegation showing 'knowledge' of a scheme and others are at most mere conclusions and cite no specific allegation whatsoever. "A successful common law fraud complaint must allege, with specificity and particularity, facts from which fraud is the necessary or probable inference, including what misrepresentations were made, when they were made, who made the misrepresentations and to whom they were made." *Connick v. Suzuki Motor Co.,* 174 Ill.2d 482, 496–497, 221 Ill.Dec. 389, 675 N.E.2d 584, 591 (1996).

For example, paragraphs 22 through 25 are nothing more than allegations of Defendant, Stephens' claim that he and Defendant Eagle are business partners. While these allegations are nothing more than hearsay and allege nothing substantive, being a business partner of Stephens does not in itself allege or prove that Eagle is a participant in a conspiracy and fails to allege any act in furtherance of the alleged conspiracy.

The Amended Complaint alleges at the following paragraphs:

> 22. Stephens ***claimed*** that his business partners were Eagle, ….
> 23. Stephens ***represented*** to Plaintiffs that Eagle, Young, and Gevirtz were the individuals who would be providing the marketing services ….
> 24. Stephens ***represented*** to Plaintiffs that Eagle and Young were the individuals who would receive Plaintiffs' payments and …
> 25. Stephens **represented** to Plaintiffs that the Smolder Partners were "inseparable"…

Obviously, none of the above allegations reflect any conduct or act or position on the part of Defendant, Eagle, other than the blatant hearsay conclusions of Defendant, Stephens that he and Eagle are business partners and further, add nothing to any substantive allegation or element of any cause of action against Eagle. The next grouping of meaningless allegations is similarly deficient as to any allegation of an element of the pleaded causes of action and constitutes only the conclusions and 'wishful' thinking of Plaintiffs. They are based on no acts of Eagle or observations

FILED DATE: 7/29/2024 2:39 PM    2024L003661

by Plaintiffs and are simply meaningless conclusions devoid of any specifics whatsoever. In general, these are cited in the following paragraphs of the FAC:

> 39. In early February of 2018, **Plaintiffs discovered** that in actuality, there was no third party attacking Skycoin's website. **Rather, the attack was instigated by Stephens, Eagle, _and/or_ the Smolder Partners** as a fraudulent means to extract additional funds from Skycoin. The invoices submitted by Stephens were fabricated.

> 57. Knowing that Skycoin was about to obtain a Bittrex listing, on or about February 25, 2018, **Stephens and Eagle threatened** Smietana…

> 58. Smietana refused to pay the money **demanded by Stephens and Eagle**, …

> 62. After Smietana refused to pay the Extortion Payments demanded by **Stephens and Eagle, both defendants conspired…**

> 63. In furtherance of the conspiracy to kidnap Smietana and his girlfriend and steal money **from them with Stephens and Eagle**, the Assailants invaded Smietana's home …

> 81. In and around June of 2020, because Smietana refused to capitulate to the extortion demands, **Stephens, in conjunction with Eagle**, Kunstman and others, embarked upon a scheme and plan to delist Skycoin …

[Emphasis added]

It is noteworthy that in this paragraph 39 of the FAC above, Plaintiffs allege the involvement of several Defendants, including Eagle in the disjunctive using the phrase "and/or" clearly evidencing the fact that Plaintiffs don't truly know who did what in regard to the alleged conspiracy. Such pleading is insufficient as "Illinois is a fact-pleading state; conclusions of law and conclusory allegations unsupported by specific facts are not deemed admitted." *Time Savers, Inc. v. LaSalle Bank, N.A.,* 371 Ill.App.3d 759, 767 (2007).

On review of the FAC, it is further important to note that there is only one time when Plaintiff, Stephens actually was even in the presence of Defendant, Eagle. That alleged meeting is described in paragraph 41 of the FAC and involved a face-to-face meeting in China between Plaintiff and Defendant, Stephens. It is alleged there that Eagle attended by Zoom. The allegation states:

FILED DATE: 7/29/2024 2:39 PM    2024L003661

41. Upon Skycoin's refusal to pay Stephens the monthly payments requested in or around February 2018, Smietana and Stephens met in Shanghai, China, with **Eagle joining the meeting via Zoom.**

[Complaint, ¶41] [Emphasis added]

Plaintiffs then go on to attempt to bolster their case against Eagle by now claiming in each of the next several paragraphs that "Stephens and Eagle" threatened them stating:

42. During this meeting, **Stephens and Eagle threatened** to have Skycoin delisted from all exchanges…
43. **Stephens and Eagle's threats** included statements …
44. **Stephens and Eagle also threatened** that …
45. Stephens and Eagle attempted to blackmail Plaintiffs…

[FAC, ¶¶42-45] [Emphasis added]

FAC paragraph 41 merely alleges that Defendant, Stephens "threatened to have Skycoin delisted from all exchanges" and only 'incidentally' or 'gratuitously' adds that Defendant, Eagle "was 'participating' via Zoom". The following allegations (¶¶ 42-45) are merely Plaintiffs' attempts to lump Defendant Eagle into a general conspiracy without alleging any specific conduct on his part engaged in in furtherance of the conspiracy, evidencing his intent to join the conspiracy. The allegations, however, fail to reflect that Eagle said or did anything. It merely, in conclusory language claims he 'was participating' via Zoom. The threat, however, is clearly alleged to have been made by Defendant Stephens in these paragraphs, not by Eagle, who at most was 'listening'. Plaintiff alleges no participation or specific acts in furtherance by Eagle. "Mere knowledge of the fraudulent or illegal actions of another is insufficient." *Benton, supra.*

The above allegations are nothing more than mere conclusions of fraud, civil conspiracy, and involvement in threats and schemes to defraud. Plaintiffs have no facts to allege in this their second attempt to plead their case against Defendant, Ryan Eagle. Additionally, Plaintiffs even include Eagle in the most serious of the allegations by nothing more than a mere conclusion alleging in paragraph 62 and 63 the following conclusion:

8

FILED DATE: 7/29/2024 2:39 PM    2024L003661

62. After Smietana refused to pay the Extortion Payments demanded by **Stephens and Eagle, both defendants conspired** with Yan Xiandong, Li Min, Sam Sing Fond and Sun Fei (collectively the "Assailants") in a plot to kidnap Smietana and his girlfriend and steal $30,000,000.00 that Stephens and Eagle claimed they were due from Skycoin.

63. **In furtherance of the conspiracy to kidnap Smietana and his girlfriend and steal money from them with Stephens and Eagle**, the Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

[See FAC, ¶¶ 62 and 63]

Paragraph 62 on the other hand is likewise insufficient and merely alleges the 'conclusion' that "Stephens and Eagle conspired" with others. It fails, however, to indicate or allege in any fashion whatsoever what Defendant, Eagle did as an 'overt act' 'in furtherance of the conspiracy'. There can be no conspiracy without such overt acts. *Illinois Traffic Court, supra.*

It is not sufficient to plead merely the elements of the civil conspiracy, it is necessary to plead ultimate facts to support the conspiracy. "Since plaintiff failed to plead the elements of a claim for civil conspiracy **or any facts to support the claim**, count VIII was properly dismissed." *Canel & Hale, Ltd. v. Tobin*, 710 N.E.2d 861 (Ill. App. Ct. 1999) [Emphasis added]

The FAC is devoid of any allegation of fact to support the ultimate 'conclusion' of Eagle's joinder in any conspiracy and the conclusions are the only allegations made by Plaintiffs. No allegation against Eagle is based upon personal knowledge or observation by the Plaintiff, Smietana or any other Plaintiff as to Eagle. Each allegation regarding Eagle is couched in terms of what Defendant, Stephens said, claimed, represented, etc. each of which representations are hearsay comments from another and do not qualify as "facts to support the claim". *Id.*

Based upon the pleading thus far, and the paucity of any facts, Defendant, Eagle has been apprised of no specific fact whatsoever to support the myriad of 'conclusions' made by Plaintiffs

FILED DATE: 7/29/2024 2:39 PM    2024L003661

and therefore, Plaintiffs' Complaint must be dismissed. Finally, in that this is Plaintiffs' second attempt and still they have nothing to allege against Eagle, this dismissal should be with prejudice. *Bellik v. Bank of Am.,* 869 N.E.2d 1179 (Ill. App. Ct. 2007).

### 2) TORTIOUS INTERFERENCE (COUNT 4) and UNJUST ENRICHMENT (COUNT 5): [Brought under 735 ILCS 5/2-615]

At this point, Eagle has no idea what he did to evidence his intent to join or participate in the alleged conspiracy, Count 3, or the substantive counts 4 and 5 for Tortious Interference and Unjust Enrichment, respectively. It is interesting to note further that each of the counts that Eagle is charged in adopts only the prior allegations in paragraphs 1-85 of the FAC under general facts and no count Eagle is charged in alleges any specific conduct by Eagle.

It is unnecessary to enumerate the elements that must be pled by Plaintiffs to establish the substantive causes of action for 'tortious interference' and 'unjust enrichment' because no allegations are made in any fashion whatsoever. There are no allegations in either count which names Ryan Eagle at all. Instead, the counts are based upon the 'adopted' prior allegations in paragraphs 1-85 of the FAC. Those allegations, a few of which reference Defendant, Eagle are set forth above. It is abundantly clear from a reading of such allegations that, again, nothing is pled or alleged against Defendant, Eagle by way of a substantive allegation. Nothing showing that he 'did' or 'said' anything at all, let alone anything relevant to the causes of action. The only allegations are that he is the business partner of the primary defendant, Bradford Stephens and that he 'conspired' with others. Again, other than the mere conclusion of conspiracy, no specific act of the Defendant is alleged or mentioned in any manner whatsoever. These counts must also be dismissed.

### 3. PLAINTIFFS' FAILURE TO REGISTER TO DO BUSINESS PRECLUDES MAINTAING THIS ACTION: [Brough under 735 ILCS 5/2-615]

Plaintiffs are foreign residents to Illinois and are thus required to register to do business in

FILED DATE: 7/29/2024 2:39 PM    2024L003661

this State and to commence and maintain this litigation against Defendant, Eagle. Plaintiffs have failed to allege such registration or obtaining of the required authorization from the Secretary of State and are thus barred from maintaining this action at this time. *Young Am.'s Found. v. Doris A. Pistole Revocable Living Tr.*, 998 N.E.2d 94 (Ill. App. Ct. 2013)

Act 5. Business Corporation Act of 1983 (5/1.01 to 5/17.05) ("BCA") provides in pertinent part, the following:

§ 13.05. Admission of foreign corporation. Except as provided in Article V of the Illinois Insurance Code,1 a foreign corporation organized for profit, before it transacts business in this State, shall procure authority so to do from the Secretary of State.

§ 13.70. Transacting business without authority.

(a) No foreign corporation transacting business in this State without authority to do so is permitted to maintain a civil action in any court of this State, until the corporation obtains that authority. Nor shall a civil action be maintained in any court of this State by any successor or assignee of the corporation on any right, claim or demand arising out of the transaction of business by the corporation in this State, until authority to transact business in this State is obtained by the corporation or by a corporation that has acquired all or substantially all of its assets.

Plaintiffs have failed to register to do business in this state and therefore the action must be dismissed for such failure.

### 4. <u>ALL ACTIONS ARE TIME-BARRED</u>: [Brought under 735 ILCS 5/2-619]

As noted above, Plaintiffs have alleged causes of action against Defendant, Eagle for Civil

FILED DATE: 7/29/2024 2:39 PM    2024L003661

Conspiracy (Count 3), Tortious Interference (Count 4) and Unjust Enrichment (Count 5). The underlying offense of the alleged 'civil conspiracy' against Defendant, Eagle is the alleged fraudulent conduct of Eagle and more specifically, "to defraud Plaintiffs, tortiously interfere with their business relationships, commit various acts of wire fraud, computer fraud, manipulate the cryptocurrency market, and convert Plaintiffs' property surreptitiously." [See Complaint, Count 3, ¶112].

In *Mauvais-Jarvis v. Wong,* 987 N.E.2d 864 (Ill. App. Ct. 2013) the court addressed the applicable statute of limitations ("S/L") issue as it relates to civil conspiracy and ruled that the underlying offense will govern the applicable limitation period. The Court ruled:

> It is well-settled that conspiracy, standing alone, is not a separate and distinct tort in Illinois. … See 15 *C.J.S. Conspiracy* § 26, at 1043 (2013) (Unless a jurisdiction provides an independent statute of limitations for civil conspiracy, "[t]he statute of limitations for a civil-conspiracy claim is determined by the nature of the underlying conduct on which the claim of conspiracy is based. A claim alleging civil conspiracy is thus time-barred if the substantive tort underlying it was time-barred.").

The statute of limitations in a civil conspiracy claim "runs from the commission of the last overt act alleged to have caused damage." *Austin v. House of Vision, Inc*., 101 Ill. App. 2d 251, 255, 243 N.E.2d 297, 299 (1968). A review of the FAC reveals that the last pleaded act of fraud occurred at the latest 2018 and there appears to be no act pled that occurred beyond 2018. Notwithstanding that there is no allegation of Defendant, Eagle as to any commission of any act or overt act in furtherance of any conspiracy, were this to be the last alleged act, the FAC is clearly filed more than 5 years from such date, having been filed April 4, 2024.

Moreover, paragraph 47 of the FAC states that the Plaintiffs discovered the fraud in February 22, 2018 and ceased the business marketing venture with Defendants. "On or about February 22, 2018, the Marketing Program engagement between Plaintiffs and the Smolder

Partners ended due to pressure from Skycoin's advisory board because of the discovery of the fraudulent invoicing and business practices." [FAC, ¶47] Defendant, Eagle is not alleged to have participated in any act cognizable in Counts 3, 5 or 6 that occurred within the applicable statute of limitations.

Additionally, and more importantly, Count 5, Unjust Enrichment would seem to be a cause of action that is certainly beyond the 5 year S/L in that the action of Unjust Enrichment would necessarily involve the receipt of something of value under circumstances whereby the receiver would expect to pay for such thing of value. "To prevail on a claim for unjust enrichment, a plaintiff must prove that the defendant "retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience." *Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci,* 34 N.E.3d 1023 (Ill. App. Ct. 2015)

The last allegation of anything of value changing hands to the other Defendants, occurred in 2018 and therefore, such cause of action must of necessity have been brought no later than 2023. The complaint was filed on April 4, 2024, and therefore Count 5 must be dismissed as time barred.

Finally, the blatant pleading deficiencies of the FAC, in its failure to allege 'any' act that Defendant, Eagle engaged in, prevents the Defendant from properly or adequately responding to the Complaint and prevents him from properly arguing further the definitive violation of any applicable S/L. Defendant simply is not on notice of any fact to show what he did or said and when he is alleged to have done or said anything that shows his participation in and intent to join the alleged conspiracy.

## II.     **CONCLUSION**

Plaintiffs have failed to allege any supporting facts whatsoever in this FAC. No facts are

FILED DATE: 7/29/2024 2:39 PM   2024L003661

FILED DATE: 7/29/2024 2:39 PM    2024L003661

alleged to show that Defendant, Ryan Eagle said or did anything at all to evidence his intent to join the conspiracy which Plaintiffs describe in the FAC. There is in fact, no statement of an overt act or statement of any kind alleged against Defendant, Eagle, save for an allegation that he was present on a Zoom call. This is clearly insufficient to plead a cause of action against Eagle in any of the counts he is included in. Counts 3, 5 and 6 must each be dismissed. Furthermore, Plaintiffs' actions against Defendant, Eagle are time-barred or at least pled in such an egregious and deficient manner so as to prevent Defendant and this Court from properly assessing if the S/L is violated or not. Finally, Plaintiffs' failure to register and obtain authority to engage in and maintain this suit requires dismissal of this action.

Moreover, it should be noted by the Court that this is continued litigation from case number 1:22-cv-00708 filed in The U.S. District Court for the Norther District of Illinois. In that case, Plaintiff's Third Amended Complaint was ultimately dismissed by the Court, and all Federal counts were dismissed with prejudice. That makes this FAC the fifth time the Plaintiffs have filed an amended complaint. Unless Plaintiffs are prepared to allege that they are in possession of any actual acts to allege against Defendant Eagle in another amended complaint, this dismissal must be with prejudice. Further, the Court must bar SKYCOIN GLOBAL FOUNDATION LIMITED and SYMBOLIC ANALYTICS INC. from participating further in this litigation until they are properly registered to do business under the BCA.

Respectfully submitted,

By: /s/ George W. Svoboda
Attorney for Defendant Ryan Eagle

George W. Svoboda #6220463
The Law Office of George W. Svoboda
P.O. Box 1299
McHenry, IL 60051
(224) 360-0696 – Phone
Email: george@georgesvobodalaw.com

14

No. 2024 L 003661                                                    Page | 1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED., AND SYMBOLIC
ANALYTICS INC.

    PLAINTIFFS,

    *v.*

BRADFORD      STEPHENS,      AARON
KUNSTMAN, RYAN EAGLE, JOEL WAYNE
CUTHRIELL, MORGEN PECK, CATHERINE
BYERLY, AMERICAN PUBLISHERS, INC.
D/B/A CONDE NAST AND D/B/A THE NEW
YORKER MAGAZINE, AND UNKNOWN
INDIVIDUALS AND COMPANIES.

    DEFENDANT.

No. 2024 L 003661

## ORDER

    This matter comes before the court on defendant Ryan Eagle's section 2-619.1 motion to dismiss plaintiffs Brandon Smietana, Skycoin Global Foundation Limited, and Symbolic Analytics Inc.'s first amended complaint.

    The court grants Eagle's motion to dismiss in part and denies it in part. The court strikes the first amended complaint, because it fails to identify Eagle's actions with sufficient particularity to state a claim against him.

    The court grants plaintiffs seven days to replead. Eagle shall answer or otherwise plead within seven days thereafter.

    The court sets this matter for status on the pleadings on September 17, 2024, at 9:00AM in courtroom 1912 or via Zoom at meeting ID: 921 0771 7798; Passcode: 881878.

    The court strikes the August 27 date.

Judge Thomas More Donnelly

AUG 20 2024

Circuit Court - 1803

Entered the 20th of August 2024
Chicago, Illinois

**Thomas More Donnelly**
**Judge**
**Circuit Court of Cook County**

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED DATE: 8/23/2024 1:48 PM   2024L003661

FILED
8/23/2024 1:48 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29082732

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

|  |  |  |
|---|---|---|
| BRANDON Smietana, Skycoin Global Foundation Limited, a Singapore Company, and Symbolic Analytics Inc., a Delaware Corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No: 2024L003661 |
| Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, American Publishers, Inc. d/b/a Condé Nast, and d/b/a The New Yorker Magazine, and Unknown Individuals and Companies, | ) ) ) ) ) ) | Calendar W |
| Defendant. | ) | |

### UNOPPOSED MOTION FOR EXTENSION OF TIME BY DEFENDANT ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE NEW YORKER (INCORRECTLY SUED HEREIN AS "AMERICAN PUBLISHERS, INC. d/b/a CONDÉ NAST AND d/b/a THE NEW YORKER MAGAZINE")

Defendant Advance Magazine Publishers Inc. d/b/a The New Yorker (incorrectly sued herein as "American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine"), by counsel, respectfully requests that this Court extend by 60 days the time by which it must answer or otherwise respond to the Complaint filed in this matter, until October 21, 2024. This requested extension is not presented for purposes of delay, but rather to allow Defendant to prepare the most appropriate responsive pleading to Plaintiff's Complaint. Defendant has agreed to accept service in exchange for Plaintiff's agreement to extend the time to answer or otherwise plead. Counsel has only recently been retained and wishes to have additional time to investigate Plaintiff's claims and prepare its response accordingly. This motion is filed in good faith and no prejudice will result to the Plaintiff by the granting of this motion.

Dated: August 23, 2024

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

*/s/ Harris L. Kay*

Harris L. Kay
Conor McDonough
300 North LaSalle Street, Suite 2200
Chicago, IL 60654
Phone: (312) 820-5460
harriskay@dwt.com
conormcdonough@dwt.com

*Attorneys for Defendant, The New Yorker Magazine*

FILED DATE: 8/23/2024 1:48 PM   2024L003661

4870-0297-9803v.1 -

FILED
8/23/2024 1:48 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29082732

FILED DATE: 8/23/2024 1:48 PM   2024L003661

**Appearance/Jury Demand** _____ **(05/03/21) CCL 0530**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Brandon Smietana, Skycoin Global Foundation
Limited, a Singapore Company, and Symbolic Analytics,

_____

**Plaintiff**

**v.**

Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel
Wayne Cuthriell, Morgan Peck, Catherine Byerly, et. al.

_____

**Defendant**

Case No.   2024L003661

Calendar:   W

### APPEARANCE/JURY DEMAND

☑ **General Appearance**       ◉ 0900 - Appearance - Fee Paid

       ○ 0909 - Appearance- No Fee

       ○ 0904 - Appearance Filed - Fee Waived

☐ **Jury Demand**       ○ 1900 - Appearance & Jury Demand - Fee Paid

       ○ 1909 - Appearance & Jury Demand - No Fee

**The undersigned enters the appearance of:**   ○ **Plaintiff**  ◉ **Defendant**
       ○ **Additional Party**
       ○ **Respondent-in-discovery**

Defendant Advance Magazine Publishers Inc. d/b/a The New Yorker (incorrectly sued herein as

"American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine")

**Litigant's Name**

**/s/**   Harris L. Kay
_____

**Signature**

☑ **INITIAL COUNSEL OF RECORD**       ☐ **PRO SE**
☐ **ADDITIONAL APPEARANCE**       ☐ **SUBSTITUTE APPEARANCE**

**A copy of this appearance shall be given to all parties who have appeared and have not been
found by the Court to be in default.**

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 2

**Appearance/Jury Demand**  **(05/03/21) CCL 0530**

FILED DATE: 8/23/2024 1:48 PM    2024L003661

◉ **Atty. No.:** 64951/Fir 100236    ○ **Pro Se 99500**

**Name:** Harris L. Kay/Davis Wright Tremaine, LLP

**Atty. for (if applicable):**

The New Yorker Magazine

**Address:** 300 N LaSalle Street, Suite 2200

**City:** Chicago

**State:** IL   **Zip:** 60645

**Telephone:** (312) 820-5460

**Primary Email:** harriskay@dwt.com

**Pro Se Only:**

☐  **I have read and agree to the terms of the Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:**

_____

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
8/23/2024 1:48 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29082732

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

BRANDON Smietana, Skycoin Global )
Foundation Limited, a Singapore Company, )
and Symbolic Analytics Inc., a Delaware )
Corporation, )
)
Plaintiffs, )
)
v. )
)
Bradford Stephens, Aaron Kunstman, Ryan Eagle, )
Joel Wayne Cuthriell, Morgen Peck, Catherine )
Byerly, American Publishers, Inc. d/b/a Condé Nast, )
and d/b/a The New Yorker Magazine, and Unknown )
Individuals and Companies, )
Defendant. )

Case No: 2024L003661

Calendar W

**NOTICE OF FILING**

To:     **SEE ATTACHED SERVICE LIST**

PLEASE TAKE NOTICE that on August 23, 2024, we filed with the Clerk of the Circuit Court of Cook County, Law Division, an **APPEARANCE** for the Defendant, Advance Magazine Publishers Inc. d/b/a The New Yorker (incorrectly sued herein as "American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine") and **UNOPPOSED MOTION FOR EXTENSION OF TIME BY DEFENDANT ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE NEW YORKER (INCORRECTLY SUED HEREIN AS "AMERICAN PUBLISHERS, INC. D/B/A CONDÉ NAST AND d/b/a THE NEW YORKER MAGAZINE")**, copies of which are attached hereto and served upon you.

Dated: August 23, 2024

Respectfully submitted,

/s/ Harris Kay
Harris Kay
Davis Wright Tremaine LLP
300 N. La Salle, Suite 2200
Chicago, IL 60654
Tel: 312-820-5460
Firm #100236
ARDC No. 6294732
Cook County. No. 64951
harriskay@dwt.com

*Attorneys for Defendant, The New Yorker Magazine*

4883-9955-1963v.1 -

FILED DATE: 8/23/2024 1:48 PM    2024L003661

## CERTIFICATE OF SERVICE

I, Harris L. Kay, an attorney, hereby certify that this **NOTICE OF FILING**, **APPEARANCE** for the Defendant, The New Yorker Magazine, and **DEFENDANT THE NEW YORKER MAGAZINE'S UNOPPOSED MOTION FOR EXTENSION OF TIME**, was served on August 23, 2024, by electronic mail to the following parties:

### SEE ATTACHED SERVICE LIST

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

/s/ *Harris L. Kay*

4883-9955-1963v.1 -

FILED DATE: 8/23/2024 1:48 PM    2024L003661

| | |
|---|---|
| BRANDON Smietana, Skycoin Global Foundation Limited, a Singapore Company, and Symbolic Analytics Inc., a Delaware Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, American Publishers, Inc. d/b/a Condé Nast, and d/b/a The New Yorker Magazine, and Unknown Individuals and Companies,<br>Defendant. | Case No: 2024L003661<br><br>Calendar W |

**SERVICE LIST**

| Party | Name | Attorney |
|---|---|---|
| Plaintiffs | Skycoin Global Foundation Limited and Brandon Smietana | James Andreas Karamanis<br>Barney & Karamanis, LLP<br>Two Prudential Plaza<br>180 North Stetson, 3050<br>Chicago, Illinois 60601<br>312-553-5300 (W)<br>james@bkchicagolaw.com |
| Defendant | Ryan Eagle | George William Svoboda<br>P.O. Box 1299<br>McHenry, Illinois 60051<br>224-360-0696 (W)<br>George@georgesvobodalaw.com |
| Defendant | Joel Wayne Cuthriell | Joel Cuthriell<br>8922 East 49th Place<br>Tulas Oklahoma 74145<br>(405) 582-0062<br>Joel@cuthriell.com |
| Defendants | Symbolic Analytics Inc., American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine, Catherin Byerly, Joel Wayne Cuthriell and Aaron Kunstman, Morgen Peck Bradford Stephens, Unknown Individuals and Companies | Unknown |

3

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
8/23/2024 5:23 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29088695

FILED DATE: 8/23/2024 5:23 PM    2024L003661

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED, a Singapore
Company, and SYMBOLIC ANALYTICS INC.,
a Delaware Corporation,

                Plaintiffs,

v.

BRADFORD STEPHENS, AARON
KUNSTMAN, RYAN EAGLE, JOEL WAYNE
CUTHRIELL, MORGEN PECK, CATHERINE
BYERLY, AMERICAN PUBLISHERS, INC.
d/b/a CONDÉ NAST and d/b/a THE NEW
YORKER MAGAZINE, and UNKNOWN
INDIVIDUALS AND COMPANIES,

                Defendants.

Case No. 2024L003661

## PLAINTIFFS' EMERGENCY MOTION FOR EXTENSION OF TIME TO REPLEAD

NOW COME the Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL

FOUNDATION LIMITED, s Singapore Company, and SYMBOLIC ANALYTICS INC., a

Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, and move this

Honorable Court for the entry of an Order granting Plaintiffs time to replead. In support of this

Motion, Plaintiffs state as follows:

1.      Plaintiffs filed their Complaint at Law in this matter on April 4, 2024.

2.      Defendant RYAN EAGLE (hereinafter "Eagle") moved to dismiss Plaintiff's

Complaint at Law on June 28, 2024.

3.      This Court ruled on Eagle's Motion to Dismiss on July 10, 2024, granting the

Motion in part and denying it in part. *See* Order dated July 10, 2024, attached hereto as Exhibit

"A."

1

4.      Pursuant to the July 10, 2024 Order, Plaintiffs filed their Amended Complaint on July 24, 2024.

5.      Eagle moved to dismiss Plaintiffs' Amended Complaint on July 29, 2024.

6.      Though Eagle's second Motion to Dismiss was set for hearing on August 27, 2024, this Court issued a ruling on Eagle's Motion on August 20, 2024, again granting the Motion in part and denying it in part. *See* Order dated August 20, 2024, attached hereto as Exhibit "B."

7.      This Court granted Plaintiff seven (7) days to replead, on or before August 27, 2024. *See* Ex. "B."

8.      The undersigned counsel for Plaintiff is set to begin a two-week jury trial on August 27, 2024.

9.      Plaintiff Brandon Smietana is presently in China and Plaintiffs' counsel is unable to efficiently communicate with him to procure the additional facts sought by Eagle's Motion to Dismiss.

10.     Given the impending trial and aforesaid lapses in communication, Plaintiffs' counsel is unable to replead within the seven (7) days ordered by this Court.

11.     No party will be prejudiced by the entry of an order granting Plaintiffs' request for an extension of time, but that the denial of this motion would greatly prejudice Plaintiffs.

12.     This Motion is brought in good faith and not for the purpose of delay.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, s Singapore Company, and SYMBOLIC ANALYTICS INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, pray for the entry of an Order granting them an additional fourteen (14) days in which to replead, and for whatever other relief this Honorable Court deems appropriate.

FILED DATE: 8/23/2024 5:23 PM    2024L003661

FILED DATE: 8/23/2024 5:23 PM    2024L003661

Respectfully submitted,

**BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation**

By: /s/James A. Karamanis
One of Plaintiffs' Attorneys

James A. Karamanis
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

FILED DATE: 8/23/2024 5:23 PM   2024L003661

# EXHIBIT A

FILED DATE: 8/23/2024 5:23 PM    2024L003661

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, et al.

        Plaintiffs,

    v.

BRADFORD STEPHENS, et al.

        Defendants.

Case No. 2024L003661

### ORDER

THIS CAUSE coming to be heard for initial case management and Defendant Ryan Eagle's Motion to Dismiss, due notice having been given and the Court being fully advised in the premises;

IT IS HEREBY ORDERED that:

1. Defendant Eagle's Motion is GRANTED in part and DENIED in part;

2. Plaintiffs' Complaint at Law is STRICKEN;

3. Plaintiffs are granted fourteen (14) days to re-plead, on or before July 24, 2024;

4. Defendant is granted fourteen (14) days to answer or otherwise plead to Plaintiffs' amended pleadings, on or before August 7, 2024; and

5. This matter is continued for status on pleadings and service of remaining Defendants to August 27, 2024, at 9:00 a.m. via Zoom, Meeting ID: 921-0771-7798, password: 881878.

ENTER:

Judge _____    Judge's No.

Judge Thomas More Donnelly

DATED: _____

JUL 10 2024

Circuit Court - 1803

James A. Karamanis
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

FILED DATE: 8/23/2024 5:23 PM   2024L003661

# EXHIBIT B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED., AND SYMBOLIC ANALYTICS INC.

PLAINTIFFS,

*v.*

BRADFORD STEPHENS, AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, AMERICAN PUBLISHERS, INC. D/B/A CONDE NAST AND D/B/A THE NEW YORKER MAGAZINE, AND UNKNOWN INDIVIDUALS AND COMPANIES.

DEFENDANT.

No. 2024 L 003661

## ORDER

This matter comes before the court on defendant Ryan Eagle's section 2-619.1 motion to dismiss plaintiffs Brandon Smietana, Skycoin Global Foundation Limited, and Symbolic Analytics Inc.'s first amended complaint.

The court grants Eagle's motion to dismiss in part and denies it in part. The court strikes the first amended complaint, because it fails to identify Eagle's actions with sufficient particularity to state a claim against him.

The court grants plaintiffs seven days to replead. Eagle shall answer or otherwise plead within seven days thereafter.

The court sets this matter for status on the pleadings on September 17, 2024, at 9:00AM in courtroom 1912 or via Zoom at meeting ID: 921 0771 7798; Passcode: 881878.

The court strikes the August 27 date.

Judge Thomas More Donnelly

AUG 20 2024

Circuit Court - 1803

Entered the 20th of August 2024
Chicago Illinois

**Thomas More Donnelly**
**Judge**
**Circuit Court of Cook County**

FILED DATE: 8/23/2024 5:23 PM 2024L003661

FILED DATE: 8/26/2024 12:00 AM   2024L003661

FILED
8/26/2024 12:00 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29091819

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED, a Singapore
Company, and SYMBOLIC ANALYTICS INC.,
a Delaware Corporation,

                     Plaintiffs,

          v.

BRADFORD STEPHENS, AARON
KUNSTMAN, RYAN EAGLE, JOEL WAYNE
CUTHRIELL, MORGEN PECK, CATHERINE
BYERLY, AMERICAN PUBLISHERS, INC.
d/b/a CONDÉ NAST and d/b/a THE NEW
YORKER MAGAZINE, and UNKNOWN
INDIVIDUALS AND COMPANIES,

                     Defendants.

Case No. 2024L003661

## NOTICE OF MOTION

TO:    See attached Service List

      PLEASE TAKE NOTICE that on the **26th day of August, 2024**, at **9:00 a.m.**, or as soon thereafter as counsel may be heard, the undersigned will appear via Zoom before the Honorable Judge Donnelly and will then and there present **Plaintiff's Motion for Extension of Time to Replead**, a copy of which is attached hereto. To join Zoom, use the following: Meeting ID 921-0771-7798, Password 881878. Telephone: call (312) 626-6799.

| | | | |
|---|---|---|---|
| NAME: | BARNEY & KARAMANIS, LLP | ATTY. FOR: | Plaintiff |
| ADDRESS: | 180 N. Stetson, Suite 3050 | PHONE: | (312) 553-5300 |
| CITY: | Chicago, IL 60601 | ATTY. NO.: | 48525 |

## CERTIFICATE OF SERVICE

      I, Michaela Coughlin, an attorney, on oath state that I served the foregoing Notice and Motion referred to therein on all counsel of record as indicated on the attached service list on or before 5:00 p.m. on this 25th day of August, 2024.

[X]    Under penalties as provided by law
       pursuant to 735 ILCS 5/1-109, I
       certify that the statements set forth
       herein are true and correct.

Date: 08/25/2024

/s/Michaela Coughlin

FILED DATE: 8/26/2024 12:00 AM   2024L003661

## **SERVICE LIST**

George W. Svoboda
THE LAW OFFICE OF GEORGE W. SVOBODA
P.O. Box 1299
McHenry, IL 60051
(224) 360-0696
george@georgesvobodalaw.com
*Counsel for Defendant Ryan Eagle*

Joel Cuthriell
8922 E. 48th Place
Tulsa, OK 74145
(405) 582-0062
joel@cuthriell.com
*Pro Se Defendant*

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, et al.

              Plaintiffs,

    v.

BRADFORD STEPHENS, et al.

              Defendants.

Case No. 2024L003661

## ORDER

THIS CAUSE coming to be heard on Plaintiffs' Emergency Motion for Extension of Time to Replead, due notice having been given and the Court being fully advised in the premises;

IT IS HEREBY ORDERED that:

1. Plaintiffs' Emergency Motion for Extension of Time to Replead is GRANTED;

2. Plaintiffs are granted fourteen (14) days to replead, on or before September 9, 2024;

3. Defendant Ryan Eagle is granted seven (7) days to answer or otherwise plead, on or before September 16, 2024; and

4. The status on the pleadings previously set for September 17, 2024, is to stand.

ENTER: _____

Judge _____ Judge's No. _____

DATED: Judge Thomas More Donnelly

AUG 2 6 2024

Circuit Court - 1803

James A. Karamanis
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED DATE: 8/29/2024 2:01 PM   2024L003661

FILED
8/29/2024 2:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29163174

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BRANDON Smietana, Skycoin Global Foundation Limited, a Singapore Company, and Symbolic Analytics Inc., a Delaware Corporation,

    Plaintiffs,

    v.

Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, American Publishers, Inc. d/b/a Condé Nast, and d/b/a The New Yorker Magazine, and Unknown Individuals and Companies,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No: 2024L003661

Calendar W

## NOTICE OF MOTION

To:  **SEE ATTACHED SERVICE LIST**

**PLEASE TAKE NOTICE** that on September 17, 2024, at 9:00 a.m., or as soon thereafter as counsel may be heard, counsel for Defendant, Advance Magazine Publishers Inc. d/b/a The New Yorker shall appear via Zoom before the Honorable Judge Donnelly, or any judge sitting in his stead in Room 1912 of the Richard J. Daley Center, and shall then and there present its **UNOPPOSED MOTION FOR EXTENSION OF TIME BY DEFENDANT ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE NEW YORKER (INCORRECTLY SUED HEREIN AS "AMERICAN PUBLISHERS, INC. D/B/A CONDÉ NAST AND d/b/a THE NEW YORKER MAGAZINE"),** copies of which are attached hereto and served upon you. To join via Zoom, use the following: Meeting ID 921-0771-7798, Password 881 878, Telephone (312) 626-6799.

Dated: August 29, 2024

      Respectfully submitted,

      /s/ Harris Kay
      Harris Kay
      Davis Wright Tremaine LLP
      300 N. La Salle, Suite 2200
      Chicago, IL 60654
      Tel: 312-820-5460
      Firm #100236
      ARDC No. 6294732
      Cook County. No. 64951
      harriskay@dwt.com

      *Attorneys for Defendant, The New Yorker Magazine*

FILED DATE: 8/29/2024 2:01 PM    2024L003661

## <u>CERTIFICATE OF SERVICE</u>

Harris L. Kay, attorney, certifies that he served the foregoing **Notice of Motion** by submission of a true and correct copy thereof to the court's electronic filing system, causing the attorneys of record to receive a copy thereof at their registered e-mail addresses, on this August 29, 2024.  I have also caused a true and correct copy of the same to be delivered by email to:

**SEE ATTACHED SERVICE LIST**

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Certificate of Service are true and correct.

/s/ *Harris L. Kay*

4883-9955-1963v.1 -

FILED DATE: 8/29/2024 2:01 PM    2024L003661

| | |
|---|---|
| BRANDON Smietana, Skycoin Global Foundation Limited, a Singapore Company, and Symbolic Analytics Inc., a Delaware Corporation, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) |
| Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, American Publishers, Inc. d/b/a Condé Nast, and d/b/a The New Yorker Magazine, and Unknown Individuals and Companies, | ) ) ) ) ) |
| Defendant. | ) ) |

Case No: 2024L003661

Calendar W

**SERVICE LIST**

| Party | Name | Attorney |
|---|---|---|
| Plaintiffs | Skycoin Global Foundation Limited and Brandon Smietana | James Andreas Karamanis Barney & Karamanis, LLP Two Prudential Plaza 180 North Stetson, 3050 Chicago, Illinois 60601 312-553-5300 (W) james@bkchicagolaw.com |
| Defendant | Ryan Eagle | George William Svoboda P.O. Box 1299 McHenry, Illinois 60051 224-360-0696 (W) George@georgesvobodalaw.com |
| Defendant | Joel Wayne Cuthriell | Joel Cuthriell 8922 East 49th Place Tulas Oklahoma 74145 (405) 582-0062 Joel@cuthriell.com |
| Defendants | Symbolic Analytics Inc., American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine, Catherin Byerly, Joel Wayne Cuthriell and Aaron Kunstman, Morgen Peck Bradford Stephens, Unknown Individuals and Companies | Unknown |

3

FILED DATE: 9/5/2024 4:28 PM   2024L003661

FILED
9/5/2024 4:28 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29247388

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| Brandon Smietana, Skycoin Global Foundation Limited, a Singapore Company, and Symbolic Analytics Inc., a Delaware Corporation, Plaintiffs, v. Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine, and Unknown Individuals and Companies, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) | Case No: 2024L003661 Calendar W |

**Verified Statement of Out-of-State Attorney Pursuant to Supreme Court Rule 707**

I, Nimra H. Azmi, submit this Verified Statement pursuant to Illinois Supreme Court Rule 707.

1.      My full name is Nimra Hameed Azmi and my date of birth is August 1, 1990.  The address of offices from which I practice law and related email address and telephone numbers are as follows:

> Davis Wright Tremaine LLP
> 1251 Avenue of the Americas, Floor 21
> New York, NY 10020
> (332) 234-5199
> nimraazmi@dwt.com

2.      I represent Defendant Advance Magazine Publishers Inc. d/b/a The New Yorker (incorrectly sued herein as "American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine") in *Brandon Smietana, et. al. vs.  Bradford Stephens, et.al.*, Case No: 2024L003661.

3(a).    I have not filed any other appearance pursuant to this rule during this calendar year.

3(b).    I have not received a registration number from the ARDC.

4(a).    I list each jurisdiction of admission, including any state, territory, or commonwealth of the United States, the District of Columbia, or in a foreign country, and my full admission name and license number.

FILED DATE: 9/5/2024 4:28 PM    2024L003661

| Date of Admission | Jurisdiction | Name | Bar Number |
|---|---|---|---|
| 10/05/2016 | New York | Nimra H. Azmi | 5466693 |
| 01/21/2019 | U.S. District Court for the Southern District of New York | Nimra H. Azmi | 5466693 |
| 01/12/2022 | U.S. District Court for the Eastern District of New York | Nimra H. Azmi | 5466693 |
| 02/05/2024 | U.S. District Court for the Western District of New York | Nimra H. Azmi | 5466693 |
| 07/02/2019 | District of Columbia | Nimra H. Azmi | 1614977 |
| 01/06/2020 | U.S. District Court for the District of Columbia | Nimra H. Azmi | 1614977 |
| 10/09/2019 | U.S. Court of Appeals for the Fourth Circuit | Nimra H. Azmi | |
| 01/12/2022 | U.S. District Court for the Eastern District of Michigan | Nimra H. Azmi | |

4(b).    I attach a letter or certificate of good standing for each of the jurisdictions listed in paragraph 4(a) above.

5.       I have no office or other presence in Illinois for the practice of law.

6.       I submit to the disciplinary authority of the Supreme Court of Illinois.

7.       I have undertaken to become familiar with and to comply, as if admitted to practice in Illinois, with the rules of the Supreme Court of Illinois, including the Illinois Rules of Professional Conduct and the Supreme Court Rules on Admission and Discipline of Attorneys, and other Illinois law and practices that pertain to the proceeding;

(8)      The full name, business address and ARDC number of the Illinois attorney with whom I have associated in the matter is:

Harris L. Kay
Davis Wright Tremaine, LLP
300 North LaSalle Street, Suite 2200
Chicago, Illinois 60654
ARDC No.: 6294732

FILED DATE: 9/5/2024 4:28 PM    2024L003661

9.      I certify that I have served this Statement upon the parties listed below and that these parties are all entitled to service under this rule.

| Plaintiffs | Skycoin Global Foundation Limited and Brandon Smietana | James Andreas Karmanis 180 North Stetson, 3050 Chicago, Illinois 60601 |
|---|---|---|
| Defendants | Symbolic Analytics Inc., American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine, Catherin Byerly, Joel Wayne Cuthriell and Ryan Eagle | George William Svoboda P.O. Box 1299 McHenry, Illinois 60051 |
|  | Aaron Kunstman, Morgen Peck Bradford Stephens, Unknown Individuals and Companies | Unknown |

## **Verification**

I verify the accuracy and completeness of each of the above statements.

          */s/ Nimra H. Azmi*


          Date:   September 5, 2024

FILED DATE: 9/5/2024 4:28 PM   2024L003661



On behalf of JULIO A. CASTILLO, Clerk of the District of Columbia Court of Appeals,
the District of Columbia Bar does hereby certify that

# *Nimra Hameed Azmi*

*was duly qualified and admitted on July 2, 2019 as an attorney and counselor entitled to
practice before this Court; and is, on the date indicated below, an Active member in good
standing of this Bar.*

**In Testimony Whereof,**
**I have hereunto subscribed my**
**name and affixed the seal of this**
**Court at the City of**
**Washington, D.C., on September 05, 2024.**

*JULIO A. CASTILLO*
*Clerk of the Court*

Issued By:

*David Chu - Director, Membership*
*District of Columbia Bar Membership*

*For questions or concerns, please contact the D.C. Bar Membership Office at 202-626-3475 or email*
*memberservices@dcbar.org.*

FILED DATE: 9/5/2024 4:28 PM 2024L003661



*Appellate Division of the Supreme Court*
*of the State of New York*
*Second Judicial Department*

I, *Darrell M. Joseph, Clerk of the Appellate Division of the Supreme Court of the State of New York, Second Judicial Department, do hereby certify that*

## Nimra Azmi

*was duly licensed and admitted to practice as an Attorney and Counselor at Law in all the courts of this State on* **October 5, 2016,** *has duly taken and subscribed the oath of office prescribed by law, has been enrolled in the Roll of Attorneys and Counselors at Law on file in this office, is duly registered with the Office of Court Administration, and according to the records of this Court is currently in good standing as an Attorney and Counselor-at-Law.*



*In Witness Whereof, I have hereunto set my hand in the City of Brooklyn on September 5, 2024.*

*Clerk of the Court*

*CertID-00189823*



**Appellate Division**
**Supreme Court of the State of New York**
**Second Judicial Department**
**45 Monroe Place**
**Brooklyn, N.Y. 11201**
(718) 875-1300

HECTOR D. LASALLE
PRESIDING JUSTICE

DARRELL M. JOSEPH
CLERK OF THE COURT

KENNETH BAND
DEPUTY CLERKS

MELISSA KRAKOWSKI
WENDY STYNES
LAUREN G. DOME
BRIAN E. KENNEDY
ASSOCIATE DEPUTY CLERKS

To Whom It May Concern

An attorney admitted to practice by this Court may request a certificate of good standing, which is the only official document this Court issues certifying to an attorney's admission and good standing.

An attorney's registration status, date of admission and disciplinary history may be viewed through the attorney search feature on the website of the Unified Court System.

New York State does not register attorneys as active or inactive.

An attorney may request a disciplinary history letter from the Attorney Grievance Committee of the Second Judicial Department.

Bar examination history is available from the New York State Board of Law Examiners.

Instructions, forms and links are available on this Court's website.

Darrell M. Joseph
Clerk of the Court

Revised March 2024

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
9/5/2024 4:28 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29247388

FILED DATE: 9/5/2024 4:28 PM   2024L003661

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BRANDON Smietana, Skycoin Global    )
Foundation Limited, a Singapore Company,   )
and Symbolic Analytics Inc., a Delaware   )
Corporation,   )
   )
       Plaintiffs,   )
   )          Case No: 2024L003661
       v.   )
   )          Calendar W
Bradford Stephens, Aaron Kunstman, Ryan Eagle,   )
Joel Wayne Cuthriell, Morgen Peck, Catherine   )
Byerly, American Publishers, Inc. d/b/a Condé Nast,   )
and d/b/a The New Yorker Magazine, and Unknown   )
Individuals and Companies,   )
              Defendant.   )

## NOTICE OF FILING

To:    **SEE ATTACHED SERVICE LIST**

      PLEASE TAKE NOTICE that on September 5, 2024, we filed with the Clerk of the Circuit Court of Cook County, Law Division, Nimra H. Azmi's **VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY PURSUANT TO SUPREME COURT RULE 707,** copies of which are attached hereto and served upon you.

Dated: September 5, 2024

                      Respectfully submitted,

                      /s/ Harris Kay
                      Harris Kay
                      Davis Wright Tremaine LLP
                      300 N. La Salle, Suite 2200
                      Chicago, IL 60654
                      Tel: 312-820-5460
                      Firm #100236
                      ARDC No. 6294732
                      Cook County. No. 64951
                      harriskay@dwt.com

                      *Attorneys for Defendant, The New Yorker Magazine*

FILED DATE: 9/5/2024 4:28 PM    2024L003661

## CERTIFICATE OF SERVICE

I, Harris L. Kay, an attorney, hereby certify that this **NOTICE OF FILING**, and **Nimra H. Azmi's VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY PURSUANT TO SUPREME COURT RULE 707**, was served on September 5, 2024, by electronic mail to the following parties:

### SEE ATTACHED SERVICE LIST

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

/s/ *Harris L. Kay*

4883-9955-1963v.1 -

FILED DATE: 9/5/2024 4:28 PM   2024L003661

BRANDON Smietana, Skycoin Global )
Foundation Limited, a Singapore Company, )
and Symbolic Analytics Inc., a Delaware )
Corporation, )
 )
              Plaintiffs, )
 )
              v. )
 )
Bradford Stephens, Aaron Kunstman, Ryan Eagle, )
Joel Wayne Cuthriell, Morgen Peck, Catherine )
Byerly, American Publishers, Inc. d/b/a Condé Nast, )
and d/b/a The New Yorker Magazine, and Unknown )
Individuals and Companies, )
              Defendant. )

Case No: 2024L003661

Calendar W

## SERVICE LIST

| Party | Name | Attorney |
|-------|------|----------|
| Plaintiffs | Skycoin Global Foundation Limited and Brandon Smietana | James Andreas Karamanis<br>Barney & Karamanis, LLP<br>Two Prudential Plaza<br>180 North Stetson, 3050<br>Chicago, Illinois 60601<br>312-553-5300 (W)<br>james@bkchicagolaw.com |
| Defendant | Ryan Eagle | George William Svoboda<br>P.O. Box 1299<br>McHenry, Illinois 60051<br>224-360-0696 (W)<br>George@georgesvobodalaw.com |
| Defendant | Joel Wayne Cuthriell | Joel Cuthriell<br>8922 East 49th Place<br>Tulas Oklahoma 74145<br>(405) 582-0062<br>Joel@cuthriell.com |
| Defendants | Symbolic Analytics Inc., American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine, Catherin Byerly, Joel Wayne Cuthriell and Aaron Kunstman, Morgen Peck Bradford Stephens, Unknown Individuals and Companies | Unknown |

4883-9955-1963v.1 -

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED DATE: 9/5/2024 4:10 PM   2024L003661

FILED
9/5/2024 4:10 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29246829

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Brandon Smietana, Skycoin Global Foundation Limited, a Singapore Company, and Symbolic Analytics Inc., a Delaware Corporation, Plaintiffs, )
)
)
)
v. )
)
Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine, and Unknown Individuals and Companies, Defendants. )
)
)
)
)
)
)
)
)
)

Case No: 2024L003661
Calendar W

### Verified Statement of Out-of-State Attorney Pursuant to Supreme Court Rule 707

I, Kate Bolger, submit this Verified Statement pursuant to Illinois Supreme Court Rule 707.

1.      My full name is Katherine M. Bolger and my date of birth is January 24, 1972.  The address of offices from which I practice law and related email address and telephone numbers are as follows:

Davis Wright Tremaine LLP
1251 Avenue of the Americas, Floor 21
New York, NY 10020
(212) 402-4068
katebolger@dwt.com

2.      I represent Defendant Advance Magazine Publishers Inc. d/b/a The New Yorker (incorrectly sued herein as "American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine") in *Brandon Smietana, et. al. vs.  Bradford Stephens, et.al.*, Case No: 2024L003661.

3(a).    I have not filed any other appearance pursuant to this rule during this calendar year.
 I have not received a registration number from the ARDC.

4(a).    I list each jurisdiction of admission, including any state, territory, or commonwealth of the United States, the District of Columbia, or in a foreign country, and my full admission name and license number.

FILED DATE: 9/5/2024 4:10 PM    2024L003661

| Date of Admission | Jurisdiction | Name | Bar Number |
|---|---|---|---|
| 1999 | New York | Katherine M. Bolger | 2976868 |
| 2024 | U.S. District Court for the Western District of New York | Katherine M. Bolger | |
| 2017 | U.S. District Court for the Northern District of Illinois | Katherine M. Bolger | |
| 2015 | U.S. Tax Court | Katherine M. Bolger | |
| 2015 | U.S. Court of Appeals for the Eighth Circuit | Katherine M. Bolger | |
| 2014 | U.S. Court of Appeals for the Fourth Circuit | Katherine M. Bolger | |
| 2014 | U.S. Court of Appeals for the Ninth Circuit | Katherine M. Bolger | |
| 2007 | U.S. Court of Appeals for the Seventh Circuit | Katherine M. Bolger | |
| 2005 | U.S. Court of Appeals for the Fifth Circuit | Katherine M. Bolger | |
| 2004 | U.S. Court of Appeals for the Eleventh Circuit | Katherine M. Bolger | |
| 2004 | U.S. Supreme Court | Katherine M. Bolger | |
| 2002 | U.S. Court of Appeals for the 2nd Circuit | Katherine M. Bolger | |
| 1999 | U.S. Court of Appeals for the 3rd Circuit | Katherine M. Bolger | |
| 1999 | U.S. District Court for the Eastern District of New York | Katherine M. Bolger | |
| 1999 | U.S. District Court for the Southern District of New York | Katherine M. Bolger | |

4(b).    I attach a letter or certificate of good standing for each of the jurisdictions listed in paragraph 4(a) above.

5.       I have no office or other presence in Illinois for the practice of law.

6.       I submit to the disciplinary authority of the Supreme Court of Illinois;

7.       I have undertaken to become familiar with and to comply, as if admitted to practice in Illinois, with the rules of the Supreme Court of Illinois, including the Illinois Rules of Professional Conduct and the Supreme Court Rules on Admission and Discipline of Attorneys, and other Illinois law and practices that pertain to the proceeding;

(8)      The full name, business address and ARDC number of the Illinois attorney with whom I have associated in the matter is:

         Harris L. Kay

FILED DATE: 9/5/2024 4:10 PM    2024L003661

Davis Wright Tremaine, LLP
300 North LaSalle Street, Suite 2200
Chicago, Illinois 60654
ARDC No.: 6294732

9.      I certify that I have served this Statement upon the parties listed below and that these parties are all entitled to service under this rule.

| Plaintiffs | Skycoin Global Foundation Limited and Brandon Smietana | James Andreas Karmanis 180 North Stetson, 3050 Chicago, Illinois 60601 |
|---|---|---|
| Defendants | Symbolic Analytics Inc., American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine, Catherin Byerly, Joel Wayne Cuthriell and Ryan Eagle | George William Svoboda P.O. Box 1299 McHenry, Illinois 60051 |
| | Aaron Kunstman, Morgen Peck Bradford Stephens, Unknown Individuals and Companies | Unknown |

**<u>Verification</u>**

I verify the accuracy and completeness of each of the above statements.

/s/ *Kate M. Bolger*


Date:   September 5, 2024

FILED DATE: 9/5/2024 4:10 PM  2024L003661



*Appellate Division of the Supreme Court*
*of the State of New York*
*First Judicial Department*

———————

*I, Susanna M. Rojas, Clerk of the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, do hereby certify that*

## Katherine Mary Bolger

*was duly licensed and admitted to practice as an Attorney and Counselor at Law in all the courts of this State on **May 24, 1999**, has duly taken and subscribed the oath of office prescribed by law, has been enrolled in the Roll of Attorneys and Counselors at Law on file in this office, is duly registered with the Office of Court Administration, and according to the records of this Court is currently in good standing as an Attorney and Counselor-at-Law.*



*In Witness Whereof, I have hereunto set my hand in the City of New York on August 12, 2024.*

*Clerk of the Court*

*CertID-00187014*



# Supreme Court of the State of New York
## Appellate Division, First Department

DIANNE T. RENWICK
PRESIDING JUSTICE

MARGARET SOWAH
DEPUTY CLERK OF THE COURT

SUSANNA MOLINA ROJAS
CLERK OF THE COURT

DOUGLAS C. SULLIVAN
DEPUTY CLERK OF THE COURT

FILED DATE: 9/5/2024 4:10 PM   2024L003661

To Whom It May Concern

An attorney admitted to practice by this Court may request a certificate of good standing, which is the only official document this Court issues certifying to an attorney's admission and good standing.

An attorney's registration status, date of admission and disciplinary history may be viewed through the attorney search feature on the website of the Unified Court System.

New York State does not register attorneys as active or inactive.

An attorney may request a disciplinary history letter from the Attorney Grievance Committee of the First Judicial Department.

Bar examination history is available from the New York State Board of Law Examiners.

Instructions, forms and links are available on this Court's website.

Susanna Rojas
Clerk of the Court

Revised October 2020

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED DATE: 9/5/2024 4:10 PM    2024L003661

FILED
9/5/2024 4:10 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29246829

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| BRANDON Smietana, Skycoin Global Foundation Limited, a Singapore Company, and Symbolic Analytics Inc., a Delaware Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, American Publishers, Inc. d/b/a Condé Nast, and d/b/a The New Yorker Magazine, and Unknown Individuals and Companies, <br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No: 2024L003661

Calendar W

## <u>NOTICE OF FILING</u>

To:    **SEE ATTACHED SERVICE LIST**

PLEASE TAKE NOTICE that on September 5, 2024, we filed with the Clerk of the Circuit Court of Cook County, Law Division, Kate Bolger's **VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY PURSUANT TO SUPREME COURT RULE 707,** copies of which are attached hereto and served upon you.

Dated: September 5, 2024

Respectfully submitted,

/s/ Harris Kay
Harris Kay
Davis Wright Tremaine LLP
300 N. La Salle, Suite 2200
Chicago, IL 60654
Tel: 312-820-5460
Firm #100236
ARDC No. 6294732
Cook County. No. 64951
harriskay@dwt.com

*Attorneys for Defendant, The New Yorker Magazine*

FILED DATE: 9/5/2024 4:10 PM    2024L003661

## <u>CERTIFICATE OF SERVICE</u>

I, Harris L. Kay, an attorney, hereby certify that this **NOTICE OF FILING**, and **Kate Bolger's** **<u>VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY PURSUANT TO SUPREME</u>** **<u>COURT RULE 707</u>**, was served on September 5, 2024, by electronic mail to the following parties:

**SEE ATTACHED SERVICE LIST**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

/s/ *Harris L. Kay* _____

4883-9955-1963v.1 -

FILED DATE: 9/5/2024 4:10 PM    2024L003661

BRANDON Smietana, Skycoin Global )
Foundation Limited, a Singapore Company, )
and Symbolic Analytics Inc., a Delaware )
Corporation, )
                            )
           Plaintiffs, )
                            )
           v. )
Bradford Stephens, Aaron Kunstman, Ryan Eagle, )
Joel Wayne Cuthriell, Morgen Peck, Catherine )
Byerly, American Publishers, Inc. d/b/a Condé Nast, )
and d/b/a The New Yorker Magazine, and Unknown )
Individuals and Companies, )
                    Defendant. )

Case No: 2024L003661

Calendar W

## SERVICE LIST

| Party | Name | Attorney |
|-------|------|----------|
| Plaintiffs | Skycoin Global Foundation Limited and Brandon Smietana | James Andreas Karamanis<br>Barney & Karamanis, LLP<br>Two Prudential Plaza<br>180 North Stetson, 3050<br>Chicago, Illinois 60601<br>312-553-5300 (W)<br>james@bkchicagolaw.com |
| Defendant | Ryan Eagle | George William Svoboda<br>P.O. Box 1299<br>McHenry, Illinois 60051<br>224-360-0696 (W)<br>George@georgesvobodalaw.com |
| Defendant | Joel Wayne Cuthriell | Joel Cuthriell<br>8922 East 49th Place<br>Tulas Oklahoma 74145<br>(405) 582-0062<br>Joel@cuthriell.com |
| Defendants | Symbolic Analytics Inc., American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine, Catherin Byerly, Joel Wayne Cuthriell and Aaron Kunstman, Morgen Peck Bradford Stephens, Unknown Individuals and Companies | Unknown |

FILED DATE: 9/9/2024 8:52 PM   2024L003661

FILED
9/9/2024 8:52 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29291047

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED, a Singapore
Company, and SYMBOLIC ANALYTICS INC.,
a Delaware Corporation,

                      Plaintiffs,

        v.

BRADFORD STEPHENS, AARON
KUNSTMAN, JOEL WAYNE CUTHRIELL,
MORGEN PECK, CATHERINE BYERLY,
ADVANCE MAGAZINE PUBLISHERS, INC.,
d/b/a THE NEW YORKER, and UNKNOWN
INDIVIDUALS AND COMPANIES,

                    Defendants.

Case No. 2024L003661

## SECOND AMENDED COMPLAINT AT LAW

    NOW COME the Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a
Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, and for their
Second Amended Complaint at Law against Defendants, BRADFORD STEPHENS, AARON
KUNSTMAN, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY,
ADVANCE MAGAZINE PUBLISHERS, INC., d/b/a THE NEW YORKER, and UNKNOWN
INDIVIDUAL(S) AND COMPANIES, state as follows:

## PARTIES

    1.    SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company (hereafter
"Skycoin") is a consortium of related entities involved in the development of software, hardware,
design, manufacturing, and services operating under the consumer brand name "Skycoin," which
includes Skycoin Global Foundation, Symbolic Analytics Inc., Shellpay China, and other entities

1

FILED DATE: 9/9/2024 8:52 PM   2024L003661

that are responsible for regional operations or management of specific assets of Skycoin's global operations.

2.     Skycoin created 100 million Skycoin Tokens during its launch in 2013, which were distributed and traded on various exchanges by 2017.

3.     The peak market capitalization of all existing Skycoin Tokens reached $5 billion USD in January 2018.

4.     Skycoin is a private company organized under the laws of Singapore, its principal place of business located at 2 Venture Drive, #11-31, Vision Exchange, Singapore.

5.     Plaintiff SYMBOLIC ANALYTICS, INC. ("SA") is a private company organized under the laws of Delaware, United States.

6.     Plaintiff, BRANDON SMIETANA ("Smietana") is an individual citizen of the United States and is the Chief Software Architect and authorized representative of Skycoin and SA.

7.     Defendant BRADFORD STEPHENS ("Stephens") is an individual citizen of the State of New York, United States.

8.     On information and belief, Defendant JOEL WAYNE CUTHRIELL ("Cuthriell") is an individual citizen of the State of Oklahoma, United States.

9.     Defendant AARON KUNSTMAN ("Kunstman") is an individual citizen of the State of Wisconsin, United States.

10.     "Sudo" is a network of similarly named Telegram accounts, operated by a minimum of four persons. At least one of these persons is known to be Kunstman. Stephens is widely believed to also be one of the account operators. The other two or more operators are currently unknown.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

11.     Defendant CATHERINE BYERLY ("Byerly") is an individual citizen of the State of Florida, United States.

12.     Byerly was employed by a marketing company called 22 Acacia Consulting, located in Chicago, Illinois.

13.     Byerly was hired by Stephens through her employment at 22 Acacia Consulting to perform marketing services for Skycoin.

14.     Defendant MORGEN PECK ("Peck") is a privately paid journalist and individual citizen of the State of New York, United States.

15.     Defendant ADVANCE MAGAZINE PUBLISHERS, INC., d/b/a THE NEW YORKER ("Advance") is a global mass media company in the business of producing world leading print, digital, video, and social media brands organized under the laws of the State of New York.

16.     Advance is the owner, operator, and publisher of The New Yorker Magazine ("The New Yorker"), a prominent American weekly magazine.

17.     On August 28, 2021, Peck authored an article published in The New Yorker titled *Pumpers, Dumpers, and Shills: The Skycoin Saga* (the "New Yorker Article").[1] A copy of the New Yorker Article is attached hereto as Exhibit A.

18.     Stephens, recognizing the success of Skycoin, devised a plan and scheme to defraud, extort, and steal money and assets from Skycoin in concert with some or all of the other named party Defendants.

---

[1] The article can be found at: https://www.newyorker.com/tech/annals-of-technology/pumpers-dumpers-and-shills-the-skycoin-saga

3

FILED DATE: 9/9/2024 8:52 PM    2024L003661

## FACTS COMMON TO ALL COUNTS

19.    On or about January 8, 2018, Plaintiffs entered into discussions with Stephens to develop, launch, and manage a comprehensive marketing and brand awareness program for Skycoin, including but not limited to revamping Skycoin's website, performing search engine optimization ("SEO") services, and generating positive publicity for Skycoin (hereafter referred to as the "Marketing Program").

20.    On or about January 8, 2018, Stephens represented himself to be the owner of Smolder LLC, a marketing startup company, to which the payments would be made for the Marketing Program.

21.    Stephens claimed that his business partners were Ryan Eagle ("Eagle"), Adam Young ("Young"), and Harrison Gevirtz ("Gevirtz") (Stephens, Eagle, Young, and Gevirtz will collectively be referred to hereinafter as the "Smolder Partners").

22.    Stephens represented to Plaintiffs that he, along with the other Smolder Partners, would be providing the marketing services contemplated by the Marketing Program.

23.    Stephens represented to Plaintiffs that Eagle and Young were the individuals who would receive Plaintiffs' payments and that they were responsible for handling the money.

24.    Stephens represented to Plaintiffs that the Smolder Partners were "inseparable" and that all business activities they conducted were done jointly and that payment for said activities was to be shared or split between them.

25.    Unbeknownst to Plaintiffs, Stephens and Eagle were prohibited from engaging in activities such as the Marketing Program pursuant to an order from the Federal Trade Commission dated February 19, 2014 ("the FTC Order"). *See Federal Trade Commission v. CPA Tank, Inc., Vito Glazers, Eagle Web Assets, Inc., and Ryan Eagle,* Case No. 14-cv-1239.

26.     At all times relevant herein, Stephens was aware that pursuant to the FTC Order, he could not accept payments for marketing activities.

27.     Stephens never informed Plaintiffs of the existence of the FTC Order and further violated it by offering to provide marketing services to Plaintiffs.

28.     If Plaintiffs had known about the FTC Order and/or if Stephens had not lied about and concealed the FTC Order, Plaintiffs would not have entered into the Marketing Program with Stephens and the Smolder Partners.

29.     Plaintiffs reached an oral agreement with Stephens to implement the Marketing Program, and as part and parcel of that agreement, paid the Smolder Partners $107,948.00 ($66,258.00 in the form of four (4) Bitcoins and $41,690.00 in the form of 1,100 Skycoin Tokens) (the "Initial Payment"). The Initial Payment included an expense budget for an upcoming industry conference in Las Vegas, Nevada. Plaintiffs and Stephens explicitly agreed that as part of their agreement, any expense in excess of $1,000.00 would require prior approval from Skycoin.

30.     In addition to the Initial Payment, Plaintiffs paid the Smolder Partners approximately $800,000.00 in Skycoin Tokens for an internet advertising campaign.

31.     Shortly after receiving the Initial Payment, Stephens submitted two additional invoices for certain work allegedly performed by Byerly totaling approximately $14,752.44.

32.     On or about January 12, 2018, Stephens and Byerly notified Plaintiffs of a potential crisis that could critically impact Skycoin's business, marketing, and internet presence. As represented by Stephens and Byerly, an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website. Such content would function to decrease Skycoin's website's ranking precipitously in search engines and irrevocably damage Skycoin's image, reputation, and internet presence.

FILED DATE: 9/9/2024 8:52 PM  2024L003661

FILED DATE: 9/9/2024 8:52 PM   2024L003661

33.    In order to combat the internet attack by said third party, Stephens represented to Plaintiffs that an additional payment of $38,000.00 would be required.

34.    On or about January 14, 2018, and January 19, 2018, Skycoin paid the Smolder Partners the requested $38,000.00.

35.    The attack on Skycoin's website damaged Skycoin's SEO ranking and significantly reduced internet traffic to Skycoin's website.

36.    In January of 2018, Skycoin made the following payments to the Smolder Partners in connection with the Marketing Program:

   a.    January 11, 2018: 20,000 Skycoin Tokens ($842,400.00) for the Marketing Program budget;

   b.    January 13, 2018: One (1) Bitcoin ($14,314.00) for a conference in Miami, Florida;

   c.    January 16, 2018: 3,899 Skycoin Tokens ($121,337.00) for the Marketing Program budget;

   d.    January 18, 2018: Two (2) Bitcoins ($23,212.00) and 2,625 Skycoin Tokens ($80,929.00) for Marketing Program labor costs; and

   e.    January 19, 2018: Four (4) Bitcoins (56,457.00) and a separate payment of 1.30 Bitcoin for the Marketing Program and to combat the aforementioned attacks on Skycoin's website. These services were never performed.

37.    In late January to early February 2018, Stephens demanded that Skycoin pay the Smolder Partners $100,000.00 per month to ward off the supposed third-party attacks on Skycoin's website. Stephens later increased his monthly demand to $300,000.00 in order to quell the attacks.

38.    In early February of 2018, Plaintiffs discovered that in actuality, there was no third party attacking Skycoin's website. Rather, the attack was instigated by Stephens and the Smolder Partners as a fraudulent means to extract additional funds from Skycoin. The invoices submitted by Stephens to combat the alleged "attacks" were fabricated.

FILED DATE: 9/9/2024 8:52 PM 2024L003661

39.     In early February of 2018, SA received deficient invoices that were highly suggestive of fraud. Upon determining that there may be fraud in the Smolder Partners' invoices, Plaintiffs discontinued all additional payments.

### DEFENDANTS' EXTORTION

40.     Upon Skycoin's refusal to pay Stephens the monthly payments requested in or around February 2018, Smietana and Stephens met in Shanghai, China, with Eagle joining the meeting via Zoom.

41.     During this meeting, Stephens threatened to have Skycoin delisted from all exchanges including, for example, Bittrex and Binance, unless Smietana agreed to pay him $30,000,000.00 in Bitcoin and $1,000,000.00 in US Dollars.

42.     Stephens' threats included statements that failure to comply would result in Skycoin's destruction and the price of Skycoin being driven to zero.

43.     Stephens also threatened that if Plaintiffs refused to pay, he would block Skycoin from being listed on Bitfinex, another prominent online cryptocurrency exchange, and would interfere with Plaintiffs' contracts so as to ensure that "no one would work with" Plaintiffs.

44.     Stephens attempted to blackmail Plaintiffs into making Stephens the COO of Skycoin and put him in control of the management of the company. Stephens also attempted to blackmail Plaintiffs into giving Gevirtz control of all Skycoin's bank accounts.

45.     Smietana, in fear of Stephens' threats, capitulated to their demand and initiated the first of three (3) extortion payments on or about February 9, 2018, in the amount of $127,000.00 (the "Extortion Payments").

FILED DATE: 9/9/2024 8:52 PM    2024L003661

46.     On or about February 22, 2018, the Marketing Program engagement between Plaintiffs and the Smolder Partners ended due to pressure from Skycoin's advisory board because of the discovery of the fraudulent invoicing and business practices.

47.     Plaintiffs requested a refund of the unspent prepayments made for the Marketing Program, however, the Smolder Partners refused to return any of said money.

48.     In and around the time Stephens demanded the Extortion Payments from Smietana, he and the Smolder Partners also attempted to hostilely seize control of Skycoin. Specifically, Stephens threatened to orchestrate the publication of a series of negative and damaging articles through various print and online media sources unless Smietana made Stephens COO of Skycoin.

49.     The Sudo account run by Stephens and/or Kunstman openly admitted their involvement in maintaining the Sudo account and that they were "trying to extort [S]ynth…for $1,000,000.00," through threatening to have published a series of articles and lies about Smietana and Skycoin and that they had a team of twelve (12) individuals who would be splitting the money (See Exhibit B).[2]

50.     In furtherance of this conspiracy and plan to take over Skycoin, Stephens paid journalist Tristian Greene ("Greene") to write and publish the article on The Next Web entitled *Skycoin: Anatomy of a cryptocurrency scam*, February 15, 2018 - 10:47 pm UTC under an anonymous name.[3]

51.     The negative article caused severe damage to the price of Skycoin Tokens and to Skycoin's reputation. Stephens openly admitted that he was responsible for paying Greene to publish the article but went to Skycoin's investors and claimed that Smietana had ordered him to have a negative article published to intentionally destroy the price of Skycoin Token.

---

[2] "Synth" is Smietana's online persona.
[3] The article can be found at: https://thenextweb.com/news/anatomy-of-a-cryptocurrency-scam-in-the-wild

FILED DATE: 9/9/2024 8:52 PM    2024L003661

52. Stephens attempted to organize a management and investor revolt in order to transfer control of the company to himself under the pretense that the unlawful actions Stephens himself had performed were in fact performed by Smietana.

53. Greene later cited that same article in another negative Skycoin article on The Next Web, in an article titled Exclusive: *We suspected this shady cryptocurrency project was a scam. Now we're sure of it*. Published March 8, 2018, 3:22 am UTC.[4]

54. A key part of Skycoin's business plan was to be listed on the Bittrex Exchange. The Bittrex Exchange is a world-wide trading platform that facilitates real-time order execution of crypto currencies, such as Skycoin.

55. Skycoin devoted significant resources to obtain a Bittrex listing, which had been negotiated through a third party.

56. Knowing that Skycoin was about to obtain a Bittrex listing, on or about February 25, 2018, Stephens threatened Smietana that unless Smietana paid him, he would approach Bittrex and purposely interfere with Skycoin's third-party relationships to prevent Skycoin from being listed on Bittrex.

57. Smietana refused to pay the money demanded by Stephens, and in turn he did, in fact, provide untrue information to Bittrex and which ultimately led to the spread of false rumors regarding Skycoin and Skycoin ultimately not being listed on the Bittrex Exchange.

58. Between February 26, 2018 and March 9, 2018, Stephens and Byerly stole access to Skycoin's media accounts, including but not limited to, Skycoin's Shopify store, Twitter account, LinkedIn account, Slack channel account, and accounts associate with the operation of

---

[4] The article can be found at: https://thenextweb.com/news/exclusive-we-suspected-this-shady-cryptocurrency-project-was-a-scam-now-were-sure-of-it

FILED DATE: 9/9/2024 8:52 PM 2024L003661

Skycoin's website. These media accounts were an integral and necessary component of Skycoin's business.

59.     On or about October 18, 2018, Stephens demanded over $150,000.00 for return of Skycoin's stolen computer-based assets and media accounts.

60.     On or about May 24, 2018, Binace announced that it would list Skycoin on its exchange. Binance holds itself out as the "world's largest crypto exchange" and is a trading platform where customers can buy and sell cryptocurrencies. It is highly desirable for cryptocurrencies to be listed on the Binance exchange.

61.     After Smietana refused to pay the Extortion Payments demanded by Stephens, Stephens conspired with Yan Xiandong, Li Min, Sam Sing Fond and Sun Fei (collectively the "Assailants") in a plot to kidnap Smietana and his girlfriend and steal $30,000,000.00 that Stephens claimed he was due from Skycoin.

62.     In furtherance of the conspiracy with Stephens to kidnap Smietana and his girlfriend and steal money from them, the Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

63.     Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin Tokens with a market value of $81,018.98, totaling $220,179.31.

64.     During the siege and home invasion, the Assailants called Stephens and complained that they did not find the thousands of Bitcoin promised to them.

FILED DATE: 9/9/2024 8:52 PM 2024L003661

## DEFENDANTS' THEFT OF ACCOUNTS

65.     Prior to the conclusion of Stephens' work with Skycoin, upon notice of his separation, the company made a list of all accounts to which Stephens had authorized access and thereinafter terminated his access to those accounts.

66.     Skycoin staff contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

67.     SA staff and members of Skycoin contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

68.     Stephens acknowledged that there were unspent funds due back to Plaintiffs, however, instead of returning the money due, Stephens hacked into the various company accounts and began to engage in a series of extortion and fraudulent acts against Skycoin.

69.     Stephens and Byerly changed the passwords to some of the company accounts, locked Skycoin and SA out of them, and then attempted to extort the company for an additional $150,000.00.

70.     Stephens and Byerly also refused to return the unspent money that was prepaid and allocated for marketing services. The amount due back to Skycoin and SA was in excess of $800,000.00.

71.     Plaintiffs incurred considerable expense to regain access to the stolen accounts and to migrate the content to the reacquired accounts. Those accounts included, but were not limited to, the Medium Account, Shopify, Twitter, Skycoin Telegram, Skycoin Rewards, Facebook, and LinkedIn.

FILED DATE: 9/9/2024 8:52 PM   2024L003661

## DEFENDANTS' UNAUTHORIZED EXPENSES

72.     Stephens and Byerly engaged in various schemes to defraud Skycoin and attempted to invoice unapproved, non-business-related costs including a Las Vegas prostitute orgy, unsubstantiated ATM withdrawals, personal entertainment costs, and what is believed to be money for the purchase of drugs. These expenses were neither approved by Skycoin nor related to any legitimate business activities.

73.     For example, Stephens sent invoices to Skycoin totaling $50,000.00 for cash payments for two days in Las Vegas. Despite several requests, Stephens refused to produce ATM receipts for the $50,000.00 expense, could not explain how the cash was used, could not show that the expenses were business related, could not justify the amount spent, and could not produce receipts for any "cash payments."

74.     Stephens and Byerly billed SA for subcontractors without seeking prior authorization from Plaintiffs for such payments.

75.     Stephens and Byerly engaged in a scheme to defraud Plaintiffs by invoicing full time rates for subcontractors employed part time and even invoicing Company for nonexistent persons.

76.     Stephens and Byerly billed for subcontractor work that not only both pre-dated and post-dated the Marketing Program, but which also included full time rates for part-time work and also included invoicing from nonexistent subcontractors.

77.     Stephens and Byerly billed for invalid date periods, such as submitting invoices for billing periods prior to the Marketing Program and work performed for billing periods after the termination of their relationship with Skycoin.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

78.     Stephens and Byerly attempted to bill for costs which had not been submitted to the Company for preapproval and made misrepresentations to Skycoin staff, including Skycoin's Head of Events, who was responsible for event budgets. Stephens made false misrepresentations claiming that these expenses had received approval, and that the Company had been notified of the expenses.

79.     Stephens and Byerly attempted to bill the company for unapproved "events" on non-existent dates. Additionally, there were several other strong indicators that many or all of the claimed expenses were fraudulent or manufactured.

## BINANCE DELISTING

80.     In and around June of 2020, because Smietana refused to capitulate to the extortion demands, Stephens, in conjunction with Kunstman and others, embarked upon a scheme and plan to delist Skycoin from Binance and effectively destroy Skycoin's reputation and depress Skycoin Tokens' market value.

81.     In furtherance of this plan and scheme, Stephens solicited other individuals to make false complaints against Skycoin in order to have Binance delist Skycoin from the exchange. The false complaints they directed others to make to Binance to achieve the delisting are as follows:

   a.   That Skycoin sells Skycoin Tokens customers outside of the Binance exchange but after receiving the funds, never sends those customers the Skycoin Tokens for which they paid;

   b.   That individuals from Skycoin would privately meet with customers and accept payment for Skycoin Tokens at 15% below market value;

   c.   After customers consummated such side transactions, they would immediately "dump" the Skycoin Tokens on the market;

   d.   That Smietana would request that customers privately pay him $1,000,000.00 in Bitcoin or cash for discounted Skycoin Tokens that they could then "dump" on the market immediately and achieve a $150,000.00 profit; and

FILED DATE: 9/9/2024 8:52 PM    2024L003661

e. That Smietana and Skycoin launders money through customers by promising them an immediate 15%-20% profit through the unauthorized purchase of Skycoin Tokens.

82.     Upon information and belief, Cuthriell and other persons were hired to harass Skycoin and interfere with Skycoin's relationships with exchanges and partners corporations, made public statements in Telegram channels bragging that they had paid journalists to publish articles to slander the company, and even publicly discussed the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance.

83.     As part of their plan and scheme to have Skycoin delisted from Binance, Stephens, Kunstman, and Cuthriell also orchestrated having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless complaints.

84.     As further evidence of the conspiracy, Cuthriell publicly congratulated all persons involved in the Binance delisting of Skycoin with the exclamation of "Nice work team" and "PARTY TIME."

## COUNT I
## FRAUD – BRADFORD STEPHENS AND CATHERINE BYERLY

85.     Plaintiffs repeat and reallege paragraphs 1 through 84 of this Second Amended Complaint at Law as and for Paragraph 85 of this Count I as if fully set forth herein.

86.     Stephens approached Plaintiffs representing himself as a legitimate advertising and marketing firm, with Stephens and Eagle Web Assets (EWA) as "business partners" involved in every aspect of the "business."

87.     EWA is and/or was a business owned and/or operated by Eagle, Gevirtz, and Young.

88.     Plaintiffs would later learn that EWA and Eagle, Gevirtz, and Young had a history of litigation and that these persons were under an FTC Order for fraudulent marketing practices.

14

FILED DATE: 9/9/2024 8:52 PM 2024L003661

89. Stephens and Byerly represented to Smietana that they would provide advertising and marketing services, including web design, online advertising, conference events, and display advertising.

90. Stephens represented to Smietana that he would provide advertising, web design, and marketing services for Plaintiffs in return for payment.

91. In reality, Stephens had no intention of providing any advertising, web design, or marketing of any kind for Plaintiffs.

92. Stephens and Byerly, in fact, did not provide any advertising or marketing services for Plaintiffs.

93. Stephens and Byerly never provided any web design services on behalf of Plaintiffs.

94. In reliance upon the representations of Stephens and Byerly, Plaintiffs paid them approximately $800,000.00 for their services and the costs of advertising and marketing.

95. When asked, Stephens and Byerly represented to Smietana that they had no prior lawsuits that had been filed against them.

96. These representations were knowingly false when made.

97. In fact, Stephens' business partners, Eagle and Gevirtz, had an extensive history of litigation and had been named in multiple lawsuits and were subject to an FTC injunction for fraudulent marketing practices.

98. Following the payment of the initial $800,000.00, Defendants Stephens and Byerly requested additional money, including an additional $60,000.00.

99. Stephens and Byerly made these representations to Smietana and other Skycoin staff with the intent to induce payments and defraud Plaintiffs.

100. These statements made by Stephens and Byerly were false when made.

FILED DATE: 9/9/2024 8:52 PM 2024L003661

101.     Stephens and Byerly created scenarios and orchestrated fraudulent crises, making numerous misrepresentations, solely for the purpose of soliciting more money from Plaintiffs.

102.     Stephens and Byerly made the following misrepresentations and/or omissions upon which Plaintiffs justifiably relied to their detriment:

a.    Lied about, concealed, and denied history of litigation against Defendants' associates, business partners, and former corporations;

b.    Failed to inform Plaintiffs of the FTC Order and government sanctions against their former company, even when explicitly asked about any history of litigation prior to payment and contract negotiations;

c.    Falsely represented that an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website;

d.    Falsely agreed to seek written pre-approval from the Company for incurred expenses;

e.    Falsely represented that they would provide marketing and advertisement services to Plaintiffs;

f.    Falsely represented that they would provide web design services to Plaintiffs; and

g.    Falsely represented the expenses and costs of said marketing and advertising services.

(*See also* Facts Common to All Counts)

103.     Plaintiffs relied upon the representations of Stephens and Byerly and paid them the requested amounts.

104.     As a direct and proximate result of Stephens and Byerly's improper actions, Plaintiffs have sustained substantial economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and damage to their reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully

FILED DATE: 9/9/2024 8:52 PM    2024L003661

pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and CATHERINE BYERLY, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

**COUNT II**
**FRAUD – BRADFORD STEPHENS, AARON KUNSTMAN, AND**
**JOEL WAYNE CUTHRIELL**

105.    Plaintiffs repeat and reallege Paragraphs 1 through 84 of this Second Amended Complaint at Law as and for Paragraph 105 of this Count II as if fully set forth herein.

106.    On or about January 8, 2018, Plaintiffs entered into an oral agreement with Stephens, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

107.    Following that agreement, Stephens defrauded Plaintiffs by failing to provide the contracted services, creating false "threats," and extorting funds from Plaintiffs through coercion. Once discovered, Plaintiffs attempted to distance themselves from Defendants. However, in retaliation, Stephens, Kunstman, and Cuthriell began making false online profiles and applications with false information in order to further defraud Plaintiffs out of approximately $2,000,000.00 worth of Skycoin product.

108.    Plaintiffs offered a reward program ("Reward Program") to entice customers to their business.

109.    In order to obtain a reward under the Reward Program, each participant was required to submit an application which conformed to S.A.'s terms and conditions. The terms included the following:

   a.  Each customer is only allowed to have one active Skywire Rewards account within a single one month period;

FILED DATE: 9/9/2024 8:52 PM   2024L003661

     b.   Each customer is allowed to claim rewards for up to 8 Skywire nodes in a one month period;

     c.   Only one instance of the "Skywire Node" software can be run on a single physical computer;

     d.   Each customer may operate only a single reward program account within a one month period;

     e.   Each computer claiming a reward must be a physically separate and independent computer; and

     f.   It is a violation of the Rewards Program terms and service for a user to run more than one Skywire node per physical computer.

110.    Cuthriell and Stephens developed software to run over 300 "nodes" on a single physical computer in order to defraud the Reward Program.

111.    Relying on the misrepresentations by Stephens, Kunstman, and Cuthriell, SA provided these persons rewards to which they were not entitled, totaling approximately $2-$4 million (the precise amount of which is unknown as they have continued to submit fraudulent applications continuously and under multiple fake aliases).

112.    Plaintiffs relied upon the information provided in those online applications and profiles.

113.    Had Plaintiffs known that these profiles and applications were being generated and submitted by Stephens, Kunstman, and Cuthriell repeatedly in order to accumulate Skycoin under false pretenses, Plaintiffs would not have made Reward Program payments to Stephens, Kunstman, and Cuthriell.

114.    Stephens, Kunstman, and Cuthriell made these repeated false representations to Plaintiffs through these applications and profiles even though they knew that they were false and

made under false pretenses, with an intent to induce Plaintiffs into providing the $2-$4 million in digital payments/digital assets/digital currency.

115.    Stephens, Kunstman, Cuthriell have at all relevant times perpetuated and deliberately concealed this fraud from Plaintiffs.

116.    Stephens, Kunstman, and Cuthriell have engaged in a scheme to defraud Plaintiffs by consistently attempting to conceal this fraud and continue to submit false applications and profiles to Plaintiffs.

117.    Plaintiffs relied upon the accuracy and truthfulness of the submitted applications and profiles, and, had Plaintiffs been aware that the representations of Stephens, Kunstman, and Cuthriell were false, Plaintiffs would not have acted as they did.

118.    As a direct and proximate result of Stephens, Kunstman, and Cuthriell's improper actions and misrepresentations, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, and JOEL WAYNE CUTHRIELL, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

### COUNT III
**CIVIL CONSPIRACY – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS AND COMPANIES**

FILED DATE: 9/9/2024 8:52 PM  2024L003661

FILED DATE: 9/9/2024 8:52 PM   2024L003661

119.     Plaintiffs repeat and reallege Paragraphs 1 through 84 of this Second Amended Complaint at Law as and for Paragraph 119 of this Count III as if fully set forth herein

120.     Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies conspired to destroy Skycoin's reputation and Plaintiffs' business by publishing false and inflammatory news articles and to extort Plaintiffs of money through making monetary demands in exchange for the articles not being published.

121.     Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies' acts in furtherance of the conspiracy included, but were not limited to:

    a.  Creating and employing a network of journalists to publish fraudulent articles to destroy Skycoin's image and reputation in order to drive down the price of Skycoins; and

        i.  Greene, a journalist and reporter, was employed by Stephens and knowingly published false articles regarding the legitimacy of Skycoin and Skycoin's technology;

            1.  Greene was within Stephens's network and at all times knew Stephens was not the COO of Skycoin, yet published that he was, and continued to publish false information even after Smietana's continuous attempts to correct the false claims.

    b.  Employing Peck to knowingly write the false and defamatory New Yorker Article alleging that Skycoin a fraud and a scam;

    c.  Publishing an article in Cointelegraph by Simon Chandler, claiming that Plaintiffs' attackers were "emboldened" to physically harm Smietana due to Skycoin's "shady dealings;"

    d.  Soliciting individuals to make false complaints against Skycoin in order to have Skycoin delisted from the Binance Exchange;

    e.  Stealing access to Skycoin's media accounts and demanding over $150,000.00 for return of the accounts;

    f.  Refusing to return unspent money that was prepaid and allocated for marketing services;

FILED DATE: 9/9/2024 8:52 PM    2024L003661

g.  Invoicing unapproved and non-business-related costs and personal entertainment costs;

h.  Invoicing Skycoin and/or SA for $50,000.00 in cash payments and refusing to provide an explanation or receipts for how the cash was used;

i.  Invoicing Skycoin and/or SA for subcontractors without prior authorization;

j.  Invoicing Skycoin and/or SA full time rates for part-time subcontractors;

k.  Invoicing Skycoin and/or SA for payment to non-existent persons;

l.  Invoicing Skycoin and/or SA for marketing services performed both before and after the company's relationship with Defendants;

m.  Made false representations to Skycoin staff that costs had been approved by Skycoin when they knew said costs had not been approved;

n.  Invoicing Skycoin and/or SA for unapproved "events" on non-existent dates; and

o.  Creating false online profiles and Rewards Program applications with false information in order to defraud Skycoin of $2-$4 million.

(*See also* Facts Common to All Counts)

122.    Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies worked in concert with one another to accomplish this fraud as evidenced by their various communications and concerted acts against Plaintiffs.

123.    Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies intended to defraud Plaintiffs out of their money, their product, and to tortiously interfere with their business relationships.

124.    As a direct and proximate result of Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies improper actions, Plaintiffs were damaged and defamed, forced to pay large sums of money, were defrauded of $2-$4 million, and Skycoin was ultimately not listed on the Bittrex Exchange and was delisted from Binance, resulting in loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

FILED DATE: 9/9/2024 8:52 PM   2024L003661

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

### COUNT IV
### TORTIOUS INTERFERENCE – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS AND COMPANIES

125.    Plaintiffs repeat and reallege Paragraphs 1 through 84 of this Second Amended Complaint at Law as and for Paragraph 125 of this Count IV as if fully set forth herein.

126.    Plaintiffs developed business relationships and contracts with various vendors and customers since Skycoin's launch in 2013.

127.    Skycoin sells non-fungible electronic products that fluctuate in value based upon the market rates on specific internet exchanges.

128.    For Skycoin to do business, it must participate in these internet exchange markets, such as, but not limited to, Bittrex, Binance, Kraken, Poloniex and Bifinex, in order to sell its goods.

129.    Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies orchestrated various schemes to undermine the reputation of Plaintiffs and cause these internet exchange markets, specifically, Bittrex and Binance, to remove Plaintiffs' products from their exchanges.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

130.     Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies were fully aware of Plaintiffs' position within these internet exchange markets.

131.     Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies were fully aware that Plaintiffs' Skycoin Token must be sold on these internet exchange markets.

132.     Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies were fully aware that Plaintiffs had agreements and/or expected agreements with these internet exchange markets.

133.     Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies nonetheless acted in concert to cause these internet exchange markets to remove Plaintiffs' Skycoin Token from those markets by committing the following acts:

   a.  Stephens and Byerly hacked and linked pornographic blogs and other harmful spam content to Skycoin's website to decrease Skycoin's website's ranking precipitously in search engines and irrevocably destroy Skycoin's image, reputation, and internet presence;

   b.  Stephens, Kunstman, Cuthriell, and Byerly created and employed a network of journalists to publish fraudulent articles to destroy Skycoin's image and reputation in order to drive down the price of Skycoins;

      i.   Greene, a journalist and reporter, was employed by Stephens and knowingly published false articles regarding the legitimacy of Skycoin and Skycoin's technology;

      ii.  Greene was within Stephens's network and at all times knew Stephens was not the COO of Skycoin, yet published that he was, and continued to publish false information even after Smietana's continuous attempts to correct the false claims;

   c.  Stephens, Kunstman, Cuthriell, and Byerly employed Peck to knowingly write a false and defamatory article published in The New Yorker alleging Skycoin as a fraud and a scam;

   d.  Stephens solicited an article to be published in Cointelegraph by Simon Chandler, claiming that Plaintiffs' attackers were "emboldened" to physically harm Smietana due to Skycoin's "shady dealings;"

FILED DATE: 9/9/2024 8:52 PM    2024L003661

e.  Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies made public statements bragging that they had paid journalists to publish articles to slander the company;

f.  Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies publicly discussed the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance; and

g.  Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies orchestrated having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless allegations.

(*See also* Facts Common to All Counts)

134.  At all relevant times herein, Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies intended to cause harm to Plaintiffs' reputation and finances in order to interfere with their relationships with these internet exchange markets, along with their customers and vendors.

135.  As a direct and proximate result of Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

## COUNT V
### UNJUST ENRICHMENT – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS AND COMPANIES

136.     Plaintiffs repeat and reallege Paragraphs 1 through 84 of this Second Amended Complaint at Law as and for Paragraph 136 of this Count V as if fully set forth herein.

137.     Defendants were provided approximately $860,000.00 in funds to provide marketing, advertising, and web design services to Plaintiffs.

138.     Specifically, Plaintiffs made the following payments to Stephens, Kunstman, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners:

    a.  $107,948.00 ($66,258.00 in the form of four (4) Bitcoins and $41,690.00 in the form of 1,100 Skycoin Tokens) in an initial payment for the Marketing Program paid to Smolder Partners;

    b.  $800,000.00 in Skycoin Tokens paid to Stephens for an internet advertising campaign;

    c.  $14,752.44 paid to Stephens and Byerly as a result of a fraudulent invoice;

    d.  $38,000.00 to Stephens in order to quell the cyber attacks initiated by Stephens;

    e.  20,000 Skycoin Tokens ($842,400.00) to Smolder Partners for the Marketing Program budget;

    f.  One (1) Bitcoin ($14,314.00) to Smolder Partners for a conference in Miami, Florida;

    g.  3,899 Skycoin Tokens ($121,337.00) to Smolder Partners for the Marketing Program budget;

    h.  Two (2) Bitcoins ($23,212.00) and 2,625 Skycoin Tokens ($80,929.00) to Smolder Partners for Marketing Program labor costs;

    i.  Four (4) Bitcoins (56,457.00) and a separate payment of 1.30 Bitcoin to Stephens for the Marketing Program and to combat the aforementioned attacks on Skycoin's website; and

    j.  $127,000.00 as part of the Extortion Payments to Stephens and Eagle.

    (*See also* Facts Common to All Counts)

FILED DATE: 9/9/2024 8:52 PM    2024L003661

139.    In addition to the payments made by Plaintiffs, the Assailants, in connection with their conspiracy with Stephens, stole 18.88 Bitcoin ($139,160.33) and 6,466 Skycoin ($81,018.98), totaling $220,179.31 from Plaintiffs.

140.    Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies also obtained approximately $2-$4 million in Skycoin Tokens through false reward applications.

141.    Stephens, Kunstman, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners invoiced and charged Plaintiffs for work that was never completed.

142.    These funds and goods were not earned, were stolen by fraudulent means, and Plaintiffs received no equivalent value for them in return.

143.    It would be unconscionable and against fundamental principles of justice, equity and good conscience for Stephens, Kunstman, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners to retain the benefit from those funds, which were paid by Plaintiffs without receiving any benefit in return.

144.    As a direct and proximate result of Stephens, Kunstman, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00,

FILED DATE: 9/9/2024 8:52 PM   2024L003661

plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

<u>**COUNT VI**</u>
**DEFAMATION – BRADFORD STEPHENS AND MORGEN PECK**

145.    Plaintiffs repeat and reallege Paragraphs 1 through 84 of this Second Amended Complaint at Law as and for Paragraph 145 of this Count VI as if fully set forth herein.

146.    The New Yorker is an American weekly magazine publication owned and published by Defendant Advance.

147.    At all times relevant herein, Peck was an actual agent of Advance.

148.    At all times relevant herein, Peck was an apparent agent of Advance.

149.    At all times relevant herein, Peck was acting within the course and scope of her authority as an agent of Advance.

150.    At all times relevant herein, Peck was acting within the course and scope of her authority as an apparent agent of Advance.

151.    On Aug 18, 2021, the New Yorker Article authored by Peck was published in The New Yorker (*see* Ex. A).

152.    The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

153.    Peck published blatant lies and misrepresentations about Plaintiffs in her New Yorker article including, but not limited to the following:

   a.   Misrepresenting Smietana's relationship with Stephens and Stephens's involvement with Skycoin and Skycoin's marketing campaign;

   b.   Statements alluding to Smietana and Skycoin as a fraud and a scammer, such as:

      i.   "In a way, it makes you into a fraud;"

FILED DATE: 9/9/2024 8:52 PM    2024L003661

      ii.   "Is it a scam? I'm 99 percent sure of it"; and

      iii.   Suggesting that Skycoin was part of a "pump and dump" scheme.

c.   Falsely stating that Stephens has recordings of Smietana stating, "We want to feminize the peasant population to make them more docile ... [i]t's so they don't revolt;"

      i.   Smietana asked Peck on multiple occasions about the existence of the alleged recording to verify the contents of her claims for this statement, however Peck never confirmed that she obtained such a recording, even though it was used as a purported source for factual information in the article.

      ii.   Smietana denied such statements to Peck multiple times, each time reiterating that they were fabricated and untrue. Peck still published the statements.

      iii.   Peck admitted to Smietana that no one she interviewed would corroborate the quotes given by Stephens. Therefore, Peck knew or should have known the published quotes were false.

      iv.   Peck knew that Stephens and Kunstman were members of the Neo Nazi alt-right internet forum "/pol/" and that similar antisemitic quotes were circulated there.

      v.   As a result of the publication of the article, a Neo Nazi publication cited to the false statement from Peck's article quoting Smietana, and thereby causing damage to Plaintiffs' reputation.

      vi.   As a result of the publication of this statement, Smietana was subjected to numerous death threats, harassment, and various hate crimes.

d.   Falsely stating that Smietana invited Binance executives to a Skycoin party during a 2018 conference in Las Vegas and instructed Stephens to hire prostitutes for the executives;

      i.   In fact, it was confirmed there were no Binance executives at the conference and the party was a private party of Stephens, without any affiliation to Skycoin or Plaintiffs.

      ii.   Stephens's job was to set up meetings at conferences. He unilaterally held a private party without instruction to do so. Any approval for holding an event was contingent upon finding people from Binance, who were, in fact, not in attendance at the conference.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

    iii.   This inaccurate depiction of events was designed to destroy the relationship between Binance and Skycoin and was manufactured solely to do damage to Plaintiffs' reputation and business.

    iv.   Peck knew or should have known the statements were false because Smietana sent her the messages from Stephens relating to the conference.

    v.   Peck interviewed Michael Terpin (the event organizer) and Daken Freebourne (Skycoin's head of events), who explicitly told Peck that Stephens was a compulsive liar and that his account was fabricated.

    vi.   Peck merged stories from three separate conferences into a non-factual and defamatory account, designed to inflict damages to Plaintiffs.

e.   Publishing conclusory and unsupported statements by others;

    i.   Stating that "according to several people" (without any evidence or support), that Skycoin privately sold to investors at a discounted rate;

    ii.   Publishing numerous unsupported statements supposedly from "employees" of Skycoin, however, Peck told Smietana that she did not have documentation to show who these "employees" were, if and when they worked at Skycoin, or any confirmation of their statements; and

    iii.   Publishing statements made by people against whom she knew Smietana had an ongoing lawsuit against and therefore knew or should have known these were unreliable sources.

f.   Falsely accusing Smietana of pre-mining "a hundred million coins, which were scheduled for circulation;"

    i.   Peck published this statement with full knowledge that Skycoin does not engage in any mining.

    ii.   During fact checking, Peck referenced a website that listed companies with pre-mine scams.[5]

        1.   The website listed "SYC Skycoin – premined" under a list titled, "List of scamcoins – do not use."

        2.   SYC Skycoin is a completely different company from SKY Skycoin (Plaintiff).

        3.   Peck knew that SYC was not Plaintiffs' company and that SYC was not SKY.

---

[5] The website can be found at: https://altcoins.com/scamcoins

FILED DATE: 9/9/2024 8:52 PM    2024L003661

4. Peck falsely accused and published in her article that Skycoin engaged in a pre-mining scam.

g. Falsely accusing Smietana of directing Skycoin's marketing unit to purposely spread negative rumors to attract attention by stating "In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention;"

   i. Peck does not provide support to confirm where this chat was from, who the "investors" were, or the full context of the conversations.

   ii. The quote itself is purposely suggestive and alludes that Skycoin publishes negative rumors for promotion but does not clarify who "they" are that "spread negative rumors."

h. Falsely accusing Smietana of "plotting new distractions;"

   i. In support of this claim, Peck quoted Smietana, "Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it."

   ii. Smietana was improperly quoted and Smietana's words were purposely skewed by Peck and taken out of context to defame Smietana and Skycoin.

   iii. The quote is a snippet of a message that clearly signifies a joke, in which the full text reads "The media is retarded. They are still writing articles about the 'insider trading' of cat memes, fake news. Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it. 'Kittycash CEO beheaded by ISIS after SEC investigation.'"

i. Purposely taking direct quotes from chatrooms/messaging conversations and placing them out of context to twist their meaning and damage Plaintiffs;

   i. Peck wrote, "A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coordinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved)."

      1. The quote was purposely misconstrued as it had nothing to do with insider trading channels.

30

FILED DATE: 9/9/2024 8:52 PM    2024L003661

2. It was evident from the chat conversations that any reference to any "secret insider trading" was a joke.

3. Peck knew that the "secret chat rooms" were, in fact, public channels, accessible to all people.

ii. Peck quoted Smietana as stating "If you put in a million dollars now, and we have a run just as large as the last one, you're going to be at fifty million dollars;"

1. This statement was knowingly taken out of context, altering its meaning, and presented Smietana in a false light.

2. Peck's quote claims that Smietana engaged in price promotion for Skycoin, knowing that Smietana was prohibited from making such statements by company policy and that Smietana could be fired or reprimanded for violation of company policy for making these statements.

3. Peck knew or should have known that these out of context statements would expose Plaintiff Smietana to legal liability and damage his reputation and business.

4. Peck admitted to Smietana that she could find no example of Smietana engaging in price promotion.

iii. Peck quoted Smietana as stating, "many could be corroborated only by people whom he swore existed but who couldn't talk because they had government security clearance, or were in hiding, or because he didn't know their real names;"

1. Smietana's actual quote was, "all software developers who work in cryptography have government security clearance, because government contractors are the only clients of the industry."

2. Peck distorted and/or manufactured, statements wholesale for the purpose of defaming Plaintiffs.

j. Falsely accusing Smietana of having sole control of the "pre-mined" coins and Skycoin's virtual wallets;

i. It is public knowledge that Skycoin is an incorporated corporate entity and not under the sole control of one person.

FILED DATE: 9/9/2024 8:52 PM  2024L003661

      ii.   Peck had possession of Skycoin's incorporation documents and corporate structure, and therefore knew or should have known that her statements were false.

k.   Accusing Smietana of soliciting advice from an online personality who used a Hitler avatar in his profile;

      i.   Peck admitted to Smietana during fact checking that she could not find any evidence substantiating her statement that Smietana solicited and made payments to internet users with a Hitler avatar.

      ii.   Peck admitted to Smietana that only Stephens and Kunstman had made these claims, and that no other persons could corroborate these statements.

      iii.   Peck continued to publish the above statement, knowing its defamatory and false nature.

l.   Alleging that Smietana lied about the extent of his medical injuries sustained from the attack on himself and his girlfriend, even after publishing that Smietana's attackers admitted to detaining and injuring Smietana and his girlfriend;

      i.   Smietana provided Peck with copies of court proceedings and medical records, clear evidence that the claims she published in the article were false.

m.   Alleging that Smietana used the attack on himself and his girlfriend to "use his power to freeze Skycoin transactions," when Smietana clearly stated in an official announcement to the Company that funds were frozen after making sure all Skycoin staff were safe after the attack and extortion demands;

      i.   Peck knew that Skycoin's lead developer, Steven Leonard, not Smietana, had initiated freezing the stolen funds from the Chinese marketing team and employee accounts after the company detected embezzlement.

      ii.   Peck knew that the funds that were frozen were solely company accounts.

n.   Peck implied that that Smietana had been employed as a software developer by the notorious Washington DC lobbyist, Jack Amabrov, who had several felony convictions, including a plea bargain for SEC violations; and

      i.   Peck was aware that the allegations were false because the company directly informed her that Smietana had briefly spoken to them in 2018, but that no agreement had been reached.

      ii.   Peck admitted that the statements were false and apologized to Smietana multiple times for bringing up false claims.

FILED DATE: 9/9/2024 8:52 PM   2024L003661

      iii.  Peck knew or should have known that claiming Smietana had been employed by Jack Amabrov would cause severe damage to Plaintiffs' business and reputation.

  o.  Peck implied that one of Skycoin's mathematical algorithms, "Obelisk", did not actually exist and that Plaintiffs committed fraud.

      i.  Peck knew that these statements were false, as she had possession of both the source codes and white paper for the algorithm.

      ii.  Additionally, Skycoin's algorithm papers were published on Skycoin's website and in peer reviewed journal articles. This information was publicly available, and Peck had access to the public links to these algorithms.

      iii.  Peck had this information at the time she claimed these algorithms did not exist.

154.    Peck wrote that "Stephens came up with a plan to strip Smietana of power and transfer management of the company to a foundation."

155.    Peck, knowing that Stephens' intentions were to take Skycoin from Smietana, continued to base her article on information provided mainly by Stephens, completely disregarding his clear bias and motive to disenfranchise Smietana from Skycoin and seize control of Skycoin.

156.    After the New Yorker Article was published, a former employee of Stephens and Kunstman contacted Plaintiffs stating that Peck received money to intentionally produce and publish a defamatory article attacking Plaintiffs and would receive bonus payments for destroying Skycoin's relationship with Binance.

157.    The statements made by Peck in the New Yorker Article were purposely false and defamatory in return for financial gain and personal benefit of Peck.

158.    Peck acted within the scope of her agency with principal Advance when she submitted and published the New Yorker Article.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

159.    As a direct and proximate result of Peck's defamatory and libelous publication, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

160.    As a direct and proximate result of Peck's libelous publication, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and MORGEN PECK, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

### COUNT VII
### DEFAMATION – ADVANCE MAGAZINE PUBLISHERS, INC., d/b/a
### THE NEW YORKER

161.    Plaintiffs repeat and reallege Paragraphs 1 through 84 and Paragraphs 146 through 160, inclusive of subparts, of this Second Amended Complaint at Law as and for Paragraph 161 of this Count VII as if fully set forth herein.

162.    Advance is a global mass media company operating various brands, including The New Yorker.

163.    The New Yorker is an American weekly magazine publication owned and operated by Advance.

164.    At all times relevant herein, Peck was an actual agent of Advance.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

165.    At all times relevant herein, Peck was an apparent agent of Advance.

166.    The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

167.    On August 18, 2021, Advance, by and through The New Yorker, published the New Yorker Article authored by Peck which reached millions of readers worldwide.

168.    Approximately one week prior to publication, Anna Boots, Fact Checker for The New Yorker, contacted Smietana regarding the article and stated:

    a.    That Peck's article was the longest fact checking she ever had to do (approximately 3 months);

    b.    That numerous unsubstantiated claims were made in Peck's article;

    c.    That Peck interviewed Michael Terpin regarding the 2018 Las Vegas conference and he informed her that Stephens was an unreliable source and a compulsive liar;

    d.    That the fact checking process was difficult to complete because almost all the information was provided two people, with most claims and statements being unsubstantiated; and

    e.    That her editor at The New Yorker set a "firm publication date regardless of [fact checking] completion."

169.    Advance, by and through The New Yorker, published Peck's article without properly and completely fact checking the defamatory statements made and checking Peck's sources and their credibility.

170.    As a direct and proximate result of the defamatory and libelous publication in The New Yorker, Plaintiffs suffered economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

171.    As a direct and proximate result of the defamatory and libelous publication in The New Yorker, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harassment, and financial harm to his company.

FILED DATE: 9/9/2024 8:52 PM     2024L003661

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendant, ADVANCE MAGAZINE PUBLISHERS, INC., d/b/a THE NEW YORKER, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

### COUNT VIII
### BREACH OF FIDUCIARY DUTY – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS AND COMPANIES

172.     Plaintiffs repeat and reallege Paragraphs 1 through 84 of this Second Amended Complaint at Law as and for Paragraph 172 of this Count VIII as if fully set forth herein.

173.     At various times, Stephens, Kunstman, Cuthriell, and Byerly were acting as contractors hired by Plaintiffs to perform certain duties for the marketing of Skycoin.

174.     Per that relationship and agreement, Stephens, Kunstman, Cuthriell, and Byerly were to adhere to the terms of the agreement and provide the services promised.

175.     Stephens, Kunstman, Cuthriell, and Byerly instead engaged in various schemes to defraud Plaintiffs, including promising marketing and promotions materials that were never performed, implementing public schemes to damage Plaintiffs' reputation needing immediate marketing damage control, and providing marketing services below the quality and type of what was agreed upon.

176.     Stephens, Kunstman, Cuthriell, and Byerly did not provide the promised services to Plaintiffs, despite Plaintiffs having paid for those services.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

177.    Stephens, Kunstman, Cuthriell, and Byerly had a duty to adhere to the terms of the agreements and to provide Plaintiffs with the promised services.

178.    Stephens, Kunstman, Cuthriell, and Byerly breached that duty by failing to adhere to the terms of the agreements and failing to provide Plaintiffs with the promised services.

179.    As a direct and proximate result of Stephens, Kunstman, Cuthriell, and Byerly's improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT IX
### BREACH OF CONTRACT – BRADFORD STEPHENS, AARON KUNSTMAN, AND JOEL WAYNE CUTHRIELL

180.    Plaintiffs repeat and reallege Paragraphs 1 through 84 of this Second Amended Complaint at Law as and for Paragraph 180 of this Count IX as if fully set forth herein.

181.    On or about January 8, 2018, Plaintiffs entered into an agreement with Stephens, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

182. Following that agreement, Stephens failed to provide the contracted services, creating false "threats," and extorting funds from Plaintiffs through coercion.

183. Stephens, Kunstman, and Cuthriell did not adhere to the terms of the Agreement despite payment.

184. Plaintiffs, at all times relevant herein, fully performed on their obligations under the their agreement with Stephens, Kunstman, and Cuthriell.

185. Stephens, Kunstman, and Cuthriell failed to provide any advertising or marketing services to Plaintiffs during the duration of the contract.

186. Stephens, Kunstman, and Cuthriell breached their obligations under the contract through the following acts or omissions:

    a. Failing to provide advertising services;

    b. Failing to provide marketing services;

    c. Failing to use the funds provided for the advertising or marketing services;

    d. Failing to provide web design services;

    e. Failing to use funds to effectuate any web design;

    f. Failing to stay within the bounds of the expense budget; and

    g. Attempting to extort additional funds outside of the contract terms.

187. As a direct and proximate result of Stephens, Kunstman, and Cuthriell's improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully

FILED DATE: 9/9/2024 8:52 PM 2024L003661

pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, and JOEL WAYNE CUTHRIELL, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

<u>**COUNT X**</u>
**VIOLATIONS OF 735 ILCS 5/12-7.1 – BRADFORD STEPHENS AND AARON KUNSTMAN**

188.　Plaintiffs repeat and reallege Paragraphs 1 through 84 of this Second Amended Complaint at Law as and for Paragraph 188 of this Count X as if fully set forth herein.

189.　Upon information and belief, during the years 2019-2021, Stephens and Kunstman, through various internet media and in person, made numerous anti-Semitic statements and threats of death, kidnapping, and other acts of violence against Smietana.

190.　All of these threats were based on Smietana's religion and Jewish heritage.

191.　Stephens and Kunstman also discussed Skycoin as a "Jew coin", called holders of Skycoin Tokens "Skygoyim," and other similar hate speech, which Smietana perceived as a direct threat due to his being Jewish (See Exhibit C).

192.　Stephens and Kunstman posted these messages on various social media platforms and also made said threats directly to Plaintiff.

193.　In furtherance of their threats, the Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

194.    Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin with a market value of $81,018.98, totaling $220,179.31.

195.    As a direct and proximate result of Stephens and Kunstman's aforesaid unlawful acts, Plaintiffs were damaged, subjected to religion and heritage-based violence, online harassment, a home invasion, kidnapping and torture, and had great sums of money stolen by the Assailants.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and AARON KUNSTMAN, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

Respectfully submitted,

**BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation**

By: /s/James A. Karamanis
One of Plaintiffs' Attorneys

James A. Karamanis
Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

40

FILED DATE: 9/9/2024 8:52 PM   2024L003661

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED, a Singapore
Company, and SYMBOLIC ANALYTICS INC.,
a Delaware Corporation,

                     Plaintiffs,

    v.

BRADFORD STEPHENS, AARON
KUNSTMAN, JOEL WAYNE CUTHRIELL,
MORGEN PECK, CATHERINE BYERLY,
ADVANCE MAGAZINE PUBLISHERS, INC.,
d/b/a THE NEW YORKER, and UNKNOWN
INDIVIDUALS AND COMPANIES,

                     Defendants.

Case No. 2024L003661

### AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222(b)

Pursuant to Supreme Court Rule 222(b), counsel for the above-named Plaintiffs certifies that Plaintiffs seek money damages in excess of Fifty Thousand and No/100 ($50,000.00), exclusive of interest and costs.

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

                     /s/James A. Karamanis

James A. Karamanis
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

FILED DATE: 9/9/2024 8:52 PM   2024L003661

# EXHIBIT A

FILED DATE: 9/9/2024 8:52 PM    2024L003661

ANNALS OF TECHNOLOGY

# PUMPERS, DUMPERS, AND SHILLS: THE SKYCOIN SAGA

*The cryptocurrency promised to change the world and make its users rich in the process. Then it began to fall apart.*

**By Morgen Peck**

August 18, 2021

FILED DATE: 9/9/2024 8:52 PM    2024L003661



Illustration by Nata Metlukh



Save this story

FILED DATE: 9/9/2024 8:52 PM    2024L003661

On an April afternoon in 2011, a twenty-seven-year-old tech entrepreneur named Bradford Stephens arrived at a stucco bungalow near the canals of Venice, California. He had recently started a new data-analytics company, and had come to speak with a coder named Brandon Smietana, whom he hoped would get involved. Stephens had already met Smietana online, where he uses the handle Synth, and where he often debated minute points about math and programming. When Stephens and Ryan Rawson, an employee who tagged along, arrived, Smietana invited them into a carpeted den. A computer sat on a table, its casings removed to reveal a tangle of circuits; a sleeping bag lay on a sofa. Smietana was in his early twenties, with dark hair and a youthful face. Rawson told me, "He had the air of this mad scientist couch surfing." Stephens pitched his new company, but got no traction. Smietana had turned his attention to a new technology: cryptocurrency. "The only people who have to work for money are the people who cannot create it or print it out of thin air," he told them.

The first cryptocurrency, Bitcoin—released in 2009 by an anonymous programmer (or a group of them) called Satoshi Nakamoto—was a feat of computational brilliance. A bitcoin is an abstract unit of value that people track and spend with digital wallets. When someone contributes her computer's power to process Bitcoin transactions, the computer also races to solve an equation, a process called "mining." Each solution that meets certain criteria mints new coins. The number created decreases by half every four years or so—an event known as the Halvening—which keeps the supply limited, guarding against inflation. The whole economy is maintained on a blockchain, a shared ledger that keeps a tally of every Bitcoin transaction. As miners add transactions, the Bitcoin software coördinates and finalizes their contributions, making the ledger transparent and unchangeable and the system nearly impossible for governments to shut down.

But the technology has a flaw: as more people use it, transactions become slower and more expensive. The average transaction fee fluctuates wildly; one day last week, it was two dollars and thirty-three cents, making it more expensive than any major credit card for everyday purchases. The pursuit of a better Bitcoin quickly became a full-blown academic field, with its own conferences, university courses, and peer-reviewed journals. But, as Smietana explained over the next few years to anyone who would listen, he had the solution. He was designing a cryptocurrency that could be sent around the world instantaneously, for next to nothing. He called it Skycoin.

He was going to use this currency, he said, to create a decentralized version of the Internet, called Skywire. He planned to build a large mesh network, a system that allows people to use special Internet routers to share bandwidth with their neighbors. With enough members, a network can bypass service providers, making it harder for corporations and governments to surveil Internet use. But it's difficult to

FILED DATE: 9/9/2024 8:52 PM    2024L003661

retain volunteers. "A community network really needs density before it is useful," Brian Hall, of NYC Mesh, the largest community network in the U.S., wrote in a blog post. "It can be a chicken and egg problem." Smietana's project proposed a different way to attract people: pay them. His customers would share bandwidth using routers called Skyminers, and get paid for their service in Skycoin. He envisioned a new cryptocurrency spent over a community-owned Internet, calling it "the last step to fulfilling Satoshi's mission."

Stephens left his first meeting with Smietana believing that he could be destined for greatness. Skycoin launched publicly two years later, in 2013. The following year, Stephens attended a party at Smietana's new place, an unrenovated warehouse just south of L.A. Someone had painted the walls with images of horned monsters. "It was very Burning Man meets H. P. Lovecraft," Stephens told me. Stephens's friend Baron Chat, a photographer who attended, said, of Smietana, "He seemed to be receiving his signal from a different station than everyone else." According to Stephens, Smietana asked him to join the fledgling project, but he demurred. (Smietana said he doesn't remember seeing Stephens at the party.)

The first cryptocurrency boom arrived in 2017. "Several investors I knew, and a lot of my friends, started pivoting from angel investing to putting money in crypto and seeing insane returns," Stephens told me. Skycoin had a "token sale"—a sort of I.P.O. for cryptocurrencies—and was listed on two small exchanges. By the end of 2017, its price had gone from a little more than a dollar per coin to about fifty dollars per coin. That December, while Stephens was on vacation with his wife in Japan, Smietana messaged him with another chance to get involved. It seemed like an opportunity to work on something revolutionary. But he also thought, Everybody else is getting rich off crypto, so why not me? He said that he later told Smietana, "I'm going to need 50K up front and I gotta hire a team." After a couple days, he checked his Bitcoin wallet and found fifty thousand dollars sitting in it. "I'm, like, 'I guess I'm hired,' " he said. (Smietana denies sending the money, though he had said he would do so in texts, and there's a record of such a transaction on the Bitcoin ledger.) Before leaving Kyoto, he and his wife had visited a shrine to Inari, the Shinto god of rice, where they left offerings and made wishes. His wife wished for the health of her father, who was battling cancer. "I asked for wealth and adventure," Stephens told me. "And I got one of those."

I n the past decade, a shift has occurred in the way that cryptocurrencies are distributed. Satoshi put bitcoins into circulation through a reward system: the more computing power you contribute, the more coins you can mint. Some early adopters paid their rent simply through mining. Around 2012, though, people began devising blockchains that could be used for more ambitious applications: supply chains with real-time geolocation, for example, or patient-controlled medical records. Such projects required capital, compelling founders to experiment with less democratic ways to distribute coins. In 2013, J. R. Willett, the founder of Mastercoin, invented the "initial coin offering," or I.C.O., the first token sale: developers partially pre-mined their tokens and then sold them off to raise money. Michael Terpin, who has managed two hundred such token sales, and who handled public relations for Skycoin,

told me that the scheme empowers entrepreneurs. "Somebody who had an innovative product could sell directly, prior to it being built, to an audience of enthusiasts," he said, without having to "give up a third of the company."

A frenzy followed a few years later. Since 2017, hundreds of projects have announced token sales. One of the most lucrative, EOS, raised about three and a half billion dollars in a yearlong I.C.O. Many projects amassed funds even before their blockchains or applications existed; some prepared assiduously, but others merely threw together a Web site, a list of advisers (sometimes without their knowledge), and some semblance of a technical paper (sometimes plagiarized). "A playbook really emerged for how to set up a legitimate-looking I.C.O.," Matt Chwierut, the head of research at Smith & Crown, a blockchain research firm, told me.

In 2018, I attended the North American Bitcoin Conference, in Miami. On the main stage, representatives from companies with unpronounceable names riled up the crowds. Downstairs, an arcade of booths hawked every kind of blockchain project: smart glasses, cargo robots, refugee-identity documents. At a booth for a group claiming to build a volunteer emergency-services network, I asked why the endeavor required a coin. The attendant told me to come back later when someone more technical would be arriving.

Because bitcoin mining is regulated by algorithms, everyone, in theory, has a fair chance of getting new coins. But, to receive pre-mined coins in a token sale, you often have to buy publicly at the sale price or else negotiate a deal behind the scenes. "A lot of coins were being sold on the side and in secret," Josh, a major cryptocurrency investor—who eventually bought into Skycoin, and requested that I use only his first name, out of concern for his safety regarding another matter—told me. "You'll do special deals with people if they give you three or four or five million dollars up front." This created a sense that making your fortune required being in the right room to get the right tip.

On the second night of the conference, I went to a strip club for an after-party, where flashing your badge got you a crypto-inspired cocktail. (I ordered a Satoshi Sour.) Guests exchanged advice, sure that they were getting the best inside information. But a few hours later a friend whisked me off to a more exclusive party, thrown at a beachside bar by Patrick Byrne, the former C.E.O. of Overstock. (Byrne stepped down in 2019, after it was revealed that he had had an affair with the Russian agent Maria Butina.) The attendees were celebrating the hundred-million-dollar token sale of Byrne's trading platform, TZero, which he said was going to "drag Wall Street behind the barn, kill it with an axe, and re-create it on blockchain." There were giant platters of sushi and oysters; the rapper Flo Rida pulled Byrne up onto the bar for a sing-along. Guests exchanged invites to exclusive chat rooms on Telegram, an app favored by coin enthusiasts. I turned to a man next to me and asked what had brought him to the party. He rubbed his thumb and forefinger together and shouted, "Making money."

FILED DATE: 9/9/2024 8:52 PM    2024L003661

FILED DATE: 9/9/2024 8:52 PM    2024L003661

The employment structure at Skycoin was loose, and Stephens joined without a contract. "Here I was, a guy used to wrangling hundred-page venture-capital contracts, and I'm joining a company with no last names and barely any first names," Stephens said. Smietana, who by then was living in Shanghai, had pre-mined a hundred million coins, which were scheduled for circulation. Skyminer routers were just starting to ship, but sales had already outstripped production. Smietana estimated that operators who used Skyminers could make between fifteen thousand and forty-five thousand dollars a month. Most coinholders I spoke to were young men around the world—medical students, craftsmen, 3-D animators—who believed in the project. In chat rooms, Smietana's followers addressed him with reverence. "We all are in honor to speak with synth," a user called Anosis wrote. "It's like having a chance to talk to Satoshi."

Although Stephens studied computer science in college, he admitted that, when he started working with Skycoin, he "hardly knew anything about crypto." He was told to handle marketing, and assembled a team composed mostly of friends and former associates. (Smietana now claims that he contracted a marketing company that Stephens ran, not Stephens himself.) But he soon realized that word about the project was already spreading. Large investors recruited in their own circles, and smaller coinholders hyped Skycoin on social media. At one point, Skycoin advertised a bounty program that promised users coins in exchange for promotional activities, such as writing blog posts and creating YouTube videos. One user-made video, titled "Skycoin - To the Moon," featured footage of a shuttle blasting off next to a chart of Skycoin's market value, interspersed with a closeup of glossy lips and the words "YOU COMIN'?" People who proved their worth on Telegram often got pulled up the ranks. "I started to spend 90 hours a week in the chat room," a user called Sudo, who became one of Skycoin's Telegram channel moderators, and who refused to tell me his name, messaged me. "They seen how active I was and offered me a job."

By early January, 2018, the total estimated value of pre-mined Skycoins had reached almost five billion dollars. Smietana sent representatives to conferences in New York, Lisbon, San Francisco, and Singapore, and arranged a retreat in Mauritius. A former marketing contractor, who requested anonymity out of fear of harassment, recalled that Smietana could spend lavishly on the people who worked with Skycoin, in one case paying for cryotherapy, vitamin injections, thousand-dollar steak dinners, and a twelve-thousand-dollar trip to the Esalen Institute. "Dude was very liberal with his spending and could be very generous," the marketing contractor said. The team posted a video of a yacht party, and thundered around in Ferraris. In New York, Skycoin reps cruised in a helicopter to grab footage of a Skyminer held over Manhattan's skyline.

That month, Stephens flew to Las Vegas to speak on a panel at the CoinAgenda summit. He wasn't up to speed on the technical aspects of Skycoin yet, but he held a Skyminer over his head and said, "You all are the first to see the new Internet!" On the first day of the conference, Smietana sent Stephens a voice memo with an urgent request. He was hoping to get Skycoin listed on Binance, one of the world's

FILED DATE: 9/9/2024 8:52 PM          2024L003661

largest cryptocurrency exchanges, which could help secure its legitimacy. During the I.C.O. boom, it was common for projects to pay a "listing fee" in order to be included on an exchange. (Binance claims that it chooses projects based solely on "strict security, legal, and regulatory compliance standards." In 2018, facing pressure, it announced that it would donate its listing fees to charity.) Smietana said that he had paid Binance executives seven and a half million dollars but that they hadn't followed through. (Binance confirmed that Skycoin paid it a hundred and fifty thousand Skycoins to spend on "promotion," which were worth seven and a half million at the coin's peak.) Smietana told Stephens to entertain the executives, to sweeten the deal. Stephens planned a party in a penthouse suite at the Bellagio. Smietana gave explicit instructions via voice messages: "You have to buy prostitutes for the people at Binance," he said. "Get them, like, three girls each." (Smietana denies any involvement in the party, and claims that his voice messages about it were "either a joke or a deep fake but probably a deep fake.")

That night, Stephens and Baron Chat, who had also started working on Skycoin's marketing, along with Catherine Byerly, another member of the team, sat in the hotel suite, with champagne on ice. Six escorts arrived at nine, and the employees instructed them to make the Binance executives feel like "rock stars." "To them, I was this, like, stereotypical businesswoman in an Ann Taylor dress," Byerly said. "But inside I'm thinking, How did my decisions lead me here?" Chat said, "It felt almost like you were in the process of living out some bizarre reality that sometimes you see in the movies. The weird excess . . . Crazy shit happens when you have a corporate account and a green light." By ten o'clock, the executives hadn't shown up, and Stephens began to worry that he'd lost the deal. He couldn't reach Smietana, so he frantically called the event organizers. They explained that not only had no Binance reps showed up at the conference—they weren't even on the registration list. (A spokesperson at Binance told me that the company neither requested nor knew about the party.) "That's when I started taking anything Brandon said with a grain of salt," Stephens told me. Still, he decided that, "if this is going to be weird, I'm going to make it memorable weird." Some of the escorts took their pay and left; the rest drank champagne and played Cards Against Humanity with the group into the morning.

When Stephens returned from Las Vegas, he set about mapping Skycoin's progress. One of the company's main selling points was Obelisk, an algorithm that allowed it to send coins cheaply and quickly. On Telegram, Smietana insisted that everything that came before was "obsolete and primitive." He boasted that Obelisk was written by Houwu Chen, a developer who had worked on Ethereum, the second-most popular cryptocurrency platform. He posted an academic paper written by Chen on the Skycoin Web site, claiming that it was a Skycoin white paper. But when Stephens reached out to Chen, he got no response. "We kept trying to chase people down to ask details, and it was slowly revealed it just . . . didn't exist," he told me. In a later discussion about technical details, a Skycoin "community manager" told coinholders that "it's too advanced to share" and that the company "can't trust the public with it." When pressed, Smietana wrote, of Chen, "He is a recluse, I doubt anyone can contact him or he would respond." Smietana eventually told me that Chen had taken a payment of a million Skycoins for his work on the white paper and then left the project. (Chen declined to comment,

FILED DATE: 9/9/2024 8:52 PM   2024L003661

saying, "Just don't put my name in the article. That's my statement.") Stephens discovered that Obelisk had never been implemented. (Smietana now acknowledges this, but claims that the project has published some of Obelisk's code and used it in simulations.)

Skycoin's payments were fast, but only because transactions were processed on a single server, rather than on a decentralized network of computers. The server sat in the Shanghai office of Scott Freeman, the C.E.O. of the C2CX cryptocurrency exchange. This also meant that, if Smietana wanted to, he could freeze transactions. "The big thing about a blockchain is it's supposed to be decentralized, and no single entity is supposed to be able to change it," Freeman told me. He added, of Skycoin's setup, "In a way, it makes you into a fraud." (Smietana claims that his power to freeze transactions was designed as a security measure.) Freeman said that he nagged Smietana about implementing Obelisk but that Smietana told him, "People don't really care. It's not worth it. We should spend our resources on other things." (Smietana denies this.)

Skycoin's Web site claimed that multiple payments were scrambled together to provide extra privacy, but this feature was never implemented in the Skycoin wallet. The pre-mined coins sat in virtual wallets under Smietana's sole control. (When pressed, Smietana claimed that he shared control of the coins with a secret group of advisers, but refused to give me their names.) When Stephens asked to see Skycoin's accounting books, Smietana explained that his girlfriend, Sarah, was in charge. Sarah told Stephens that the accounting was a work in progress. (Smietana denies directing Stephens to Sarah, and she denies being in charge of the project's accounting.) Everything seemed haphazard. Stephens was once paid from a bank account in Mauritius registered under a different name; many employees were paid in bitcoin or Skycoin.

In early February, 2018, a month after the CoinAgenda conference, Stephens booked a trip to Shanghai to see Smietana, determined to bring some order to Skycoin. One night, he had dinner with Smietana and members of a Chinese marketing team that Smietana had hired, at a steak house in Xuhui. As the dinner began, Smietana rose from his chair and launched into a rambling diatribe of conspiracy theories. For hours, he catalogued the hidden crimes of a class of global élites who controlled citizens through virtual reality, medical marijuana, and pornography. At some point, Stephens started recording Smietana on his phone. "We want to feminize the peasant population to make them more docile," Smietana says. "It's so they don't revolt."

Stephens told me, "I just became shell-shocked. What the fuck have I gotten myself into?" He had seen Smietana post conspiracy theories on Telegram before, but he figured it was a joke. In the weeks after the dinner, Stephens tried to warn some investors, but felt that they brushed him off: "They would be, like, 'Brandon is just doing his thing, and the value of the coin keeps going up.' "

Shortly after Stephens returned from Shanghai, a reporter named Tristan Greene published a scathing article about Skycoin on the Next Web, a technology-news Web site, condemning the

FILED DATE: 9/9/2024 8:52 PM    2024L003661

company for pre-mining its coins. The Skyminer router was being sold for one bitcoin—worth about ten thousand dollars at the time—but Greene highlighted the fact that it was constructed from components worth about six hundred dollars. Customers got back the ninety-four-hundred-dollar difference, but it came in Skycoin, which still sold only on small exchanges, making it difficult to trade in quantity. (The software for the miners was also incomplete; users connecting to Skywire had no way to pay for the service. Smietana claims that this feature is still under development.) Stephens granted Greene an interview but couldn't persuade him of the project's legitimacy. Greene wrote, "Is it a scam? I'm 99 percent sure of it."

Skycoin went into full damage-control mode. The project had been running a black-ops marketing unit sometimes referred to as Shill Team Six, composed of users plucked from Telegram who specialized in manipulating attention on the Internet. The "shills" occasionally flooded 4chan and Reddit, keeping engagement up with memes and bots. A former member of Skycoin's inner circle, who also requested anonymity, told me that if someone spoke ill of Skycoin the shills could be sent in to "make their life difficult," by digging up embarrassing information. (Smietana denied directing the group, saying it was "completely out of control.") The shills found that even bad publicity could be good for Skycoin. In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention. "Direct promotion does not get to front page and has low click rate," he wrote. "If they create contraversy, then it directs attention and clicks to skycoin." (Smietana claimed that these messages were taken out of context.)

Stephens knew that Smietana pored over texts about crowd psychology and even solicited advice from DJ Hives, an anonymous online personality who at one point used a Hitler avatar, on controlling public opinion. In voice messages, DJ Hives referred to Skycoin customers as "fish," a poker term for easily exploited players, and encouraged Smietana to cultivate an aura of infallibility: "We want to put you on the level of deity as far as the masses are concerned." (When contacted on Telegram, DJ Hives said, "None of this is correct," and declined to comment further.)

The team gamed search algorithms into ignoring Greene's article. "We helped bury that page for a while," Sudo, the anonymous user, who claimed to be part of Shill Team Six, messaged me on Telegram. (Smietana claimed that Skycoin ignored the article.) But word was already spreading. Skeptics showed up in Skycoin's social-media channels to ask questions, and Skycoin moderators started blocking them. "After banning enough losers, everyone left will be winners," Smietana wrote. Skycoin enthusiasts smeared Greene on Telegram, accusing him of writing a paid hit piece. When Greene showed up in the channel to address their concerns, moderators kicked him out. Someone claiming to be a Skycoin investor e-mailed Greene and threatened to "visit" him, his wife, and their son if he didn't stop "messing" with Skycoin, writing, "nothing is really impossible in the world for people like us that grew theire wealth on crypto."

FILED DATE: 9/9/2024 8:52 PM    2024L003661

Stephens contacted Michael Terpin, the adviser, to voice his worries, but, he said, "It turns out Terpin didn't give a shit." (Terpin told me that, by this time, his company was phasing out its involvement with Skycoin. "Brandon's got a flair for the dramatic," he said. "Honestly, that's one reason I found it difficult to keep working with Skycoin.") Stephens came up with a plan to strip Smietana of power and transfer management of the company to a foundation; he still believed that Skycoin could become a reality if reasonable people were in charge. But, by late February, 2018, six weeks after he joined the project, he found that he was locked out of both the Skycoin Telegram and his work e-mail. Members of his team were locked out, too. "The whole thing was so terrible," Chat, from the marketing team, told me. Smietana sent an e-mail to the Next Web denying that Stephens represented Skycoin. "The person you interviewed has nothing to do with Skycoin and is a known scammer," Smietana wrote. "Please update the article." Stephens heard from Smietana again in June, 2018, when Smietana sent him a mysterious Facebook message in which he claimed that he had acted out of concern for Stephens's safety. "I saved your life. You do not even know," Smietana wrote. "I will tell you in a few years."

In July, 2018, a recording leaked of Li Xiaolai, a Chinese billionaire and the founder of a coin that launched with an eighty-two-million-dollar token sale, giving his unfiltered perspective on the industry. "From the start, I knew one thing," he said. "The main power to compete here is the traffic." Successful coins accrue value, in other words, not because of technical sophistication but because they get people's attention. This requires having a founder who can capture the imagination. "All the successful 100X, 1000X projects—you go and look at the founder, they will definitely be a spin doctor," he said. What matters with a coin is that people are talking about it. "The consensus of idiots is still consensus," he said.

To some extent, this is true of most modern currencies: they have no value apart from what we collectively assign them. But the U.S. dollar is supported by government guarantees and controlled through monetary policies. Bitcoin abolished government backing, but its scarcity is regulated through algorithms. (Even so, a tweet or statement from a high-profile coinholder like Elon Musk can raise or crash its price.) Coins that are manually distributed in token sales provide even fewer assurances. It is often impossible to know how many are in circulation. Their value is built on a promise that some feature, often still in development, will make them more useful than other currencies. Until that promise is fulfilled, it is largely a matter of faith. "Money is a social construct," Smietana wrote, on Telegram. "It is based upon CONFIDENCE . . . Confidence is a religion and is built upon perception and not reality."

Founders that control perception control the price of their coin. According to Chwierut, the blockchain researcher, during the I.C.O. bubble, it was not uncommon for founders to spend as much as thirty per cent of their budget on ad campaigns. Some of the effort went to gaming the attention economy, requesting mentions from influencers or using bots to create an illusion of broad support. Traders can even use these metrics to manage their portfolios: IntoTheBlock, a "crypto-intelligence" firm, tracks

FILED DATE: 9/9/2024 8:52 PM     2024L003661

Twitter mentions and Telegram-member counts and sells the information to investors; a data platform called Santiment alerts users when chatter about their coins surges. Recommendation algorithms can encourage the spread of incendiary content, and coins promoted with controversy and falsehood often perform well. Some coin promoters use stunts or scandals to keep users engaged. After closing a fifty-million-dollar token sale, the founder of a cryptocurrency called Savedroid posted a picture of himself at what looked like an airport with a caption reading "Thanks guys! Over and out," which was taken as a confession that he was running off with the funds. A day later, he revealed that he was trolling about escaping with the money, but only after several articles had been written about the scandal. The firm ASKfm hired mountaineers to climb Mt. Everest and film themselves leaving a cryptocurrency wallet on its peak. (The company released a statement saying, "On a market where launching a blockchain endeavor is not really a newsbreak, companies have to stand out.") A sherpa died in the process.

Market manipulation is rampant. In schemes called "pump and dumps," traders meet in exclusive chat rooms where they coördinate to purchase a coin, causing the trading volume to go up and others to take interest. When the price is at its highest, the pump-and-dumpers sell, leaving faithful users holding the bag. In an industry where everyone is a coinholder, there is no one left to pull the alarm. Should investors realize that their coin is a sham, it would be an act of self-sabotage to raise concerns. Better to become evangelists, wooing others in order to boost the price.

U.S. law generally requires projects to register with the S.E.C., forcing them to make financial disclosures that investors could then inspect before buying. Almost none do, giving convoluted rationales that John Reed Stark, the founder of the S.E.C.'s Internet-enforcement office, told me are "poppycock." Not registering can facilitate further rule-breaking, as when, say, influencers promote coins without disclosing their investment, or projects pump coins with fraudulent claims. Stark said, of I.C.O.s, "Every single one I ever saw was unlawful on multiple levels." The S.E.C. began cracking down in 2017, but prosecution often requires "extraordinary resources from an alphabet soup of federal and state law-enforcement agencies," Stark said. As a result, few projects face consequences.

In the spring of 2018, Skycoin climbed into the list of the top hundred coins, and appeared on a Nasdaq Web cast. That May, Binance announced that it would list Skycoin on its trading platform. Around the time of the listing, the price jumped thirty-eight per cent. Then, suddenly, it came crashing down. According to several people involved, Skycoin privately sold to investors at a steep discount—in at least one case, coins worth millions of dollars—inadvertently giving them an incentive to dump it on the market as soon as they could. (Smietana denied being involved in such sales.) Smietana had claimed on Telegram that the investors were restricted from selling. But, as soon as Binance listed Skycoin, the market flooded with sell orders. Freeman, from the C2CX exchange, had been acting as the project's primary "market maker," using a pool of reserves to provide market liquidity and stabilize prices. "I tried to hold at about twenty," he told me. But the sell-off was too much to contain. Coinholders shared their misery on Telegram. "Its been fun guys, i'm gonns hang myself in 2 hours," a user named Willy Jr. wrote.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

"Bought 20K at 20 dollars." A user named Dante wrote, "synth told me this shit would moon," adding, "i took a mortage on my house."

A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coördinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved.) Rumor spread that the S.E.C. would investigate Skycoin as a result, and that Binance was considering delisting it. In the public chat, coinholders prepared for a death spiral. A user called Opaque wrote, "I want to say calm down guys, but its really doesnt look good."

Then, out of nowhere, Smietana announced that he had big news to share once "all the staff are safe." In the coming days, he accused members of the Chinese marketing team of breaking into his house with five gang members, holding him and his girlfriend hostage for six hours, beating him until one of his ribs broke, and stealing a small quantity of cryptocurrency. Members of the Chinese marketing team denied this. In a letter to investors, they claimed that Smietana and his girlfriend had pushed them out, refused to pay them, and frozen their Skycoin wallets, which contained coins that were then worth somewhere between four and nine million dollars. This was the first apparent instance of Smietana's using his power to freeze Skycoin transactions. (Smietana claims that the wallets contained embezzled company funds.) In their letter, the marketing-team members claimed that they had been invited to Smietana's apartment to find a resolution, and a small scuffle broke out in which he got a bruised wrist. Afterward, Smietana's girlfriend filed a police report, and four defendants spent a few months in detention, after admitting to detaining Smietana and his girlfriend in an incident that left them "lightly" injured.

Smietana blitzed Telegram with messages about the alleged "kidnapping." "This is the best thing that has ever happened to Skycoin. Ever...As long as we can keep this drama going, we can get [the trading volume] even higher." He amused himself by plotting new distractions: "Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it." But coinholders seemed not to buy it. When he did a live YouTube interview, shortly after the incident, someone commented, "I dont see one bruise on his face. beaten the shit out of me, what with ? a piece of toast.?" As the sell-off continued, Smietana blamed it on the "kidnappers" for dumping their stolen coins. "They have been surpressing the price the whole time," he wrote.

In November, 2018, Smietana, apparently growing desperate, enlisted John McAfee to promote the coin. McAfee, once famous for the antivirus software that he developed in the eighties, had earned a reputation as a kind of cyber outlaw: he was a "person of interest" in a murder in Belize, in 2012, and subsequently fled the country, later posting images of himself cruising the Caribbean in his yacht, brandishing guns. He was a sought-after crypto promoter. McAfee tweeted a video that seemed to show

FILED DATE: 9/9/2024 8:52 PM    2024L003661

him with the Skycoin logo freshly tattooed on his back and the message, "Why Skycoin? If you have to ask, you've been living in a fucking closet." (Smietana admitted to paying McAfee during this period but insisted that it was a gift to help with "yacht repairs.") Smietana urged people to buy: "If you put in a million dollars now, and we have a run just as large as the last one, you're going to be at fifty million dollars," he said, in a video. Then, in March, 2019, McAfee publicly broke ties with Skycoin. (Smietana told me that McAfee began demanding large fees that he refused to pay.) When asked on Twitter what he would do about the tattoo, McAfee replied, "I'll keep it as a reminder that no matter how old I get, I still get scammed by unscrupulous people with pie in the sky plans. They almost drove me to violence." Stephens, watching from afar, felt that he had been spared the worst. He hadn't behaved perfectly: he had been taken in by Skycoin's promise, but he also promoted a coin that he knew little about. After being cut off, he took Skycoin's social-media accounts hostage, and unsuccessfully demanded a severance payment. In the end, he told me, he sold his holdings for thirty thousand dollars. The internal drama and crashing prices prompted a broader exodus from the project. In 2019, Freeman's exchange announced that it was delisting Skycoin. Michael Terpin's name still appears on the Skycoin Web site, but he told me that he no longer has anything to do with it. Josh, the cryptocurrency investor, lost faith after visiting Smietana in China, last year. "Crypto is a bunch of con artists conning each other," he said. "Obelisk was always a week away, and it still is." He sold his holdings and told me that he lost ninety-nine per cent of his investment.

Investors who sold at the peak would have made large profits, but many average coinholders suffered. (Smietana claimed that he urged restraint: "I told people not to put money into the market that they were not prepared to lose.") Armon Koochek, a recent college graduate in Santa Barbara, California, invested in Skycoin in 2018, lured by the promise of a new Internet and excited by the "memes and content on Reddit and Twitter." He lost some fifteen thousand dollars. He tried to warn others away from the project in the Telegram chat room, and was soon banned. "I hope I saved a lot of investors," he told me. Dael Lithgow, a forty-five-year-old bootmaker in Pietermaritzburg, South Africa, invested most of his savings in Skycoin in 2017, and convinced his mother and girlfriend to invest, as well. Had they sold during the boom, the profits would have been "life-changing," but they held on. "I really believed in what they were trying to do," he told me. Today their coins are nearly worthless.

In the summer of 2019, I met Smietana at a mozzarella bar in Manhattan. He was wearing all black, and his hair was starting to gray. As we sat, he warned me, unprompted, "Honestly, like, ninety-eight per cent of the people are scammers in blockchain." Then, preëmpting my questions, he visited every bit of Skycoin intrigue. The "gang members" who kidnapped him in China had demanded "sixty million dollars." The technology for Skywire, the decentralized Internet service, was already "working" and Obelisk was just "a few months" out. His girlfriend, Sarah, called several times while we were speaking. He showed me frantic messages from her, and said that he was blowing off an important meeting, but he kept talking, telling me about his coin's promise. He seemed to regard me as the next potential pump.

FILED DATE: 9/9/2024 8:52 PM    2024L003661

Almost four hours into my lunch, I made an excuse to leave, saying that I needed to walk to my bank. Smietana followed along for almost thirty blocks, ranting about his court case in China. Eventually, I brought him to Times Square, where his girlfriend was waiting. She must have seen something in my eyes, and said, "He's a mad scientist." After New York, they were headed to the Caribbean, where they would see Terpin and check out the crypto scene. They invited me to join. In the months that followed, Skycoin's price dropped below a dollar a coin, but Smietana remained optimistic. He told me, on Telegram, that he had a new hardware lab where he was developing antennae for the Skyminer, and said that Skycoin was moving into the medical industry, agricultural automation, and underground mining.

When I confronted Smietana about Skycoin's history, he began sending me dozens of voice messages a day, spinning elaborate stories that often contradicted one another. Many could be corroborated only by people whom he swore existed but who couldn't talk because they had government security clearance, or were in hiding, or because he didn't know their real names. He attacked those who spoke ill of Skycoin, calling them criminals, junkies, and blackmailers. He claimed at first that he didn't know Stephens ("I contacted advisor board and no one involved in Skycoin has heard of Bradford"), then that he was a "con artist," then that he was a "federal informant/agent" trying to entrap him. At one point, Smietana even suggested that he wasn't the real founder of Skycoin. I began to feel dizzy reporting this story, trying to sort through the layers of deception and to figure out whom I could trust. Everyone seemed to think that they could spin what I wrote to their advantage.

Smietana continues to post in the Telegram chat room, assuring loyal coinholders that the features they've waited years for are almost complete. "In that Telegram group, he is king," the former member of Skycoin's inner circle told me. Former employees remain divided about Smietana's motives. "It's almost as if he viewed Skycoin as a money printer," the former marketing contractor told me. "Everything that happened was a distraction or ruse to keep people in the dark while he kept his shit-coin casino operating." It's impossible to know how much Smietana made on the currency. ("Overall, I would say, I did ok," Smietana wrote to me.) But other founders have pulled "exit scams," dumping all of their coins at the market's height and disappearing entirely, which Smietana never did. One of Skycoin's lead software developers—who was also Smietana's friend from college, and who requested anonymity out of fear of harassment—doesn't think Smietana was in it to get rich: "Being a figurehead in blockchain is like being a cult leader and I think he enjoyed that more than the money." At one point, Smietana sent me a voice message, asking, "Why didn't I just take the seventy million and just, like, run off?"

In the past several years, the S.E.C. has charged multiple I.C.O. operators with offering unregistered securities and committing fraud, and the cases have resulted in settlements that have ordered hundreds of millions of dollars returned to coinholders. Last July, Jack Abramoff, who became famous, in 2006, for his role in a political-lobbying scheme, pleaded guilty to committing securities fraud with a token sale. The project, called AML BitCoin, published a white paper in 2017 that listed Smietana as one of its software developers. (Smietana claims that he was included without his consent.) In October, Spanish

FILED DATE: 9/9/2024 8:52 PM    2024L003661

authorities arrested McAfee on an extradition request from the U.S., where he faced charges of tax evasion and illegally promoting cryptocurrencies. (In June, he was found dead in his jail cell, in an apparent suicide.) In the past few years, cryptocurrency founders have tweaked their strategies; instead of I.C.O.s, they now hold "initial exchange offerings" and "initial decentralized exchange offerings." Stark, the former S.E.C. official, told me that the new terminology is "designed to create confusion and avoid S.E.C. scrutiny, but all of it is the same." David Silver, a lawyer who represents victims of cryptocurrency fraud, hopes that, as the S.E.C. enforces securities laws, fraud in the market will decrease. "Yesterday's crypto heroes are tomorrow's crypto felons," he said. "The statute of limitations is very long."

This past January, a Telegram channel named after WallStreetBets, the Reddit forum that supercharged GameStop's stock price, targeted Skycoin with a pumping campaign. As the pump spread to other social-media platforms, the price punched up above five dollars per coin. The mood in the chat was ecstatic. "I'm frantically moving funds around to buy more," a user named Krzys P wrote. Smietana wrote, "MOON MOON LAMBO MOON." Stephens is now a software developer at Salesforce, and insists that he is done with cryptocurrency: "My personality is not well suited to fraud, and mafioso, and everything that crypto is." He recently returned with his wife to Japan and sought out a new Shinto shrine where, he said, he wished for good health.

## New Yorker Favorites

- What happens when a bad-tempered, distractible doofus runs an empire?
- Remembering the murder you did not commit.
- The repressive, authoritarian soul of Thomas the Tank Engine.
- The mystery of people who speak dozens of languages.
- Margaret Atwood, the prophet of dystopia.
- The many faces of women who identify as witches.
- Sign up for our daily newsletter to receive the best stories from *The New Yorker*.

*Morgen Peck is a freelance journalist who has covered cryptocurrency since 2012.*

More:   **Cryptocurrency**    **Bitcoin**    **Entrepreneurs**    **Fraud**    **Money**    **Technology**

DAILY

Our flagship newsletter highlights the best of *The New Yorker*, including top stories, fiction, humor, and podcasts.

**E-mail address**

E-mail address

Sign up

By signing up, you agree to our **User Agreement** and **Privacy Policy & Cookie Statement**. This site is protected by reCAPTCHA and the Google **Privacy Policy** and **Terms of Service** apply.

---

# READ MORE

DAILY COMMENT

## The Obscene Energy Demands of A.I.

How can the world reach net zero if it keeps inventing new ways to consume energy?

**By Elizabeth Kolbert**

ON AND OFF THE MENU

## Why New York Restaurants Are Going Members-Only

Ultra-exclusive places, like Rao's and the Polo Bar, once seemed like rarities in the city's dining scene. Now clubbiness is becoming a norm.

**By Hannah Goldfield**

OUR COLUMNISTS

## A Financial Reckoning for Donald Trump

The former President's inability to secure a $464-million bond in his New York civil fraud case is a reminder of the deep legal and financial peril he's in.

**By John Cassidy**

INFINITE SCROLL

## Trump's Social-Media Potemkin Village

After an I.P.O. last week, Truth Social is confronting the gaping incongruity between its valuation and the paltry reality of its product.

**By Kyle Chayka**

⊘ Do Not Sell My Personal Info

FILED DATE: 9/9/2024 8:52 PM   2024L003661

# EXHIBIT B

FILED DATE: 9/9/2024 8:52 PM    2024L003661



FILED DATE: 9/9/2024 8:52 PM    2024L003661



**Deleted Account**
last seen a long time ago

**William McKenzie**
So you want to burn it down?
Unless he pays          8:26 PM

I'm still working on organizing all the shit he
sent me over 2 years                    8:27 PM

If I read to much in a day I'll get autism   8:27 PM

**Deleted Account**
If I read to much in a day I'll get autism
Haha                              8:27 PM ✓✓

**Deleted Account**
If I read to much in a day I'll get autism
I bet his conversations are crazy   8:27 PM ✓✓

Yes lol   8:27 PM

How long are you going to wait?   8:28 PM ✓✓

I need to get the evidence organized before I
give him one last chance to pay        8:28 PM

So nobody knows you are Sudo in there?
                                    8:29 PM ✓✓

If I got your help on publishing shit I can pay
you $10,000+ if he pays for it to stop   8:29 PM

I just have a team of 12 people who are
splitting the money                  8:29 PM

Delete this chat

FILED DATE: 9/9/2024 8:52 PM   2024L003661

# EXHIBIT C

FILED DATE: 9/9/2024 8:52 PM 2024L003661



**Paul Brainy** @Paul__Brainy · Oct 13

**Sudo** 🔒 @Sudo_TCPdump · 3 godz.
W odpowiedzi do @Sudo_TCPdump
There will be articles coming out that will be forever engraved into googles search that I plan to release, those will be my main focus. Every time you search skygoyim you'll be conflicted between truths (from my articles) and lies the same bullshit Skycoin regurgitates yearly.

○ 1          ♡ 2

**Sudo** 🔒 @Sudo_TCPdump · 3 godz.
The average skygoyim holder (that still remains) is just entirely too stupid to even try to persuade they are so lost into the Scientology cult Brandon Smietana

○ 3          ♡

**Garrett Grubbs** @GarrettJGrubbs · Oct 13
Sadly he doesnt understands that we understand that Synth is an ass just like @realDonaldTrump but we only care about the technology and the vision so as long as they get it done, we don't cares.

○ 2          ♡ 1

4

FILED DATE: 9/9/2024 8:52 PM 2024L003661

**Anonymous** Thu May 30 16:02:31 2019 No.13913634

Quoted by: >>13914238

>>OP

synth is an ashkenazi jew and unironically drinks the blood of newborns

**Anonymous** Fri Feb 15 09:43:09 2019 No.12759311

Quoted by: >>12759390

>>12759145

Brandon is a literal Israeli Jew.

**Anonymous** Tue Oct 1 15:40:04 2019 No.15777897

>>OP

Synth is a homosexual Mossad agent

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED DATE: 9/11/2024 1:49 PM   2024L003661

FILED
9/11/2024 1:49 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29323177

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| Brandon Smietana, Skycoin Global Foundation Ltd., a Singapore Company, and Symbolic Analytics Inc., a Delaware Corporation, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| Bradford Stephens, Aaron Kunstman, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, Advance Magazine Publishers Inc. d/b/a The New Yorker, and Unknown Individuals and Companies, | ) ) ) ) ) |
| Defendants. | ) ) |

Case No: 2024L003661

Calendar W

## UNOPPOSED MOTION FOR EXTENSION OF TIME BY DEFENDANT ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE NEW YORKER

Defendant Advance Magazine Publishers Inc. d/b/a The New Yorker ("Defendant"), by counsel, respectfully requests that this Court extend its time to answer or otherwise respond to Plaintiffs' **Second Amended Complaint**, filed on September 9, 2024, until October 21, 2024. This requested extension is not presented for purposes of delay, but rather to allow Defendant to prepare the most appropriate responsive pleading to Plaintiffs' Second Amended Complaint. Defendant had previously agreed to accept service in exchange for Plaintiffs' agreement to extend the time to answer or otherwise respond to Plaintiffs' prior complaint filed on July 24, 2024, until October 21, 2024. This unopposed motion is made to maintain that originally agreed-upon response time and because counsel has only recently been retained and wishes to have additional time to investigate Plaintiffs' claims and prepare Defendant's response accordingly. This motion is filed in good faith and no prejudice will result to the Plaintiffs by the granting of this motion.

FILED DATE: 9/11/2024 1:49 PM    2024L003661

Dated: September 11, 2024

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

*/s/ Harris L. Kay*

Harris L. Kay
Conor McDonough
300 North LaSalle Street, Suite 2200
Chicago, IL 60654
Phone: (312) 820-5460
harriskay@dwt.com
conormcdonough@dwt.com

Kate Bolger (admitted pro hac vice)
Nimra H. Azmi (admitted pro hac vice)
1251 Avenue of the Americas, Floor 21
New York, NY 10020
Phone: (212) 489-8230
katebolger@dwt.com
nimraazmi@dwt.com

*Attorneys for Advance Magazine Publishers Inc.*
*d/b/a The New Yorker*

2

FILED DATE: 9/11/2024 1:49 PM    2024L003661

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED
9/11/2024 1:49 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29323177

| | |
|---|---|
| Brandon Smietana, Skycoin Global Foundation Ltd., a Singapore Company, and Symbolic Analytics Inc., a Delaware Corporation, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) |
| Bradford Stephens, Aaron Kunstman, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, Advance Magazine Publishers Inc. d/b/a The New Yorker, and Unknown Individuals and Companies, | ) ) ) ) ) |
| Defendants. | ) |

Case No: 2024L003661

Calendar W

## NOTICE OF MOTION

To:    **SEE ATTACHED SERVICE LIST**

**PLEASE TAKE NOTICE** that on September 17, 2024, at 9:00 a.m., or as soon thereafter as counsel may be heard, counsel for Defendant Advance Magazine Publishers Inc. d/b/a The New Yorker shall appear via Zoom before the Honorable Judge Donnelly, or any judge sitting in his stead in Room 1912 of the Richard J. Daley Center, and shall then and there present its **UNOPPOSED MOTION FOR EXTENSION OF TIME BY DEFENDANT ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE NEW YORKER**, copies of which are attached hereto and served upon you. To join via Zoom, use the following: Meeting ID 921-0771-7798, Password 881 878, Telephone (312) 626-6799.

Dated: September 11, 2024

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

*/s/ Harris L. Kay*

Harris L. Kay
Conor McDonough
300 North LaSalle Street, Suite 2200
Chicago, IL 60654
Phone: (312) 820-5460
harriskay@dwt.com
conormcdonough@dwt.com

FILED DATE: 9/11/2024 1:49 PM    2024L003661

Kate Bolger (admitted pro hac vice)
Nimra H. Azmi (admitted pro hac vice)
1251 Avenue of the Americas, Floor 21
New York, NY 10020
Phone: (212) 489-8230
katebolger@dwt.com
nimraazmi@dwt.com

*Attorneys for Advance Magazine Publishers Inc.
d/b/a The New Yorker*

2

FILED DATE: 9/11/2024 1:49 PM    2024L003661

## CERTIFICATE OF SERVICE

Harris L. Kay, attorney, certifies that he served the foregoing **NOTICE OF MOTION and UNOPPOSED MOTION FOR EXTENSION OF TIME BY DEFENDANT ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE NEW YORKER** by submission of a true and correct copy thereof to the court's electronic filing system, causing the attorneys of record to receive a copy thereof at their registered e-mail addresses, on September 11, 2024. I have also caused a true and correct copy of the same to be delivered by email to:

### SEE ATTACHED SERVICE LIST

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Certificate of Service are true and correct.

/s/ *Harris L. Kay*

**SERVICE LIST**

| Party | Name | Attorney |
|---|---|---|
| Plaintiffs | Skycoin Global Foundation Limited and Brandon Smietana | James Andreas Karamanis<br>Barney & Karamanis, LLP<br>Two Prudential Plaza<br>180 North Stetson, 3050<br>Chicago, Illinois 60601<br>312-553-5300 (W)<br>james@bkchicagolaw.com |
| Defendant | Joel Wayne Cuthriell<br>8922 East 49th Place<br>Tulas Oklahoma 74145<br>(405) 582-0062<br>Joel@cuthriell.com | Pro se |
| Defendants | Symbolic Analytics Inc., Catherine Byerly, and Aaron Kunstman, Morgen Peck Bradford Stephens, Unknown Individuals and Companies | Unknown |

FILED DATE: 9/11/2024 1:49 PM   2024L003661

FILED
9/13/2024 2:47 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29362488

| 2120 - Served | 2121- Served | 2620 - Sec. of State |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |

Summons - Alias Summons                    (12/01/20) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

BRANDON SMIETANA/SKYCOIN,

                                        Plaintiff(s)

                    V.

MORGEN PECK

                                        Defendant(s)

Case No.  2024 L 003661

76 Canal St., #5FL, New York, NY 10002

Address of Defendant(s)

Please serve as follows (check one):    Certified Mail    Sheriff Service  Alias  Process Server X

### ALIAS SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/ appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Page 1 of 3

**Summons - Alias Summons** (12/01/20) CCG 0001 B

FILED DATE: 9/13/2024 2:47 PM  2024L003661

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

Atty. No.:  48525 _____ Witness date _____

Name: _____   _____
Barney & Karamanis, LLP.

Atty. for                                                          IRIS Y. MARTINEZ, Clerk of Court

Plaintiff _____   ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____   ❑ Date of Service: _____
                                                          (To be inserted by officer on copy left with employer or other person)

City: Chicago, IL.  60601 _____

Telephone: (312) 553-5300 _____      **9/13/2024 2:47 PM IRIS Y. MARTINEZ**

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 9/13/2024 2:47 PM   2024L003661

### GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

#### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

#### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

#### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

#### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

#### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

#### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

#### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

#### ALL SUBURBAN CASE TYPES

##### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

##### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

##### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

##### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

##### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
9/13/2024 2:47 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29362488

| | | |
|---|---|---|
| **2120 - Served** | **2121- Served** | **2620 - Sec. of State** |
| **2220 - Not Served** | **2221 - Not Served** | **2621 - Alias Sec of State** |
| **2320 - Served By Mail** | **2321 - Served By Mail** | |
| **2420 - Served By Publication** | **2421 - Served By Publication** | |
| **Summons - Alias Summons** | | **(12/01/20) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

BRANDON SMIETANA/SKYCOIN,

Plaintiff(s)

V.

BRANDON STEPHENS

Case No. <u>2024 L 003661</u>

Defendant(s)

c/o ServiceTitan, Inc.
801 N. Brand Blvd., Glendale, CA 91203

Address of Defendant(s)

Please serve as follows (check one):  Certified Mail  Sheriff Service  Alias  Process Server <u>X</u>

### ALIAS SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/ appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

FILED DATE: 9/13/2024 2:47 PM 2024L003661

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

Atty. No.: 48525 _____ Witness date _____

Name: _____ _____
Barney & Karamanis, LLP.

Atty. for IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____ ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____ ❑ Date of Service: _____
                                                    (To be inserted by officer on copy left with employer or other person)

City: Chicago, IL. 60601 _____

Telephone: (312) 553-5300 _____    9/13/2024 2:47 PM IRIS Y. MARTINEZ

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 9/13/2024 2:47 PM 2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED DATE: 9/13/2024 2:47 PM   2024L003661

FILED
9/13/2024 2:47 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29362488

| | | |
|---|---|---|
| **2120 - Served** | **2121- Served** | **2620 - Sec. of State** |
| **2220 - Not Served** | **2221 - Not Served** | **2621 - Alias Sec of State** |
| **2320 - Served By Mail** | **2321 - Served By Mail** | |
| **2420 - Served By Publication** | **2421 - Served By Publication** | |
| **Summons - Alias Summons** | | **(12/01/20) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

BRANDON SMIETANA/SKYCOIN,

Plaintiff(s)

V.

BRANDON STEPHENS

Defendant(s)

1649 North Fairfield Ave., Chicago, IL 60647

Address of Defendant(s)

Case No.  2024 L 003661

Please serve as follows (check one):      Certified Mail      Sheriff Service  Alias  Process Server X

### ALIAS SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/ appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourtorg**

FILED DATE: 9/13/2024 2:47 PM  2024L003661

**Summons - Alias Summons** (12/01/20) CCG 0001 B

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

Atty. No.: 48525 _____ Witness date _____

Name: _____
Barney & Karamanis, LLP.

Atty. for IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____ ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____ ❑ Date of Service: _____

City: Chicago, IL. 60601 _____ (To be inserted by officer on copy left with employer or other person)

Telephone: (312) 553-5300 _____ 9/13/2024 2:47 PM IRIS Y. MARTINEZ

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 9/13/2024 2:47 PM   2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

#### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

#### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

#### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

#### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

#### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

FILED
9/16/2024 10:11 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29374072

FILED DATE: 9/16/2024 10:11 AM   2024L003661

| | | |
|---|---|---|
| 2120 - Served | 2121- Served | 2620 - Sec. of State |
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |

**Summons - Alias Summons**        (12/01/20) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

BRANDON SMIETANA/SKYCOIN,

_____

Plaintiff(s)

V.

BRADFORD STEPHENS

_____

Defendant(s)

289 Clinton Ave., Apt. 2, Brooklyn, NY 11205

_____

Address of Defendant(s)

Case No.   2024 L 003661

Please serve as follows (check one):     Certified Mail     Sheriff Service   Alias   Process Server <u>X</u>

### ALIAS SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/ appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourtorg**

**Summons - Alias Summons** (12/01/20) CCG 0001 B

FILED DATE: 9/16/2024 10:11 AM 2024L003661

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

9/16/2024 10:11 AM IRIS Y. MARTINEZ

Atty. No.: 48525 _____ Witness date _____

Name: _____
Barney & Karamanis, LLP.

Atty. for                                    IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____ ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____ ❑ Date of Service: _____
                                          (To be inserted by officer on copy left with employer or other person)

City: Chicago, IL. 60601 _____

Telephone: (312) 553-5300 _____

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 9/16/2024 10:11 AM 2024L003661

### GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

#### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

#### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

#### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

#### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

#### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

#### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

#### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

#### ALL SUBURBAN CASE TYPES

#### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

#### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

#### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

#### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

#### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
9/13/2024 2:47 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29362488

FILED DATE: 9/13/2024 2:47 PM   2024L003661

| | | |
|---|---|---|
| **2120 - Served** | **2121- Served** | **2620 - Sec. of State** |
| **2220 - Not Served** | **2221 - Not Served** | **2621 - Alias Sec of State** |
| **2320 - Served By Mail** | **2321 - Served By Mail** | |
| **2420 - Served By Publication** | **2421 - Served By Publication** | |
| **Summons - Alias Summons** | | **(12/01/20) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

BRANDON SMIETANA/SKYCOIN,

Plaintiff(s)

V.

CATHERINE J. BYERLY

Case No.  2024 L 003661

Defendant(s)

c/o Annuity.org
1 S. Orange Ave, #500B, Orlando, FL 32801

Address of Defendant(s)

Please serve as follows (check one):     Certified Mail     Sheriff Service  Alias  Process Server X

### ALIAS SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/ appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourtorg**

**Summons - Alias Summons** (12/01/20) CCG 0001 B

FILED DATE: 9/13/2024 2:47 PM 2024L003661

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

Atty. No.: 48525 _____ Witness date _____

Name: _____
Barney & Karamanis, LLP.

Atty. for                                                                IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____  ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____  ❑ Date of Service: _____
                                                                (To be inserted by officer on copy left with employer or other person)
City: Chicago, IL. 60601 _____

Telephone: (312) 553-5300 _____          9/13/2024 2:47 PM IRIS Y. MARTINEZ

Primary Email: james@bkchicagolaw.com



**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 2 of 3

FILED DATE: 9/13/2024 2:47 PM   2024L003661

### GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

#### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

#### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

#### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

#### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

#### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

#### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

#### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

#### ALL SUBURBAN CASE TYPES

#### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

#### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

#### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

#### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

#### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED
9/13/2024 2:47 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
29362488

FILED DATE: 9/13/2024 2:47 PM   2024L003661

| 2120 - Served | 2121- Served | 2620 - Sec. of State |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |

Summons - Alias Summons                               (12/01/20) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

BRANDON SMIETANA/SKYCOIN,

_____

Plaintiff(s)

V.

AARON M. KUNSTMAN

_____

Defendant(s)

2101 13th Street, Sheboygan, WI 53081

_____

Address of Defendant(s)

Case No.  2024 L 003661

Please serve as follows (check one):      Certified Mail      Sheriff Service  Alias  Process Server X

### ALIAS SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address;, a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/ appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

**Summons - Alias Summons** (12/01/20) CCG 0001 B

FILED DATE: 9/13/2024 2:47 PM   2024L003661

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://wwwillinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit wwwillinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERKS OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

Atty. No.: 48525 _____ Witness date _____

Name: _____
Barney & Karamanis, LLP.

Atty. for                                                                     IRIS Y. MARTINEZ, Clerk of Court

Plaintiff_____      ❑ Service by Certified Mail: _____

Address: 180 N. Stetson, Suite 3050 _____      ❑ Date of Service: _____
                                                                                  (To be inserted by officer on copy left with employer or other person)

City: Chicago, IL.  60601 _____

Telephone: (312) 553-5300 _____      9/13/2024 2:47 PM IRIS Y. MARTINEZ

Primary Email: james@bkchicagolaw.com

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 9/13/2024 2:47 PM   2024L003661

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

#### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

#### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

#### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

#### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

#### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

BRANDON SMIETANA, et al.

                Plaintiffs,

    v.                                Case No. 2024L003661

BRADFORD STEPHENS, et al.

                Defendants.

## <u>ORDER</u>

THIS CAUSE coming to be heard by agreement of Plaintiffs and the Defendant, Ryan Eagle, due notice having been given and the Court being fully advised in the premises;

IT IS HEREBY ORDERED that:

1. Plaintiffs' claims against Defendant Ryan Eagle are DISMISSED pursuant to 735 ILCS 5/2-1009, without prejudice to any right to re-file within one year of entry of this Order, with costs to be paid upon refiling; and

2. Plaintiffs' claims against all other Defendants remain pending.

ENTER:

_____
Judge                    Judge's No.

*Judge Thomas More Donnelly*

DATED: _____

SEP 17 2024

Circuit Court - 1803

James A. Karamanis
Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

|  |  |  |
|---|---|---|
| Brandon Smietana, Skycoin Global Foundation Ltd., a Singapore Company, and Symbolic Analytics Inc., a Delaware Corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No: 2024L003661 |
| v. | ) ) | Hon. Thomas M. Donnelly |
| Bradford Stephens, Aaron Kunstman, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, Advance Magazine Publishers Inc. d/b/a The New Yorker, and Unknown Individuals and Companies, | ) ) ) ) ) | Calendar W |
| Defendants. | ) | |

## ORDER

This matter came before the Court for status, and on the unopposed motion for extension of time to answer or otherwise respond to plaintiffs' Second Amended Complaint filed Defendant Advance Magazine Publishers Inc. d/b/a The New Yorker (the "Motion").

The Court being advised of the premises, it is HEREBY ORDERED:

1) The court grants the Motion. Defendant must answer or otherwise respond to Plaintiffs' Seconded Amended Complaint on or before October 21, 2024.

2) The court sets this matter for status on the pleadings on November 12, 2024, at 9:00 a.m. in courtroom 1912 or via Zoom at meeting ID: 921 0771 7798; Passcode: 881878.

ENTERED:

Judge Thomas More Donnelly

SEP 17 2024

Circuit Court - 1803

_____
Hon. Thomas M. Donnelly

1

**<u>Order Prepared By:</u>**
Harris L. Kay
Conor McDonough
Davis Wright Tremaine LLP
300 N. LaSalle St. Ste. 2200
Chicago, Illinois 60654
(312) 820-5460
harriskay@dwt.com
conormcdonough@dwt.com
*Counsel for Defendant American Publishers, Inc.*


**<u>Seen and Agreed:</u>**
James A. Karamanis
Barney & Karamanis
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, Illinois 60601
(312) 553-5300
james@bkchicagolaw.com
*Counsel for Plaintiffs*

Joel Cuthriell
8922 E. 49th Place
Tulsa, Oklahoma 74145
joel@cuthriell.com
*Defendant Pro Se*