# EXHIBIT C

Law Division Motion Section Initial Case Management Dates for CALENDARS (A,B,C,D,E,F,H,R,X,Z) will be heard via Zoom
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 7/10/2024 9:00 AM

FILED
4/4/2024 10:00 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27132074

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED, a Singapore
Company, and SYMBOLIC ANALYTICS INC.,
a Delaware Corporation,

                        Plaintiffs,

       v.                                        Case No.

BRADFORD STEPHENS, AARON
KUNSTMAN, RYAN EAGLE, JOEL WAYNE
CUTHRIELL, MORGEN PECK, CATHERINE
BYERLY, AMERICAN PUBLISHERS, INC.
d/b/a CONDÉ NAST and d/b/a THE NEW
YORKER MAGAZINE, and UNKNOWN
INDIVIDUALS AND COMPANIES,

                        Defendants.

**COMPLAINT AT LAW**

       NOW COME the Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL

FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a

Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, and for their

Complaint against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, RYAN

EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, and

AMERICAN PUBLISHERS, INC. d/b/a CONDÉ NAST and d/b/a THE NEW YORKER

MAGAZINE, and UNKNOWN INDIVIDUAL(S) AND COMPANIES, state as follows:

**PARTIES**

       1.     SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company (hereafter

"Skycoin") is a consortium of related entities involved in the development of software, hardware,

design, manufacturing, and services operating under the consumer brand name "Skycoin," which

includes Skycoin Global Foundation, Symbolic Analytics Inc., Shellpay China, and other entities that are responsible for regional operations or management of specific assets of Skycoin's global operations.

2.     Skycoin created 100 million Skycoin Tokens during its launch in 2013, which were distributed and traded on various exchanges by 2017.

3.     The peak market capitalization of all existing Skycoin Tokens reached $5 billion USD in January 2018.

4.     Skycoin is a private company organized under the laws of Singapore, its principal place of business located at 2 Venture Drive, #11-31, Vision Exchange, Singapore.

5.     Plaintiff Symbolic Analytics ("SA") is a private company organized under the laws of Delaware, United States.

6.     Plaintiff, BRANDON SMIETANA ("Smietana") is an individual citizen of the United States and is the Chief Software Architect and authorized representative of Skycoin and SA.

7.     Defendant BRADFORD STEPHENS ("Stephens) is an individual citizen of the State of New York, United States.

8.     Defendant RYAN EAGLE ("Eagle") is an individual citizen of the State of Illinois, United States, and the Village of Buffalo Grove.

9.     On information and belief, Defendant JOEL WAYNE CUTHRIELL ("Cuthriell") is an individual citizen of the State of Oklahoma, United States.

10.     Defendant AARON KUNSTMAN ("Kunstman") is an individual citizen of the State of Wisconsin, United States.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

FILED DATE: 4/4/2024 10:00 PM   2024L003661

11.     "Sudo" is a network of similarly named Telegram accounts, operated by a minimum of four persons. At least one of these persons is known to be Kunstman. Stephens is widely believed to also be one of the account operators. The other two or more operators are currently unknown.

12.     Defendant CATHERINE BYERLY ("Byerly") is an individual citizen of the State of Florida, United States.

13.     Byerly was employed by a marketing company called 22 Acacia Consulting, located in Chicago, Illinois.

14.     Byerly was hired by Stephens through her employment at 22 Acacia Consulting to perform marketing services for Skycoin.

15.     Defendant MORGEN PECK ("Peck") is a privately paid journalist and individual citizen of the State of New York, United States.

16.     Defendant AMERICAN PUBLISHERS, INC. d/b/a CONDÉ NAST and d/b/a THE NEW YORKER MAGAZINE ("Condé Nast") is a global mass media company in the business of producing world leading print, digital, video, and social media brands organized under the laws of the State of New York.

17.     Condé Nast is the owner, operator, and publisher of The New Yorker Magazine ("The New Yorker"), a prominent American weekly magazine.

18.     On August 28, 2021, Peck authored an article published in The New Yorker titled *Pumpers, Dumpers, and Shills: The Skycoin Saga*.[1]

---

[1] The article can be found at: https://www.newyorker.com/tech/annals-of-technology/pumpers-dumpers-and-shills-the-skycoin-saga

19.     Stephens, recognizing the success of Skycoin, devised a plan and scheme to defraud, extort, and steal money and assets from Skycoin in concert with some or all of the other named party Defendants.

## FACTS COMMON TO ALL COUNTS

20.     On or about January 8, 2018, Plaintiffs entered into discussions with Stephens to develop, launch, and manage a comprehensive marketing and brand awareness program for Skycoin, including but not limited to revamping Skycoin's website, performing search engine optimization ("SEO") services, and generating positive publicity for Skycoin (hereafter referred to as the "Marketing Program").

21.     On or about January 8, 2018, Stephens represented himself to be the owner of Smolder LLC, a marketing startup company, to which the payments would be made for the Marketing Program. Stephens claimed that his business partners were Eagle, Adam Young, and Harrison Gevirtz.

22.     Unbeknownst to Plaintiffs, Stephens and Eagle were prohibited from engaging in activities such as the Marketing Program pursuant to an order from the Federal Trade Commission ("FTC"), dated February 19, 2014 ("the Order"). *See Federal Trade Commission v. CPA Tank, Inc., Vito Glazers, Eagle Web Assets, Inc., and Ryan Eagle,* Case No. 14-cv-1239.

23.     At all times relevant herein, Stephens was aware that pursuant to the Order, he could not accept payments for marketing activities.

24.     Stephens failed to inform Plaintiffs of the existence of the Order and further violated it by offering to provide marketing services to Plaintiffs.

25.     If Plaintiffs had known about the Order and/or if Stephens had not lied about and concealed the Order, Plaintiffs would not have entered into the Marketing Program with Stephens.

FILED DATE: 4/4/2024 10:00 PM   2024L003661

FILED DATE: 4/4/2024 10:00 PM    2024L003661

26.     Plaintiffs reached an oral agreement with Stephens to implement the Marketing Program, and as part and parcel of that agreement, paid him $107,948.00 ($66,258.00 in the form of four (4) Bitcoins and $41,690.00 in the form of 1,100 Skycoin Tokens) (the "Initial Payment"). The Initial Payment included an expense budget for an upcoming industry conference in Las Vegas, Nevada. Plaintiffs and Stephens explicitly agreed that as part of their agreement, any expense in excess of $1,000.00 would require prior approval from Skycoin.

27.     In addition to the Initial Payment, Plaintiffs paid Stephens approximately $800,000.00 in Skycoin Tokens for an internet advertising campaign.

28.     Shortly after receiving the Initial Payment, Stephens submitted two additional invoices for certain work allegedly performed by Byerly totaling approximately $14,752.44.

29.     On or about January 12, 2018, Stephens and Byerly notified Plaintiffs of a potential crisis that could critically impact Skycoin's business, marketing, and internet presence. As represented by Stephens and Byerly, an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website. Such content would function to decrease Skycoin's website's ranking precipitously in search engines and irrevocably damage Skycoin's image, reputation, and internet presence.

30.     In order to combat the internet attack by said third party, Stephens represented to Plaintiffs that an additional payment of $38,000.00 would be required.

31.     On or about January 14, 2018, and January 19, 2018, Skycoin paid Stephens the requested $38,000.00.

32.     Stephens's attack on Skycoin's website damaged Skycoin's SEO ranking and significantly reduced internet traffic to Skycoin's website.

FILED DATE: 4/4/2024 10:00 PM 2024L003661

33.     In January of 2018, Skycoin made the following payments to Stephens in connection with the Marketing Program:

a.  January 11, 2018: 20,000 Skycoin Tokens ($842,400.00) for the Marketing Program budget;

b.  January 13, 2018: One (1) Bitcoin ($14,314.00) for a conference in Miami, Florida;

c.  January 16, 2018: 3,899 Skycoin Tokens ($121,337.00) for the Marketing Program budget;

d.  January 18, 2018: Two (2) Bitcoins ($23,212.00) and 2,625 Skycoin Tokens ($80,929.00) for Marketing Program labor costs; and

e.  January 19, 2018: Four (4) Bitcoins (56,457.00) and a separate payment of 1.30 Bitcoin for the Marketing Program and to combat the aforementioned attacks on Skycoin's website. These services were never performed.

34.     In late January to early February 2018, Stephens demanded that Skycoin pay him $100,000.00 per month to ward off the supposed third party attacks on Skycoin's website. Stephens later increased his monthly demand to $300,000.00 in order to quell the attacks.

35.     In early February of 2018, Plaintiffs discovered that in actuality, there was no third party attacking Skycoin's website. Rather, the attack was instigated by Stephens as a fraudulent means to extract additional funds from Skycoin. The invoices submitted by Stephens were fabricated.

36.     In early February of 2018, SA received deficient invoices that were highly suggestive of fraud. Upon determining that there may be fraud in Stephens's invoices, Plaintiffs discontinued all additional payments.

## **DEFENDANTS' EXTORTION**

37.     Upon Skycoin's refusal to pay Stephens the monthly payments requested in or around February 2018, Stephens met Smietana in Shanghai, China, and in association with Eagle, who was participating via Zoom, threatened to have Skycoin delisted from all exchanges including,

6

FILED DATE: 4/4/2024 10:00 PM   2024L003661

for example, Bittrex and Binance, unless Smietana agreed to pay them $30,000,000.00 in Bitcoin and $1,000,000.00 in US Dollars.

38.    Defendants' threats included statements that failure to comply would result in Skycoin's destruction and the price of Skycoin being driven to zero.

39.    Stephens demanded that he be made COO of Skycoin and be put in control of the management of the company.

40.    Smietana, in fear of Defendants' threats, capitulated to their demand and initiated the first of three (3) extortion payments on or about February 9, 2018, in the amount of $127,000.00 (the "Extortion Payments").

41.    On or about February 22, 2018, Stephens ended his Marketing Program engagement with Plaintiffs under pressure from Skycoin's advisory board because of the discovery of the fraudulent invoicing and business practices.

42.    Plaintiffs requested a refund of the unspent prepayments made for the Marketing Program, however, Stephens refused to return any of said money.

43.    In and around the time Stephens demanded the Extortion Payments from Smietana, they also attempted to hostilely seize control of Skycoin. Specifically, Stephens threatened to orchestrate the publication of a series of negative and damaging articles through various print and online media sources unless Smietana made Defendant Stephens COO of Skycoin.

44.    In furtherance of this conspiracy and plan to take over Skycoin, Stephens paid journalist Tristian Greene ("Greene") to write and publish the article entitled "Skycoin: Anatomy of a cryptocurrency scam," February 15, 2018 - 10:47 pm UTC under an anonymous name.[2]

---

[2] The article can be found at: https://thenextweb.com/news/anatomy-of-a-cryptocurrency-scam-in-the-wild

FILED DATE: 4/4/2024 10:00 PM   2024L003661

45.     The negative article caused severe damage to the price of Skycoin Tokens and to Skycoin's reputation. Stephens openly admitted that he was responsible for paying Greene to publish the article, but went to Skycoin's investors and claimed that Smietana had ordered him to have a negative article published to intentionally destroy the price of Skycoin Token. Stephens attempted to organize a management and investor revolt, to transfer control of the company to himself, under the pretense that the actions Stephen had himself performed were in fact performed by Smietana

46.     Greene later cited that same article in another negative Skycoin article on "The Next Web," in an article titled "Exclusive: We suspected this shady cryptocurrency project was a scam. Now we're sure of it." Published March 8, 2018, 3:22 am UTC.[3]

47.     A key part of Skycoin's business plan was to be listed on the Bittrex Exchange. The Bittrex Exchange is a world-wide trading platform that facilitates real-time order execution of crypto currencies, such as Skycoin.

48.     Skycoin devoted significant resources to obtain a Bittrex listing, which had been negotiated through a third party.

49.     Knowing that Skycoin was about to obtain a Bittrex listing, on or about February 25, 2018, Stephens threatened Smietana that unless Smietana paid Stephens and Eagle, he would approach Bittrex and purposely interfere with Skycoin's third-party relationships to prevent Skycoin from being listed on Bittrex.

50.     Smietana refused to pay the money demanded by Defendant Stephens, and in turn Stephens did, in fact, provide untrue information to Bittrex and which ultimately led to the spread of false rumors regarding Skycoin and Skycoin ultimately not being listed on the Bittrex Exchange.

---

[3] The article can be found at: https://thenextweb.com/news/exclusive-we-suspected-this-shady-cryptocurrency-project-was-a-scam-now-were-sure-of-it

FILED DATE: 4/4/2024 10:00 PM    2024L003661

51.     Between February 26, 2018, through March 9, 2018, Stephens and Byerly stole access to Skycoin's media accounts, including but not limited to, Skycoin's Shopify store, Twitter account, Linkedin account, Slack channel account, and accounts associate with the operation of Skycoin's website. These media accounts were an integral and necessary component of Skycoin's business.

52.     On or about October 18, 2018, Stephens demanded over $150,000.00 for return of Skycoin's stolen computer-based assets and media accounts.

53.     On or about May 24, 2018, Binace announced that it would list Skycoin on its exchange. Binance holds itself out as the "world's largest crypto exchange" and is a trading platform where customers can buy and sell cryptocurrencies. It is highly desirable for cryptocurrencies to be listed on the Binance exchange.

54.     On or about June 12, 2018, when Smietana refused to succumb to Stephens's extortion demands, Stephens and Eagle conspired with Yan Xiandong, Li Min, Sam Sing Fond and Sun Fei (collectively the "Assailants") in a plot to kidnap Smietana and his girlfriend and steal $30,000,000.00 that Stephens claimed he was due from Skycoin.

55.     In furtherance of the conspiracy, the Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer sustems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

56.     Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin Tokens with a market value of $81,018.98, totaling $220,179.31.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

57.    During the siege and home invasion, the Assailants called Defendant Stephens and complained that they did not find the thousands of Bitcoin promised to them.

<u>**DEFENDANTS' THEFT OF ACCOUNTS**</u>

58.    Prior to Stephens's separation from Skycoin, upon notice of his departure, the company made a list of all accounts to which Stephens had authorized access and thereinafter terminated his access to those accounts.

59.    Skycoin staff contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

60.    SA staff and members of Skycoin contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

61.    Stephens acknowledged that there were unspent funds due back to Plaintiffs, however, instead of returning the money due, Defendant Stephens hacked into the various company accounts and began to engage in a series of extortion and fraudulent acts against Skycoin.

62.    Stephens and Byerly changed the passwords to some of the company accounts, locked Skycoin and SA out of them, and then attempted to extort the company for an additional $150,000.00. In addition, Defendants refused to return the unspent money that was prepaid and allocated for marketing services. The amount due back to Skycoin and SA was in excess of $800,000.00.

63.    Plaintiffs incurred considerable expense to regain access to the stolen accounts and to migrate the content to the reacquired accounts. Those accounts included, but were not limited

to, the Medium Account, Shopify, Twitter, Skycoin Telegram, Skycoin Rewards, Facebook, and Linkedin.

## **DEFENDANTS' UNAUTHORIZED EXPENSES**

64.     Stephens and Byerly engaged in various schemes to defraud Skycoin and attempted to invoice unapproved, non-business related costs including a Las Vegas prostitute orgy, unsubstantiated ATM withdrawals, personal entertainment costs and what is believed to be money for the purchase of drugs. These expenses were neither approved by Skycoin nor related to any legitimate business activities.

65.     For example, Stephens sent invoices to Skycoin totaling $50,000.00 for cash payments for two days in Las Vegas. Despite several requests, Defendants refused to produce ATM receipts for the $50,000.00 expense, could not explain how the cash was used, could not show that the expenses were business related, could not justify the amount spent, and could not produce receipts for any "cash payments."

66.     Stephens and Byerly billed SA for subcontractors without seeking prior authorization from Plaintiffs for such payments.

67.     On information and belief, Stephens and Byerly engaged in a scheme to defraud Plaintiffs by invoicing full time rates for subcontractors employed part time and even invoicing Company for nonexistent persons.

68.     Stephens and Byerly billed for subcontractors work that not only both pre-dated and post-dated the Marketing Program, but which also included full time rates for part-time work and also included invoicing from nonexistent subcontractors.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

FILED DATE: 4/4/2024 10:00 PM    2024L003661

69.     Stephens and Byerly billed for invalid date periods, such as submitting invoices for billing periods prior to the Marketing Program and work performed for billing periods after the termination of their relationship with Skycoin.

70.     Stephens and Byerly attempted to bill for costs which had not been submitted to the Company for preapproval and made misrepresentations to Skycoin staff, including Skycoin's Head of Events, who was responsible for event budgets. Stephens made false misrepresentations claiming that these expenses had received approval, and that the Company had been notified of the expenses.

71.     Stephens and Byerly attempted to bill the company for unapproved "events" on non-existent dates. Additionally, there were several other strong indicators that many or all of the claimed expenses were fraudulent or manufactured.

## BINANCE DELISTING

72.     In and around June of 2020, because Smietana refused to capitulate to the extortion demands, Stephens, in conjunction with Kunstman and others, embarked upon a scheme and plan to delist Skycoin from Binance and effectively destroy Skycoin's reputation and depress Skycoin Tokens' market value.

73.     In furtherance of this plan and scheme, Defendant Stephens solicited other individuals to make false complaints against Skycoin in order to have Binance delist Skycoin from the exchange. The false complaints they directed others to make to Binance to achieve the delisting are as follows:

   a.   That Skycoin sells Skycoin Tokens customers outside of the Binance exchange but after receiving the funds, never sends those customers the Skycoin Tokens for which they paid;

   b.   That individuals from Skycoin would privately meet with customers and accept payment for Skycoin Tokens at 15% below market value;

FILED DATE: 4/4/2024 10:00 PM    2024L003661

c. After customers consummated such side transactions, they would immediately "dump" the Skycoin Tokens on the market;

d. That Smietana would request that customers privately pay him $1,000,000.00 in Bitcoin or cash for discounted Skycoin Tokens that they could then "dump" on the market immediately and achieve a $150,000.00 profit; and

e. That Smietana and Skycoin launders money through customers by promising them an immediate 15%-20% profit through the unauthorized purchase of Skycoin Tokens.

74. Upon evidence and belief, Cuthriell and other persons were hired to harass Skycoin and interfere with Skycoin's relationships with exchanges and partners corporations, made public statements in Telegram channels bragging that they had paid journalists to publish articles to slander the company, and even publicly discussed the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance.

75. As part of his plan and scheme to have Skycoin delisted from Binance, Stephens, Kunstman, and Cuthriell also orchestrated having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless allegations.

76. As further evidence of the conspiracy, Cuthriell publicly congratulated all persons involved in the Binance delisting of Skycoin with the exclamation of "Nice work team" and "PARTY TIME."

<u>**COUNT I**</u>
**Fraud – Bradford Stephens and Catherine Byerly**

77. Plaintiffs repeat and reallege paragraphs 1 through 76 of this Complaint as and for Paragraph 77 of this Count I as if fully set forth herein.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

78.     Stephens approached Plaintiffs representing himself as a legitimate advertising and marketing firm, with Stephens and Eagle Web Assets (EWA) as "business partners" involved in every aspect of the "business".

79.     Plaintiffs would later learn that these persons came from a company "EWA" which had a history of litigation and that these persons were under an FTC Order for fraudulent marketing practices.

80.     Stephens and Byerly represented to Smietana that they would provide advertising and marketing services, including web design, online advertising, conference events, and display advertising.

81.     Stephens represented to Smietana that he would provide advertising, web design, and marketing services for Plaintiffs in return for payment.

82.     In reality, Stephens had no intention of providing any advertising, web design, or marketing of any kind for Plaintiffs.

83.     Stephens and Byerly, in fact, did not provide any advertising or marketing services for Plaintiffs.

84.     Stephens and Byerly never provided any web design services on behalf of Plaintiffs.

85.     In reliance upon the representations of Stephens and Byerly, Plaintiffs paid them approximately $800,000.00 for their services and the costs of advertising and marketing.

86.     When asked, Defendants represented to Plaintiff Smietana that they had no prior lawsuits that had been filed against them.

87.     These representations were knowingly false when made.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

88. In fact, Stephens' business partners, Harrison Gevirtz and Eagle, had an extensive history of litigation and had been named in multiple lawsuits and were subject to an FTC injunction for fraudulent marketing practices.

89. Following the payment of the initial $800,000.00, Defendants Stephens and Byerly requested additional money, including an additional $60,000.00.

90. Stephens and Byerly made these representations to Smietana and other Skycoin staff with the intent to induce payments and defraud Plaintiffs.

91. These statements made by Stephens and Byerly were false when made.

92. Defendants created scenarios and orchestrated fraudulent crises, making numerous misrepresentations, solely for the purpose of soliciting more money from Plaintiffs.

93. Stephens and Byerly made the following misrepresentations and/or omissions upon which Plaintiffs justifiably relied to their detriment:

    a. Lied about, concealed, and denied history of litigation against Defendants' associates, business partners, and former corporations;

    b. Failed to inform Plaintiffs of the FTC Order and government sanctions against their former company, even when explicitly asked about any history of litigation prior to payment and contract negotiations;

    c. Falsely represented that an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website;

    d. Falsely agreed to seek written pre-approval from the Company for incurred expenses;

    e. Falsely represented that they would provide marketing and advertisement services to Plaintiffs;

    f. Falsely representing that they would provide web design services to Plaintiffs; and

    g. Falsely represented the expenses and costs of said marketing and advertising services.

    (*See also* Facts Common to All Counts)

FILED DATE: 4/4/2024 10:00 PM    2024L003661

94.     Plaintiffs relied upon the representations of Defendants Stephens, Gevirtz, and Byerly and paid the requested amounts to Defendants.

95.     As a direct and proximate result of Defendants Stephens, Gevirtz, and Byerly's improper actions, Plaintiffs have sustained substantial economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and damage to their reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and CATHERINE BYERLY, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT II
**Fraud – Bradford Stephens, Aaron Kunstman, and Joel Wayne Cuthriell**

96.     Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 96 of this Count II as if fully set forth herein.

97.     On or about January 8, 2018, Plaintiffs entered into an oral agreement with Stephens, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

98.     Following that agreement, Stephens defrauded Plaintiffs by failing to provide the contracted services, creating false "threats," and extorting funds from Plaintiffs through coercion. Once discovered, Plaintiffs attempted to distance themselves from Defendants. However, in retaliation, Stephens, Kunstman, and Cuthriell began making false online profiles and applications

with false information in order to further defraud Plaintiffs out of approximately $2,000,000.00 worth of Skycoin product.

99.     Plaintiffs offered a reward program ("Reward Program") to entice customers to their business.

100.    In order to obtain a reward, each participant is required to submit an application which conformed to S.A.'s terms and conditions. The terms included the following:

    a.  Each customer is only allowed to have one active Skywire Rewards account within a single one month period.

    b.  Each customer is allowed to claim rewards for up to 8 Skywire nodes in a one month period.

    c.  Only one instance of the "Skywire Node" software can be run on a single physical computer.

    d.  Each customer may operate only a single reward program account within a one month period

    e.  Each computer claiming a reward must be a physically separate and independent computer.

    f.  It is a violation of the Rewards Program terms and service, for a user to run more than one Skywire node per physical computer.

101.    Cuthriell and Stephens developed software to run over 300 "nodes" on a single physical computer, to defraud the Reward Program.

102.    Relying on the misrepresentations, SA provided these persons rewards to which they were not entitled, totaling approximately $2-$4 million (the precise amount of which is unknown as they have continued to submit fraudulent applications continuously and under multiple fake aliases). It is a regular method of the conspirators' business to harass SA in this and other ways, and they will not stop without judicial intervention.

FILED DATE: 4/4/2024 10:00 PM  2024L003661

FILED DATE: 4/4/2024 10:00 PM    2024L003661

103.    Plaintiffs relied upon the information provided in those online applications and profiles.

104.    Had Plaintiffs known that these profiles and applications were being generated and submitted by Stephens, Kunstman, and Cuthriell repeatedly in order to accumulate Skycoin under false pretenses, Plaintiffs would not have made Reward Program payments to Defendants Stephens, Kunstman, and Cuthriell.

105.    Stephens, Kunstman, and Cuthriell made these repeated false representations to Plaintiffs through these applications and profiles even though they knew that they were false and made under false pretenses, with an intent to induce Plaintiffs into providing the $2,000,000.00 in digital payments/digital assets/digital currency.

106.    Stephens, Kunstman, Cuthriell have at all relevant times perpetuated and deliberately concealed this fraud from Plaintiffs.

107.    Stephens, Kunstman, and Cuthriell have engaged in a scheme to defraud Plaintiffs by consistently attempting to conceal this fraud and continue to submit false applications and profiles to Plaintiffs.

108.    Eagle conspired with Stephens and Kunstman to extort Plaintiffs out of money by threats of physical harm through the Assailants who invaded Smietana's home and tortured both him and his pregnant girlfriend for over six hours.

109.    As a direct and proximate result of Stephens, Kunstman, and Cuthriell's improper actions and misrepresentations, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

110.    Plaintiffs relied upon the accuracy and truthfulness of the submitted applications and profiles, and, had Plaintiffs been aware that the representations of Stephens, Kunstman, and Cuthriell were false, Plaintiffs would not have acted as they did.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, and JOEL WAYNE CUTHRIELL, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## <u>COUNT III</u>
**Civil Conspiracy – Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Morgen Peck, Catherine Byerly, and Unknown Individuals and Companies**

111.    Plaintiffs repeat and reallege Paragraphs 1-76 of this Complaint as and for Paragraph 111 of this Count III as if fully set forth herein.

112.    Defendants agreed and conspired with one another to defraud Plaintiffs, tortiously interfere with their business relationships, commit various acts of wire fraud, computer fraud, manipulate the cryptocurrency market, and convert Plaintiffs' property surreptitiously.

113.    Defendants' acts in furtherance of the conspiracy included, but were not limited to:

    a.  Devising and implementing the Marketing Program to defraud Plaintiffs of money;

    b.  Hacking and linking pornographic blogs and other harmful spam content to Skycoin's website to decrease Skycoin's website's ranking precipitously in search engines and irrevocably destroy Skycoin's image, reputation, and internet presence;

    c.  Threatening Plaintiffs with physical harm to extort them out of money;

FILED DATE: 4/4/2024 10:00 PM    2024L003661

d. Invading Smietana's home and torturing Plaintiff Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets;

e. Creating and employing a network of journalists to publish fraudulent articles to destroy Skycoin's image and reputation in order to drive down the price of Skycoins; and

    i. Greene, a journalist and reporter, was employed by Stephens and knowingly published false articles regarding the legitimacy of Skycoin and Skycoin's technology;

        1. Greene was within Stephens's network and at all times knew Stephens was not the COO of Skycoin, yet published that he was, and continued to publish false information even after Smietana's continuous attempts to correct the false claims.

    ii. Employing Peck to knowingly write a false and defamatory article published in The New Yorker alleging Skycoin as a fraud and a scam; and

    iii. Publishing an article in Cointelegraph by Simon Chandler, claiming that Plaintiffs' attackers were "emboldened" to physically harm Smietana due to Skycoin's "shady dealings."

f. Hacking Skycoin's Reward Program to defraud Plaintiffs out of millions of dollars.

114. Defendants worked in concert with one another to accomplish this fraud as evidenced by their various communications and concerted acts against Plaintiffs.

115. Defendants intended to defraud Plaintiffs out of their money, their product, and to tortiously interfere with their business relationships.

116. As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully

FILED DATE: 4/4/2024 10:00 PM    2024L003661

pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT IV
### Tortious Interference – Bradford Stephens, Aaron Kunstman, Joel Wayne Cuthriell, Catherine Byerly, Ryan Eagle, and Unknown Individuals and Companies

117. Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 117 of this Count IV as if fully set forth herein.

118. Plaintiffs developed business relationships and contracts with various vendors and customers since its launch in 2013.

119. Skycoin sells non-fungible electronic products that fluctuate in value based upon the market rates on specific internet exchanges.

120. For Skycoin to do business, it must participate in these internet exchange markets, such as, but not limited to, Bittrex, Binance, Kraken, Poloniex and Bifinix, in order to sell its goods.

121. Stephens, Kunstman, Eagle, Cuthriell, Byerly, and UNKNOWN INDIVIDUALS AND COMPANIES, orchestrated various schemes to undermine the reputation of Plaintiffs and cause these internet exchange markets, specifically, Bittrex and Binance, to remove Plaintiffs' products from their exchanges (known as "Delisting").

122. Defendants were fully aware of Plaintiffs' position within these internet exchange markets.

123.     Defendants were fully aware that Plaintiffs' Skycoin Token must be sold on these internet exchange markets.

124.     Defendants were fully aware that Plaintiffs had agreements and/or expected agreements with these internet exchange markets.

125.     Defendants, nonetheless, acted in concert to cause these internet exchange markets to remove Plaintiffs' Skycoin Token from those markets by harassing Skycoin and interfering with Skycoin's relationships with exchanges and partners corporations, making public statements bragging that they had paid journalists to publish articles to slander the company, publicly discussing the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance, and orchestrating having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless allegations.

126.     At all relevant times herein, Defendants intended to cause harm to Plaintiffs' reputation and finances in order to interfere with their relationships with these internet exchange markets, along with their customers and vendors.

127.     As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, RYAN EAGLE,

FILED DATE: 4/4/2024 10:00 PM    2024L003661

FILED DATE: 4/4/2024 10:00 PM   2024L003661

and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

<u>**COUNT V**</u>
**Unjust Enrichment – Bradford Stephens, Aaron Kunstman, Ryan Eagle, Joel Wayne Cuthriell, Catherine Byerly, and Unknown Individuals and Companies**

128.    Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 128 of this Count V as if fully set forth herein.

129.    Defendants were provided approximately $860,000.00 in funds to provide marketing, advertising, and web design services to Plaintiffs.

130.    These funds and goods were not earned, and Plaintiffs received no equivalent value for them in return.

131.    It would be unconscionable and against fundamental principles of justice, equity and good conscience for Defendants to retain the benefit from those funds, which were paid by Plaintiffs without receiving any benefit in return.

132.    Defendants also obtained approximately $2,000,000.00 in Skycoin Tokens through false reward applications.

133.    These funds and goods were not earned, were stolen by fraudulent means, and Plaintiffs received no equivalent value for them in return.

134.    It would be unconscionable and against fundamental principles of justice, equity and good conscience for Defendants to be unjustly enriched by retaining the benefit from the stolen funds, without Plaintiffs receiving any benefit in return.

135.    As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, RYAN EAGLE, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

### <u>COUNT VI</u>
**Defamation – Morgen Peck and Bradford Stephens**

136.    Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 136 of this Count VI as if fully set forth herein.

137.    The New Yorker is an American weekly magazine publication owned and published by Defendant Condé Nast.

138.    At all times relevant herein, Peck was an agent of Condé Nast.

139.    At all times relevant herein, Peck was an apparent agent of Condé Nast.

140.    At all times relevant herein, Peck was acting within the course and scope of her authority as an agent of Condé Nast.

141.    At all times relevant herein, Peck was acting within the course and scope of her authority as an apparent agent of Condé Nast.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

FILED DATE: 4/4/2024 10:00 PM 2024L003661

142.    On Aug 18, 2021 an article submitted by Peck was published in The New Yorker (See Appendix A).

143.    The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

144.    Peck published blatant lies and misrepresentations about Plaintiffs in her article including, but not limited to the following:

    a.  Misrepresenting Smietana's relationship with Stephens and Stephens's involvement with Skycoin and Skycoin's marketing campaign;

    b.  Statements alluding to Smietana and Skycoin as a fraud and a scammer, such as:

        i.  "In a way, it makes you into a fraud";

        ii.  "Is it a scam? I'm 99 percent sure of it"; and

        iii.  Suggesting that Skycoin was part of a "pump and dump" scheme.

    c.  Falsely stating Stephens has recordings of Smietana stating, "We want to feminize the peasant population to make them more docile ... [i]t's so they don't revolt."

        i.  Smietana asked Peck on multiple occasions regarding the existence of the alleged recording to verify the contents of her claims for this statement, however Peck never confirmed that she obtained such a recording, even though it was used as a purported source for factual information in the article.

        ii.  Smietana also denied such statements to Peck multiple times, each time reiterating that they were fabricated and untrue. Peck still published the statements.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

  iii. Peck admitted to Smietana that no one she interviewed would corroborate the quotes given by Stephens. Therefore, Peck knew or should have known the published quotes were false.

  iv. Peck knew that Stephens and Kunstman were members of the neo-nazi, alt-right internet forum "/pol/" and that similar antisemitic quotes were circulated there.

  v. As a result of the publication of the article, a Neo Nazi publication cited to the false statement from Peck's article quoting Smietana, and thereby causing damage to Plaintiffs' reputation.

  vi. As a result of the publication of this statement, Smietana was subjected to numerous death threats, harassment, and various hate crimes.

 d. Stating falsely that Smietana invited Binance executives to a Skycoin party during a 2018 conference in Las Vegas and instructed Stephens to hire prostitues for the executives;

  i. In fact, it was confirmed there were no Binance executives at the conference and the party was a private party of Stephens, without any affiliations to Skycoin or Plaintiffs. (See Appendix C)

  ii. Stephens's job was to set up meetings at conferences. He unilaterally held a private party without instruction to do so. Any approval for holding an event was contingent upon finding people from Binance, who were, in fact, not even in attendance at the conference.

FILED DATE: 4/4/2024 10:00 PM   2024L003661

    iii.  This inaccurate depiction of events was designed to destroy the relationship between Binance and Skycoin and was manufactured solely to do damage to Plaintiffs' reputation and business.

    iv.  Peck knew or should have known the statements were false, because Smietana sent her the messages from Defendant Stephens for the conference.

    v.  Peck interviewed Michael Terpin (the event organizer) and Daken Freebourne (Skycoin's head of events), who explicitly told Peck that Stephens was a compulsive liar and that his account was fabricated.

    vi.  Peck merged stories from three separate conferences into a non-factual and defamatory account, designed to inflict damages to Plaintiffs.

e.  Conclusory and unsupported statements by others;

    i.  Stating that "according to several people" (without any further evidence), that Skycoin privately sold to investors at a discounted rate;

    ii.  The article continuously includes unsupported statements supposedly from "employees" of Skycoin, however Peck told Smietana in conversations that she did not have documentation to show who these "employees" were, if and when they worked at Skycoin, or any confirmation of their statements.

    iii.  Peck published statements made by people against whom she knew Plaintiff Smietana had an ongoing lawsuit against and therefore knew or should have known these were unreliable sources.

f.  Falsely accusing Smietana of pre-mining "a hundred million coins, which were scheduled for circulation;"

FILED DATE: 4/4/2024 10:00 PM   2024L003661

     i.   Peck published this statement with full knowledge that Skycoin does not engage in any mining.

     ii.   During fact checking, Peck referenced a website that listed companies with pre-mine scams.[4]

         1.   The website listed "SYC Skycoin – premined" under a list titled, "List of scamcoins – do not use"

         2.   SYC Skycoin is a completely different company from SKY Skycoin (Plaintiff).

         3.   Peck knew that SYC was not Plaintiffs' company and that SYC was not SKY.

         4.   Therefore, Peck falsely accused and published in her article that Skycoin engaged in a pre-mining scam.

g.  Falsely accusing Smietana of directing Skycoin's marketing unit to purposely spread negative rumors to attract attention by stating "In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention;"

     i.   Peck does not provide support to confirm where this chat was from, who the "investors" were, or the full context of the conversations.

     ii.   The quote itself is purposely suggestive and alludes that Skycoin publishes negative rumors for promotion but does not clarify who "they" are that "spread negative rumors. "

h.  Falsely accusing Smietana of "plotting new distractions;"

---

[4] The website can be found at: https://altcoins.com/scamcoins

FILED DATE: 4/4/2024 10:00 PM   2024L003661

    i.   In support, Peck quoted Smietana, "Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it."

    ii.   The quote was purposely skewed by Peck and taken out of context to defame Smietana and Skycoin.

    iii.   The quote is a snippet of a message that clearly signifies a joke, in which the full text reads "The media is retarded. They are still writing articles about the 'insider trading' of cat memes, fake news. Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it. 'Kittycash CEO beheaded by ISIS after SEC investigation.'"

i.   Purposely taking direct quotes from chatrooms/messaging conversations and placing them out of context to twist their meaning and damage Plaintiffs;

    i.   Peck wrote, "A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coordinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved.)"

        1.   The quote was purposely misconstrued as it had nothing to do with insider trading channels;

FILED DATE: 4/4/2024 10:00 PM   2024L003661

      2.   It was evident from the chat conversations that any reference to any "secret insider trading" was a joke. (See Appendix I)

      3.   Peck knew that the "secret chat rooms" were, in fact, public channels, accessible to all people.

ii.  Peck quoted Smietana as stating "If you put in a million dollars now, and we have a run just as large as the last one, you're going to be at fifty million dollars."

      1.   This statement was knowing taken out of context, altering its meaning, and presenting Smietana in a false light.

      2.   Peck's quote claims that Smietana engaged in price promotion for Skycoin, knowing that Smietana was prohibited from making such statements by company policy and that Smietana could be fired or reprimanded for violation of company policy for making these statements.

      3.   Peck knew, or should have known, these out of context statements would expose Plaintiff Smietana to legal liability and damage his reputation and business.

      4.   Peck admitted to Smietana that she could find no example of Smietana engaging in price promotion.

iii.  Defendant Peck quoted Smietana as stating, "many could be corroborated only by people whom he swore existed but who couldn't talk because they had government security clearance, or were in hiding, or because he didn't know their real names."

FILED DATE: 4/4/2024 10:00 PM    2024L003661

1. Smietana actually said, "all software developers who work in cryptography have government security clearance, because government contractors are the only clients of the industry."

2. Peck distorted, or even manufactured, statements wholesale for the purpose of defaming Plaintiffs.

j.   Falsely accusing Smietana of having sole control of the "pre-mined" coins and Skycoin's virtual wallets;

   i.   It is public knowledge that Skycoin is an incorporated corporate entity and not under the sole control of one person.

   ii.  Peck had posession of Skycoin's incorporation documents and corporate structure, and therefore knew, or should have known, that her statements were false.

k.   Accusing Smietana of soliciting advice from an online personality who used a Hitler avatar in his profile;

   i.   Peck admitted to Smietana during fact checking that she could not find any evidence substantiating her statement that Smietana solicited and made payments to internet users with a Hitler avatar.

   ii.  Peck admitted to Smietana that only Stephens and Kuntsman had made these claims, and that no other persons could corroborate these statements.

   iii. Peck continued to publish the above statement, knowing its defamatory and false nature.

31

FILED DATE: 4/4/2024 10:00 PM   2024L003661

l.  Alleging that Smietana lied about the extent of his medical injuries sustained from the attack on himself and his girlfriend, even after publishing that Smietana's attackers admitted to detaining and injuring Smietana and his girlfriend;

    i.  Smietana provided Peck with copies of court proceedings and medical records, completely contradicting the false statements she published in the article.

m.  Alleging that Smietana used the attack on himself and his girlfirend to "use his power to freeze Skycoin transactions," when Smietana clearly stated in an official announcement to the Company that funds were frozen after making sure all Skycoin staff were safe after the attack and extortion demands;

    i.  Peck knew that Skycoin's lead developer, Steven Leonard, not Smietana, had initated freezing the stolen funds from the Chinese marketing team and employee accounts after the company detected embezzlement.

    ii.  Peck knew that the funds that were frozen were solely company accounts.

n.  Peck implied that That Smietana had been employed as a software developer by the notorious Washington DC lobbyist, Jack Amabrov, who had several felony convictions, including a plea bargain for SEC violations; and

    i.  Peck was aware that the allegations were false because the company directly informed her that Smietana had briefly spoken to them in 2018, but that no agreement had been reached.

    ii.  Peck admitted that the statements were false and apologized to Smietana multiple times for bringing up false claims.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

    iii.   Peck knew or should have known that claiming Smietana had been employed by Jack Amabrov, would cause severe damage to Plaintiffs' business and reputation.

  o.  Peck implied that one of Skycoin's mathematical algorithms, "Obelisk", did not actually exist and that Plaintiffs committed fraud.

    i.   Peck knew that these statements were false, as she had possession of both the source codes and white paper for the algorithm.

    ii.   Additionally, Skycoin's algorithm papers were published on Skycoin's website and in peer reviewed journal articles. This information was publicly available, and Peck had access to the public links to these algorithms.

    iii.   Peck had this information at the time she claimed these algorithms did not exist.

145.    Defendant Peck published that "Stephens came up with a plan to strip Smietana of power and transfer management of the company to a foundation."

146.    Peck, knowing that Stephens's intentions were to take the Company from Smietana, continued to base her article on information provided mainly by Stephens, completely disregarding his clear bias and motive to disenfranchise Smietana from Skycoin and seize control of the Company.

147.    After publication of the article, a former employee of Stephens and Kunstman contacted Plaintiffs stating that Peck received money to intentionally produce and publish a defamatory article attacking Plaintiffs and would receive bonus payments for destroying Skycoin's relationship with Binance. (See Appendix C)

148. The statements made by Peck in the article were purposely false and defamatory in return for financial gain and personal benefit of Peck.

149. Peck acted within the scope of her agency with principal Condé Nast when she submitted and published the article.

150. As a direct and proximate result of Peck's libelous publication, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

151. As a direct and proximate result of the libelous publication in The New Yorker, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendant, MORGEN PECK, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT VII
### Defamation - American Publishers, Inc. d/b/a Condé Nast and d/b/a The New Yorker Magazine

152. Plaintiffs repeat and reallege Paragraphs 1 through 76 and Paragraphs 136 through 151 as and for Paragraph 152 of this Count VIII as if fully set forth herein.

153. Condé Nast is a global mass media company operating various brands, including Defendant The New Yorker.

154. The New Yorker is an American weekly magazine publication owned and operated by Defendant Condé Nast.

155. At all times relevant herein, Peck was an agent of Condé Nast.

156. At all times relevant herein, Peck was an apparent agent of Condé Nast.

157. The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

158. On August 18, 2021, Condé Nast, by and through The New Yorker, published Peck's article which reached millions of readers worldwide.

159. Approximately one week prior to publication, Anna Boots, Fact Checker for The New Yorker, contacted Smietana regarding the article and stated:

   a. That Peck's article was the longest fact checking she ever had to do (approximately 3 months);

   b. That numerous unsubstantiated claims were made in Peck's article;

   c. That Peck interviewed Michael Terpin regarding the 2018 Las Vegas conference and he informed her that Stephens was an unreliable source and a compulsive liar;

   d. That the fact checking process was difficult to complete because almost all the information was provided two people, with most claims and statements being unsubstantiated; and

   e. That her editor at The New Yorker set a "firm publication date regardless of [fact checking] completion."

160. Condé Nast, by and through The New Yorker, published Peck's article without properly and completely fact checking the defamatory statements made and checking Peck's sources and their credibility.

161. As a direct and proximate result of the libelous publication in The New Yorker, Plaintiffs suffered economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

FILED DATE: 4/4/2024 10:00 PM    2024L003661

FILED DATE: 4/4/2024 10:00 PM    2024L003661

162.     As a direct and proximate result of the libelous publication in the New Yorker, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendant, AMERICAN PUBLISHERS, INC., d/b/a CONDÉ NAST and d/b/a THE NEW YORKER MAGAZINE, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT VIII
**Breach of Fiduciary Duty – Bradford Stephens, Aaron Kunstman, Joel Wayne Cuthriell, Catherine Byerly, and Unknown Individuals and Companies**

163.     Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 163 of this Count VIII as if fully set forth herein.

164.     At various times, Stephens, Kunstman, Cuthriell, and Byerly were acting as contractors hired by Plaintiffs to perform certain duties for the marketing of Skycoin.

165.     Per that relationship and agreement, Defendants were to adhere to the terms of the agreements and provide the services promised.

166.     Defendants instead engaged in various schemes to defraud Plaintiffs, including promising marketing and promotions materials that were never performed, implementing public schemes to damage Plaintiffs' reputation needing immediate marketing damage control, and providing marketing services below the quality and type of what was agreed upon.

FILED DATE: 4/4/2024 10:00 PM  2024L003661

167.    Defendants did not provide the promised services to Plaintiffs, despite Plaintiffs having paid for those services.

168.    Defendants had a duty to adhere to the terms of the agreements and to provide Plaintiffs with the promised services.

169.    Defendants breached that duty by failing to adhere to the terms of the agreements and failing to provide Plaintiffs with the promised services.

170.    As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## <u>COUNT IX</u>
### Breach of Contract – Bradford Stephens, Aaron Kunstman, and Joel Wayne Guthriell

171.    Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 163 of this Count VIII as if fully set forth herein.

172.    On or about January 8, 2018, Plaintiffs entered into an agreement with Stephens, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

FILED DATE: 4/4/2024 10:00 PM   2024L003661

173.    Following that agreement, Stephens failed to provide the contracted services, creating false "threats," and extorting funds from Plaintiffs through coercion.

174.    Defendants did not adhere to the terms of the Agreement despite payment.

175.    Plaintiffs, at all times relevant herein, fully performed on their obligations under the Agreements with Defendants.

176.    Defendants failed to provide any advertising or marketing services to Plaintiffs during the duration of the contract.

177.    Defendants breached their obligations under the contract through the following acts or omissions:

    a.  failing to provide advertising services;

    b.  Failing to provide marketing services;

    c.  failing to use the funds provided for the advertising or marketing services;

    d.  failing to provide web design services;

    e.  failing to use funds to effectuate any web design;

    f.  failing to stay within the bounds of the expense budget; and

    g.  attempting to extort additional funds outside of the contract terms.

178.    As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS

FILED DATE: 4/4/2024 10:00 PM 2024L003661

AARON KUNSTMAN, and JOEL WAYNE CUTHRIELL, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

**COUNT X**

**Violations of 735 ILCS 5/12-7.1 – Bradford Stephens and Aaron Kunstman**

179.     Plaintiffs repeat and reallege Paragraphs 1 through 76 of this Complaint as and for Paragraph 179 of this Count X as if fully set forth herein.

180.     On information and belief, during the years 2019-2021, Stephens and Kunstman, through various internet media and in person, made numerous antisemetic statements and threats of death, kidnapping, and other acts of violence against Smietana.

181.     All of these threats were based on Smietana's religion and Jewish heritage.

182.     Defendants also discussed Company as a "Jew coin", called holders of Skycoin Tokens "Skygoyim",and other similar hate speech, which Smietana perceived as a direct threat due to his being Jewish.

183.     Defendants posted these messages on various social media platforms and also made said threats directly to Plaintiff.

184.     In furtherance of their threats, Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

185.     Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin with a market value of $81,018.98, totalling $220,179.31.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and AARON KUNSTMAN, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

Respectfully submitted,

**BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation**

By: /s/James A. Karamanis
One of Plaintiffs' Attorneys

James A. Karamanis
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchicagolaw.com

FILED DATE: 4/4/2024 10:00 PM   2024L003661

FILED DATE: 4/5/2024 1:57 PM    2024L003661

FILED
4/5/2024 1:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L003661
Calendar, W
27143636

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BRANDON SMIETANA, SKYCOIN GLOBAL
FOUNDATION LIMITED, a Singapore
Company, and SYMBOLIC ANALYTICS INC.,
a Delaware Corporation,

                         Plaintiffs,

        v.                                        Case No.

BRADFORD STEPHENS, AARON
KUNSTMAN, RYAN EAGLE, JOEL WAYNE
CUTHRIELL, MORGEN PECK, CATHERINE
BYERLY, AMERICAN PUBLISHERS, INC.
d/b/a CONDÉ NAST and d/b/a THE NEW
YORKER MAGAZINE, and UNKNOWN
INDIVIDUALS AND COMPANIES,

                         Defendants.

## AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222(b)

Pursuant to Supreme Court Rule 222(b), counsel for the above-named Plaintiffs certifies

that Plaintiff seeks money damages in excess of Fifty Thousand and No/100 ($50,000.00),

exclusive of interest and costs.

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the

statements set forth herein are true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

                                        /s/James A. Karamanis

James A. Karamanis
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, Illinois 60601
Tel.: (312) 553-5300
Attorney No.: 48525
james@bkchiagolaw.com

FILED DATE: 4/5/2024 1:57 PM   2024L003661

# APPENDIX A

ANNALS OF TECHNOLOGY

# PUMPERS, DUMPERS, AND SHILLS: THE SKYCOIN SAGA

*The cryptocurrency promised to change the world and make its users rich in the process. Then it began to fall apart.*

**By Morgen Peck**

August 18, 2021

FILED DATE: 4/5/2024 1:57 PM   2024L003661

FILED DATE: 4/5/2024 1:57 PM   2024L003661



Illustration by Nata Metlukh


Save this story

FILED DATE: 4/5/2024 1:57 PM   2024L003661

On an April afternoon in 2011, a twenty-seven-year-old tech entrepreneur named Bradford Stephens arrived at a stucco bungalow near the canals of Venice, California. He had recently started a new data-analytics company, and had come to speak with a coder named Brandon Smietana, whom he hoped would get involved. Stephens had already met Smietana online, where he uses the handle Synth, and where he often debated minute points about math and programming. When Stephens and Ryan Rawson, an employee who tagged along, arrived, Smietana invited them into a carpeted den. A computer sat on a table, its casings removed to reveal a tangle of circuits; a sleeping bag lay on a sofa. Smietana was in his early twenties, with dark hair and a youthful face. Rawson told me, "He had the air of this mad scientist couch surfing." Stephens pitched his new company, but got no traction. Smietana had turned his attention to a new technology: cryptocurrency. "The only people who have to work for money are the people who cannot create it or print it out of thin air," he told them.

The first cryptocurrency, Bitcoin—released in 2009 by an anonymous programmer (or a group of them) called Satoshi Nakamoto—was a feat of computational brilliance. A bitcoin is an abstract unit of value that people track and spend with digital wallets. When someone contributes her computer's power to process Bitcoin transactions, the computer also races to solve an equation, a process called "mining." Each solution that meets certain criteria mints new coins. The number created decreases by half every four years or so—an event known as the Halvening—which keeps the supply limited, guarding against inflation. The whole economy is maintained on a blockchain, a shared ledger that keeps a tally of every Bitcoin transaction. As miners add transactions, the Bitcoin software coördinates and finalizes their contributions, making the ledger transparent and unchangeable and the system nearly impossible for governments to shut down.

But the technology has a flaw: as more people use it, transactions become slower and more expensive. The average transaction fee fluctuates wildly; one day last week, it was two dollars and thirty-three cents, making it more expensive than any major credit card for everyday purchases. The pursuit of a better Bitcoin quickly became a full-blown academic field, with its own conferences, university courses, and peer-reviewed journals. But, as Smietana explained over the next few years to anyone who would listen, he had the solution. He was designing a cryptocurrency that could be sent around the world instantaneously, for next to nothing. He called it Skycoin.

He was going to use this currency, he said, to create a decentralized version of the Internet, called Skywire. He planned to build a large mesh network, a system that allows people to use special Internet routers to share bandwidth with their neighbors. With enough members, a network can bypass service providers, making it harder for corporations and governments to surveil Internet use. But it's difficult to

FILED DATE: 4/5/2024 1:57 PM    2024L003661

retain volunteers. "A community network really needs density before it is useful," Brian Hall, of NYC Mesh, the largest community network in the U.S., wrote in a blog post. "It can be a chicken and egg problem." Smietana's project proposed a different way to attract people: pay them. His customers would share bandwidth using routers called Skyminers, and get paid for their service in Skycoin. He envisioned a new cryptocurrency spent over a community-owned Internet, calling it "the last step to fulfilling Satoshi's mission."

Stephens left his first meeting with Smietana believing that he could be destined for greatness. Skycoin launched publicly two years later, in 2013. The following year, Stephens attended a party at Smietana's new place, an unrenovated warehouse just south of L.A. Someone had painted the walls with images of horned monsters. "It was very Burning Man meets H. P. Lovecraft," Stephens told me. Stephens's friend Baron Chat, a photographer who attended, said, of Smietana, "He seemed to be receiving his signal from a different station than everyone else." According to Stephens, Smietana asked him to join the fledgling project, but he demurred. (Smietana said he doesn't remember seeing Stephens at the party.)

The first cryptocurrency boom arrived in 2017. "Several investors I knew, and a lot of my friends, started pivoting from angel investing to putting money in crypto and seeing insane returns," Stephens told me. Skycoin had a "token sale"—a sort of I.P.O. for cryptocurrencies—and was listed on two small exchanges. By the end of 2017, its price had gone from a little more than a dollar per coin to about fifty dollars per coin. That December, while Stephens was on vacation with his wife in Japan, Smietana messaged him with another chance to get involved. It seemed like an opportunity to work on something revolutionary. But he also thought, Everybody else is getting rich off crypto, so why not me? He said that he later told Smietana, "I'm going to need 50K up front and I gotta hire a team." After a couple days, he checked his Bitcoin wallet and found fifty thousand dollars sitting in it. "I'm, like, 'I guess I'm hired,' " he said. (Smietana denies sending the money, though he had said he would do so in texts, and there's a record of such a transaction on the Bitcoin ledger.) Before leaving Kyoto, he and his wife had visited a shrine to Inari, the Shinto god of rice, where they left offerings and made wishes. His wife wished for the health of her father, who was battling cancer. "I asked for wealth and adventure," Stephens told me. "And I got one of those."

In the past decade, a shift has occurred in the way that cryptocurrencies are distributed. Satoshi put bitcoins into circulation through a reward system: the more computing power you contribute, the more coins you can mint. Some early adopters paid their rent simply through mining. Around 2012, though, people began devising blockchains that could be used for more ambitious applications: supply chains with real-time geolocation, for example, or patient-controlled medical records. Such projects required capital, compelling founders to experiment with less democratic ways to distribute coins. In 2013, J. R. Willett, the founder of Mastercoin, invented the "initial coin offering," or I.C.O., the first token sale: developers partially pre-mined their tokens and then sold them off to raise money. Michael Terpin, who has managed two hundred such token sales, and who handled public relations for Skycoin,

FILED DATE: 4/5/2024 1:57 PM    2024L003661

told me that the scheme empowers entrepreneurs. "Somebody who had an innovative product could sell directly, prior to it being built, to an audience of enthusiasts," he said, without having to "give up a third of the company."

A frenzy followed a few years later. Since 2017, hundreds of projects have announced token sales. One of the most lucrative, EOS, raised about three and a half billion dollars in a yearlong I.C.O. Many projects amassed funds even before their blockchains or applications existed; some prepared assiduously, but others merely threw together a Web site, a list of advisers (sometimes without their knowledge), and some semblance of a technical paper (sometimes plagiarized). "A playbook really emerged for how to set up a legitimate-looking I.C.O.," Matt Chwierut, the head of research at Smith & Crown, a blockchain research firm, told me.

In 2018, I attended the North American Bitcoin Conference, in Miami. On the main stage, representatives from companies with unpronounceable names riled up the crowds. Downstairs, an arcade of booths hawked every kind of blockchain project: smart glasses, cargo robots, refugee-identity documents. At a booth for a group claiming to build a volunteer emergency-services network, I asked why the endeavor required a coin. The attendant told me to come back later when someone more technical would be arriving.

Because bitcoin mining is regulated by algorithms, everyone, in theory, has a fair chance of getting new coins. But, to receive pre-mined coins in a token sale, you often have to buy publicly at the sale price or else negotiate a deal behind the scenes. "A lot of coins were being sold on the side and in secret," Josh, a major cryptocurrency investor—who eventually bought into Skycoin, and requested that I use only his first name, out of concern for his safety regarding another matter—told me. "You'll do special deals with people if they give you three or four or five million dollars up front." This created a sense that making your fortune required being in the right room to get the right tip.

On the second night of the conference, I went to a strip club for an after-party, where flashing your badge got you a crypto-inspired cocktail. (I ordered a Satoshi Sour.) Guests exchanged advice, sure that they were getting the best inside information. But a few hours later a friend whisked me off to a more exclusive party, thrown at a beachside bar by Patrick Byrne, the former C.E.O. of Overstock. (Byrne stepped down in 2019, after it was revealed that he had had an affair with the Russian agent Maria Butina.) The attendees were celebrating the hundred-million-dollar token sale of Byrne's trading platform, TZero, which he said was going to "drag Wall Street behind the barn, kill it with an axe, and re-create it on blockchain." There were giant platters of sushi and oysters; the rapper Flo Rida pulled Byrne up onto the bar for a sing-along. Guests exchanged invites to exclusive chat rooms on Telegram, an app favored by coin enthusiasts. I turned to a man next to me and asked what had brought him to the party. He rubbed his thumb and forefinger together and shouted, "Making money."

FILED DATE: 4/5/2024 1:57 PM          2024L003661

The employment structure at Skycoin was loose, and Stephens joined without a contract. "Here I was, a guy used to wrangling hundred-page venture-capital contracts, and I'm joining a company with no last names and barely any first names," Stephens said. Smietana, who by then was living in Shanghai, had pre-mined a hundred million coins, which were scheduled for circulation. Skyminer routers were just starting to ship, but sales had already outstripped production. Smietana estimated that operators who used Skyminers could make between fifteen thousand and forty-five thousand dollars a month. Most coinholders I spoke to were young men around the world—medical students, craftsmen, 3-D animators—who believed in the project. In chat rooms, Smietana's followers addressed him with reverence. "We all are in honor to speak with synth," a user called Anosis wrote. "It's like having a chance to talk to Satoshi."

Although Stephens studied computer science in college, he admitted that, when he started working with Skycoin, he "hardly knew anything about crypto." He was told to handle marketing, and assembled a team composed mostly of friends and former associates. (Smietana now claims that he contracted a marketing company that Stephens ran, not Stephens himself.) But he soon realized that word about the project was already spreading. Large investors recruited in their own circles, and smaller coinholders hyped Skycoin on social media. At one point, Skycoin advertised a bounty program that promised users coins in exchange for promotional activities, such as writing blog posts and creating YouTube videos. One user-made video, titled "Skycoin - To the Moon," featured footage of a shuttle blasting off next to a chart of Skycoin's market value, interspersed with a closeup of glossy lips and the words "YOU COMIN'?" People who proved their worth on Telegram often got pulled up the ranks. "I started to spend 90 hours a week in the chat room," a user called Sudo, who became one of Skycoin's Telegram channel moderators, and who refused to tell me his name, messaged me. "They seen how active I was and offered me a job."

By early January, 2018, the total estimated value of pre-mined Skycoins had reached almost five billion dollars. Smietana sent representatives to conferences in New York, Lisbon, San Francisco, and Singapore, and arranged a retreat in Mauritius. A former marketing contractor, who requested anonymity out of fear of harassment, recalled that Smietana could spend lavishly on the people who worked with Skycoin, in one case paying for cryotherapy, vitamin injections, thousand-dollar steak dinners, and a twelve-thousand-dollar trip to the Esalen Institute. "Dude was very liberal with his spending and could be very generous," the marketing contractor said. The team posted a video of a yacht party, and thundered around in Ferraris. In New York, Skycoin reps cruised in a helicopter to grab footage of a Skyminer held over Manhattan's skyline.

That month, Stephens flew to Las Vegas to speak on a panel at the CoinAgenda summit. He wasn't up to speed on the technical aspects of Skycoin yet, but he held a Skyminer over his head and said, "You all are the first to see the new Internet!" On the first day of the conference, Smietana sent Stephens a voice memo with an urgent request. He was hoping to get Skycoin listed on Binance, one of the world's

FILED DATE: 4/5/2024 1:57 PM          2024L003661

largest cryptocurrency exchanges, which could help secure its legitimacy. During the I.C.O. boom, it was common for projects to pay a "listing fee" in order to be included on an exchange. (Binance claims that it chooses projects based solely on "strict security, legal, and regulatory compliance standards." In 2018, facing pressure, it announced that it would donate its listing fees to charity.) Smietana said that he had paid Binance executives seven and a half million dollars but that they hadn't followed through. (Binance confirmed that Skycoin paid it a hundred and fifty thousand Skycoins to spend on "promotion," which were worth seven and a half million at the coin's peak.) Smietana told Stephens to entertain the executives, to sweeten the deal. Stephens planned a party in a penthouse suite at the Bellagio. Smietana gave explicit instructions via voice messages: "You have to buy prostitutes for the people at Binance," he said. "Get them, like, three girls each." (Smietana denies any involvement in the party, and claims that his voice messages about it were "either a joke or a deep fake but probably a deep fake.")

That night, Stephens and Baron Chat, who had also started working on Skycoin's marketing, along with Catherine Byerly, another member of the team, sat in the hotel suite, with champagne on ice. Six escorts arrived at nine, and the employees instructed them to make the Binance executives feel like "rock stars." "To them, I was this, like, stereotypical businesswoman in an Ann Taylor dress," Byerly said. "But inside I'm thinking, How did my decisions lead me here?" Chat said, "It felt almost like you were in the process of living out some bizarre reality that sometimes you see in the movies. The weird excess . . . Crazy shit happens when you have a corporate account and a green light." By ten o'clock, the executives hadn't shown up, and Stephens began to worry that he'd lost the deal. He couldn't reach Smietana, so he frantically called the event organizers. They explained that not only had no Binance reps showed up at the conference—they weren't even on the registration list. (A spokesperson at Binance told me that the company neither requested nor knew about the party.) "That's when I started taking anything Brandon said with a grain of salt," Stephens told me. Still, he decided that, "if this is going to be weird, I'm going to make it memorable weird." Some of the escorts took their pay and left; the rest drank champagne and played Cards Against Humanity with the group into the morning.

When Stephens returned from Las Vegas, he set about mapping Skycoin's progress. One of the company's main selling points was Obelisk, an algorithm that allowed it to send coins cheaply and quickly. On Telegram, Smietana insisted that everything that came before was "obsolete and primitive." He boasted that Obelisk was written by Houwu Chen, a developer who had worked on Ethereum, the second-most popular cryptocurrency platform. He posted an academic paper written by Chen on the Skycoin Web site, claiming that it was a Skycoin white paper. But when Stephens reached out to Chen, he got no response. "We kept trying to chase people down to ask details, and it was slowly revealed it just . . . didn't exist," he told me. In a later discussion about technical details, a Skycoin "community manager" told coinholders that "it's too advanced to share" and that the company "can't trust the public with it." When pressed, Smietana wrote, of Chen, "He is a recluse, I doubt anyone can contact him or he would respond." Smietana eventually told me that Chen had taken a payment of a million Skycoins for his work on the white paper and then left the project. (Chen declined to comment,

FILED DATE: 4/5/2024 1:57 PM 2024L003661

saying, "Just don't put my name in the article. That's my statement.") Stephens discovered that Obelisk had never been implemented. (Smietana now acknowledges this, but claims that the project has published some of Obelisk's code and used it in simulations.)

Skycoin's payments were fast, but only because transactions were processed on a single server, rather than on a decentralized network of computers. The server sat in the Shanghai office of Scott Freeman, the C.E.O. of the C2CX cryptocurrency exchange. This also meant that, if Smietana wanted to, he could freeze transactions. "The big thing about a blockchain is it's supposed to be decentralized, and no single entity is supposed to be able to change it," Freeman told me. He added, of Skycoin's setup, "In a way, it makes you into a fraud." (Smietana claims that his power to freeze transactions was designed as a security measure.) Freeman said that he nagged Smietana about implementing Obelisk but that Smietana told him, "People don't really care. It's not worth it. We should spend our resources on other things." (Smietana denies this.)

Skycoin's Web site claimed that multiple payments were scrambled together to provide extra privacy, but this feature was never implemented in the Skycoin wallet. The pre-mined coins sat in virtual wallets under Smietana's sole control. (When pressed, Smietana claimed that he shared control of the coins with a secret group of advisers, but refused to give me their names.) When Stephens asked to see Skycoin's accounting books, Smietana explained that his girlfriend, Sarah, was in charge. Sarah told Stephens that the accounting was a work in progress. (Smietana denies directing Stephens to Sarah, and she denies being in charge of the project's accounting.) Everything seemed haphazard. Stephens was once paid from a bank account in Mauritius registered under a different name; many employees were paid in bitcoin or Skycoin.

In early February, 2018, a month after the CoinAgenda conference, Stephens booked a trip to Shanghai to see Smietana, determined to bring some order to Skycoin. One night, he had dinner with Smietana and members of a Chinese marketing team that Smietana had hired, at a steak house in Xuhui. As the dinner began, Smietana rose from his chair and launched into a rambling diatribe of conspiracy theories. For hours, he catalogued the hidden crimes of a class of global élites who controlled citizens through virtual reality, medical marijuana, and pornography. At some point, Stephens started recording Smietana on his phone. "We want to feminize the peasant population to make them more docile," Smietana says. "It's so they don't revolt."

Stephens told me, "I just became shell-shocked. What the fuck have I gotten myself into?" He had seen Smietana post conspiracy theories on Telegram before, but he figured it was a joke. In the weeks after the dinner, Stephens tried to warn some investors, but felt that they brushed him off: "They would be, like, 'Brandon is just doing his thing, and the value of the coin keeps going up.'"

Shortly after Stephens returned from Shanghai, a reporter named Tristan Greene published a scathing article about Skycoin on the Next Web, a technology-news Web site, condemning the

FILED DATE: 4/5/2024 1:57 PM          2024L003661

company for pre-mining its coins. The Skyminer router was being sold for one bitcoin—worth about ten thousand dollars at the time—but Greene highlighted the fact that it was constructed from components worth about six hundred dollars. Customers got back the ninety-four-hundred-dollar difference, but it came in Skycoin, which still sold only on small exchanges, making it difficult to trade in quantity. (The software for the miners was also incomplete; users connecting to Skywire had no way to pay for the service. Smietana claims that this feature is still under development.) Stephens granted Greene an interview but couldn't persuade him of the project's legitimacy. Greene wrote, "Is it a scam? I'm 99 percent sure of it."

Skycoin went into full damage-control mode. The project had been running a black-ops marketing unit sometimes referred to as Shill Team Six, composed of users plucked from Telegram who specialized in manipulating attention on the Internet. The "shills" occasionally flooded 4chan and Reddit, keeping engagement up with memes and bots. A former member of Skycoin's inner circle, who also requested anonymity, told me that if someone spoke ill of Skycoin the shills could be sent in to "make their life difficult," by digging up embarrassing information. (Smietana denied directing the group, saying it was "completely out of control.") The shills found that even bad publicity could be good for Skycoin. In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention. "Direct promotion does not get to front page and has low click rate," he wrote. "If they create contraversy, then it directs attention and clicks to skycoin." (Smietana claimed that these messages were taken out of context.)

Stephens knew that Smietana pored over texts about crowd psychology and even solicited advice from DJ Hives, an anonymous online personality who at one point used a Hitler avatar, on controlling public opinion. In voice messages, DJ Hives referred to Skycoin customers as "fish," a poker term for easily exploited players, and encouraged Smietana to cultivate an aura of infallibility: "We want to put you on the level of deity as far as the masses are concerned." (When contacted on Telegram, DJ Hives said, "None of this is correct," and declined to comment further.)

The team gamed search algorithms into ignoring Greene's article. "We helped bury that page for a while," Sudo, the anonymous user, who claimed to be part of Shill Team Six, messaged me on Telegram. (Smietana claimed that Skycoin ignored the article.) But word was already spreading. Skeptics showed up in Skycoin's social-media channels to ask questions, and Skycoin moderators started blocking them. "After banning enough losers, everyone left will be winners," Smietana wrote. Skycoin enthusiasts smeared Greene on Telegram, accusing him of writing a paid hit piece. When Greene showed up in the channel to address their concerns, moderators kicked him out. Someone claiming to be a Skycoin investor e-mailed Greene and threatened to "visit" him, his wife, and their son if he didn't stop "messing" with Skycoin, writing, "nothing is really impossible in the world for people like us that grew theire wealth on crypto."

FILED DATE: 4/5/2024 1:57 PM    2024L003661

Stephens contacted Michael Terpin, the adviser, to voice his worries, but, he said, "It turns out Terpin didn't give a shit." (Terpin told me that, by this time, his company was phasing out its involvement with Skycoin. "Brandon's got a flair for the dramatic," he said. "Honestly, that's one reason I found it difficult to keep working with Skycoin.") Stephens came up with a plan to strip Smietana of power and transfer management of the company to a foundation; he still believed that Skycoin could become a reality if reasonable people were in charge. But, by late February, 2018, six weeks after he joined the project, he found that he was locked out of both the Skycoin Telegram and his work e-mail. Members of his team were locked out, too. "The whole thing was so terrible," Chat, from the marketing team, told me. Smietana sent an e-mail to the Next Web denying that Stephens represented Skycoin. "The person you interviewed has nothing to do with Skycoin and is a known scammer," Smietana wrote. "Please update the article." Stephens heard from Smietana again in June, 2018, when Smietana sent him a mysterious Facebook message in which he claimed that he had acted out of concern for Stephens's safety. "I saved your life. You do not even know," Smietana wrote. "I will tell you in a few years."

In July, 2018, a recording leaked of Li Xiaolai, a Chinese billionaire and the founder of a coin that launched with an eighty-two-million-dollar token sale, giving his unfiltered perspective on the industry. "From the start, I knew one thing," he said. "The main power to compete here is the traffic." Successful coins accrue value, in other words, not because of technical sophistication but because they get people's attention. This requires having a founder who can capture the imagination. "All the successful 100X, 1000X projects—you go and look at the founder, they will definitely be a spin doctor," he said. What matters with a coin is that people are talking about it. "The consensus of idiots is still consensus," he said.

To some extent, this is true of most modern currencies: they have no value apart from what we collectively assign them. But the U.S. dollar is supported by government guarantees and controlled through monetary policies. Bitcoin abolished government backing, but its scarcity is regulated through algorithms. (Even so, a tweet or statement from a high-profile coinholder like Elon Musk can raise or crash its price.) Coins that are manually distributed in token sales provide even fewer assurances. It is often impossible to know how many are in circulation. Their value is built on a promise that some feature, often still in development, will make them more useful than other currencies. Until that promise is fulfilled, it is largely a matter of faith. "Money is a social construct," Smietana wrote, on Telegram. "It is based upon CONFIDENCE . . . Confidence is a religion and is built upon perception and not reality."

Founders that control perception control the price of their coin. According to Chwierut, the blockchain researcher, during the I.C.O. bubble, it was not uncommon for founders to spend as much as thirty per cent of their budget on ad campaigns. Some of the effort went to gaming the attention economy, requesting mentions from influencers or using bots to create an illusion of broad support. Traders can even use these metrics to manage their portfolios: IntoTheBlock, a "crypto-intelligence" firm, tracks

FILED DATE: 4/5/2024 1:57 PM    2024L003661

Twitter mentions and Telegram-member counts and sells the information to investors; a data platform called Santiment alerts users when chatter about their coins surges. Recommendation algorithms can encourage the spread of incendiary content, and coins promoted with controversy and falsehood often perform well. Some coin promoters use stunts or scandals to keep users engaged. After closing a fifty-million-dollar token sale, the founder of a cryptocurrency called Savedroid posted a picture of himself at what looked like an airport with a caption reading "Thanks guys! Over and out," which was taken as a confession that he was running off with the funds. A day later, he revealed that he was trolling about escaping with the money, but only after several articles had been written about the scandal. The firm ASKfm hired mountaineers to climb Mt. Everest and film themselves leaving a cryptocurrency wallet on its peak. (The company released a statement saying, "On a market where launching a blockchain endeavor is not really a newsbreak, companies have to stand out.") A sherpa died in the process.

Market manipulation is rampant. In schemes called "pump and dumps," traders meet in exclusive chat rooms where they coördinate to purchase a coin, causing the trading volume to go up and others to take interest. When the price is at its highest, the pump-and-dumpers sell, leaving faithful users holding the bag. In an industry where everyone is a coinholder, there is no one left to pull the alarm. Should investors realize that their coin is a sham, it would be an act of self-sabotage to raise concerns. Better to become evangelists, wooing others in order to boost the price.

U.S. law generally requires projects to register with the S.E.C., forcing them to make financial disclosures that investors could then inspect before buying. Almost none do, giving convoluted rationales that John Reed Stark, the founder of the S.E.C.'s Internet-enforcement office, told me are "poppycock." Not registering can facilitate further rule-breaking, as when, say, influencers promote coins without disclosing their investment, or projects pump coins with fraudulent claims. Stark said, of I.C.O.s, "Every single one I ever saw was unlawful on multiple levels." The S.E.C. began cracking down in 2017, but prosecution often requires "extraordinary resources from an alphabet soup of federal and state law-enforcement agencies," Stark said. As a result, few projects face consequences.

In the spring of 2018, Skycoin climbed into the list of the top hundred coins, and appeared on a Nasdaq Web cast. That May, Binance announced that it would list Skycoin on its trading platform. Around the time of the listing, the price jumped thirty-eight per cent. Then, suddenly, it came crashing down. According to several people involved, Skycoin privately sold to investors at a steep discount—in at least one case, coins worth millions of dollars—inadvertently giving them an incentive to dump it on the market as soon as they could. (Smietana denied being involved in such sales.) Smietana had claimed on Telegram that the investors were restricted from selling. But, as soon as Binance listed Skycoin, the market flooded with sell orders. Freeman, from the C2CX exchange, had been acting as the project's primary "market maker," using a pool of reserves to provide market liquidity and stabilize prices. "I tried to hold at about twenty," he told me. But the sell-off was too much to contain. Coinholders shared their misery on Telegram. "Its been fun guys, i'm gonns hang myself in 2 hours," a user named Willy Jr. wrote.

FILED DATE: 4/5/2024 1:57 PM    2024L003661

"Bought 20K at 20 dollars." A user named Dante wrote, "synth told me this shit would moon," adding, "i took a mortage on my house."

A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coördinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved.) Rumor spread that the S.E.C. would investigate Skycoin as a result, and that Binance was considering delisting it. In the public chat, coinholders prepared for a death spiral. A user called Opaque wrote, "I want to say calm down guys, but its really doesnt look good."

Then, out of nowhere, Smietana announced that he had big news to share once "all the staff are safe." In the coming days, he accused members of the Chinese marketing team of breaking into his house with five gang members, holding him and his girlfriend hostage for six hours, beating him until one of his ribs broke, and stealing a small quantity of cryptocurrency. Members of the Chinese marketing team denied this. In a letter to investors, they claimed that Smietana and his girlfriend had pushed them out, refused to pay them, and frozen their Skycoin wallets, which contained coins that were then worth somewhere between four and nine million dollars. This was the first apparent instance of Smietana's using his power to freeze Skycoin transactions. (Smietana claims that the wallets contained embezzled company funds.) In their letter, the marketing-team members claimed that they had been invited to Smietana's apartment to find a resolution, and a small scuffle broke out in which he got a bruised wrist. Afterward, Smietana's girlfriend filed a police report, and four defendants spent a few months in detention, after admitting to detaining Smietana and his girlfriend in an incident that left them "lightly" injured.

Smietana blitzed Telegram with messages about the alleged "kidnapping." "This is the best thing that has ever happened to Skycoin. Ever...As long as we can keep this drama going, we can get [the trading volume] even higher." He amused himself by plotting new distractions: "Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it." But coinholders seemed not to buy it. When he did a live YouTube interview, shortly after the incident, someone commented, "I dont see one bruise on his face. beaten the shit out of me, what with ? a piece of toast.?" As the sell-off continued, Smietana blamed it on the "kidnappers" for dumping their stolen coins. "They have been surpressing the price the whole time," he wrote.

In November, 2018, Smietana, apparently growing desperate, enlisted John McAfee to promote the coin. McAfee, once famous for the antivirus software that he developed in the eighties, had earned a reputation as a kind of cyber outlaw: he was a "person of interest" in a murder in Belize, in 2012, and subsequently fled the country, later posting images of himself cruising the Caribbean in his yacht, brandishing guns. He was a sought-after crypto promoter. McAfee tweeted a video that seemed to show

FILED DATE: 4/5/2024 1:57 PM    2024L003661

him with the Skycoin logo freshly tattooed on his back and the message, "Why Skycoin? If you have to ask, you've been living in a fucking closet." (Smietana admitted to paying McAfee during this period but insisted that it was a gift to help with "yacht repairs.") Smietana urged people to buy: "If you put in a million dollars now, and we have a run just as large as the last one, you're going to be at fifty million dollars," he said, in a video. Then, in March, 2019, McAfee publicly broke ties with Skycoin. (Smietana told me that McAfee began demanding large fees that he refused to pay.) When asked on Twitter what he would do about the tattoo, McAfee replied, "I'll keep it as a reminder that no matter how old I get, I still get scammed by unscrupulous people with pie in the sky plans. They almost drove me to violence." Stephens, watching from afar, felt that he had been spared the worst. He hadn't behaved perfectly: he had been taken in by Skycoin's promise, but he also promoted a coin that he knew little about. After being cut off, he took Skycoin's social-media accounts hostage, and unsuccessfully demanded a severance payment. In the end, he told me, he sold his holdings for thirty thousand dollars. The internal drama and crashing prices prompted a broader exodus from the project. In 2019, Freeman's exchange announced that it was delisting Skycoin. Michael Terpin's name still appears on the Skycoin Web site, but he told me that he no longer has anything to do with it. Josh, the cryptocurrency investor, lost faith after visiting Smietana in China, last year. "Crypto is a bunch of con artists conning each other," he said. "Obelisk was always a week away, and it still is." He sold his holdings and told me that he lost ninety-nine per cent of his investment.

Investors who sold at the peak would have made large profits, but many average coinholders suffered. (Smietana claimed that he urged restraint: "I told people not to put money into the market that they were not prepared to lose.") Armon Koochek, a recent college graduate in Santa Barbara, California, invested in Skycoin in 2018, lured by the promise of a new Internet and excited by the "memes and content on Reddit and Twitter." He lost some fifteen thousand dollars. He tried to warn others away from the project in the Telegram chat room, and was soon banned. "I hope I saved a lot of investors," he told me. Dael Lithgow, a forty-five-year-old bootmaker in Pietermaritzburg, South Africa, invested most of his savings in Skycoin in 2017, and convinced his mother and girlfriend to invest, as well. Had they sold during the boom, the profits would have been "life-changing," but they held on. "I really believed in what they were trying to do," he told me. Today their coins are nearly worthless.

In the summer of 2019, I met Smietana at a mozzarella bar in Manhattan. He was wearing all black, and his hair was starting to gray. As we sat, he warned me, unprompted, "Honestly, like, ninety-eight per cent of the people are scammers in blockchain." Then, preëmpting my questions, he visited every bit of Skycoin intrigue. The "gang members" who kidnapped him in China had demanded "sixty million dollars." The technology for Skywire, the decentralized Internet service, was already "working" and Obelisk was just "a few months" out. His girlfriend, Sarah, called several times while we were speaking. He showed me frantic messages from her, and said that he was blowing off an important meeting, but he kept talking, telling me about his coin's promise. He seemed to regard me as the next potential pump.

FILED DATE: 4/5/2024 1:57 PM    2024L003661

Almost four hours into my lunch, I made an excuse to leave, saying that I needed to walk to my bank. Smietana followed along for almost thirty blocks, ranting about his court case in China. Eventually, I brought him to Times Square, where his girlfriend was waiting. She must have seen something in my eyes, and said, "He's a mad scientist." After New York, they were headed to the Caribbean, where they would see Terpin and check out the crypto scene. They invited me to join. In the months that followed, Skycoin's price dropped below a dollar a coin, but Smietana remained optimistic. He told me, on Telegram, that he had a new hardware lab where he was developing antennae for the Skyminer, and said that Skycoin was moving into the medical industry, agricultural automation, and underground mining.

When I confronted Smietana about Skycoin's history, he began sending me dozens of voice messages a day, spinning elaborate stories that often contradicted one another. Many could be corroborated only by people whom he swore existed but who couldn't talk because they had government security clearance, or were in hiding, or because he didn't know their real names. He attacked those who spoke ill of Skycoin, calling them criminals, junkies, and blackmailers. He claimed at first that he didn't know Stephens ("I contacted advisor board and no one involved in Skycoin has heard of Bradford"), then that he was a "con artist," then that he was a "federal informant/agent" trying to entrap him. At one point, Smietana even suggested that he wasn't the real founder of Skycoin. I began to feel dizzy reporting this story, trying to sort through the layers of deception and to figure out whom I could trust. Everyone seemed to think that they could spin what I wrote to their advantage.

Smietana continues to post in the Telegram chat room, assuring loyal coinholders that the features they've waited years for are almost complete. "In that Telegram group, he is king," the former member of Skycoin's inner circle told me. Former employees remain divided about Smietana's motives. "It's almost as if he viewed Skycoin as a money printer," the former marketing contractor told me. "Everything that happened was a distraction or ruse to keep people in the dark while he kept his shit-coin casino operating." It's impossible to know how much Smietana made on the currency. ("Overall, I would say, I did ok," Smietana wrote to me.) But other founders have pulled "exit scams," dumping all of their coins at the market's height and disappearing entirely, which Smietana never did. One of Skycoin's lead software developers—who was also Smietana's friend from college, and who requested anonymity out of fear of harassment—doesn't think Smietana was in it to get rich: "Being a figurehead in blockchain is like being a cult leader and I think he enjoyed that more than the money." At one point, Smietana sent me a voice message, asking, "Why didn't I just take the seventy million and just, like, run off?"

In the past several years, the S.E.C. has charged multiple I.C.O. operators with offering unregistered securities and committing fraud, and the cases have resulted in settlements that have ordered hundreds of millions of dollars returned to coinholders. Last July, Jack Abramoff, who became famous, in 2006, for his role in a political-lobbying scheme, pleaded guilty to committing securities fraud with a token sale. The project, called AML BitCoin, published a white paper in 2017 that listed Smietana as one of its software developers. (Smietana claims that he was included without his consent.) In October, Spanish

FILED DATE: 4/5/2024 1:57 PM    2024L003661

authorities arrested McAfee on an extradition request from the U.S., where he faced charges of tax evasion and illegally promoting cryptocurrencies. (In June, he was found dead in his jail cell, in an apparent suicide.) In the past few years, cryptocurrency founders have tweaked their strategies; instead of I.C.O.s, they now hold "initial exchange offerings" and "initial decentralized exchange offerings." Stark, the former S.E.C. official, told me that the new terminology is "designed to create confusion and avoid S.E.C. scrutiny, but all of it is the same." David Silver, a lawyer who represents victims of cryptocurrency fraud, hopes that, as the S.E.C. enforces securities laws, fraud in the market will decrease. "Yesterday's crypto heroes are tomorrow's crypto felons," he said. "The statute of limitations is very long."

This past January, a Telegram channel named after WallStreetBets, the Reddit forum that supercharged GameStop's stock price, targeted Skycoin with a pumping campaign. As the pump spread to other social-media platforms, the price punched up above five dollars per coin. The mood in the chat was ecstatic. "I'm frantically moving funds around to buy more," a user named Krzys P wrote. Smietana wrote, "MOON MOON LAMBO MOON." Stephens is now a software developer at Salesforce, and insists that he is done with cryptocurrency: "My personality is not well suited to fraud, and mafioso, and everything that crypto is." He recently returned with his wife to Japan and sought out a new Shinto shrine where, he said, he wished for good health.

## New Yorker Favorites

- What happens when a bad-tempered, distractible doofus runs an empire?
- Remembering the murder you did not commit.
- The repressive, authoritarian soul of Thomas the Tank Engine.
- The mystery of people who speak dozens of languages.
- Margaret Atwood, the prophet of dystopia.
- The many faces of women who identify as witches.
- Sign up for our daily newsletter to receive the best stories from *The New Yorker*.

*Morgen Peck is a freelance journalist who has covered cryptocurrency since 2012.*

More:  Cryptocurrency    Bitcoin    Entrepreneurs    Fraud    Money    Technology

DAILY

Our flagship newsletter highlights the best of *The New Yorker*, including top stories, fiction, humor, and podcasts.

**E-mail address**

E-mail address

Sign up

By signing up, you agree to our **User Agreement** and **Privacy Policy & Cookie Statement**. This site is protected by reCAPTCHA and the Google **Privacy Policy** and **Terms of Service** apply.

---

## READ MORE

DAILY COMMENT

### The Obscene Energy Demands of A.I.

How can the world reach net zero if it keeps inventing new ways to consume energy?

**By Elizabeth Kolbert**

ON AND OFF THE MENU

### Why New York Restaurants Are Going Members-Only

Ultra-exclusive places, like Rao's and the Polo Bar, once seemed like rarities in the city's dining scene. Now clubbiness is becoming a norm.

**By Hannah Goldfield**

OUR COLUMNISTS

### A Financial Reckoning for Donald Trump

The former President's inability to secure a $464-million bond in his New York civil fraud case is a reminder of the deep legal and financial peril he's in.

**By John Cassidy**

INFINITE SCROLL

### Trump's Social-Media Potemkin Village

After an I.P.O. last week, Truth Social is confronting the gaping incongruity between its valuation and the paltry reality of its product.

**By Kyle Chayka**

FILED DATE: 4/5/2024 1:57 PM   2024L003661