# Exhibit A

# Exhibit 1

**IN THE ~~CIRCUIT~~UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ~~COOK COUNTY,~~ILLINOIS ~~COUNTY DEPARTMENT, LAW~~ EASTERN DIVISION**

BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS INC., a Delaware Corporation,

|  |  |
|---|---|
| Plaintiffs, | Civil Action No. 24-cv-08617 |
| | Judge: Hon. John Robert Blakey |
| v. | |
| BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, ADVANCE MAGAZINE PUBLISHERS, INC., d/b/a THE NEW YORKER, and UNKNOWN INDIVIDUALS AND COMPANIES, | |
| Defendants. | |

~~Case No. 2024L003661~~

**~~SECOND~~THIRD AMENDED COMPLAINT AT LAW**

NOW COME the Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, and for their Second Amended Complaint at Law against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, ADVANCE MAGAZINE PUBLISHERS, INC., d/b/A THE NEW YORKER, and UNKNOWN INDIVIDUAL(S) AND COMPANIES, state as follows:

**PARTIES**

1.      SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company (hereafter "Skycoin") is a consortium of related entities involved in the development of software, hardware, design, manufacturing, and services operating under the consumer brand name "Skycoin," which includes Skycoin Global Foundation, Symbolic Analytics Inc., Shellpay China, and other entities that are responsible for regional operations or management of specific assets of Skycoin's global operations.

2.      Skycoin created 100 million Skycoin Tokens during its launch in 2013, which were distributed and traded on various exchanges by 2017.

3.      The peak market capitalization of all existing Skycoin Tokens reached $5 billion USD in January 2018.

4.      Skycoin is a private company organized under the laws of Singapore, its principal place of business located at 2 Venture Drive, #11-31, Vision Exchange, Singapore.

5.      Plaintiff SYMBOLIC ANALYTICS, INC. ("SA") is a private company organized under the laws of Delaware, United States.

6.      Plaintiff, BRANDON SMIETANA ("Smietana") is an individual citizen of the United States and is the Chief Software Architect and authorized representative of Skycoin and SA.

7.      Defendant BRADFORD STEPHENS ("Stephens") is an individual citizen of domiciled the City of Chicago and State of New YorkIllinois, United States.

8.      On information and belief, Defendant JOEL WAYNE CUTHRIELL ("Cuthriell") is an individual citizen ofdomiciled in the State of Oklahoma, United States.

9.      Defendant AARON KUNSTMAN ("Kunstman") is an individual citizen ofdomiciled in the State of Wisconsin, United States.

10.     "Sudo" is a network of similarly named Telegram accounts, operated by a minimum of four persons. At least one of these persons is known to be Kunstman. Stephens is widely believed to also be one of the account operators. The other two or more operators are currently unknown.

11.     Defendant CATHERINE BYERLY ("Byerly") is an individual ~~citizen of~~domiciled in the State of Florida, United States.

12.     Byerly was employed by a marketing company called 22 Acacia Consulting, located in Chicago, Illinois.

13.     Byerly was hired by Stephens through her employment at 22 Acacia Consulting to perform marketing services for Skycoin.

14.     Defendant MORGEN PECK ("Peck") is a privately paid journalist and individual ~~citizen of~~domiciled in the State of New York, United States.

15.     Defendant ADVANCE MAGAZINE PUBLISHERS, INC., d/b/a THE NEW YORKER ("Advance") is a global mass media company in the business of producing world leading print, digital, video, and social media brands organized under the laws of the State of New York.

16.     Advance is the owner, operator, and publisher of The New Yorker Magazine ("The New Yorker"), a prominent American weekly magazine.

17.     On August 28, 2021, Peck authored an article published in The New Yorker titled *Pumpers, Dumpers, and Shills: The Skycoin Saga* (the "New Yorker Article").[1] A copy of the New Yorker Article is attached hereto as Exhibit A.

---

[1] The article can be found at: https://www.newyorker.com/tech/annals-of-technology/pumpers-dumpers-and-shills-the-skycoin-saga

18.     Stephens, recognizing the success of Skycoin, devised a plan and scheme to defraud, extort, and steal money and assets from Skycoin in concert with some or all of the other named party Defendants.

### JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1), 1332(a)(2) and 1332(a)(3) given that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and in addition thereto, this civil action is between (a) citizens of different States (28 U.S.C. § 1332(a)(1)),(b) citizens of a State and a citizen or subject of a foreign state who are not domiciled in the same state (29 U.S.C. § 1332(a)(2)), and/or (c) citizens of different States and in which a citizen or subject of a foreign state is an additional party (28 U.S.C. § 1332(a)(3)).

20.     This Court may exercise supplemental subject matter jurisdiction over all counts contained in this Third Amended Complaint pursuant to 28 U.S.C. §§ 1367 because the claims arise out of the same core or nucleus of operative fact as the other claims and are so related to those claims that they form part of the same case or controversy. The Plaintiffs also have a common interest in one or more of the claims.

21.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) because the Defendant Stephens resides in the Northern District of Illinois.

### FACTS COMMON TO ALL COUNTS

22.     ~~19.~~On or about January 8, 2018, Plaintiffs entered into discussions with Stephens to develop, launch, and manage a comprehensive marketing and brand awareness program for Skycoin, including but not limited to revamping Skycoin's website, performing search engine

optimization ("SEO") services, and generating positive publicity for Skycoin (hereafter referred to as the "Marketing Program").

23. 20.On or about January 8, 2018, Stephens represented himself to be the owner of Smolder LLC, a marketing startup company, to which the payments would be made for the Marketing Program.

24. 21.Stephens claimed that his business partners were Ryan Eagle ("Eagle"), Adam Young ("Young"), and Harrison Gevirtz ("Gevirtz") (Stephens, Eagle, Young, and Gevirtz will collectively be referred to hereinafter as the "Smolder Partners").

25. 22.Stephens represented to Plaintiffs that he, along with the other Smolder Partners, would be providing the marketing services contemplated by the Marketing Program.

26. 23.Stephens represented to Plaintiffs that Eagle and Young were the individuals who would receive Plaintiffs' payments and that they were responsible for handling the money.

27. 24.Stephens represented to Plaintiffs that the Smolder Partners were "inseparable" and that all business activities they conducted were done jointly and that payment for said activities was to be shared or split between them.

28. 25.Unbeknownst to Plaintiffs, Stephens and Eagle were prohibited from engaging in activities such as the Marketing Program pursuant to an order from the Federal Trade Commission dated February 19, 2014 ("the FTC Order"). *See Federal Trade Commission v. CPA Tank, Inc., Vito Glazers, Eagle Web Assets, Inc., and Ryan Eagle,* Case No. 14-cv-1239.

29. 26.At all times relevant herein, Stephens was aware that pursuant to the FTC Order, he could not accept payments for marketing activities.

30. 27.Stephens never informed Plaintiffs of the existence of the FTC Order and further violated it by offering to provide marketing services to Plaintiffs.

31. ~~28.~~If Plaintiffs had known about the FTC Order and/or if Stephens had not lied about and concealed the FTC Order, Plaintiffs would not have entered into the Marketing Program with Stephens and the Smolder Partners.

32. ~~29.~~Plaintiffs reached an oral agreement with Stephens to implement the Marketing Program, and as part and parcel of that agreement, paid the Smolder Partners $107,948.00 ($66,258.00 in the form of four (4) Bitcoins and $41,690.00 in the form of 1,100 Skycoin Tokens) (the "Initial Payment"). The Initial Payment included an expense budget for an upcoming industry conference in Las Vegas, Nevada. Plaintiffs and Stephens explicitly agreed that as part of their agreement, any expense in excess of $1,000.00 would require prior approval from Skycoin.

33. ~~30.~~In addition to the Initial Payment, Plaintiffs paid the Smolder Partners approximately $800,000.00 in Skycoin Tokens for an internet advertising campaign.

34. ~~31.~~Shortly after receiving the Initial Payment, Stephens submitted two additional invoices for certain work allegedly performed by Byerly totaling approximately $14,752.44.

35. ~~32.~~On or about January 12, 2018, Stephens and Byerly notified Plaintiffs of a potential crisis that could critically impact Skycoin's business, marketing, and internet presence. As represented by Stephens and Byerly, an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website. Such content would function to decrease Skycoin's website's ranking precipitously in search engines and irrevocably damage Skycoin's image, reputation, and internet presence.

36. ~~33.~~In order to combat the internet attack by said third party, Stephens represented to Plaintiffs that an additional payment of $38,000.00 would be required.

37. ~~34.~~On or about January 14, 2018, and January 19, 2018, Skycoin paid the Smolder Partners the requested $38,000.00.

38. 35.The attack on Skycoin's website damaged Skycoin's SEO ranking and significantly reduced internet traffic to Skycoin's website.

39. 36.In January of 2018, Skycoin made the following payments to the Smolder Partners in connection with the Marketing Program:

    a. January 11, 2018: 20,000 Skycoin Tokens ($842,400.00) for the Marketing Program budget;

    b. January 13, 2018: One (1) Bitcoin ($14,314.00) for a conference in Miami, Florida;

    c. January 16, 2018: 3,899 Skycoin Tokens ($121,337.00) for the Marketing Program budget;

    d. January 18, 2018: Two (2) Bitcoins ($23,212.00) and 2,625 Skycoin Tokens ($80,929.00) for Marketing Program labor costs; and

    e. January 19, 2018: Four (4) Bitcoins (56,457.00) and a separate payment of 1.30 Bitcoin for the Marketing Program and to combat the aforementioned attacks on Skycoin's website. These services were never performed.

40. 37.In late January to early February 2018, Stephens demanded that Skycoin pay the Smolder Partners $100,000.00 per month to ward off the supposed third-party attacks on Skycoin's website. Stephens later increased his monthly demand to $300,000.00 in order to quell the attacks.

41. 38.In early February of 2018, Plaintiffs discovered that in actuality, there was no third party attacking Skycoin's website. Rather, the attack was instigated by Stephens and the Smolder Partners as a fraudulent means to extract additional funds from Skycoin. The invoices submitted by Stephens to combat the alleged "attacks" were fabricated.

42. 39.In early February of 2018, SA received deficient invoices that were highly suggestive of fraud. Upon determining that there may be fraud in the Smolder Partners' invoices, Plaintiffs discontinued all additional payments.

**DEFENDANTS' EXTORTION**

43. 40. Upon Skycoin's refusal to pay Stephens the monthly payments requested in or around February 2018, Smietana and Stephens met in Shanghai, China, with Eagle joining the meeting via Zoom.

44. 41. During this meeting, Stephens threatened to have Skycoin delisted from all exchanges including, for example, Bittrex and Binance, unless Smietana agreed to pay him $30,000,000.00 in Bitcoin and $1,000,000.00 in US Dollars.

45. 42. Stephens' threats included statements that failure to comply would result in Skycoin's destruction and the price of Skycoin being driven to zero.

46. 43. Stephens also threatened that if Plaintiffs refused to pay, he would block Skycoin from being listed on Bitfinex, another prominent online cryptocurrency exchange, and would interfere with Plaintiffs' contracts so as to ensure that "no one would work with" Plaintiffs.

47. 44. Stephens attempted to blackmail Plaintiffs into making Stephens the COO of Skycoin and put him in control of the management of the company. Stephens also attempted to blackmail Plaintiffs into giving Gevirtz control of all Skycoin's bank accounts.

48. 45. Smietana, in fear of Stephens' threats, capitulated to their demand and initiated the first of three (3) extortion payments on or about February 9, 2018, in the amount of $127,000.00 (the "Extortion Payments").

49. 46. On or about February 22, 2018, the Marketing Program engagement between Plaintiffs and the Smolder Partners ended due to pressure from Skycoin's advisory board because of the discovery of the fraudulent invoicing and business practices.

50. 47. Plaintiffs requested a refund of the unspent prepayments made for the Marketing Program, however, the Smolder Partners refused to return any of said money.

51. 48.In and around the time Stephens demanded the Extortion Payments from Smietana, he and the Smolder Partners also attempted to hostilely seize control of Skycoin. Specifically, Stephens threatened to orchestrate the publication of a series of negative and damaging articles through various print and online media sources unless Smietana made Stephens COO of Skycoin.

52. 49.The Sudo account run by Stephens and/or Kunstman openly admitted their involvement in maintaining the Sudo account and that they were "trying to extort [S]ynth…for $1,000,000.00," through threatening to have published a series of articles and lies about Smietana and Skycoin and that they had a team of twelve (12) individuals who would be splitting the money (See Exhibit B).[2]

53. 50.In furtherance of this conspiracy and plan to take over Skycoin, Stephens paid journalist Tristian Greene ("Greene") to write and publish the article on The Next Web entitled *Skycoin: Anatomy of a cryptocurrency scam*, February 15, 2018 - 10:47 pm UTC under an anonymous name.[3]

54. 51.The negative article caused severe damage to the price of Skycoin Tokens and to Skycoin's reputation. Stephens openly admitted that he was responsible for paying Greene to publish the article but went to Skycoin's investors and claimed that Smietana had ordered him to have a negative article published to intentionally destroy the price of Skycoin Token.

55. 52.Stephens attempted to organize a management and investor revolt in order to transfer control of the company to himself under the pretense that the unlawful actions Stephens himself had performed were in fact performed by Smietana.

---

[2] "Synth" is Smietana's online persona.

[3] The article can be found at: https://thenextweb.com/news/anatomy-of-a-cryptocurrency-scam-in-the-wild

56. ~~53.~~Greene later cited that same article in another negative Skycoin article on The Next Web, in an article titled Exclusive: *We suspected this shady cryptocurrency project was a scam. Now we're sure of it*. Published March 8, 2018, 3:22 am UTC.[4]

57. ~~54.~~A key part of Skycoin's business plan was to be listed on the Bittrex Exchange. The Bittrex Exchange is a world-wide trading platform that facilitates real-time order execution of crypto currencies, such as Skycoin.

58. ~~55.~~Skycoin devoted significant resources to obtain a Bittrex listing, which had been negotiated through a third party.

59. ~~56.~~Knowing that Skycoin was about to obtain a Bittrex listing, on or about February 25, 2018, Stephens threatened Smietana that unless Smietana paid him, he would approach Bittrex and purposely interfere with Skycoin's third-party relationships to prevent Skycoin from being listed on Bittrex.

60. ~~57.~~Smietana refused to pay the money demanded by Stephens, and in turn he did, in fact, provide untrue information to Bittrex and which ultimately led to the spread of false rumors regarding Skycoin and Skycoin ultimately not being listed on the Bittrex Exchange.

61. ~~58.~~Between February 26, 2018 and March 9, 2018, Stephens and Byerly stole access to Skycoin's media accounts, including but not limited to, Skycoin's Shopify store, Twitter account, LinkedIn account, Slack channel account, and accounts associate with the operation of Skycoin's website. These media accounts were an integral and necessary component of Skycoin's business.

62. ~~59.~~On or about October 18, 2018, Stephens demanded over $150,000.00 for return of Skycoin's stolen computer-based assets and media accounts.

---

[4] The article can be found at: https://thenextweb.com/news/exclusive-we-suspected-this-shady-cryptocurrency-project-was-a-scam-now-were-sure-of-it

63. 60. On or about May 24, 2018, Binace announced that it would list Skycoin on its exchange. Binance holds itself out as the "world's largest crypto exchange" and is a trading platform where customers can buy and sell cryptocurrencies. It is highly desirable for cryptocurrencies to be listed on the Binance exchange.

64. 61. After Smietana refused to pay the Extortion Payments demanded by Stephens, Stephens conspired with Yan Xiandong, Li Min, Sam Sing Fond and Sun Fei (collectively the "Assailants") in a plot to kidnap Smietana and his girlfriend and steal $30,000,000.00 that Stephens claimed he was due from Skycoin.

65. 62. In furtherance of the conspiracy with Stephens to kidnap Smietana and his girlfriend and steal money from them, the Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

66. 63. Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin Tokens with a market value of $81,018.98, totaling $220,179.31.

67. 64. During the siege and home invasion, the Assailants called Stephens and complained that they did not find the thousands of Bitcoin promised to them.

## DEFENDANTS' THEFT OF ACCOUNTS

68. 65. Prior to the conclusion of Stephens' work with Skycoin, upon notice of his separation, the company made a list of all accounts to which Stephens had authorized access and thereinafter terminated his access to those accounts.

69. 66.Skycoin staff contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

70. 67.SA staff and members of Skycoin contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

71. 68.Stephens acknowledged that there were unspent funds due back to Plaintiffs, however, instead of returning the money due, Stephens hacked into the various company accounts and began to engage in a series of extortion and fraudulent acts against Skycoin.

72. 69.Stephens and Byerly changed the passwords to some of the company accounts, locked Skycoin and SA out of them, and then attempted to extort the company for an additional $150,000.00.

73. 70.Stephens and Byerly also refused to return the unspent money that was prepaid and allocated for marketing services. The amount due back to Skycoin and SA was in excess of $800,000.00.

74. 71.Plaintiffs incurred considerable expense to regain access to the stolen accounts and to migrate the content to the reacquired accounts. Those accounts included, but were not limited to, the Medium Account, Shopify, Twitter, Skycoin Telegram, Skycoin Rewards, Facebook, and LinkedIn.

## DEFENDANTS' UNAUTHORIZED EXPENSES

75. 72.Stephens and Byerly engaged in various schemes to defraud Skycoin and attempted to invoice unapproved, non-business-related costs including a Las Vegas prostitute orgy, unsubstantiated ATM withdrawals, personal entertainment costs, and what is believed to

be money for the purchase of drugs. These expenses were neither approved by Skycoin nor related to any legitimate business activities.

76. ~~73.~~For example, Stephens sent invoices to Skycoin totaling $50,000.00 for cash payments for two days in Las Vegas. Despite several requests, Stephens refused to produce ATM receipts for the $50,000.00 expense, could not explain how the cash was used, could not show that the expenses were business related, could not justify the amount spent, and could not produce receipts for any "cash payments."

77. ~~74.~~Stephens and Byerly billed SA for subcontractors without seeking prior authorization from Plaintiffs for such payments.

78. ~~75.~~Stephens and Byerly engaged in a scheme to defraud Plaintiffs by invoicing full time rates for subcontractors employed part time and even invoicing Company for nonexistent persons.

79. ~~76.~~Stephens and Byerly billed for subcontractor work that not only both pre-dated and post-dated the Marketing Program, but which also included full time rates for part-time work and also included invoicing from nonexistent subcontractors.

80. ~~77.~~Stephens and Byerly billed for invalid date periods, such as submitting invoices for billing periods prior to the Marketing Program and work performed for billing periods after the termination of their relationship with Skycoin.

81. ~~78.~~Stephens and Byerly attempted to bill for costs which had not been submitted to the Company for preapproval and made misrepresentations to Skycoin staff, including Skycoin's Head of Events, who was responsible for event budgets. Stephens made false misrepresentations claiming that these expenses had received approval, and that the Company had been notified of the expenses.

82. ~~79.~~Stephens and Byerly attempted to bill the company for unapproved "events" on non-existent dates. Additionally, there were several other strong indicators that many or all of the claimed expenses were fraudulent or manufactured.

## BINANCE DELISTING

83. ~~80.~~In and around June of 2020, because Smietana refused to capitulate to the extortion demands, Stephens, in conjunction with Kunstman and others, embarked upon a scheme and plan to delist Skycoin from Binance and effectively destroy Skycoin's reputation and depress Skycoin Tokens' market value.

84. ~~81.~~In furtherance of this plan and scheme, Stephens solicited other individuals to make false complaints against Skycoin in order to have Binance delist Skycoin from the exchange. The false complaints they directed others to make to Binance to achieve the delisting are as follows:

   a. That Skycoin sells Skycoin Tokens customers outside of the Binance exchange but after receiving the funds, never sends those customers the Skycoin Tokens for which they paid;

   b. That individuals from Skycoin would privately meet with customers and accept payment for Skycoin Tokens at 15% below market value;

   c. After customers consummated such side transactions, they would immediately "dump" the Skycoin Tokens on the market;

   d. That Smietana would request that customers privately pay him $1,000,000.00 in Bitcoin or cash for discounted Skycoin Tokens that they could then "dump" on the market immediately and achieve a $150,000.00 profit; and

   e. That Smietana and Skycoin launders money through customers by promising them an immediate 15%-20% profit through the unauthorized purchase of Skycoin Tokens.

85. ~~82.~~Upon information and belief, Cuthriell and other persons were hired to harass Skycoin and interfere with Skycoin's relationships with exchanges and partners corporations, made public statements in Telegram channels bragging that they had paid journalists to publish articles to slander the company, and even publicly discussed the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance.

86. ~~83.~~As part of their plan and scheme to have Skycoin delisted from Binance, Stephens, Kunstman, and Cuthriell also orchestrated having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless complaints.

87. ~~84.~~As further evidence of the conspiracy, Cuthriell publicly congratulated all persons involved in the Binance delisting of Skycoin with the exclamation of "Nice work team" and "PARTY TIME."

## <u>COUNT I</u>
## FRAUD – BRADFORD STEPHENS AND CATHERINE BYERLY

88. ~~85.~~Plaintiffs repeat and reallege paragraphs 1 through ~~84~~87 of this ~~Second~~Third Amended Complaint at Law as and for Paragraph ~~85~~88 of this Count I as if fully set forth herein.

89. ~~86.~~Stephens approached Plaintiffs representing himself as a legitimate advertising and marketing firm, with Stephens and Eagle Web Assets (EWA) as "business partners" involved in every aspect of the "business."

90. ~~87.~~EWA is and/or was a business owned and/or operated by Eagle, Gevirtz, and Young.

91. ~~88.~~Plaintiffs would later learn that EWA and Eagle, Gevirtz, and Young had a history of litigation and that these persons were under an FTC Order for fraudulent marketing practices.

92. ~~89.~~Stephens and Byerly represented to Smietana that they would provide advertising and marketing services, including web design, online advertising, conference events, and display advertising.

93. ~~90.~~Stephens represented to Smietana that he would provide advertising, web design, and marketing services for Plaintiffs in return for payment.

94. ~~91.~~In reality, Stephens had no intention of providing any advertising, web design, or marketing of any kind for Plaintiffs.

95. ~~92.~~Stephens and Byerly, in fact, did not provide any advertising or marketing services for Plaintiffs.

96. ~~93.~~Stephens and Byerly never provided any web design services on behalf of Plaintiffs.

97. ~~94.~~In reliance upon the representations of Stephens and Byerly, Plaintiffs paid them approximately $800,000.00 for their services and the costs of advertising and marketing.

98. ~~95.~~When asked, Stephens and Byerly represented to Smietana that they had no prior lawsuits that had been filed against them.

99. ~~96.~~These representations were knowingly false when made.

100. ~~97.~~In fact, Stephens' business partners, Eagle and Gevirtz, had an extensive history of litigation and had been named in multiple lawsuits and were subject to an FTC injunction for fraudulent marketing practices.

101. ~~98.~~Following the payment of the initial $800,000.00, Defendants Stephens and Byerly requested additional money, including an additional $60,000.00.

102. ~~99.~~Stephens and Byerly made these representations to Smietana and other Skycoin staff with the intent to induce payments and defraud Plaintiffs.

103. ~~100.~~These statements made by Stephens and Byerly were false when made.

104. ~~101.~~ Stephens and Byerly created scenarios and orchestrated fraudulent crises, making numerous misrepresentations, solely for the purpose of soliciting more money from Plaintiffs.

105. ~~102.~~ Stephens and Byerly made the following misrepresentations and/or omissions upon which Plaintiffs justifiably relied to their detriment:

    a. Lied about, concealed, and denied history of litigation against Defendants' associates, business partners, and former corporations;

    b. Failed to inform Plaintiffs of the FTC Order and government sanctions against their former company, even when explicitly asked about any history of litigation prior to payment and contract negotiations;

    c. Falsely represented that an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website;

    d. Falsely agreed to seek written pre-approval from the Company for incurred expenses;

    e. Falsely represented that they would provide marketing and advertisement services to Plaintiffs;

    f. Falsely represented that they would provide web design services to Plaintiffs; and

    g. Falsely represented the expenses and costs of said marketing and advertising services.

    (*See also* Facts Common to All Counts)

106. ~~103.~~ Plaintiffs relied upon the representations of Stephens and Byerly and paid them the requested amounts.

107. ~~104.~~ As a direct and proximate result of Stephens and Byerly's improper actions, Plaintiffs have sustained substantial economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and damage to their reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a

Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully

pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS

and CATHERINE BYERLY, and each of them, in an amount in excess of $~~50,000.00~~75,000.00,

plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable

Court deems just and equitable in the premises.

## <u>COUNT II</u>
## FRAUD – BRADFORD STEPHENS, AARON KUNSTMAN, AND
## JOEL WAYNE CUTHRIELL

108.   ~~105.~~Plaintiffs repeat and reallege Paragraphs 1 through ~~84~~87 of this ~~Second~~Third

Amended Complaint at Law as and for Paragraph ~~105~~108 of this Count II as if fully set forth

herein.

109.   ~~106.~~On or about January 8, 2018, Plaintiffs entered into an oral agreement with

Stephens, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing

services for Plaintiffs.

110.   ~~107.~~Following that agreement, Stephens defrauded Plaintiffs by failing to provide

the contracted services, creating false "threats," and extorting funds from Plaintiffs through

coercion. Once discovered, Plaintiffs attempted to distance themselves from Defendants.

However, in retaliation, Stephens, Kunstman, and Cuthriell began making false online profiles

and applications with false information in order to further defraud Plaintiffs out of approximately

$2,000,000.00 worth of Skycoin product.

111.   ~~108.~~Plaintiffs offered a reward program ("Reward Program") to entice customers

to their business.

112. ~~109.~~In order to obtain a reward under the Reward Program, each participant was required to submit an application which conformed to S.A.'s terms and conditions. The terms included the following:

    a. Each customer is only allowed to have one active Skywire Rewards account within a single one month period;

    b. Each customer is allowed to claim rewards for up to 8 Skywire nodes in a one month period;

    c. Only one instance of the "Skywire Node" software can be run on a single physical computer;

    d. Each customer may operate only a single reward program account within a one month period;

    e. Each computer claiming a reward must be a physically separate and independent computer; and

    f. It is a violation of the Rewards Program terms and service for a user to run more than one Skywire node per physical computer.

113. ~~110.~~Cuthriell and Stephens developed software to run over 300 "nodes" on a single physical computer in order to defraud the Reward Program.

114. ~~111.~~Relying on the misrepresentations by Stephens, Kunstman, and Cuthriell, SA provided these persons rewards to which they were not entitled, totaling approximately $2-$4 million (the precise amount of which is unknown as they have continued to submit fraudulent applications continuously and under multiple fake aliases).

115. ~~112.~~Plaintiffs relied upon the information provided in those online applications and profiles.

116. ~~113.~~Had Plaintiffs known that these profiles and applications were being generated and submitted by Stephens, Kunstman, and Cuthriell repeatedly in order to accumulate Skycoin under false pretenses, Plaintiffs would not have made Reward Program payments to Stephens, Kunstman, and Cuthriell.

117. 114.Stephens, Kunstman, and Cuthriell made these repeated false representations to Plaintiffs through these applications and profiles even though they knew that they were false and made under false pretenses, with an intent to induce Plaintiffs into providing the $2-$4 million in digital payments/digital assets/digital currency.

118. 115.Stephens, Kunstman, Cuthriell have at all relevant times perpetuated and deliberately concealed this fraud from Plaintiffs.

119. 116.Stephens, Kunstman, and Cuthriell have engaged in a scheme to defraud Plaintiffs by consistently attempting to conceal this fraud and continue to submit false applications and profiles to Plaintiffs.

120. 117.Plaintiffs relied upon the accuracy and truthfulness of the submitted applications and profiles, and, had Plaintiffs been aware that the representations of Stephens, Kunstman, and Cuthriell were false, Plaintiffs would not have acted as they did.

121. 118.As a direct and proximate result of Stephens, Kunstman, and Cuthriell's improper actions and misrepresentations, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, and JOEL WAYNE CUTHRIELL, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

**COUNT III**
**CIVIL CONSPIRACY – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS AND COMPANIES**

122. ~~119.~~Plaintiffs repeat and reallege Paragraphs 1 through ~~84~~87 of this ~~Second~~Third Amended Complaint at Law as and for Paragraph ~~119~~122 of this Count III as if fully set forth herein

123. ~~120.~~Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies conspired to destroy Skycoin's reputation and Plaintiffs' business by publishing false and inflammatory news articles and to extort Plaintiffs of money through making monetary demands in exchange for the articles not being published.

124. ~~121.~~Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies' acts in furtherance of the conspiracy included, but were not limited to:

    a. Creating and employing a network of journalists to publish fraudulent articles to destroy Skycoin's image and reputation in order to drive down the price of Skycoins; and

        i. Greene, a journalist and reporter, was employed by Stephens and knowingly published false articles regarding the legitimacy of Skycoin and Skycoin's technology;

            1. Greene was within Stephens's network and at all times knew Stephens was not the COO of Skycoin, yet published that he was, and continued to publish false information even after Smietana's continuous attempts to correct the false claims.

    b. Employing Peck to knowingly write the false and defamatory New Yorker Article alleging that Skycoin a fraud and a scam;

    c. Publishing an article in Cointelegraph by Simon Chandler, claiming that Plaintiffs' attackers were "emboldened" to physically harm Smietana due to Skycoin's "shady dealings;"

    d. Soliciting individuals to make false complaints against Skycoin in order to have Skycoin delisted from the Binance Exchange;

e.  Stealing access to Skycoin's media accounts and demanding over $150,000.00 for return of the accounts;

f.  Refusing to return unspent money that was prepaid and allocated for marketing services;

g.  Invoicing unapproved and non-business-related costs and personal entertainment costs;

h.  Invoicing Skycoin and/or SA for $50,000.00 in cash payments and refusing to provide an explanation or receipts for how the cash was used;

i.  Invoicing Skycoin and/or SA for subcontractors without prior authorization;

j.  Invoicing Skycoin and/or SA full time rates for part-time subcontractors;

k.  Invoicing Skycoin and/or SA for payment to non-existent persons;

l.  Invoicing Skycoin and/or SA for marketing services performed both before and after the company's relationship with Defendants;

m.  Made false representations to Skycoin staff that costs had been approved by Skycoin when they knew said costs had not been approved;

n.  Invoicing Skycoin and/or SA for unapproved "events" on non-existent dates; and

o.  Creating false online profiles and Rewards Program applications with false information in order to defraud Skycoin of $2-$4 million.

(*See also* Facts Common to All Counts)

125.  ~~122.~~Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies worked in concert with one another to accomplish this fraud as evidenced by their various communications and concerted acts against Plaintiffs.

126.  ~~123.~~Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies intended to defraud Plaintiffs out of their money, their product, and to tortiously interfere with their business relationships.

127.  ~~124.~~As a direct and proximate result of Stephens, Kunstman, Cuthriell, Peck, Byerly, and Unknown Individuals and Companies improper actions, Plaintiffs were damaged and

defamed, forced to pay large sums of money, were defrauded of $2-$4 million, and Skycoin was ultimately not listed on the Bittrex Exchange and was delisted from Binance, resulting in loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, MORGEN PECK, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $~~50,000.00~~75,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT IV
### TORTIOUS INTERFERENCE – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS AND COMPANIES

128.   ~~125.~~Plaintiffs repeat and reallege Paragraphs 1 through ~~84~~87 of this ~~Second~~Third Amended Complaint at Law as and for Paragraph ~~125~~128 of this Count IV as if fully set forth herein.

129.   ~~126.~~Plaintiffs developed business relationships and contracts with various vendors and customers since Skycoin's launch in 2013.

130.   ~~127.~~Skycoin sells non-fungible electronic products that fluctuate in value based upon the market rates on specific internet exchanges.

131.   ~~128.~~For Skycoin to do business, it must participate in these internet exchange markets, such as, but not limited to, Bittrex, Binance, Kraken, Poloniex and Bifinex, in order to sell its goods.

132. 129.Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies orchestrated various schemes to undermine the reputation of Plaintiffs and cause these internet exchange markets, specifically, Bittrex and Binance, to remove Plaintiffs' products from their exchanges.

133. 130.Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies were fully aware of Plaintiffs' position within these internet exchange markets.

134. 131.Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies were fully aware that Plaintiffs' Skycoin Token must be sold on these internet exchange markets.

135. 132.Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies were fully aware that Plaintiffs had agreements and/or expected agreements with these internet exchange markets.

136. 133.Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies nonetheless acted in concert to cause these internet exchange markets to remove Plaintiffs' Skycoin Token from those markets by committing the following acts:

    a. Stephens and Byerly hacked and linked pornographic blogs and other harmful spam content to Skycoin's website to decrease Skycoin's website's ranking precipitously in search engines and irrevocably destroy Skycoin's image, reputation, and internet presence;

    b. Stephens, Kunstman, Cuthriell, and Byerly created and employed a network of journalists to publish fraudulent articles to destroy Skycoin's image and reputation in order to drive down the price of Skycoins;

        i. Greene, a journalist and reporter, was employed by Stephens and knowingly published false articles regarding the legitimacy of Skycoin and Skycoin's technology;

        ii. Greene was within Stephens's network and at all times knew Stephens was not the COO of Skycoin, yet published that he was, and continued to

publish false information even after Smietana's continuous attempts to correct the false claims;

c.  Stephens, Kunstman, Cuthriell, and Byerly employed Peck to knowingly write a false and defamatory article published in The New Yorker alleging Skycoin as a fraud and a scam;

d.  Stephens solicited an article to be published in Cointelegraph by Simon Chandler, claiming that Plaintiffs' attackers were "emboldened" to physically harm Smietana due to Skycoin's "shady dealings;"

e.  Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies made public statements bragging that they had paid journalists to publish articles to slander the company;

f.  Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies publicly discussed the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance; and

g.  Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies orchestrated having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless allegations.

(*See also* Facts Common to All Counts)

137. 134. At all relevant times herein, Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies intended to cause harm to Plaintiffs' reputation and finances in order to interfere with their relationships with these internet exchange markets, along with their customers and vendors.

138. 135. As a direct and proximate result of Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully

pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS,

AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and

UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of

$~~50,000.00~~75,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for

Plaintiff as this Honorable Court deems just and equitable in the premises.

**<u>COUNT V</u>**
**UNJUST ENRICHMENT – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL**
**WAYNE CUTHRIELL, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS**
**AND COMPANIES**

<u>139.</u> ~~136.~~Plaintiffs repeat and reallege Paragraphs 1 through ~~84~~87 of this ~~Second~~Third

Amended Complaint at Law as and for Paragraph ~~136~~139 of this Count V as if fully set forth

herein.

<u>140.</u> ~~137.~~Defendants were provided approximately $860,000.00 in funds to provide

marketing, advertising, and web design services to Plaintiffs.

<u>141.</u> ~~138.~~Specifically, Plaintiffs made the following payments to Stephens,

Kunstman, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder

Partners:

a. $107,948.00 ($66,258.00 in the form of four (4) Bitcoins and $41,690.00 in the form of 1,100 Skycoin Tokens) in an initial payment for the Marketing Program paid to Smolder Partners;

b. $800,000.00 in Skycoin Tokens paid to Stephens for an internet advertising campaign;

c. $14,752.44 paid to Stephens and Byerly as a result of a fraudulent invoice;

d. $38,000.00 to Stephens in order to quell the cyber attacks initiated by Stephens;

e. 20,000 Skycoin Tokens ($842,400.00) to Smolder Partners for the Marketing Program budget;

f. One (1) Bitcoin ($14,314.00) to Smolder Partners for a conference in Miami, Florida;

g.  3,899 Skycoin Tokens ($121,337.00) to Smolder Partners for the Marketing Program budget;

h.  Two (2) Bitcoins ($23,212.00) and 2,625 Skycoin Tokens ($80,929.00) to Smolder Partners for Marketing Program labor costs;

i.  Four (4) Bitcoins (56,457.00) and a separate payment of 1.30 Bitcoin to Stephens for the Marketing Program and to combat the aforementioned attacks on Skycoin's website; and

j.  $127,000.00 as part of the Extortion Payments to Stephens and

Eagle. (*See also* Facts Common to All Counts)

142. ~~139.~~In addition to the payments made by Plaintiffs, the Assailants, in connection with their conspiracy with Stephens, stole 18.88 Bitcoin ($139,160.33) and 6,466 Skycoin ($81,018.98), totaling $220,179.31 from Plaintiffs.

143. ~~140.~~Stephens, Kunstman, Cuthriell, Byerly, and Unknown Individuals and Companies also obtained approximately $2-$4 million in Skycoin Tokens through false reward applications.

144. ~~141.~~Stephens, Kunstman, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners invoiced and charged Plaintiffs for work that was never completed.

145. ~~142.~~These funds and goods were not earned, were stolen by fraudulent means, and Plaintiffs received no equivalent value for them in return.

146. ~~143.~~It would be unconscionable and against fundamental principles of justice, equity and good conscience for Stephens, Kunstman, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners to retain the benefit from those funds, which were paid by Plaintiffs without receiving any benefit in return.

147. ~~144.~~As a direct and proximate result of Stephens, Kunstman, Cuthriell, Byerly, Unknown Individuals and Companies, and/or the Smolder Partners' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $~~50,000.00~~75,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT VI
### DEFAMATION – BRADFORD STEPHENS AND MORGEN PECK

148. ~~145.~~Plaintiffs repeat and reallege Paragraphs 1 through ~~84~~87 of this ~~Second~~Third Amended Complaint at Law as and for Paragraph ~~145~~148 of this Count VI as if fully set forth herein.

149. ~~146.~~The New Yorker is an American weekly magazine publication owned and published by Defendant Advance.

150. ~~147.~~At all times relevant herein, Peck was an actual agent of Advance.

151. ~~148.~~At all times relevant herein, Peck was an apparent agent of Advance.

152. ~~149.~~At all times relevant herein, Peck was acting within the course and scope of her authority as an agent of Advance.

153. ~~150.~~At all times relevant herein, Peck was acting within the course and scope of her authority as an apparent agent of Advance.

154. ~~151.~~On Aug 18, 2021, the New Yorker Article authored by Peck was published in The New Yorker (*see* Ex. A).

155. ~~152.~~The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

156. ~~153.~~Peck published blatant lies and misrepresentations about Plaintiffs in her New Yorker article including, but not limited to the following:

    a. Misrepresenting Smietana's relationship with Stephens and Stephens's involvement with Skycoin and Skycoin's marketing campaign;

    b. Statements alluding to Smietana and Skycoin as a fraud and a scammer, such as:

        i. "In a way, it makes you into a fraud;"
        ii. "Is it a scam? I'm 99 percent sure of it"; and

        iii. Suggesting that Skycoin was part of a "pump and dump" scheme.

    c. Falsely stating that Stephens has recordings of Smietana stating, "We want to feminize the peasant population to make them more docile ... [i]t's so they don't revolt;"

        i. Smietana asked Peck on multiple occasions about the existence of the alleged recording to verify the contents of her claims for this statement, however Peck never confirmed that she obtained such a recording, even though it was used as a purported source for factual information in the article.

        ii. Smietana denied such statements to Peck multiple times, each time reiterating that they were fabricated and untrue. Peck still published the statements.

        iii. Peck admitted to Smietana that no one she interviewed would corroborate the quotes given by Stephens. Therefore, Peck knew or should have known the published quotes were false.

    iv. Peck knew that Stephens and Kunstman were members of the Neo Nazi alt- right internet forum "/pol/" and that similar antisemitic quotes were circulated there.

    v. As a result of the publication of the article, a Neo Nazi publication cited to the false statement from Peck's article quoting Smietana, and thereby causing damage to Plaintiffs' reputation.

    vi. As a result of the publication of this statement, Smietana was subjected to numerous death threats, harassment, and various hate crimes.

d. Falsely stating that Smietana invited Binance executives to a Skycoin party during a 2018 conference in Las Vegas and instructed Stephens to hire prostitutes for the executives;

    i. In fact, it was confirmed there were no Binance executives at the conference and the party was a private party of Stephens, without any affiliation to Skycoin or Plaintiffs.

    ii. Stephens's job was to set up meetings at conferences. He unilaterally held a private party without instruction to do so. Any approval for holding an event was contingent upon finding people from Binance, who were, in fact, not in attendance at the conference.

    iii. This inaccurate depiction of events was designed to destroy the relationship between Binance and Skycoin and was manufactured solely to do damage to Plaintiffs' reputation and business.

    iv. Peck knew or should have known the statements were false because Smietana sent her the messages from Stephens relating to the conference.

    v. Peck interviewed Michael Terpin (the event organizer) and Daken Freebourne (Skycoin's head of events), who explicitly told Peck that Stephens was a compulsive liar and that his account was fabricated.

    vi. Peck merged stories from three separate conferences into a non-factual and defamatory account, designed to inflict damages to Plaintiffs.

e. Publishing conclusory and unsupported statements by others;

    i. Stating that "according to several people" (without any evidence or support), that Skycoin privately sold to investors at a discounted rate;

    ii. Publishing numerous unsupported statements supposedly from "employees" of Skycoin, however, Peck told Smietana that she did not have documentation to show who these "employees" were, if and when they worked at Skycoin, or any confirmation of their statements; and

        iii.  Publishing statements made by people against whom she knew Smietana had an ongoing lawsuit against and therefore knew or should have known these were unreliable sources.

   f.  Falsely accusing Smietana of pre-mining "a hundred million coins, which were scheduled for circulation;"

        i.  Peck published this statement with full knowledge that Skycoin does not engage in any mining.

        ii.  During fact checking, Peck referenced a website that listed companies with pre-mine scams.[5]

            1.  The website listed "SYC Skycoin – premined" under a list titled, "List of scamcoins – do not use."

            2.  SYC Skycoin is a completely different company from SKY Skycoin (Plaintiff).

            3.  Peck knew that SYC was not Plaintiffs' company and that SYC was not SKY.

            4.  Peck falsely accused and published in her article that Skycoin engaged in a pre-mining scam.

   g.  Falsely accusing Smietana of directing Skycoin's marketing unit to purposely spread negative rumors to attract attention by stating "In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention;"

        i.  Peck does not provide support to confirm where this chat was from, who the "investors" were, or the full context of the conversations.

        ii.  The quote itself is purposely suggestive and alludes that Skycoin publishes negative rumors for promotion but does not clarify who "they" are that "spread negative rumors."

   h.  Falsely accusing Smietana of "plotting new distractions;"

        i.  In support of this claim, Peck quoted Smietana, "Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it."

---

[5] The website can be found at: https://altcoins.com/scamcoins

    ii.    Smietana was improperly quoted and Smietana's words were purposely skewed by Peck and taken out of context to defame Smietana and Skycoin.

    iii.    The quote is a snippet of a message that clearly signifies a joke, in which the full text reads "The media is retarded. They are still writing articles about the 'insider trading' of cat memes, fake news. Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it. 'Kittycash CEO beheaded by ISIS after SEC investigation.'"

i.    Purposely taking direct quotes from chatrooms/messaging conversations and placing them out of context to twist their meaning and damage Plaintiffs;

    i.    Peck wrote, "A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coordinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved)."

        1.    The quote was purposely misconstrued as it had nothing to do with insider trading channels.

        2.    It was evident from the chat conversations that any reference to any "secret insider trading" was a joke.

        3.    Peck knew that the "secret chat rooms" were, in fact, public channels, accessible to all people.

    ii.    Peck quoted Smietana as stating "If you put in a million dollars now, and we have a run just as large as the last one, you're going to be at fifty million dollars;"

        1.    This statement was knowingly taken out of context, altering its meaning, and presented Smietana in a false light.

        2.    Peck's quote claims that Smietana engaged in price promotion for Skycoin, knowing that Smietana was prohibited from making such statements by company policy and that Smietana could be fired or reprimanded for violation of company policy for making these statements.

        3.    Peck knew or should have known that these out of context statements would expose Plaintiff Smietana to legal liability and damage his reputation and business.

        4. Peck admitted to Smietana that she could find no example of Smietana engaging in price promotion.

    iii. Peck quoted Smietana as stating, "many could be corroborated only by people whom he swore existed but who couldn't talk because they had government security clearance, or were in hiding, or because he didn't know their real names;"

        1. Smietana's actual quote was, "all software developers who work in cryptography have government security clearance, because government contractors are the only clients of the industry."

        2. Peck distorted and/or manufactured, statements wholesale for the purpose of defaming Plaintiffs.

j. Falsely accusing Smietana of having sole control of the "pre-mined" coins and Skycoin's virtual wallets;

    i. It is public knowledge that Skycoin is an incorporated corporate entity and not under the sole control of one person.

    ii. Peck had possession of Skycoin's incorporation documents and corporate structure, and therefore knew or should have known that her statements were false.

k. Accusing Smietana of soliciting advice from an online personality who used a Hitler avatar in his profile;

    i. Peck admitted to Smietana during fact checking that she could not find any evidence substantiating her statement that Smietana solicited and made payments to internet users with a Hitler avatar.

    ii. Peck admitted to Smietana that only Stephens and Kunstman had made these claims, and that no other persons could corroborate these statements.

    iii. Peck continued to publish the above statement, knowing its defamatory and false nature.

l. Alleging that Smietana lied about the extent of his medical injuries sustained from the attack on himself and his girlfriend, even after publishing that Smietana's attackers admitted to detaining and injuring Smietana and his girlfriend;

    i. Smietana provided Peck with copies of court proceedings and medical records, clear evidence that the claims she published in the article were false.

m. Alleging that Smietana used the attack on himself and his girlfriend to "use his power to freeze Skycoin transactions," when Smietana clearly stated in an official announcement to the Company that funds were frozen after making sure all Skycoin staff were safe after the attack and extortion demands;

    i. Peck knew that Skycoin's lead developer, Steven Leonard, not Smietana, had initiated freezing the stolen funds from the Chinese marketing team and employee accounts after the company detected embezzlement.

    ii. Peck knew that the funds that were frozen were solely company accounts.

n. Peck implied that that Smietana had been employed as a software developer by the notorious Washington DC lobbyist, Jack Amabrov, who had several felony convictions, including a plea bargain for SEC violations; and

    i. Peck was aware that the allegations were false because the company directly informed her that Smietana had briefly spoken to them in 2018, but that no agreement had been reached.

    ii. Peck admitted that the statements were false and apologized to Smietana multiple times for bringing up false claims.

    iii. Peck knew or should have known that claiming Smietana had been employed by Jack Amabrov would cause severe damage to Plaintiffs' business and reputation.

o. Peck implied that one of Skycoin's mathematical algorithms, "Obelisk", did not actually exist and that Plaintiffs committed fraud.

    i. Peck knew that these statements were false, as she had possession of both the source codes and white paper for the algorithm.

    ii. Additionally, Skycoin's algorithm papers were published on Skycoin's website and in peer reviewed journal articles. This information was publicly available, and Peck had access to the public links to these algorithms.

    iii. Peck had this information at the time she claimed these algorithms did not exist.

157. ~~154.~~Peck wrote that "Stephens came up with a plan to strip Smietana of power and transfer management of the company to a foundation."

158. ~~155.~~Peck, knowing that Stephens' intentions were to take Skycoin from Smietana, continued to base her article on information provided mainly by Stephens, completely

disregarding his clear bias and motive to disenfranchise Smietana from Skycoin and seize control of Skycoin.

159. ~~156.~~After the New Yorker Article was published, a former employee of Stephens and Kunstman contacted Plaintiffs stating that Peck received money to intentionally produce and publish a defamatory article attacking Plaintiffs and would receive bonus payments for destroying Skycoin's relationship with Binance.

160. ~~157.~~The statements made by Peck in the New Yorker Article were purposely false and defamatory in return for financial gain and personal benefit of Peck.

161. ~~158.~~Peck acted within the scope of her agency with principal Advance when she submitted and published the New Yorker Article.

162. ~~159.~~As a direct and proximate result of Peck's defamatory and libelous publication, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

163. ~~160.~~As a direct and proximate result of Peck's libelous publication, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and MORGEN PECK, in an amount in excess of $~~50,000.00~~75,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT VII
### DEFAMATION – ADVANCE MAGAZINE PUBLISHERS, INC.,
### d/b/a THE NEW YORKER

164. ~~161.~~Plaintiffs repeat and reallege Paragraphs 1 through ~~84~~88 and Paragraphs

~~146~~149 through ~~160~~163, inclusive of subparts, of this ~~Second~~Third Amended Complaint at Law

as and for Paragraph ~~161~~164 of this Count VII as if fully set forth herein.

165. ~~162.~~Advance is a global mass media company operating various brands, including

The New Yorker.

166. ~~163.~~The New Yorker is an American weekly magazine publication owned and

operated by Advance.

167. ~~164.~~At all times relevant herein, Peck was an actual agent of Advance.

168. ~~165.~~At all times relevant herein, Peck was an apparent agent of Advance.

169. ~~166.~~The New Yorker has 6 million monthly readers, 16 million digital users, and

16.8 million social media followers.

170. ~~167.~~On August 18, 2021, Advance, by and through The New Yorker, published

the New Yorker Article authored by Peck which reached millions of readers worldwide.

171. ~~168.~~Approximately one week prior to publication, Anna Boots, Fact Checker for

The New Yorker, contacted Smietana regarding the article and stated:

 a. That Peck's article was the longest fact checking she ever had to do
   (approximately 3 months);

 b. That numerous unsubstantiated claims were made in Peck's article;

 c. That Peck interviewed Michael Terpin regarding the 2018 Las Vegas conference
   and he informed her that Stephens was an unreliable source and a compulsive
   liar;

 d. That the fact checking process was difficult to complete because almost all the
   information was provided two people, with most claims and statements being
   unsubstantiated; and

e.  That her editor at The New Yorker set a "firm publication date regardless of [fact checking] completion."

172. ~~169.~~Advance, by and through The New Yorker, published Peck's article without properly and completely fact checking the defamatory statements made and checking Peck's sources and their credibility.

173. ~~170.~~As a direct and proximate result of the defamatory and libelous publication in The New Yorker, Plaintiffs suffered economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

174. ~~171.~~As a direct and proximate result of the defamatory and libelous publication in The New Yorker, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendant, ADVANCE MAGAZINE PUBLISHERS, INC., d/b/a THE NEW YORKER, in an amount in excess of $~~50,000.00~~75,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

## COUNT VIII
### BREACH OF FIDUCIARY DUTY – BRADFORD STEPHENS, AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, AND UNKNOWN INDIVIDUALS AND COMPANIES

175. ~~172.~~Plaintiffs repeat and reallege Paragraphs 1 through ~~84~~87 of this ~~Second~~Third Amended Complaint at Law as and for Paragraph ~~172~~175 of this Count VIII as if fully set forth herein.

176. 173.At various times, Stephens, Kunstman, Cuthriell, and Byerly were acting as contractors hired by Plaintiffs to perform certain duties for the marketing of Skycoin.

177. 174.Per that relationship and agreement, Stephens, Kunstman, Cuthriell, and Byerly were to adhere to the terms of the agreement and provide the services promised.

178. 175.Stephens, Kunstman, Cuthriell, and Byerly instead engaged in various schemes to defraud Plaintiffs, including promising marketing and promotions materials that were never performed, implementing public schemes to damage Plaintiffs' reputation needing immediate marketing damage control, and providing marketing services below the quality and type of what was agreed upon.

179. 176.Stephens, Kunstman, Cuthriell, and Byerly did not provide the promised services to Plaintiffs, despite Plaintiffs having paid for those services.

180. 177.Stephens, Kunstman, Cuthriell, and Byerly had a duty to adhere to the terms of the agreements and to provide Plaintiffs with the promised services.

181. 178.Stephens, Kunstman, Cuthriell, and Byerly breached that duty by failing to adhere to the terms of the agreements and failing to provide Plaintiffs with the promised services.

182. 179.As a direct and proximate result of Stephens, Kunstman, Cuthriell, and Byerly's improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, JOEL WAYNE CUTHRIELL, CATHERINE BYERLY, and

UNKNOWN INDIVIDUALS AND COMPANIES, and each of them, in an amount in excess of $50,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

**COUNT IX**
**BREACH OF CONTRACT – BRADFORD STEPHENS, AARON KUNSTMAN, AND JOEL WAYNE CUTHRIELL**

183. ~~180.~~Plaintiffs repeat and reallege Paragraphs 1 through ~~84~~87 of this ~~Second~~Third Amended Complaint at Law as and for Paragraph ~~180~~183 of this Count IX as if fully set forth herein.

184. ~~181.~~On or about January 8, 2018, Plaintiffs entered into an agreement with Stephens, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

185. ~~182.~~Following that agreement, Stephens failed to provide the contracted services, creating false "threats," and extorting funds from Plaintiffs through coercion.

186. ~~183.~~Stephens, Kunstman, and Cuthriell did not adhere to the terms of the Agreement despite payment.

187. ~~184.~~Plaintiffs, at all times relevant herein, fully performed on their obligations under the their agreement with Stephens, Kunstman, and Cuthriell.

188. ~~185.~~Stephens, Kunstman, and Cuthriell failed to provide any advertising or marketing services to Plaintiffs during the duration of the contract.

189. ~~186.~~Stephens, Kunstman, and Cuthriell breached their obligations under the contract through the following acts or omissions:

    a.   Failing to provide advertising services;

    b.   Failing to provide marketing services;

c.   Failing to use the funds provided for the advertising or marketing services;

d.   Failing to provide web design services;

e.   Failing to use funds to effectuate any web design;

f.   Failing to stay within the bounds of the expense budget; and

g.   Attempting to extort additional funds outside of the contract terms.

190.   ~~187.~~As a direct and proximate result of Stephens, Kunstman, and Cuthriell's improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS AARON KUNSTMAN, and JOEL WAYNE CUTHRIELL, and each of them, in an amount in excess of $~~50,000.00~~75,000.00, plus Plaintiffs' costs herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

**COUNT X**
**VIOLATIONS OF 735 ILCS 5/12-7.1 – BRADFORD STEPHENS**
**AND AARON KUNSTMAN**

191.   ~~188.~~Plaintiffs repeat and reallege Paragraphs 1 through ~~84~~87 of this ~~Second~~Third Amended Complaint at Law as and for Paragraph ~~188~~191 of this Count X as if fully set forth herein.

192.   ~~189.~~Upon information and belief, during the years 2019-2021, Stephens and Kunstman, through various internet media and in person, made numerous anti-Semitic statements and threats of death, kidnapping, and other acts of violence against Smietana.

193. ~~190.~~All of these threats were based on Smietana's religion and Jewish heritage.

194. ~~191.~~Stephens and Kunstman also discussed Skycoin as a "Jew coin", called holders of Skycoin Tokens "Skygoyim," and other similar hate speech, which Smietana perceived as a direct threat due to his being Jewish (See Exhibit C).

195. ~~192.~~Stephens and Kunstman posted these messages on various social media platforms and also made said threats directly to Plaintiff.

196. ~~193.~~In furtherance of their threats, the Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets.

197. ~~194.~~Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin with a market value of $81,018.98, totaling $220,179.31.

198. ~~195.~~As a direct and proximate result of Stephens and Kunstman's aforesaid unlawful acts, Plaintiffs were damaged, subjected to religion and heritage-based violence, online harassment, a home invasion, kidnapping and torture, and had great sums of money stolen by the Assailants.

WHEREFORE, Plaintiffs, BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation, by and through their attorneys, Barney & Karamanis, LLP, respectfully pray that this Honorable Court enter a judgment against Defendants, BRADFORD STEPHENS and AARON KUNSTMAN, in an amount in excess of $~~50,000.00~~75,000.00, plus Plaintiffs' costs

herein, as well as such further and other relief for Plaintiff as this Honorable Court deems just and equitable in the premises.

Respectfully submitted,

**BRANDON SMIETANA, SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation**

By: /s/James A. Karamanis

One of Plaintiffs' Attorneys

James A. Karamanis BARNEY & K ARAMANIS, LLP Two Prudential Plaza 180 N. Stetson, Suite 3050 Chicago, IL 60601 Tel.: (312) 553-5300 ~~Attorney No.: 48525~~
james@bkchicagolaw.com